**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| JACKSON TRAILS LLC, a New Jersey limited liability corporation, JACKSON 222324 LLC, a New Jersey limited liability corporation, JACKSON FARMS LLC, a New Jersey limited liability corporation, JACKSON RUN LLC, a New Jersey limited liability corporation, JACKSON WALK LLC, a New Jersey limited liability corporation, and LAKEWOOD INVESTMENTS LLC, a New Jersey limited liability corporation.<br>Plaintiffs,<br><br>v.<br><br>TOWNSHIP OF JACKSON, a New Jersey municipal corporation and body politic; and the PLANNING BOARD OF THE TOWNSHIP OF JACKSON, a municipal agency,<br><br>Defendants. | Civ. No. 3:20-cv-01150 |

**AMENDED COMPLAINT**

Plaintiffs, Jackson Trails LLC ("JTL"), Jackson 222324 LLC, Jackson Farms LLC, Jackson Run LLC, Jackson Walk LLC and Lakewood Investments LLC by their undersigned attorneys, complains of Defendants, the Township of Jackson ("Township"), and the Township of Jackson Planning Board ("Board"), as follows:

**NATURE OF ACTION**

1. This action is commenced by Plaintiffs to redress violations of its civil rights, caused by the Defendants' actions to obstruct JTL from developing homes within the Township in order

to prevent Orthodox Jews from residing in the Township, in violation of the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3604 and 3617; the Free Exercise and Establishment Clauses of the First Amendment, the Equal Protection and Due Process Clauses of the Fourteenth Amendment of the United States Constitution; 42 U.S.C. § 1982; the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. §§ 2000cc, *et seq.*; and New Jersey law.

2.      JTL, whose principal is an Orthodox Jew, sought to develop real property owned or under contract to purchase by the Plaintiffs within the Township as a housing development (the "Development"). In furtherance thereof, JTL submitted an application for conditional use, subdivision and site plan to the Planning Board that fully complied with the Township's zoning regulations.

3.      The Board denied the application, bowing to severe anti-Semitic pressure from local residents and fears that Orthodox Jews may purchase homes and reside in the Development, and due to the inclusion in the Development of a house of worship that may be used as a synagogue by Orthodox Jews.

4.      This recent denial is part of a rising tide of anti-Semitism in the Township, a hostility toward Orthodox Jews shared by many both in the Township government and in its population and local resident groups who are hostile to the movement of Orthodox Jews into the Township.

5.      The Defendants' actions were motivated by religious and racial animus and have effectively impeded the ability of Orthodox Jews to move into the Township. Defendants have intentionally discriminated against Orthodox Jews by prohibiting the development of housing within the Township.

6.      Further, the Board's denial has violated state law by resulting in a breach of the Township's Fair Share Plan, an October 25, 2016 Settlement Agreement, and a state court

Judgement of Compliance and Repose, incorporated by reference herein and attached hereto as Exhibits A, B, and C, respectively.

**JURISDICTION AND VENUE**

7. The subject matter jurisdiction of this Court is founded upon 28 U.S.C. § 1331 (federal question jurisdiction) in that this action is brought under 42 U.S.C. §§ 3604 & 3617, 42 U.S.C. § 1983, and 42 U.S.C. §§ 2000cc, *et seq*.

8. This Court also has supplemental jurisdiction over Counts XII, XIII and XIV under 28 U.S.C. § 1367(a) for claims brought under New Jersey law.

9. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) in that all of the events giving rise to the claims herein occurred in this District and the Defendants are subject to personal jurisdiction in this District as of the commencement of this action.

**PARTIES**

10. Plaintiff JACKSON TRAILS LLC ("JTL") is a Limited Liability Corporation located in Ocean County, New Jersey, with an address of 305 Main Street, Lakewood, New Jersey 08701.

11. Plaintiff JACKSON 222324 LLC is a Limited Liability Corporation located in Ocean County, New Jersey, with an address of 305 Main Street, Lakewood, New Jersey 08701.

12. Plaintiff JACKSON FARMS LLC is a Limited Liability Corporation located in Ocean County, New Jersey, with an address of 305 Main Street, Lakewood, New Jersey 08701.

13. Plaintiff JACKSON RUN LLC is a Limited Liability Corporation located in Ocean County, New Jersey, with an address of 305 Main Street, Lakewood, New Jersey 08701.

14. Plaintiff JACKSON WALK LLC is a Limited Liability Corporation located in

Ocean County, New Jersey, with an address of 305 Main Street, Lakewood, New Jersey 08701.

15.     Plaintiff LAKEWOOD INVESTMENTS LLC is a Limited Liability Corporation located in Ocean County, New Jersey, with an address of 305 Main Street, Lakewood, New Jersey 08701.

16.     Defendant TOWNSHIP OF JACKSON, NEW JERSEY ("Jackson Township" or "Township"), is a municipal corporation of the State of New Jersey, having offices at 95 West Veterans Highway, in the Township of Jackson, in the State of New Jersey.

17.     Defendant, TOWNSHIP OF JACKSON PLANNING BOARD, NEW JERSEY ("Board"), is a municipal agency organized pursuant to N.J.S.A. 40:55D-69 with its principal place of business at 95 West Veterans Highway, in the Township of Jackson, in the State of New Jersey.

18.     Each of the Plaintiffs is an aggrieved persons as that term is defined in the Fair Housing Act, 42 U.S.C. § 3602(i).

19.     Each of these Defendants is a "government" within the meaning of 42 U.S.C. § 2000cc-5(4)(A).

## FACTUAL ALLEGATIONS

### Background

20.     Jackson Township is located within Ocean County, New Jersey.

21.     Jackson Township is approximately one hundred square miles in area.

22.     Jackson Township is located directly to the west of Lakewood Township, New Jersey.

23.     A large Orthodox Jewish community resides in Lakewood Township.

24.     This Orthodox Jewish population, sometimes referred to as "ultra-Orthodox" or

*haredi*, is characterized by distinctive dress, customs, religious practices, and educational needs, among other attributes.

25. Because of a shortage of available housing in Lakewood, some Orthodox Jews have moved from Lakewood Township and elsewhere to townships surrounding Lakewood, including Jackson Township, in recent years.

26. Orthodox Jews have been purchasing homes in the Township in growing numbers in recent years.

27. It is estimated that there are approximately 1,200 Orthodox Jewish families residing in the Township at the present time.

28. There is a great need for housing among the Orthodox Jewish population in Jackson Township.

**The Development**

29. .Consistent with the Township's reliance on the Plaintiffs' property, JTL intended to develop property situated in the Township's Residential Growth 3 ("RG-3") zoning district as a residential housing development which would include 367 single-family homes and 92 multi-family units (satisfying the Township's *Mount Laurel* obligations), and a house of worship (the "Development"). *Southern Burlington County, NAACP v. Township of Mount Laurel*, 67 N.J. 151 (1975) ("*Mount Laurel I*"), and *Southern Burlington County, NAACP v. Township of Mount Laurel*, 92 N.J. 158 (1983) ("*Mount Laurel II*").

30. The property on which the Development would be located consists of Block 23001, Lots 22-29 as designated on the tax map of the Township together with Division Street (the "Property").

31. Plaintiff Jackson 222324 LLC is the owner of Block 23001, Lots 22, 23 and 24 as designated on the tax map of the Township.

32.     Plaintiff Jackson Trails LLC is the owner of Block 23001, Lot 25 as designated on the tax map of the Township.

33.     Plaintiff Lakewood Investments LLC is the contract purchaser of Block 23001, Lot 26 as designated on the tax map of the Township and has an equitable interest in same.

34.     Plaintiff Jackson Run LLC is the owner of Block 23001, Lot 27 as designated on the tax map of the Township.

35.     Plaintiff Jackson Farms LLC is the owner of Block 23001, Lot 28 as designated on the tax map of the Township.

36.     Plaintiff Jackson Walk LLC is the owner of Block 23001, Lot 29 as designated on the tax map of the Township.

37.     Plaintiff Lakewood Investments LLC is the owner of Division Street in the Township which does not have a tax map designation in the Township.

38.     The Development was permitted as a fully complying conditional use in the zoning district where the Property is located.

39.     Single family residential homes and houses of worship are permitted uses if certain conditions are met in the RG-3 zoning district.

40.     No variances were required for the Development.

41.     There exists a high and increasing demand for housing in the Township among the Orthodox Jewish population within the surrounding housing market. Orthodox Jews will disproportionately purchase new housing units in the Development because of their outsized need for housing and because certain amenities will be available in units within the Development that would accommodate their religious faith.

42.     JTL planned to develop and sell this housing on the Property with an option for amenities such as a kosher kitchen and five bedrooms, which would be desirable for Orthodox

Jewish families.

43.     The religious beliefs of the Orthodox Jewish community often result in larger family sizes for Orthodox Jews, and a need for more bedrooms.

44.     JTL also planned to develop a 24,500-square foot structure on the Property that was to be used as a house of worship.

45.     The house of worship, a synagogue, was intended to be a place where residents could assemble for religious worship, prayer and study.

46.     The synagogue would include men's and women's mikvahs.

47.     This structure would be a religious assembly land use.

48.     Residents who desired to use the synagogue could walk to the synagogue from their homes.

49.     The structure would likely have been used by Orthodox Jewish residents.

50.     The Development was also to have an *eruv*.

51.     An *eruv* is an area enclosed by a wire boundary that symbolically extends the private domain of Jewish households into public areas, permitting activities within it that are normally forbidden in public on the Sabbath and Yom Kippur.

52.     Orthodox Jews have the sincerely held religious belief that, without an *eruv*, they are not permitted to push or carry objects outside their homes on the Sabbath and Yom Kippur.

53.     An *eruv* allows observant Jews to carry or push objects from place to place within a designated unbroken area during the Sabbath and on Yom Kippur including being able to carry items such as food, medication, canes, water bottles, house keys, personal identification, books, prayer shawls and/or reading glasses and use wheelchairs and strollers.

54.      In 2017, the Township enacted Ordinance No. 20-17, which prohibits the establishment of any *eruv* throughout the Township by prohibiting outright the placement of

articles of any nature in the right of way of any street or public place.

55.     The only exception is that Township consent has since been provided to attach *eruv* markers to utility poles throughout the Township, provided it does not violate Ordinance No. 20-17.

56.     This *eruv* would be an amenity desirable for Orthodox Jewish families seeking housing in the Township in order to accommodate their faith.

57.     Other housing developments in the area that are similar to the Development have historically been occupied by a disproportionate number of Orthodox Jews.

58.     The principal of JTL has developed other housing developments in neighboring Lakewood Township that make available certain similar amenities that Orthodox Jews can use to accommodate their religious faith.

59.     These include Ocean Pointe, consisting of 72 townhomes with a synagogue, park, kosher kitchens, and four or five bedrooms, and Harmony Park/Vine Park, consisting of 90 townhomes with a synagogue, park, kosher kitchens, and four or five bedrooms.

60.     Orthodox Jews have disproportionately purchased housing in these developments and constitute the majority of the residents.

61.     There are also approximately 30-40 other housing developments in Lakewood Township of various sizes that afford certain amenities to Orthodox Jews including Westgate, Prospect Vines, Oak Vines and Sunset Grove, all of which have synagogues and offer units with kosher kitchens and larger numbers of bedrooms.

62.     Orthodox Jews have disproportionately purchased housing in these developments and are the majority of the residents residing in same.

63.     Royal Grove is a housing community in the Township.

64.     A synagogue was approved on property near the community last year, as it was

fully conforming with the Township code.

65. A disproportionate number of families who have moved into the Royal Grove housing community since the approval of the synagogue have been Orthodox Jews.

66. Upon information and belief, the Defendants are aware of the housing developments in Lakewood Township offering certain amenities to Orthodox Jews that accommodate their religious faith.

67. Upon information and belief, the Defendants are aware that Orthodox Jews have purchased housing units in these developments and are the majority of the residents residing in them.

68. Upon information and belief, Defendants are aware of the influx of Orthodox Jewish families into the Royal Grove community.

69. Upon information and belief, the Defendants are aware that it is likely that a disproportionate percentage of Orthodox Jews would have purchased homes in the JTL Development.

70. The Township's denial of JTL's application for the Development, and the Township's policies and/or practices that led to that denial, had a disproportionate, adverse impact on Orthodox Jews because the percentage of unit purchasers would have disproportionately been Orthodox Jews as compared to the percentage of Orthodox Jews in the Township and the applicable housing market.

**The Township's Land Use Regulations**

71. The use of the Property is subject to the laws and regulations of Jackson Township and the State of New Jersey.

72. Jackson Township regulates zoning within its borders through its Land Use and

Development Regulations, codified at Chapter 244 of the Township's Code (hereinafter the "Land Use Code").

73. Section 244-3 of the Land Use Code, entitled "Intent; purpose," provides in pertinent part that "[i]t is the intent and purpose of this chapter to establish a pattern for the uses of land and of buildings and structures thereon based on the land use element of the Master Plan[.]"

74. The Township adopted a Master Plan in 2009.

75. Included in the Master Plan are Regional Growth Management Districts which, upon information and belief, have existed since the early 1980s.

76. As provided in the Master Plan: The purpose and intent of the Regional Growth Management Districts is the following: "Regional growth areas are areas of existing growth or lands immediately adjacent thereto which are capable of accommodating regional growth influences while protecting the essential character and environment of the Pinelands, provided that the environmental objectives [of the CMP] are implemented through municipal master plan and land use ordinances."

77. The Master Plan further states:

> The Concept in the CMP was to establish Regional Growth Areas around the fringe of the Pinelands Area where substantive growth was permitted to occur. The use of Pinelands Development Credits would permit the maximum permitted density to be increased. However, in the case of Jackson Township, the Regional Growth Areas are in the vicinity of the potential noise impacts associated with the Joint Base and specifically with the air training mission that has been assigned to NAES Lakehurst. As stated in the JLUS, the concept of transferring Pinelands Development Credits is a sound planning policy provided that the receiving area is well suited for the density incentive. The two Regional Growth areas that are currently located in Jackson Township are described below.
>
> . . . .
>
> <u>RG-3 Regional Growth Area</u>. This regional growth area allows the uses permitted in the PV Zone. Single-family development that is served by a wastewater treatment system can be developed at a

> maximum density of 2.5 dwelling units per acre. With Pinelands Credits, this density can be increased to 4.5 dwelling units per acre.

78. Zoning for the Master Plan's "Regional Growth Areas" includes § 244-91 of the Township Code entitled "RG-3 Regional Growth Zone."

79. On November 22, 2017, Jackson Township adopted Ordinance No. 22-17, thereby amending and supplementing, in relevant part, § 244-91 of the Land Use Code entitled "RG-3 Regional Growth Zone," to allow cluster residential development with a mandatory 20% set aside within the RG-2 and RG-3 zones. This change enabled the construction of inclusionary development in these regional growth zones with mandatory affordable housing units incorporated therein to aid the Township in satisfying its *Mount Laurel* obligation, as proposed in the Settlement Agreement, described below.

80. Permitted principal uses in the "RG-3" regional growth zone are the same as those in the "PV" Pinelands Village Zone and include agriculture, detached single-family dwellings, churches and similar places of worship, parish houses and convents, public and quasi-public schools and institutions of higher learning which are not conducted as a business, municipal parks, playgrounds and other municipal buildings and uses deemed appropriate and necessary by the Township Committee, other public buildings of a governmental or cultural nature, clubhouse or community recreational buildings associated with an age-restricted development consisting of at least 100 residential units.[1]

81. Conditional uses in the "RG-3" zone include detached, single-family developments on lots less than one acre subject to certain conditions.

82. These conditions include a variety of setback and other bulk requirements.

83. Another condition of detached, single-family developments on lots less than one acre is compliance with the requirement of an affordable housing set-aside, such that:

> The units required for the affordable housing set-aside may be constructed as attached dwellings with a maximum of four dwelling

[1] Some of the uses have additional conditions.

> units per building; such structures shall be subject to the bulk regulations set forth in this section.

84. Additional conditions are the submission of a traffic impact assessment and acquisition and redemption of Pinelands development credits for 30% of the proposed units in accordance with a Township Code provision, which is not required for affordable housing units provided that such units do not exceed 20% of the total number of proposed units.

85. JTL's application for the Development complied completely with these conditions.

86. Any application for a Preliminary and Final Major Subdivision must comply with the Development Application Procedures contained in the Land Use Code sections 244-26 and 244-27. Any application for a Preliminary and Final Major Site Plan must comply with the Development Application Procedures contained in the Land Use Code sections 244-30 and 244-31.

87. JTL's application for Development complied completely with these Land Use Code provisions.

**JTL's Application and Proceedings Before the Board**

88. On August 10, 2018, JTL applied to the Board seeking conditional use approval, preliminary and final major subdivision approval, and preliminary and final major site plan approval for the Development on the Property (the "Application").

89. JTL's Application was deemed administratively complete on April 15, 2019.

90. In furtherance of its Application, JTL submitted architectural plans, a boundary survey, a traffic impact study, an environmental impact study, a stormwater report, and several other plans and documents to the Board.

91. The Application complied completely with the specific area, dimensional and setback requirements of the RG-3 zoning district, including utilizing the Pinelands Credits as

required for affordable housing developments in that zone.

92.     JTL proposed sanitary sewer connected through an interlocal agreement with Manchester Township, while obtaining potable water from the Jackson Township Municipal Utilities Authority.

93.     In furtherance of its Application and the Township's Affordable Housing Plan, JTL proposed a twenty percent set-aside for affordable housing at the Property in compliance with the Fair Share Plan and § 244-91.

94.     The Application was compliant with the State's Residential Site Improvement Standards and all Township Code requirements under N.J.A.C. 5:21-1, *et seq*.

95.     JTL did request a design waiver with respect to lighting, in order to permit a lower lighting level than otherwise required by Township Ordinance, as directed by the Board.

96.     JTL also left the issue of a design waiver relating to a sidewalk along South Hope Chapel Road to the Board's discretion.

97.     As the Property is located within the Pinelands, the Pinelands Commission must review all developments within the Pinelands.

98.     The Pinelands Commission must review and accept any Township approval that would be granted to the JTL Development.

99.     The first step in the approval process is to file a copy of an application for a development with the Pinelands Commission to obtain a Certificate of Filing.

100.    JTL filed its Application for the Development with the Pinelands Commission on August 7, 2018.

101.    Once it receives an application, the Pinelands Commission then issues a Certificate of Filing, which enables a private developer to seek the municipal and county approval needed for its development in the Pinelands.

102.     The Certificate of Filing also identifies any issues unique to the Pinelands area and the jurisdiction of the Pinelands Commission.

103.     JTL received a Certificate of Filing from the Pinelands Commission on April 5, 2019.

104.     It was entitled "Inconsistent Certificate of Filing."

105.     The Certificate of Filing was inconsistent due to one inconsistency identified by the Pinelands Commission that was attached to the Certificate of Filing.

106.     The inconsistency identified by the Pinelands Commission was, in pertinent part, the following:

> The application as currently proposed is inconsistent with the following standard(s) of the Jackson Township certified land use ordinance and the Pinelands Comprehensive Management Plan (CMP).
>
> 1.     Stormwater discharge to wetlands (N.J.A.C. 7:50-6/84(a)6ii4).

107.     The stormwater inconsistency contained in the Pinelands Certificate of Filing inconsistency was addressed by revisions made to the Stormwater Report and plans that were reflected in the Plans and report submitted to the Planning Board on July 30, 2019. Additional stormwater volume was added and basin outlet structures revised to render the basin discharge consistent to the Pinelands CMP.

108.     These revisions addressed the inconsistency identified by the Pinelands Commission.

109.     A Certificate of Filing also includes the number of Pineland Development Credits ("PDC") that must be redeemed by a developer (such as JTL) in the Pinelands, as well as endangered species that may be located on the Property.

110.     This Certificate of Filing issued to JTL certified the number of PDCs that must be purchased and redeemed by JTL in connection with the Development.

111.     The number of PDCs for JTL is 27.50.

112.     The Certificate of Filing issued to JTL did not identify any concerns regarding the existence of endangered species on the Property.

113.     The Jackson Township Municipal Utilities Authority issued preliminary and tentative approval of provision for water and sewer for the Development.

114.     The Jackson Township Bureau of Fire Prevention issued its approval for the Development.

115.     The first hearing before the Board on the Application took place on August 19, 2019.

116.     At the August 19, 2019 hearing, JTL's planner testified that the house of worship would be a two-story building with a full basement and three sanctuaries.

117.     The proposed house of worship had 208 parking spaces, where 195 are required.

118.     The building coverage proposed on the lot for the house of worship is 4.6 percent where 25 percent is permitted.

119.     The house of worship complied with all of the conditional use requirements in the RG-3 zoning district.

120.     The plans for the house of worship submitted to the Board reflected the men's and women's *mikvahs* to be included in the building.

121.     During the course of the hearing, it became evident that questions and comments by board members and local residents were veiled discussions of issues relating to the Orthodox Jewish community.

122.     One of these issues relating to the Orthodox Jewish community concerned basements in the homes JTL intended to construct at the Property.

123.     Upon information and belief, local residents and Township officials are concerned that members of the Orthodox Jewish community would illegally use their basements as rentals

for other Orthodox Jews.

124. At the hearing, the Township's Administrator, Terrance Wall, who is also the Mayoral appointee to the Board, asked the following questions of JTL's planner, some of which was met with applause by the audience:

> (a) "Does the water table indicate, are there any so-called English basements above ground, and if so, do they have any egress, or how does --"
>
> (b) "Will the basements be constructed in a manner that meets all the codes for a living area?"
>
> (c) "Well, I'm talking about egress windows and so forth, you know."

125. Board member and Township Council member Kenneth Bressi then engaged in the following exchange with JTL's planner:

> MR. BRESSI: It might be a premature time to ask it. Would the applicant be willing to stipulate there will be no rentals of basements, only be for the person who owns the house personal use?
>
> THE WITNESS: It's not permitted. Sure. These are single-family homes.
>
> MR. BRESSI: Single-family home and the basement, they'd stipulate to that?
>
> THE WITNESS: Yes.

126. Board member Jeffery Riker asked: "Your basements, exterior entrance?"

127. The Board Engineer, Douglas Klee, stated to JTL's engineer:

> "And the last question kind of relates I think -- and it was brought up during Ian's testimony -- but the issue of basements. I guess what insurance is there that a house that's built with a basement doesn't turn into a two-family, the long and the short of it."

128. The Board Planner, Ernest Peters, asked JTL's engineer:

> "[F]ollowing up on Mr. Klee's question about the houses, is sanitary sewer service provided for the basements or just for the ground floor and -- or first floor and second floor?"

129. Mr. Peters also stated:

> "I think as a practical matter, we decide -- the basement normally doesn't have a bathroom in it. I think that's a control we can easily put forward."

130. Mr. Peters further stated:

> "When you say owner, so they're rental?"

131. Board Member Campbell questioned the JTL engineer:

> "And my second question is, I'm looking at the plans of the proposed townhouses, which are rental properties. There are no basements."
>
> THE WITNESS: Correct.
>
> DR. CAMPBELL: Correct, no basements.
>
> THE WITNESS: Correct.

132. Board Attorney Greg McGuckin then asked:

> "Is the applicant willing to stipulate with a deed restriction that those rental units will never be dorms?"

133. Upon information and belief, this reference to "dorms" also concerned the Orthodox Jewish community since the Township had banned dormitories in 2017, as described below.

134. The Township's dormitory ban was aimed at preventing boarding schools, or *yeshivas*, for the Orthodox Jewish community in the Township.

135. The August 19 hearing was opened to public questioning.

136. Township residents asked the following:

> "Everything is moot here if there are more than one family living in that house."
>
> "We all hear this, but it's happening already in Jackson right down the street."

> "Are these homes set up for one-family, two-family houses?"
>
> "And what happens if there is two families in that house?"
>
> "Oh, yeah, but I'm bringing a point. House of worship, it's singular. How do you -- how are you going to accommodate in that same house of worship other denominations?"
>
> "These basements, when you're building these homes, I know you're saying it's a building question. You're proposing homes with basements. Are your basement windows going to be egress windows for livable space, or is it going to be the standard little 1-foot-by-2-foot window?"

137. One resident was concerned with the grade level at which the houses would be built, targeting the basement issue, and stated at one point:

> "I think the question that I'm asking you is are you going to -- is this development going to be built at street level, or are we going to come in and we have street level and then we're going to bring in fill so that we can raise the house to raise the basement to accommodate that 8-foot water table? Do you understand where I'm going with this?"

138. Another issue directly relating to the Orthodox Jewish community was the inclusion of the house of worship in the Development.

139. Township Environmental Commission Member Stephen De Marzo, who, upon information and belief, is appointed by the Mayor of Jackson Township, engaged in the following questioning at the hearing from the audience:

> "The question I had really was about the house of worship and who decides <u>what denomination goes in there</u>. You just answered it. It's whoever buys the lot. So I would gather that whoever is living on the property, whoever buys all the homes, they are going to be the dominant player for that house of worship, correct?"

(Emphasis added.)

140. Another issue in Jackson Township commonly associated with the Orthodox Jewish community concerns schools.

141. Orthodox Jews generally seek religious schooling for their children, which requires

the development of private schools.

142. This normally requires the bussing of Orthodox Jewish children to these schools.

143. At the August 19 Board meeting, a Township resident stated: "I've got two questions for the applicant. One, where would most of the residents' children be going to school?"

144. Another individual asked:

> "How many provided school Jackson need pretty soon? You contemplate to transportations, and you know how many illegal business in the basements and how many illegal daycares in the houses?
>
> And the more major question is how much they pay you guys. Listen, owners for the property in Jackson, keep strong because I don't want to see Jackson –
>
> And yes, I want to let you know I don't like to see my neighbors in the same situation with Lakewood. Thank you so much."

145. The second hearing on the JTL Application was heard before the Board on October 7, 2019.

146. At the commencement of the hearing, the Board's attorney indicated the following:

> "The board is in receipt of an e-mail that was communicated this morning and then this afternoon. I have advised the board members that you should not consider that e-mail, and I'm going to ask the attorney for the applicant to state their position on the record if I could."

147. The email at issue was sent by Board member Jeffrey Riker to the Planning Board, which was addressed: "Dear Mr. Riccardi and fellow members of the Jackson Township Planning Board[.]"

148. It was sent on the morning of the October 7, 2019 hearing on the JTL Application.

149. The email stated:

> "I regret that I will most likely be able [sic] to attend this evenings

meeting due to a previously scheduled medical procedure.

With that understanding, I am deeply concerned that the applicant for Jackson Trails has repositioned the project on the agenda, having not kept their commitment to the Environmental Commision. The applicant, specifically Mr. Borden is due to respond to the EC at it's [sic] next meeting, which would have afforded ample time for the EC to respond to the Planning Board with it's [sic] finding's [sic] and recommendations. This maneuver, thwarts that process.

I will remind the Planning Board that the EC has taken issue with Mr. Borden's credentials, and has yet to find any evidence that he or his firm has traversed the property to perform the required inspections to develop a comprehensive and realistic Environmental Impact Study.

We have reason to distrust his oral statements based oninconsistent testimony on previous projects.

Further, I have become personally aware that on or about September 4th, 2019 and continuing through the Labor Day weekend, there was significant work being performed on the property, where there were no less than 3 30CY dumpsters of material being removed. It was also apparent that a remediation contractor was performing work on site. None of which was stated in oral testimony and within the Environmental Impact Statement provided.

And now, it has come to our attention that heavy construction equipment has been active onsite, which is and continues to disrupt local wildlife and vegetation, potentially negating the ability to verify species which are threatened and endangered

It would appear that the applicant has not been entirely truthful, forthcoming and reasonably compliant in the "due process" of procuring the required approvals by altering the site, thereby negating any reasonable effort to make an accurate determination of the existence of protected and threatened species.

It is the recommendation of the Environmental Commision, based on the above identified concerns that this application does not move forward without the appropriate responses to the EC, and a explanation as to why work has started, stop work orders issued by the Building Official, and no response provided to our request at the applicants last appearance before the Planning Board.

The applicant is due a fair process, however in this case, the applicant is clearly not playing by the rules.

> This is not in the best interests of Jackson Township, fair and equal due process to this applicant and future applicants."

150. The email was signed by Mr. Riker as "Chairman, Environmental Commission" and "Member, Planning Board."

151. Upon information and belief, Mr. Riker posted the following online comment:

> "The Asbury Park Press is a one sided rag that rattles the sabre of Anti Semitism and is entirely clueless and prefers to sanitize the history of over development and manipulation of resources for the benefit of one group. The embodied residents of Jackson want to all be equal, and not reside in segregated neighborhoods patrolled by special interest groups."

152. The email suggested the existence of an action taken by the Township's Environmental Commission, when there was no such official action taken by the Environmental Commission.

153. Despite sending this email, which clearly constitutes a conflict of interest on his part, Mr. Riker appeared at the hearing intending to hear the JTL application and vote on it.

154. JTL's attorney requested, through the Board attorney, that Mr. Riker recuse himself from considering and voting on the JTL application. Mr. Riker did so.

155. JTL agreed to proceed with having its application heard by the Board provided the Board members had not been prejudiced by Mr. Riker's email and comments.

156. The Board attorney then asked that any Board members who believed that the email from Mr. Riker would in any way influence their decision making process with respect to the JTL application recuse themselves.

157. No Board members announced their recusal.

158. The Board attorney then indicated for the record that the Board members were not to consider the email from Mr. Riker.

159. The October 7 hearing then proceeded.

160.    JTL's traffic engineer testified that a full and complete traffic impact analysis was performed.

161.    JTL's traffic engineer testified that all traffic impacts on roadways and intersections analyzed were projected to operate at acceptable levels with the Development except for one.

162.    The one intersection at issue, located at Whitesville Road and South Hope Chapel Road, was not projected to operate at an acceptable level with the Development.

163.    Upon information and belief, Ocean County is in the process of improving and redesigning this intersection.

164.    JTL's traffic engineer testified that Ocean County had requested that JTL propose mitigation in connection with this intersection.

165.    The mitigation proposed by JTL was the addition of two right-hand turn lanes at the subject intersection.

166.    The intersection at issue was under the jurisdiction of Ocean County and, although mitigation was proposed by JTL, only Ocean County could mitigate the intersection.

167.    JTL would contribute to that mitigation through the payment of a traffic impact fee to Ocean County.

168.    The Board Planner, Mr. Peters, then raised the issue of a report from the Township Police Department dated September 19, 2018 regarding JTL.

169.    JTL's traffic engineer addressed issues raised in the report and indicated that a formal response had been submitted to the Township Police Department on July 18, 2019.

170.    Board Member Wall then expressed concern that Ocean County had not made any final determination with respect to the traffic issues that may impact the Development.

171.    The Board Planner echoed these concerns.

172.    JTL's attorney reminded the Board that only Ocean County, not the Board or

Township, had jurisdiction over the off-site improvements.

173. Pursuant to New Jersey law, a planning board is without authority to deny site plan approval because of off-site traffic conditions. *Dunkin' Donuts of New Jersey, Inc. v. N. Brunswick Twp. Planning Bd.*, 193 N.J. Super. 513, 515 (App. Div. 1984).

174. With respect to traffic impacts, the Board only has authority to determine whether the traffic access points to a development such as JTL's proposed Development will operate safely and efficiently.

175. JTL's attorney reminded the Board that the Board cannot refrain from acting on the JTL Application "while waiting for an outside agency's review and approval."

176. Pursuant to N.J.S.A. 40:55D-22b, "[i]n the event that development proposed by an application for development requires an approval by a governmental agency other than the municipal agency, the municipal agency shall, in appropriate instances, condition its approval upon the subsequent approval of such governmental agency;"

177. The Board attorney questioned whether JTL had received approval from Ocean County for the access points to the Development.

178. JTL's attorney indicated that JTL had received conditional approval from Ocean County for the access points to the Development.

179. JTL's attorney provided a copy of minutes memorializing the conditional approval from Ocean County dated August 21, 2019 to the Board.

180. Despite this, Board member Wall asked:

> "Just to get an answer on was there an official resolution approved by the Ocean County Planning Board and minutes to reflect that and where is that (inaudible)[.]"

181. JTL's engineer then testified as follows:

> "As far back as August of last year, I got an e-mail from the county engineer saying that basically that design is okay, let's proceed now

> into the final design of the proposed improvements, which we did. We then made the formal application to the county. The county engineer issues those comments, which there was whatever, the 10 or 12 comments that recommend conditional approval, and then the county planning board did take action and offered that conditional approval. They document that in a form of minutes that are available on their web site."

182. In response to further questioning JTL's engineer testified;

> "It's a conditional approval at this time. The application is approved subject to us satisfying again those 10 or 12 points as itemized."

183. The conditional approval from Ocean County related to both on-site and off-site traffic conditions. Off-site traffic conditions are not within the jurisdiction of the Board.

184. JTL's traffic engineer testified further that he had provided the suggested mitigation of the two right-hand turn lanes at the subject intersection, as requested by Ocean County.

185. JTL's attorney then provided the minutes from the Ocean County Planning Board's August 21, 2019 meeting to the Board.

186. The October 7 meeting was opened to public comment.

187. One resident requested that the application be tabled.

188. With respect to the house of worship, a Jackson Township resident (Elenor Hannum) stated:

> "So I guess my other question is in regards to -- the comment was constantly made 'for the community.' What exactly does that mean? What community is this for? Because it is facing that so --
>
> . . . .
>
> Well, what -- so the design was it's going on that feeder road I guess you'll call it into the entrance of this development, and through testimony that I heard all night long, it was for the community. What community exactly are we talking about?"
>
> . . . .
>
> The reference throughout all of testimony tonight was to this community. That was the reference. I did tape it.

> . . . .
>
> And that is -- okay. So essentially, the house of worship will accommodate anyone of the faith that can go there." October 7th meeting

189. Upon information and belief, the "community" Ms. Hannum referred to repeatedly was the Orthodox Jewish community.

190. The Board attorney had to admonish Ms. Hannum:

> "I'm going to jump in here. Let me be perfectly clear. Whatever house of worship it is has no bearing on this application. The board will not consider it and will not hear any type of testimony as to what type of house of worship it will be or who it will be for. It is inappropriate for the board to consider that. Any comments or questions about that should not be addressed to the microphone at all.

191. Upon information and belief, Ms. Hannum has previously made the following statements on Facebook regarding the Orthodox Jewish community:

> a. "All to continue funding the BMG[2] machine. Keep pumping out graduates to open more private schools. It's just a money making machine where most staff are part time, paid half on the books and the other half in gift cards so they can remain in welfare. And the wheel keeps churning, case WE are all paying for it."
>
> b. To Jackson Community Watchdog News: "Hi Jackson, its [sic] that time of year again. Let the Blockbusing commence! . . . "
>
> c. "Is it possible you will wake up tomorrow to a summer camp next door or across the street? Quite possible … Only in Jackson. This was sent to me from a resident who has this in her neighborhood: just curious - has anyone noticed schools / camps run out of homes in their neighborhood? I called code enforcement about this . . . . If you see something, say something! . . ."
>
> d. "And these new Lakewood residents have no loyalty to heritage or tradition, they can care less … only for what they

---

[2] BMG refers to Beth Medrash Govoha, which is an ultra-Orthodox Jewish *yeshiva* in Lakewood Township, New Jersey, and is the second largest *yeshiva* in the world.

can get for them self [sic] at the expense of everyone."

e. "Residential homes ARE NOT allowed to be used as a place of worship. Please Private message me with addresses. Take pictures and video."

f. "If the owners want to use it as a place of worship, they must go before the zoning Board for a change of use variance."

g. "It's all part of the plan people. Saw this before as a means to get so many residents disgusted that they either leave or never go back to use the facilities our tax dollars pay for. Once you no longer feel comfortable in the town or neighborhood you live, the ones causing this wins. I have sent numerous emails and texts to our local political leaders . . ."

h. "Here's the thing…. These private schools are a money making industry. You have the largest rabbinical college pumping out rabbis, where is the employment outlet?? Open a school and have the state & federal government foot most of the bill. That's what's happening."

i. "Then you have must [sic] of your teachers/aid work part time so your family income stays at the poverty level and the family lives on subsidies. Working in Lakewood retail for almost 20 years, you get the full education of economic manipulation, right down to stores programs, return policies, tipping, etc."

192. Upon information and belief, all of these comments related to the Orthodox Jewish community.

193. In an email to the Township Council and Mayor, Ms. Hannum wrote:

> "This is what is in store for Jackson, maybe not tomorrow or next year, but the turnover will begin in 5 years. And as you listen, you will see the parallels are the same from Ramapo NY, to Lakewood here. It's only a matter of time. Oh, and on a side note, ran into an old friend of my parents, lives on Veterans Hwy, just past Jackson Little League field. She told me that she got a knock on her door to

> sell on Thanksgiving Day, not by a realtor, but a private citizen either from Lakewood or Brooklyn… just sayin. Its happening."

194. Upon information and belief, Ms. Hannum made the following comments at meetings before the Township Council:

> a. "We have a LLC intermingled as profit and non-profitusing our parks and now LLC's renting out with Section 8 that can transfer anywhere. The largest is in Brooklyn, whereby taking that renter and placing them in Section 8 here."
>
> b. "I refuse to get a No Knock and want them to come to my home. [met with applause]. The videos disclosed that there is a concerted effort to block bust this town and finally something has been done."
>
> c. "She stated this ethical issue has come in from the east[3] and they have no ethics. They don't abide by our laws and we have realtors using their own appraisers to drive up the cost of the home."
>
> d. "There are people receiving mailers from Brooklyn and they are highly offended and worried. It would be nice if our local leadership supported legislation for cease and desist."

(Emphasis added.)

195. Upon information and belief, all of these comments related to the Orthodox Jewish community.

196. In a news article, Ms. Hannum was described as being "at the forefront of the community's response to a wave of real estate solicitations and recent home sales to Orthodox Jewish buyers and investors."

197. During the second hearing, several residents raised the issue of bussing of the children in the Development to schools.

198. This is an issue targeted at the Orthodox Jewish community.

199. Resident comments at the October 7 hearing included the following:

---

[3] Lakewood Township is located to the east of Jackson Township.

> “This board needs to decide if they are able and willing to shoulder the busing burden if these children do not go to Jackson Township schools.”
>
> “The board has to understand it’s not where the children go to school. It's the busing of the children. It’s going to put a burden on Jackson, not to supply the busing, to reimburse each and every family in that development cash money every month by check, whatever, to reimburse them for transporting their own children to school. Check with the Department of Transportation, and you'll find out that's what happens. It has nothing to do with us providing the buses. They get their money back.”
>
> “And would there be separate buses for boys and separate buses for girls?”
>
> “The question now is I'm just talking about tax rates because now if you do have buses for boys, buses for girls --”
>
> “How are you going to base any study on anything with how many buses and how much it's going to cost the taxpayers of Jackson --”

200. The Board attorney repeatedly admonished this was not a consideration for the Board, saying:

> “Just for the record, Chris, and for the board members, the board cannot consider school children as part of this application. It’s improper for them to do so. Any decision based on that would be automatically struck down by the courts.
>
> . . . .
>
> Sir, [separate busing for boys and girls] has no bearing on this application. The board cannot consider it. . . . and you are contaminating the record with stuff like that --”

201. The Board attorney’s last admonishment was the following:

> “We cannot consider buses, and we cannot consider the number of children. It's illegal for the board to consider that. They cannot do it. They can't consider it. No matter how many times you ask, we can't consider it. It's illegal for the board to do so.”

202. All other traffic issues associated with the JTL Development are within the jurisdiction of Ocean County.

203.    All environmental issues associated with the JTL Development are within the jurisdiction of the Pinelands Commission.

204.    The Pinelands Commission will not review the JTL Application for final approval until the Board has granted its approval of the JTL Application.

205.    Section 244-189(A)(2)(c) of the Land Use Code required the submission of an Environmental Impact Study.

206.    JTL provided an Environmental Impact Study to the Board, which was submitted on June 30, 2018.

207.    The Ordinance has no sunset provision with respect to Environmental Impact Studies that must be provided to the Board.

208.    JTL's attorney indicated to the Board that JTL would agree to having a vote only on preliminary approval and, once outside agency approvals were received, it would return to the Board for final approval.

209.    Board Member Bressi made a motion for preliminary approval of the JTL Development.

210.    The Board attorney recited some of the stipulations on the record that would be included with others in a Resolution memorializing an approval.

211.    While the motion was pending, the following occurred:

> A BOARD MEMBER: I read an e-mail today about --
>
> MR. McGUCKIN: Well, that's -- those e-mails are not to be considered. They cannot be considered.
>
> A BOARD MEMBER: Before those e-mails.
>
> MR. McGUCKIN: You cannot consider it. It's not before this board. It's not in this hearing.

212.    Board member Wall stated:

> "I just want to share that from my perspective, we're asking for a vote under duress for at least two members here from what I've heard tonight.
>
> . . . .
>
> [W]hether the applicant is agreeing to an adjournment or not . . . . [t]hey've indicated that they won't, which is forcing a vote at 11 o'clock at night, which is my comment on duress."

213. The Board members were not operating under any duress.

214. The JTL Application had been presented to the Board and was ready for a vote by the Board as to approval.

215. The vote was taken in the normal course of business of the Board.

216. A vote was then taken.

217. The vote on the motion to grant preliminary site plan and subdivision approval was tied at four votes to four. The tie vote was a denial of the Application.

218. The Board attorney then instructed the Board to make another motion, such as a motion to deny, or an adjournment request.

219. Board member Wall made a motion to carry the matter to another date.

220. The motion was passed unanimously.

221. The new meeting date was December 2, 2019.

222. On November 22, 2019, JTL filed a Motion for Reconsideration.

223. On December 2, 2019, a third hearing was held by the Board with respect to the JTL Application.

224. The Board failed to act on the Motion for Reconsideration.

225. On December 2, 2019, the Board adopted Resolution 2019-31 denying JTL's Application.

226. The Resolution included the following statements:

a. "each of the proposed building lots would comply with the specific area, dimensional and setback requirements of the RG-3 Zoning District, utilizing the Pinelands Development Credits in accordance with Ordinance Section 244-91(D);"

b. "Mr. Borden testified as to the conditional use standards of Ordinance 244-91, and testified that the Applicant meets the conditions of the conditional use standards"

c. "Mr. Macfarlane's testimony revealed that the Application as presented would be compliant with RSIS Standards and all Ordinance requirements"

d. "the Applicant's expert testified that the application as presented conforms with all zoning requirements anddesign standards, and the Applicant is not seeking any variance relief as part of this application"

e. "the Board did discuss a number of conditions which the Applicant acknowledged"

f. "numerous members of the public, again, testified in opposition to this application"

227. With respect to the denial, the Resolution noted:

a. **WHEREAS,** questions remained relating to the impact of this application on the Joint Military Base of Lakehurst Dix Maguire [sic]; and

b. **WHEREAS,** the Board requested from the Applicant additional time to review the details of the items which had been presented in evidence, to review the application plans as presented before rendering an ultimate decision on this matter; and

c. **WHEREAS,** the Applicant's Attorney advised the Board that they would not consent to any further adjournments, did not want to present or permit any additional testimony or allow any additional public comment and argued that their application was fully compliant and essentially demanded the Board vote to approve their application; and

d. **WHEREAS,** Board Members relayed concerns regarding the Applicant's Environmental Study, the terms of any proposed stipulations or conditions which would apply to any approval granted whether it be preliminary and final; and

e. **WHEREAS,** the Board questioned whether an additional Traffic Study would be required as the phasing plan was completed, as well as the age of certain environmental studies being more than 14 years old; and

> f. **WHEREAS,** despite concerns of certain Members of the Board that it was inappropriate to vote that evening, a motion was duly made and seconded by other Members to approve the application, which motion received 4 votes in the affirmative and 4 votes in the negative; and
>
> g. **WHEREAS,** the matter was subsequently adjourned, however, the failure of the motion to receive affirmative vote of *5* of the 8 Members present resulted as a matter of law in the denial of the application; and
>
> h. **WHEREAS,** the Applicant subsequently filed a Motion for Reconsideration before the Board, which Motion was heard on December 2, 2019; and
>
> i. **WHEREAS,** that motion reargued, essentially, questions of law, and again, the Applicant did not agree therein to permit any additional information to be provided to the Board

228. The statement that "questions remained relating to the impact of this application on the Joint Military Base of Lakehurst Dix Maguire [sic]" is a pretextual justification for the denial.

229. The off-site condition of a military base in the Township is not a consideration that the Board can take into account pursuant to New Jersey law and Jackson Township ordinances.

230. The Board attorney acknowledged this during the October 7, 2019 meeting on the JTL application, stating:

> "The board is still subject to the rules and regulations and statutes of the Pinelands Commission, the New Jersey Municipal Land Use Law, and the township zoning code, and none of those are overwritten by the memorandum of understanding or any other federal regulation that I'm aware of whatsoever I can tell you that as a matter of law, nothing with the base would overturn -- would be the basis to not vote on this application."

231. The following statements in the Resolution are also pretextual justifications for the denial:

> "the Board requested from the Applicant additional time to review the details of the items which had been presented in evidence, to review the application plans as presented before rendering an ultimate decision on this matter" and
>
> "the Applicant's Attorney advised the Board that they would not

> consent to any further adjournments, did not want to present or permit any additional testimony or allow any additional public comment and argued that their application was fully compliant and essentially demanded the Board vote to approve their application"

232. JTL is not obligated to consent to nor provide additional time for Board review of its Application.

233. JTL is not obligated to consent to further adjournments nor to present or permit any additional testimony or allow any additional public comment.

234. JTL's Application was a fully compliant application.

235. Pursuant to the New Jersey Municipal Land Use Law, JTL was entitled to a Board vote on its Application.

236. Pursuant to N.J.S.A. 40:55D-46, the Board was required to "grant or deny preliminary approval within 95 days of the date of such submission or within such further time as may be consented to by the developer. Otherwise, the planning board shall be deemed to have granted preliminary approval of the site plan."

237. Pursuant to N.J.S.A. 40:55D-48, the Board was required to "grant or deny preliminary approval within 95 days of the date of such submission or within such further time as may be consented to by the developer. Otherwise, the planning board shall be deemed to have granted preliminary approval to the subdivision."

238. Pursuant to N.J.S.A. 40:55D-67, the Board was required to "grant or deny an application for a conditional use within 95 days of submission of a complete application by a developer to the administrative officer, or within such further time as may be consented to by the applicant."

239. At the time of the vote, the Board was required by law to grant or deny JTL's Application.

240. The statement in the Resolution that "Board Members relayed concerns regarding

the Applicant's Environmental Study, the terms of any proposed stipulations or conditions which would apply to any approval granted whether it be preliminary and final" was a pretextual justification for denial.

241. JTL provided an Environmental Study as required by the Land Use Code.

242. Any substantive environmental issues associated with the Property are solely within the jurisdiction of the Pinelands Commission.

243. The Board cannot impose any stipulations or conditions related to environmental issues associated with the Property on an approval of the JTL Application.

244. The statement in the Resolution that "the Board questioned whether an additional Traffic Study would be required as the phasing plan was completed, as well as the age of certain environmental studies being more than 14 years old" is a pretextual justification for denial.

245. JTL provided a traffic impact study as required by the Township's Land Use Code.

246. The traffic impact study submitted by JTL demonstrated that there were no concerns regarding on-site traffic conditions.

247. Pursuant to New Jersey law, a planning board is without authority to deny site plan approval because of off-site traffic conditions. *Dunkin' Donuts of New Jersey, Inc. v. N. Brunswick Twp. Planning Bd.*, 193 N.J. Super. 513, 515 (App. Div. 1984).

248. The Board only has authority to determine whether the traffic access points to a development such as JTL's proposed Development will operate safely and efficiently.

249. JTL had received conditional approval from Ocean County regarding off-site traffic impacts.

250. The statement in the Resolution that "[the Motion for Reconsideration] reargued, essentially, questions of law, and again, the Applicant did not agree therein to permit any additional information to be provided to the Board" is a pretextual justification for denial.

251.    JTL was not obligated to provide any additional information to the Board.

252.    The Resolution was adopted by the Board on December 16, 2019.

253.    Notice of decision of the Board's action was published in the local newspaper on December 21, 2019.

254.    In making its determination, the Board relied in great part on the testimony of objecting Township residents and the comments and questions of Board members.

255.    Irregularities with respect to the Board's hearing of the JTL Application included the involvement of the Township Environmental Commission ("EC").

256.    The Township EC is organized pursuant to N.J.S.A. 40:56A-1, *et seq*.

257.    The powers of such an Environmental Commission are codified at N.J.S.A. 40:56A-2 and include:

> An environmental commission organized under this act shall have power to conduct research into the use and possible use of the open land areas of the municipality and may coordinate the activities of unofficial bodies organized for similar purposes, and may advertise, prepare, print and distribute books, maps, charts, plans and pamphlets which in its judgment it deems necessary for its purposes. It shall keep an index of all open areas, publicly or privately owned, including open marshlands, swamps and other wetlands, in order to obtain information on the proper use of such areas, and may from time to time recommend to the planning board or, if none, to the mayor and governing body of the municipality plans and programs for inclusion in a municipal master plan and the development and use of such areas.

258.    An Environmental Commission may also undertake Studies and Recommendations pursuant to N.J.S.A. 40:56A-6 as follows:

> An environmental commission shall have power to study and make recommendations concerning open space preservation, water resources management, air pollution control, solid waste management, noise control, soil and landscape protection, environmental appearance, marine resources and protection of flora and fauna.

259.    The EC is advisory in nature only.

260.    Section 3-147 of the Jackson Township Code establishes a Township Environmental Commission.

261.    Section 3-147 E of that provision of the Jackson Township Code provides as follows:

> Powers and duties. The Commission is established for the protection, development or use of natural resources, including water resources, located within the territorial limits of the Township of Jackson. The Commission shall have power to conduct research into the use and possible use of the open land areas of the Township and may coordinate the activities of unofficial bodies organized for similar purposes and may advertise, prepare, print and distribute books, maps, charts, plans and pamphlets which, in its judgment, it deems necessary for its purposes. It shall keep an index of all open areas, publicly or privately owned, including open marshlands, swamps and other wetlands, in order to obtain information on the proper use of such areas, and may from time to time recommend to the Planning Board plans and programs for inclusion in the Master Plan and the development and use of such areas.

262.    Pursuant to sections 244-26A(7) and 244-189(C) of the Land Use Code, any application for development in the Township must be sent to the EC for review and recommendation.

263.    In furtherance of its Application and the Township Code, JTL submitted information relevant to the Development to the EC on August 10, 2018 and June 20, 2019.

264.    On July 16, 2019, the Jackson Township EC met regarding the JTL Application.

265.    On July 19, 2019, the EC issued a review letter to JTL's planner regarding the JTL Application, requesting additional information.

266.    On August 12, 2019, JTL's planner sent a reply letter to the EC responding to its requests and provided the additional information requested.

267.    Following the first Board meeting on the JTL Application, JTL's planner sent another letter to the EC on September 24, 2019 regarding clarification of an issue raised at the

Board meeting.

268.    That issue concerned a neighboring property owned by Walter Earle Corp. ("Earle"), which includes a Classification Exception Area ("CEA") for groundwater because it is a contaminated property under NJDEP's Site Remediation Program ("SRP").

269.    This issue was irrelevant to the Property and the JTL Application, as it concerned an off-site condition on another property.

270.    On November 19, 2019, the EC sent a five-page letter regarding the JTL Application to JTL's planner with additional concerns regarding the Development.

271.    The letter was sent to not only the Board and Commission members, but to other individuals such as the Township Zoning Official, Township Code Officer, and an individual at the Pinelands Commission.

272.    On November 25, 2019, the planner for JTL responded once again and stated in pertinent part:

> It was at the October Planning Board meeting the Commission Chairman recused himself from all review relating to this project. Additionally a member of the Commission, Stephan De Marzo, spoke in objection to the project at the October Planning Board Meeting thereby disqualifying himself from any consideration of this project by the Commission. As a result, there is an insufficient quorum of Commission members available to discuss the project since only three (3) other Commission members remain. These facts were explained to Chairman Riker by the project attorney, Sal Alfieri prior to the meeting.
>
> . . . .
>
> The continued monitoring of the CEA is the obligation of Earle and Jackson Trails has no obligations or responsibilities. If you have continuing questions it is recommended you contact Earle since they are the responsible party.
>
> . . . .
>
> In fact, the EIS is fully compliant with 244-189 as it strictly follows the project description, site description and inventory and impacts

> have been addressed consistent to the ordinance. This project is located in the Pinelands and NJDEP has no jurisdiction on threatened and endangered species. Pinelands has reviewed this and other projects proposed on these properties many times over the past 15 years and have consistently found them consistent with their "Fish and Wildlife" standards which includes threatened and endangered species (T&E). Most recently, Pinelands has issued a Certificate of filing on April 5, 2019 which is consistent with regard to their fish and wildlife standards found in the Comprehensive Management Plan, NJAC 7:50-6.33. The Pinelands Commission contains the regulatory authority and qualified staff to review the T&E issues, consistent with the testimony at the Planning Board Pinelands is required to review any approval granted by the Planning Board and the applicant will be guided by any requirements imposed by the Pinelands Commission.
>
> . . . .
>
> No trees regulated by the Jackson Township Tree Ordinance have been removed and a Tree Permit was not required. A site visit was performed with the Township Forester on October 14, 2019. The equipment on the site was utilized on the site to dispose of debris collected throughout the site as well as the two (2) decrepit chicken coops that were removed as authorized by a demolition permit issued by the Township Building Department. It is not required to provide the Environmental Commission with any further information.
>
> . . . .
>
> No development has occurred on this site and none will be performed until all required regulatory approvals have been obtained, included the final review of the Pinelands Commission, consistent with the testimony provided at the Planning Board.

273. The scope of the letter from the EC clearly exceeds the powers of the EC.

274. The letter from the EC was intended to influence the Board members to vote in opposition to the JTL Application.

275. Stephen De Marzo was one of the EC members listed on the letter as voting "aye."

276. Mr. De Marzo spoke in opposition to the JTL Application at both the August 19, 2019 and October 7, 2019 meetings.

277. Due to these actions, Mr. De Marzo was obligated to recuse himself as a member

of the Environmental Commission from consideration of the JTL Application.

278.    Mr. De Marzo did not do so.

279.    In addition to his public opposition to the JTL Application as discussed above,

Mr. De Marzo had posted many anti-Semitic comments to social media.

280.    These include the following:

    a.  A post on Facebook stated: "There is no compromising unfortunately. It's wires or poles or nothing." Mr. De Marzo replied "Nothing! Fuck them. Stay in laywood!"

    b.  Other Facebook posts stating:

        i.  "Bullshit. It's about our quality of life. It has Nothing to do with who and what you are or bring. The question to be asked is why do you want the Dorms? Come and live with us just don't bring the schools. Why do you want it? What's in it for your community?"

        ii.  "How about NO!"

        iii.  "That's just fucking great! Second paragraph talks about us respecting them and their religion. HOW ABOUT THEM RESPECTING OURS AND US! New flash we were here first."

        iv.  "Your coming to our team. Don't like it, DON'T COME."

281.    Upon information and belief, Mr. De Marzo's references to "them" and each of the statements quoted above refer to the Orthodox Jewish community.

282.    On December 3, 2019, Stephen De Marzo posted in the Facebook closed group "Jackson, NJ Residents 2.0": "Jackson Trails FAILED TO PASS! The vote to reconsider the vote failed also. The application is now dead."

283.    Lonnie Cromwell is another member of the Environmental Commission who is listed as voting "aye" on the letter signed November 21, 2019 regarding the JTL Application.

284.    Upon information and belief, Mr. Cromwell was seen "high-fiving" members of the public who spoke in opposition to the JTL Application at the second JTL hearing.

285.    Upon information and belief, the EC intended to influence the Board members to

vote in opposition to the JTL Application.

286. The Board had an obligation to approve JTL's fully conforming Application.

287. The Board erred in failing to approve JTL's Application.

288. In denying JTL's Application, the Board was knowingly responsive to Jackson Township residents who were hostile toward the ultra-Orthodox Jewish community.

289. The Board was motivated to deny JTL's Application based on the hostility of local Jackson Township residents.

290. By denying the Application, the Board gave effect to the private biases of Jackson Township residents.

291. Although not referenced in the Resolution, the reasons stated in the Resolution for denial are a pretense for the real reason, which is the likelihood that members of the Orthodox Jewish community would reside in the JTL Development.

292. Upon information and belief, JTL would have received Pinelands Commission approval to develop the Property as proposed.

293. Upon information and belief, JTL would have received any and all approvals necessary from Ocean County to develop the Property as proposed.

294. Upon information and belief, JTL would have received any and all other third-party approvals necessary to develop the Property as proposed.

295. Upon information and belief, JTL would have proceeded with construction and completion of the Development on the Property had it received Board approval.

## Anti-Semitic Hostility Toward JTL

296. There has been significant anti-Semitic hostility directed toward Orthodox Jews in Ocean County, New Jersey and in Jackson Township itself.

297. Some of this hostility has been directed specifically at JTL.

298.    Significant evidence of the anti-Semitic hostility of Township residents has frequently appeared on social media.

299.    Upon information and belief, a group called Citizens United to Protect our Neighborhoods ("CUPON") was formed in opposition to development that would likely serve the Orthodox Jewish community, including JTL's proposed Development, in Jackson Township.

300.    CUPON is a group originally formed in Rockland County, New York to oppose Orthodox Jewish development in that area.

301.    Upon information and belief, up to eight townships in Ocean County, New Jersey are planning to form their own "CUPON" group.

302.    On October 28, 2019, a nonprofit corporation called CUPON Jackson Manchester filed for formation with the State of New Jersey.

303.    The business purpose listed for CUPON Jackson Manchester is "neighborhood protection."

304.    The First Board of Trustees listed in the Certificate of Formation for CUPON Jackson Manchester are Sheldon Hofstein, Elenor Hannum and Cathy Giancola.

305.    All of the First Board of Trustees for CUPON Jackson Manchester are residents of Jackson Township.

306.    Sheldon Hofstein is a former Chairman of the Jackson Township Zoning Board of Adjustment.

307.    Mr. Hofstein resigned from the Zoning Board on August 26, 2019 as a result of his attendance at a CUPON meeting held in Jackson Township.

308.    The CUPON meeting, held on August 15, 2019, was attended by Richard Egan, Joe Sullivan, Elenor Hannum, Sheldon Hofstein, and other residents of Jackson Township, including Chris Kissberth and Rosario Herrero.

309.     Two of the other residents in attendance were, at the time, Jackson Township Planning Board member and Environmental Commission member Richard Egan and Jackson Township Zoning Board of Adjustment, Joseph Sullivan.

310.     Upon information and belief, these three officials knew that it was improper for them to have attended this meeting.

311.     Upon information and belief, at the CUPON meeting, Mr. Hofstein said: "We're not supposed to be here," and "[n]obody saw us."

312.     Upon information and belief, at the CUPON meeting, Mr. Sullivan said "We weren't here."

313.     Upon information and belief, at the CUPON meeting, Mr. Egan said "We didn't sign in, we're neutral like we're -- we're invisible."

314.     Upon information and belief, Mr. Egan also said about the JTL Application at the CUPON meeting, "Oh yeah, they're going to have to, and sidewalks, curbs, swingsets, magic wires, the whole thing."

315.     Upon information and belief, the term "magic wires" refers to *eruvim*.

316.     Mr. Egan was also on the Board when he posted comments to Facebook:

        a.   "The Four Beards of the Apocalypse."

        b.   "Just giveum a good scare!!"

317.     Upon information and belief, Mr. Egan refers to Orthodox Jewish individuals as "beards."

318.     Mr. Egan was still on the Board at the time he made the comments about the JTL Application, which was pending before the Board.

319.     Mr. Egan resigned from the Board on August 22, 2019.

320.     Mr. Sullivan resigned from the Township Zoning Board of Adjustment and Rent

Leveling Board on August 23, 2019.

321.    Upon information belief, Mr. Sullivan has posted the following comments to social media: "I am a member of the Republican club and support no-knock, dormitory, school, and ROW ordinances."

322.    Each of these ordinances were targeted at the Orthodox Jewish community.

323.    Mr. Hofstein resigned from the Zoning Board on August 26, 2019.

324.    Upon information and belief, these individuals resigned from their respective positions solely as a result of their attendance at the CUPON meeting.

325.    Upon information and belief, the main topic of the CUPON meeting on August 15, 2019 was JTL's Application.

326.    Upon information and belief, at the August 15, 2019 CUPON meeting the following comments were made by Elenor Hannum:

a.    Elenor Hannum: "We are going to get started. Has everyone been able to look over the mission of CUPON? CUPON is Citizens United to Protect Our Neighborhoods. Jen and I, and a few other people, we were fortunate enough to be at a meeting at the end of July. Rockland County, Michael Miller, who actually created CUPON, came down with Sarah Wells and CUPON from Mahwah. I believe we had eight -- Jen we had eight towns represented at this meeting."

b.    Elenor Hannum: "I was asked a question about pulling in Lakehurst, because Lakehurst really has no idea what is about to hit them. And they're a very tiny community[.]"

c.    Elenor Hannum: "Um -- um -- so as we are together as a group now -- um -- because of a project that is going to be hitting the table on Monday, you know, we have to know that we can gain forces to actually fight that. Because if we can't fill a room in the planning board meeting or in the zoning board meeting, we're done. We're done."

d.    Elenor Hannum: "I have been fighting this fight probably since 2014. Um -- I'm really behind it now."

e.    Elenor Hannum: "So let's -- let's talk about the [Planning Board] meeting August 19th. You're all aware of what is about to happen in Jackson Trails."

f.  Elenor Hannum: "Um -- we maybe have another meeting after Jackson Trails, prior to the next Jackson Trails."

g.  Elenor Hannum: "I think that is the important because I met Rockland County because I was part of that Toms River, the group of women fighting the Toms River. And finally got that blocked busting zones. So I was good with them and New York came down again.  These people are more than willing to be here and help us."

327.  At the Township Council meeting on September 10, 2019, Ms. Hannum stated:

a.  "I come here, I am the person who did organize that CUPON meeting."

b.  "He decided to educate the Jackson population on the RG-2 and RG-3 zones in which he decided to let everyone know that they were established back in the '80s. What he failed to do or educate our public about is that it was in November 2017 that those zones were, in fact, changed into high density housing, so part of the problem that I have where I am bringing CUPON in unfortunately this town needs it."

c.  "Right now the wolves are at the gate and it's a feeding frenzy."

328.  A second CUPON meeting was held in Jackson Township on October 2, 2019.

329.  At the second CUPON meeting, the following was said in relation to JTL and the

Orthodox Jewish community:

a.  Elenor Hannum: "-- feet and a basement, a walk-in basement."

UNIDENTIFIED FEMALE VOICE: "So it is more than a family house? Or is it a three-family house?"

Elenor Hannum: "It is a single-family dwelling that holds a lot of people."

Richard Egan: "It has windows in the basement. So that means that --"

b.  Joe Sullivan: "[I]n Jackson Township right now, it is not legal to rent out a basement as an apartment. However, all of these new homes that are being built are being designed with the ability to have apartments in the basements with escape egresses in the basement and entrances and exits -- exit and entrance directly through the basement -- . . . from the outside. So obviously, what they're probably going to do is, when they go before the planning

board, they'll say, look, we're not asking for apartments --"

c.  Joe Sullivan: "But they're going to build them so that they can have it.  So that eventually, when they get a favorable committee --

UNIDENTIFIED MALE VOICE: "Yep."

Joe Sullivan: "Council, they will change the law and allow themselves to have apartments."

d.  Elenor Hannum: "So this is just the beginning steps. This is -- this one project is the beginning steps to -- um -- ensure that they can set it up for basement Apartments."

e.  Joe Sullivan: "If you want to see these kinds of houses that are already being built, drive through Royal Grove."

Elenor Hannum: "Yes."

Joe Sullivan: "The new section of Royal Grove off of Grand Boulevard, these are the exact kind of houses they're building."

Chris Kissberth: "That is where the synagogue --"

Joe Sullivan: "Pretty much."

UNIDENTIFIED FEMALE VOICE: "And they just threw the synagogue up?"

f.  Elenor Hannum: "The meeting -- the second meeting to hear Jackson Trails is this Monday. Because it got upped. Um -- they did it on purpose."

g.  Elenor Hannum: "So we'll get people to throw it all over Facebook. But we need to pack that room to the capacity that it gets shut down, the meeting gets shut down because the fire marshal will come in. And if we get enough people, because we're over capacity, they'll shut it down."

h.  UNIDENTIFIED MALE VOICE: "But you'll have them lock the door."

Elenor Hannum: "Then he probably -- that will probably be pushed, unless --"

Joe Sullivan: "Two months probably."

UNIDENTIFIED FEMALE VOICE: “It will buy us more time to get more research.”

UNIDENTIFIED MALE VOICE: “They'll have the police at the door telling people you can't come in.”

i. UNIDENTIFIED FEMALE VOICE: “But when they do a house of worship, the whole community is built around that. And then they are the only people that are allowed to buy in there.”

j. Elenor Hannum: “So this is one of the objectives of CUPON. We are only strong in numbers. That is the only way we can get the block busting to stop.”

k. UNIDENTIFIED FEMALE VOICE: “So if we can pack that room, it can't happen. Because --”

UNIDENTIFIED FEMALE VOICE: “We can put it off two months.”

UNIDENTIFIED MALE VOICE: “Fire hazard.”

UNIDENTIFIED FEMALE VOICE: “We can put it off.”

Sheldon Hofstein: “Just you talk about the development now. You have -- there is an ad for the Satmar Lakewood, which is on Cross Street and Route 9, okay. Here is how it reads. Just look around. All of it is advertised in Brooklyn. This is how they advertise it.”

UNIDENTIFIED FEMALE VOICE: “Yeah.”

Sheldon Hofstein: “So it is in the Brooklyn newspapers.”

Richard Egan: “People are buying Jackson Trails from --”

l. Elenor Hannum: “Illegal daycares going on. So the state needs to be called on that.”

Joe Sullivan: “You have people in the summer renting out their swimming pools, which is also illegal.”

Elenor Hannum: “On Birmingham or Buckingham over in Flair.”

UNIDENTIFIED FEMALE VOICE: “Buckingham.”

Elenor Hannum: “Buckingham. I was just told that there is a

house that is not being lived in that is only being used -- um -- for -- um -- Friday nights and Saturdays."

Joe Sullivan: "Religious services."

m.  Elenor Hannum: "You should not have to worry about what is happening across the street or next door to you where you have van fulls of children being dropped off, or you have strange people walking to a home that is supposed to be a residential home when your children are out front playing, and it is being used for something other than the residential use."

n.  UNIDENTIFIED MALE VOICE: "I just see the beginning of -- um -- of something. You're looking at that project as, you know, changing the course of the future for the town."

UNIDENTIFIED UNIDENTIFIED MALE VOICE: "Yes."

UNIDENTIFIED FEMALE VOICE: "Yes."

o.  UNIDENTIFIED MALE VOICE: "There is an agenda. That is -- that is already -- I mean this agenda --"

Richard Egan: "It is tried and true."

Richard Egan: "This is how you destroy a town."

UNIDENTIFIED FEMALE VOICE: "Yeah"

UNIDENTIFIED MALE VOICE: "It is a playbook."

p.  Elenor Hannum: "So some of us over many years, Chris, me, and some other people, we have pushed. The No Knock kind of was pushed because we really pushed that. Um -- we pushed for not allowing port-a-potties on the front lawn. Every time we have requested these things at council, or we have sent e-mails to -- um -- the council requesting that this be heard and discussed . . . ."

q.  Joe Sullivan: "They haven't done an environmental study since 2005. That needs to be brought up a lot at this meeting. Of course, that means they're doing another environmental study. But at the very least, that will play the part."

r.  "Joe Sullivan: Like I said, push the environmental survey, the fact that they haven't -- that [Ian Borden] wants to go cheap on this and not do it --"

s. Joe Sullivan: "Well, they already have the sidewalks."

UNIDENTIFIED FEMALE VOICE: "Yes, the synagogue."

UNIDENTIFIED MALE VOICE: 'Some of the sidewalks have the lights."

t. Joe Sullivan: "[O]f what is coming just go into Royal Grove and look at one of the houses being built and approach somebody and say you want to buy it and see what happens. Royal Grove. Because I have heard stories of people going in there and doing that and being pretty much told to get out."

Richard Egan: "Get out. There is nothing here. There is no homes for sale. There is nothing here."

Joe Sullivan: "And then they get on the cell phone, and everybody comes out of their homes like Night of the Living Dead. And they stand there, and they stare at you until you leave."

Elenor Hannum: "I have worked with them for 18 years. That doesn't bother me."

u. UNIDENTIFIED FEMALE VOICE: "So during the day from Monday to Friday where in these towns do you need us going around (inaudible)?"

Joe Sullivan: "Well, Friday nights would be the days that you're looking for illegal houses of worship."

UNIDENTIFIED FEMALE VOICE: "Yes."

UNIDENTIFIED FEMALE VOICE: "Yes."

Joe Sullivan: "Because they have to walk to them."

UNIDENTIFIED FEMALE VOICE: "Right."

UNIDENTIFIED FEMALE VOICE: "But then they (inaudible) --"

Joe Sullivan: "Like daycares, that would be during the day."

UNIDENTIFIED FEMALE VOICE: "Like the illegal daycare that is down the street from you?"

UNIDENTIFIED FEMALE VOICE: "I don't know, because

where I am --"

UNIDENTIFIED FEMALE VOICE: "Yes."

UNIDENTIFIED FEMALE VOICE: "During the day."

v. UNIDENTIFIED FEMALE VOICE: "Municipal building. We need to pack that room. Tell all your friends."

UNIDENTIFIED FEMALE VOICE: "If we get 200 people, we'll delay them by two months."

330. At the second CUPON meeting, Ms. Hannum indicated that she had spoken to Township Administrator and Board member Terrence Wall about the JTL Application.

331. Ms. Hannum stated at the meeting, about her conversation with Mr. Wall: "I had a very nice conversation with him. He doesn't come from this area. He lives out in (phonetic) Pundem. And he said I didn't know anything about Jackson. I came and -- . . . . -- I started seeing things that were being pushed through. And he said, why are you accepting this? Why are you -- . . . . accepting this type of developing, these types of plans?

332. Upon information and belief, Mr. Wall has described the Orthodox Jewish community as a pyramid with "Rabbi Kotler" at the top, engaged in an effort to overdevelop the Township, and everyone answers to one authority.

333. There have been many Facebook posts about JTL's Application.

334. On or about July 2019, the "Concerned Ocean County" Facebook group was formed.

335. Upon information and belief, its administrator is Jackson resident Jennifer Cussanelli, who has also gone by the names of Girza and Gal.

336. In late 2018, a Facebook group called "Rise Up Ocean County" was formed.

337. Upon information and belief, Rise Up Ocean County was formed to oppose overdevelopment of Lakewood, New Jersey, by Orthodox Jews.

338. Rise Up Ocean County's home page contains the following statements:

1. "Welcome to Rise Up Ocean County" "Mobilizing to preserve and improve the quality of life in Ocean County"

2. "Ocean County is at a crossroad. We can choose to allow our quality of life to suffer at the hands of a group of people that are seemingly unwilling to comply with the rule of law and societal norms or we can RISE UP!"

3. "The adverse effects of continued development and growth in Lakewood, NJ are being felt by every surrounding community, particularly in Toms River, Brick, Howell and Jackson. Schools, infrastructure, municipal and school budgets, municipal, county and state resources are all being pushed to the breaking point."

4. "Quality of life issues in the surrounding towns are arising on an almost daily basis. The vast majority of these issues come about as a result of an unwillingness to abide by normal societal standards, standards that ALL residents are expected to adhere to regardless of race, creed, color, religion, disability or sexual identity."

339. Upon information and belief, the "group of people" referred to on Rise Up Ocean County's home page is the Orthodox Jewish community.

340. On April 5, 2019, the New Jersey Division of Civil Rights wrote a letter to Mark Zuckerberg, the Chief Executive Officer of Facebook, Inc. to bring attention to the comments on the Rise Up Ocean County's page "inciting violence against Orthodox Jews."

341. The letter concluded:

> You at Facebook also have a role to play in monitoring comments that incite violence based on race, religion, gender, sexual orientation, gender identity or expression, national origin, ancestry, and disability.

342. Upon information and belief, Rise Up Ocean County has formed a closed Facebook group.

343. On May 8, 2017, Agudath Israel of America and WR Property LLC, an owner of real property in the Township, filed suit against the Township as a result of its enactment on March

16, 2017 of Ordinances No. 03-17 and 04-17 (the "School Ordinances"), as described below.

344.    Upon information and belief, one of the Defendants in the *Agudath* litigation, Code Enforcement Officer William Campbell, and other Township residents are members of this new closed Facebook group.

345.    In February 2019, the Township of Lakewood, New Jersey adopted a Resolution that condemned Rise Up Ocean County.

346.    The Township of Jackson Council was asked to introduce a similar Resolution, but refused to do so.

347.    The majority of the posts on Rise Up Ocean County's public Facebook page are directed negatively at the Orthodox Jewish community.

348.    Comments have been posted on Rise Up Ocean County open Facebook page about JTL and the Orthodox Jewish community as follows:

a.   Pictures of the property were posted with text stating "Future home of Jackson Trails unless you RISE UP. Monday, 7 pm, Jackson Township municipal building."

b.   "UPDATE: A member of the Jackson Township Planning Board has posted below that the application has been adjourned and will not be heard Monday night.  When a new date is known we will let everyone know."

c.   "Jackson Township residents have a choice. You can choose to step up and stop an exclusive enclave of 500 house from being built or you can step aside and watch as your wildlife relocates, your natural resources dwindle, your public schools are drained to support private schools and your rural roads become city streets. On August 19th at 7:30 pm the Jackson Township Planning Board will begin hearing the application for Jackson Trails, a community that if buil [sic], is of the magnitude to begin remaking Jackson Township forever. Be there, bring a friend, let's make some noise. Please, take a moment and share this post. Pack the house Jackson, it's your battle to win or lose."

d.   "To my Jackson friends, you know how dedicated I have been to this town by trying to preserve a quality of life that we have all come to love. Myself and very few others have done the

work. We've put the time in. We have become targets. But we have made progress that most will never even realize has been made but undoubtedly reap the benefits. It's an ongoing battle and has consumed a good portion of my life. But I need your help. Tomorrow is a very important Planning Board meeting. Jackson Trails, if built, will be the first exclusive religious community in our area. This community has red flags all over it. It must be stopped. Please show up tomorrow. If for nothing else, out of respect for those who have stuck our necks and have been working our asses off to save our town from becoming another Lakewood. We need bodies. You don't have to speak. You just need to be there."

e. "The first subject that we intend to address has to do with the house of worship. As a refresher, when the applicant filed their application for Jackson Trails they included a 'statement of operation' for the house of worship. In it they included that there would be several services per day, 7 days per week, more will be held on holidays. The simcha, defined as a Jewish party room, will be used for birthday parties and bar/bat mitzvahs. The mikvah, a Jewish ritualistic bathhouse, has a maximum occupancy of 6 and will not be used during religious services. So can we just all agree that this is a synagogue being built exclusively for the orthodox Jewish community?"

f. "Another good turn out at the Jackson Township Planning Board meeting. Folks were none too happy when Mr. Riker was told that he should recuse himself from the Jackson Trails application."

g. "This video is actually shot in Lakewood but you may rest assured that it will be in Jackson if Jackson Trails is approved. Early morning construction decimating the forest behind you, thousands of new children needing transportation to Lakewood private, religious schools, 1,000 or so cars funnelling into the intersection of South Hope Chapel Road and Ridgeway Avenue . . . basically all of the worst parts of the scariest book that you have ever read. This says nothing of the fact that if approved, the Jackson MUA has agreed to run water and sewer lines to a part of town that is otherwise almost undevelopable. Tonight at 7:30 pm the Jackson Trails application hearing continues. Last time we had a good turnout, it would be nice if tonight was even bigger. 95 W. Veterans Highway Jackson, NJ." This was followed by a video that had a scroll line "Once Dense Forests Gone Replaced By An Orthodox Jewish Enclave."

h. "THERE IS SUPPOSED TO BE AN ARCHAEOLOGICAL SURVEY OF THE PROPOSED JACKSON TRAILS SITE. BY LAW So so [sic] far we have a totally inadequate EIS. One that

was done prior to the current standards of practice . . . The EIS needs to be done by a firm that is qualified, can do all the aspects required including a survey by a trained, licensed archaeologist, and completely free of conflicts of interest. One who will not try to pass off a study that was done before the current standards were enacted as valid and timely. One that since it was presented has been totally invalidated by the ordinary folks who went out there and found pine snakes, and sent us the pictures to prove it."

i.   "LOVE THY NEIGHBOR as long as thy neighbor is one of your own. Sort of like Kiryas Vizhnitz only bigger and located in Jackson instead of Lakewood. On July 1, 2019 at 7 pm Jackson Trails will be before the Jackson Township Planning Board with an application to build an exclusive enclave which includes 500 homes, all with basements and including a synagogue to be located within the enclave. Whether or not those basements will be finished and include secondary entrances to be operated as apartments remains to be seen The synagogue proposed will host multiple prayer services per day, 7 days per week beginning at 7 am, sometimes earlier. A simcha room is included to host birthday parties, bar/bat mitvahs [sic] and other events. There is also a mikvah or ritual bath house, included with a maximum occupancy of 6."

j.   "Maybe the creation of an exclusive Jewish enclave complete with a synagogue and mikvah in Jackson Township doesn't trouble you. Maybe bumper to bumper traffic doesn't concern you. Maybe thousands of private school students draining public schools of money doesn't cause you to cringe."

k.   "As a quick refresher, Jackson Trails is an exclusive Jewish enclave of 500 or so homes, complete with synagogue and mikvah, proposed to be built on the border of Jackson and Manchester Testimony was also offered that the "house of worship" would belong to whoever bought it. You know, like a Catholic church that wanted to be located next to a Jewish, ritual bathouse."

l.   "Reliable sources confirm that the Jackson Crossing plaza is sold to Lakewood investors. There are already a number of businesses that have left, the pizzeria was sold and is now a kosher pizzeria. Not 1 mile away is the proposed site for Jackson Trails, the exclusive orthodox Jewish enclave on South Hope Chapel Rd. The next planning board meeting is Monday night at 7:30 pm. Please plan on attending, our voices and objections must be heard."

m.   "Here's a shocker . . . The developer of Jackson Trails, the proposed, exclusive orthodox Jewish enclave, has broken the rules and quite possibly made it impossible to know if there are endangered species on the property. Over the last year we have shown you countless examples of people that simply refuse to

play by the rules. From welfare fraud to building code violations, from pillaging money from public schools to redirecting money from affordable housing to the construction of private, religious schools. The lawlessness at times resembles the wild, wild west. So it should come as no surprise that the developer of Jackson Trails has chosen to break the rules by disrupting the land where we are almost certain there are endangered species to be found. With an application still pending before the Jackson Township Planning Board and a hearing scheduled for tomorrow night, trees have fallen, buildings that would be home to short eared owls were falling and underbrush, the nesting home of Northern Pine Snakes, has been cleared. Construction equipment is on site, construction roads have been put in place and the developer has begun 'burying the evidence' before anyone had a chance to walk the property."

n.   "To our knowledge, Pine Barrens Golf Course is not for sale nor did we say that it was in our earlier post. Furthermore, the adjacent property to Jackson Trails belonging to Earle Asphalt is not for sale, nor did we say that it was.  What we did was paint a picture of the possibilities that one or the other or both could be put in play should Jackson Trails be approved and built. We based that picture on patterns of behavior that we have seen in Rockland County, NY and here in Ocean County. Those patterns often include the acquisition of contiguous properties to new developments, particularly those the size of Jackson Trails."

o.   "Is Jackson Trails only the beginning of something MUCH BIGGER? . . . We aren't conspiracy nuts but we do learn from history. Should Jackson Trails be approved you can rest assured that an effort would be undertaken (if it is not already underway) to acquire the adjacent Earle Asphalt property and then the goff course. Based on the same density as Jackson Trails, this COULD lead to another 1,800 homes on top of the proposed 500. 2,300 homes in total which produces 4,600 cars. 13,000 people of which 9,200 would be children . . . minimum . . . . Which leads us back to Jackson Trails and the POSSIBILITY of something far more damaging then just (hard to believe we used the word JUST here) 500 houses and a synagogue with a mikvah. When we said that the battle for Jackson is underway we meant it and the first skirmish is the planning board meeting on Monday night at 7:30 pm at the municipal building.  PLEASE . . . be there and be loud."

p.   "This is about opposing an exclusively orthodox Jewish enclave that has the potential to add thousands of children to the community . . . . It's about, QUALITY OF LIFE for existing residents of Jackson Township. And their fears are not unwarranted, all they need to do is look one town to the east.  It's also about establishing precedent. When a community is

designed with one road in and out, 500 homes with basements and a synagogue complete with a mikvah (a ritualistic bathhouse) plopped in the middle of it, this is not an all welcoming community, this is an exclusive enclave built for a single group of people. If approved it will become the model for others in Jackson Township And it's not just publicschools that suffer when hge numbers of orthodox Jews move in. The environmental destruction to accommodate housing needs, the stress on natural resources and the strains on unimproved infrastructure push entire communities to the breaking point. Lakewood and the surrounding towns are now there. So to Jackson Township residents we say that now is the time to rise up. This application is going to be difficult to stop but it is a worthy and WINNABLE battle and your voices must be heard. Monday at 7:30 pm at the municipal building is the first of what likely will be be multiple hearing before a final vote will be case. Be there and be loud."

q. "When there's $300,000,000 at stake, anything is possible and that's Jackson Trails. 500 houses at roughly $600,000 each."

r. "It is a constant mystery. Why does one group of people who profess to love God and thrive on constant demonstrations of the same . . . consistently destroy what little is left of our environment, insisting it is their God-given right to do so? . . . Yet when a development of 500 households like Jackson Trails is planned, everyone knows full well it will not be 500. but[sic] more like 1200-1500, with the illegal dwellings in basements and attics everyone knows will be added . . . and the illegal businesses, boarding houses, schools, and daycares Then factor in that these "households" are not the normal number of 5 or 6, but somewhere between 8 and 14."

*s.* Another post on Rise Up Ocean County explained what a *mikvah* (ritual bath) is:

> "Long but worthy post alert . . . sound the alarm bells . . . . One of the more amusing and frustrating parts of the presentation made by Ian Borden on behalf of Jackson Trails last night came when there was discussion about the 'house of worship'. When asked who this 'house of worship' would belong to, the response was 'whoever buys it' We thought about who the potential suitors might be. Maybe a non-denominational house of worship that could accommodate Jew, Christian, Mulim, Hindu and Atheist alike would be ideal but what to do about that Mikvah and Simcha (party room) for bar/bat 'Mitzvahs' that are in the plans? You see, a Mikvah is used by only one people and they aren't Christian, Muslim, Hindu or Atheist. Yes some faiths use a ritual bath but the development application includes a specific description

> of a MIKVAH including hours of operation. And to be sure, everyone uses a party room but does not refer to it as a Simcha designed to celebrate a bar/bat 'Mitzvah'. Again, only one people would be utilizing that party room and it too comes with hours of operation in the plans. So why not just call it what it is; a synagogue, a party facility to celebrate Jewish milestones and an orthodox Jewish ritual bath called a Mikvah?"

349. Upon information and belief, Richard Ciullo runs the "Rise Up Ocean County" page.

350. Upon information and belief, at the CUPON meeting August 15, 2019, Richard Egan and Joseph Sullivan discussed pine snakes:

> Joseph Sullivan: "Pine snakes -- if you could prove there are pine snakes, one would be enough."

351. Upon information and belief, at the Board's meeting on JTL's Application on August 19, 2019, Ms. Hannum engaged in the following conversation with Richard Cuillo and a third party outside the hearing room:

> Richard Ciullo: "I have been on Google all day long trying to buy a Northern Pine Snake. Just one."
>
> Elenor Hannum: "I can hook you up with a guy."
>
> Richard Ciullo: "I want one. That is all I want."

352. Comments have been posted on Rise Up Ocean County's open Facebook page regarding JTL and Pine Snakes as follows:

a. While discussing Jackson Trails, Chris Adrich posted a video of a snake as a comment. The administrator of the page Rise Up Ocean County commented, "Speaking only for myself, I will spend the rest of the day with my feet up in the air thinking that dude is right here with me."

b. While discussing Jackson Trails, another individual commented: "Put a crew of volunteers together to walk the area and photographs…..bring it to the next meeting so when the professionals say this and that don't exist….you have photographic proof…..with GPS headings…..it can't be

denied."

   c.   Chris Aldrich replied, ". . . you mean like this?" with an attached photo of an aerial view of land without a snake with comments.

   d.   An administrator from Rise Up Ocean County commented and stated: "This is great but you need to establish habitat. You also want to focus on more than just pine snakes to have a much stronger case."

353.    Chris Aldrich stated at the October 7, 2019 Board Meeting on the JTL

Application:

> Chris Aldrich: "About the environmental, I am the one who found the pine snake, who as Mr. Borden said a day or two before the last meeting, I did find the pine snake, and the pine snake is approximately 1,500 feet from this development being proposed. Not only did I find the pine snake, you may ask how I find all these things. Mr. Borden knows my family. My family and I are avid outdoorsmen, and we're in the woods constantly and yesterday found a Cope's tree frog, which is also on the endangered species list. So I have a picture of that. I haven't had a chance to send that to the board. I was tied up at work today and couldn't send that to the board."

354.    Comments have been posted on the Rise Up Ocean County closed Facebook page

such as:

> "Can everyone from Manchester and Jackson, who attended the Cupon meeting last night, please forward me your info. Name, address, number, email. If you didn't attend but would still like to help, please forward me your info. We need to address Jackson Trails ASAP!"

355.    The Facebook group "Jackson NJ" Strong also includes posts targeting the

Orthodox Jewish community.

356.    These have included the following post: "We support Richard Egan, Joseph

Sullivan and Sheldon Hofstein."

357.    They have also included posts directed specifically at JTL's Application,

including the following:

a.  "The folks at Rise Up Ocean County have taken the initiative, on behalf of Ocean County residents, and have sought legal counsel to fight the creation of an exclusively Jewish enclave.  If this is approved and built, it will forever change the county as we know it. It will be the beginning of government approved (and funded) segregation and the end to the quality of life and diversity that we have all grown to appreciate. Many people ask how they can help. Well, plain and simple, DONATE! We, as residents, need representation and like anything else, there is a cost Together we have over 16,000 followers. A few dollars from each will secure us the legal team we need and at the very least, postpone the building. The application was adjourned from July 1, 2019 to July 15, 2019 so there is little time to waste."

b.  "Listen up my friends. This is very important to fight. This will a full blown Religious Enclave. This is complete segregation and dangerous to all of us who want diversity in Jackson." This was followed by a picture of the Statement of Operation of the house of worship for JTL.

c.  "We are halfway there! We need to retain the lawyers to help us fight Jackson Trails. Please donate!"

d.  Potsted with a video about the JTL planner as Pinocchio, "Very important! Mark it on your calendars. October 7! Be there." On the video there was a scroll that said "Sorry kid, you really blew it on the 'house of worship' question."

e.  "IMPORTANT!!!!!! We need to fill this room up. Please show up at 7:30 Monday. Jackson Trails is last on the agenda and there's a good chance that it will be postponed, especially if it is standing room only, but we need a showing. Very important." This is followed by a video which has a scroll showing "AN EXCLUSIVE ORTHODOX JEWISH ENCLAVE IN JACKSON TOWNSHIP."

f.  "This is sickening. This is our future if our government doesn't get a handle on allowing a special interest religious group to continue to purchase land and only allow their own group to

occupy it. They only advertise to their own communities and the properties are sold to non locals before they even break ground. Why is this type of segregation being allowed in our 'free' country?"

358. Upon information and belief, some of these same residents have made other posts targeting the Orthodox Jewish community on media and social media including:

a. "[S]till working hard. Lots going on behind the scenes. Selling has slowed. The only way to stop is to not sell or run. There are 3 lawsuits against the twp currently and I don't think we are going to give in to their demands."

b. "If anyone doesn't think there is a bigger plan to turn the USA into then next Israel, then do your homework. The influx of the orthodox communities coming into America isalarming!!!! Our government is funding this through welfare and state and federal aid, Kiryas Joel, Ramapo, Monroe, Lakewood "

c. "Houses of worship coming to a neighborhood near you! So your neighbor can now hold prayer services with up to 35 people and strangers coming in and out whenever they want and in addition they will no longer have to pay taxes once the house is deemed a HOW! Why is it that only those NOT paying taxes are being represented by our government yet those paying taxes are losing all their rights? EVERY SINGLE TOWN this group sets it sights on winds up getting sued and then settles having to pay all the legal fees. They are allowed to discriminate, segregate with government funded schools and busing and housing and destroy towns all in the name of religion. Any 99.9 percent of residents aren't saying a damn thing about it. Don't say I didn't warn you."

d. We need to become the "bloc vote"! It's the only way. And we need to continue to open up people's eyes to what is actually happening in our country with special interest groups and radical religious groups taking over entire communities."

359. One of these same residents wrote and posted the following:

a. Referring to an *eruv*: "White Rd near Galassi Court. As you can see it's attached to the utility pole. There are several others in Kensington Manor."

b. "[W]hat good are laws if they refuse to enforce them? The Chief of Police is too busy playing security detail to the guys installing eruv wires."

c. About the first CUPON meeting on August 15, 2019: "Please respond if you can attend. This is very important for Ocean

County."

360. This CUPON notice which is the subject of the post read in pertinent part:

> Aug. 19, The Planning Board will hear the Jackson Trails, LLC project
>
> It is located on S. Hope Chapel Road and asking for a Major Subdivision with a subsequent Major Site Plan approval to include 367 Single Family Homes & a house of Worship.

(Emphasis added.)

361. Upon information and belief, Cathy Giancola, one of the Trustees of CUPON, is the administrator for several Facebook groups expressing anti-Orthodox Jewish statements including Jackson Community Watchdog News (both private and public groups) and Jackson Brookwood's (1,2,3&4).

362. On October 2, 2017, Ms. Giancola wrote to the Township administrator and copied the Township Mayor and Council as follows:

> ". . . 146 S. New Prospect has been operating what appears to be an illegal house of worship for quite awhile now. The home is owned by WSNP LLC, who comes back to a Mr. Meir Katz from 2 Harvest Court. As a concerned resident of Jackson, I was wondering how this is not only possible, but continues in the middle of a residential community. This is starting to become an all to common issue in Jackson and I hope this is being looked at through serious eyes."

**Other Anti-Semitic Hostility in Jackson Township**

363. Jackson Township, New Jersey has been a hotbed of anti-Orthodox Jewish sentiment and action directed at that community.

364. Members of the Orthodox Jewish community have recently sought housing in Jackson Township.

365. Members of the Orthodox Jewish community and real estate agents serving that community have inquired into the potential availability of homes.

366.    Such inquiries have caused an outcry against the Orthodox Jewish community by Jackson Township residents.

367.    Certain Jackson Township residents have initiated and participated in a campaign known as "Jackson Strong," which is intended to discourage homeowners from selling their homes specifically to the Orthodox Jewish community.

368.    Upon information and belief, Jackson Township officials support this campaign.

369.    There are a number of lawsuits pending against Jackson Township related to hostility toward Orthodox Jews.

370.    On May 8, 2017, Agudath Israel of America and WR Property LLC, and owner of real property in the Township, filed suit against the Township as a result of its enactment on March 16, 2017 of Ordinances No. 03-17 and 04-17 (the "School Ordinances").

371.    The School Ordinances prohibit schools from locating in the Township's residential zoning districts, and prohibit outright dormitories throughout the Township.

372.    Subsequent to the filing of that lawsuit, on September 12, 2017, the Township passed Ordinance No. 20-17 (the "Eruv Ordinance" and, collectively, the "Ordinances" when discussing all three Ordinances). The Eruv Ordinance prohibited the establishment of any *eruv* throughout the Township by preventing outright the placement of articles of any nature in the right of way of any street or public place.

373.    The purpose of each of these Ordinances was to target the Orthodox Jewish community, to prevent that community from being able to have the necessary educational institutions to teach their youth, and to discourage that community from residing in Jackson Township and practicing their religion.

374.    That lawsuit was amended twice with the latest filing including claims against the Mayor of Jackson Township, Michael Reina, the former Township Administrator, the Township Zoning Officer, the former Township Code Enforcement Officer, and the former Township

Council President.

375.    The actions complaint of consist of a deliberate and consistent targeting by the Township, through its officials, of the Orthodox Jewish community.

376.    These actions include the targeting of *sukkahs*, the singling out of *eruvs* for prohibition from the Township because of their association with Orthodox Jews, and even the surveillance of specific homes that hostile local residents have identified to the Township as being owned by Orthodox Jews.

377.    The Township has adopted other Ordinances and Resolutions specifically targeting the Orthodox Jewish community.

378.    The Township filed complaints with the United States Department of Justice and the New Jersey Attorney General asserting that Orthodox Jews' attempts to buy homes in the Township constituted so-called "blockbusting."

379.    The New Jersey Attorney General's Office rejected the Township's complaint.

380.    The United States Department of Justice, after reviewing the Township's complaint, responded to the Township's attorneys on October 14, 2016 that "we have determined that no action by the Department of Justice is necessary at this time."

381.    In order to further discourage Orthodox Jews from purchasing homes in Jackson Township, in or about August 2015, the Township adopted an amended "no-knock" ordinance that prohibits individuals from knocking on doors in the Township unless they are registered with the Township, and prohibits solicitation at premises that are listed on a "No-Knock Registry."

382.    The "no-knock" ordinance was specifically aimed at members of the Orthodox Jewish community approaching homeowners regarding the potential sale of their homes.

383.    In a state court action (Docket Nos. L-822-92, L-1879-15) related to Jackson Township's *Mount Laurel* affordable housing obligations, the issue of the Township's refusal to

adopt Ordinance 30-16, which would have created a "Planned Inclusionary Community Zone," and the reasons for such refusal, were raised by certain parties.

384. Ordinance 30-16 would have provided for affordable housing units, integrated with market rate units to be developed in the Township.

385. Ordinance 30-16 was the result of extensive negotiations between the developers of a potential housing site and the Township.

386. During the course of those proceedings, in 2016 Township representatives repeatedly stated that they wanted to (a) limit the number of bedrooms that such housing development would include; and (b) substantially reduce the size of the "clubhouse" included in such development or eliminate it entirely.

387. Upon information and belief, the Township's opposition to greater numbers of bedrooms and restrictions on a clubhouse was directly related to its hostility toward the Orthodox Jewish community.

388. Another example of hostility toward the Orthodox Jewish community is the Township's actions with respect to the Lakewood Civilian Safety Watch ("LCSW"), a neighborhood watch group, to prevent it from entering its jurisdiction.

389. Subsequently, the Township Council passed Resolution No. 192R-16, which bans local police from affiliating with any neighborhood watch group based outside of the Township.

390. In 2013, the Oros Bais Yaakov High School, an Orthodox Jewish religious girls school, submitted a zoning application to the Jackson Township Zoning Board of Adjustment in order to locate in Jackson Township.

391. Substantial hostility of Township residents toward the Orthodox Jewish community was demonstrated during the hearings on the Oros Bais Yaakov application.

392. The Zoning Board denied the Oros Bais Yaakov's use variance application despite

several other public and private schools having been built in the same area and zoning district.

393.     Zoning Board members were directly responsive to the questions and statements made by Township residents hostile toward that school.

394.     One of the Zoning Board members who heard and voted on the application was Sheldon Hofstein, one of the Trustees of CUPON Manchester Jackson.

395.     Other Jackson Township Zoning Board members that voted on that school's application made the following statements about the Orthodox Jewish community on social media websites:

     a.  "Jackson is not prepared for the tsunami of orthodoxy that is mounting at the border. I beg you all to CONFRONT OR ACCOST the council members and demand that they appoint Rae Ann Walker to the zoning board she is strong enough and smart and will quell and regulate the tide before it envelopes Jackson."

     b.  Describing the Orthodox community as "Cockroaches."

     c.  "They DO have more money than you or me or all of us put together and they have a long term plan and an abundance of patience."

     d.  "Over time, enabled by group unity, they will form a bloc vote that will elect whomever they choose Over time they will become dominant."

     e.  "[A]sk him what to do about the scourge of the cockroaches from the east[.]"

     f.  "Jackson is not prepared for the tsunami of orthodoxy that is mounting at the border."

     g.  "They are on target for a repeat of the 1930s."

     h.  "They DO have more money than you or me or all of us put together and they have a long term plan and an abundance of patience."

396.     Jackson Township officials engaged in the monitoring of properties owned by Orthodox Jews in the Township.

397.     The former Code Enforcement Officer for the Township made the following

comments about some of the properties:

     a. "2 and 4 Danielle Court - ERUV wires. They are placed well within the property line."

     b. "146 N. New Prospect - Rental CCO obtained and registered as a Rental Property with 'TBD' for renters. In the meantime from all we can tell this is actively being used as a school or Shul."

     c. "64 Villanova - Renter left for Israel for about 6 weeks. He is letting a friend (couple) stay there from time to time while he is gone. They are not paying rent as reported but instead doing them a favor watching the place. Both the owner and property manager are aware."

     d. "24 Winchester - newly reported for Friday night activity, cars, etc. Home is lived in. We will monitor."

398.	The Township's monitoring of these properties included the following statements by this same individual:

     a. "On Friday (2/10/2017) evening there were 10 walkers observed entering 9 Harvest. Additionally a total of 10 vehicles came between both properties. They parked in the driveway of #7 and #9 and then some were parked legally on the street."

     b. "I apologize for not getting back to you sooner but I was out sick and I am just getting caught up. For Friday evening on Harvest Ct. there were 6 vehicles in the driveway of 7 Harvest Ct. and 5 vehicles in the driveway at 9 Harvest Ct. One car was on the street and no noise in the area."

     c. "Also, 6 Meadow Run Ct. was monitored and there were 5 cars in the driveways there with no noise in the area."

     d. "There were also other areas monitored in the Township where there have been calls of concern. The numbers you see are the maximum numbers throughout the monitoring period. With this we are finding no violations at this time at any location. We will continue to monitor over time."

399.	Upon information and belief, a "Watch List" of properties was created at the Township.

400.	This monitoring of Orthodox Jews by the Township started as early as July 2016.

401.	The Township undertook this ongoing monitoring in direct response to complaints against the Orthodox Jewish community by Jackson Township residents to Township officials.

402.     In addition, the Township engaged in monitoring of *sukkahs*, which are tent-like structures erected during the eight-day long festival of Sukkot, in the Township.

403.     The Township issued violations for the erection of *sukkahs* in the Township.

404.     This occurred after a resident complained to the Mayor about the erection of *sukkahs*.

405.     In 2016, the Township became concerned about the use of trailers in the Township.

406.     On September 13, 2016, the Township thereafter adopted Ordinance 21-16 limiting the use of trailers and portable storage structures in the Township.

407.     Upon information and belief, this Ordinance was enacted to target the Orthodox Jewish community to prevent them from assembling in or utilizing trailers for worship.

408.     On December 27, 2016, the Township adopted Ordinance 32-16, which requires that Landlords in the Township register annually on the anniversary date of their initial registration or face penalties.

409.     Upon information and belief, this Ordinance was enacted to target the Orthodox Jewish community to penalize Orthodox Jewish individuals and entities acquiring properties within the Township.

410.     This series of actions constitutes an ongoing pattern and practice of discriminating against Orthodox Jewish residents, interfering with and obstructing their protected rights, and harassment in their reasonable practice of their religion.

411.     In or about November 2017, the State of New Jersey, Office of the Attorney General ("AG") opened an investigation, "In re Jackson Township Ordinance Nos. 03-17 04-17 and 20-17."

412.     In furtherance of that investigation, the AG served a subpoena upon the Township seeking that certain documents and information be produced.

413.    Upon information and belief, that matter is still pending.

414.    Upon information and belief, the Chairwoman of the Jackson Republican Club and Treasurer of the Jackson Township Municipal Utility Authority, Clara Glory, shares the posts of Rise Up Ocean County on her personal Facebook Page.

415.    This included Ms. Glory sharing the date and time of the JTL hearing before the Board on August 19, 2019.

416.    On December 17, 2019, Newsweek published an article regarding anti-Semitic comments made on Facebook by Ms. Glory and the President of the Jackson Republican Club, Todd Porter.

417.    Jackson NJ Strong Facebook group published a post stating:

> For the record, the comments made by Glory and Porter DO NOT MAKE THEM ANTISEMETIC! This is so out of control. Heaven forbid you speak against the bad behavior coming from this ultra religious group. Why are their rights more important than ours? The track records speak for themselves. People are fed up with the cheating and the selfish ways they live their lives. It's hurting all those around them. Whether it be the welfare fraud, tax evasion, misappropriation of government funds, blockbusting, abuse of the system or the favoritisms they receive from our law makers. We've all had enough, and they, along with the government for turning a blind eye are solely responsible for creating animosity against. . . .

418.    Upon information and belief, Republican National Committee Chairwoman Ronna McDaniel, New Jersey GOP Chairman Doug Steinhardt, and New Jersey State Senator Robert Singer (R-Ocean/Monmouth County) issued a joint statement condemning the statements made by Glory and Porter stating "[w]e condemn hateful rhetoric in the strongest possible terms. There is no place for anti-Semitism in our party."

419.    On January 3, 2020, it was reported that the Rise Up Ocean County group page had been taken down by Facebook.

420.    Upon information and belief, Jackson NJ Strong posted "We are sorry to report that

it appears that Rise Up Ocean County has been taken down by Facebook. We reached out and the only answer we got through email was 'the page was taken down.' What a horrible thing to do and we will miss them as an ally. More information when it becomes available."

421. Upon information and belief, New Jersey Governor Murphy and New Jersey Attorney General Gurbir Grewal wrote, regarding the shut down of the Rise Up Ocean County Facebook group: "We had serious concerns with racist and anti-Semitic statements on the page, including an explicit goal of preventing Orthodox Jews from moving to Ocean County We have continued to follow up with Facebook since that initial letter in April, and we renewed our concerns as recently as this week."

422. However, the Rise Up Ocean County Facebook page was only taken down temporarily and returned to full operation.

423. New Jersey Attorney General Grewal tweeted: "It's outrageous that just as our Jewish brothers and sisters are gathering to celebrate the Sabbath, 'Rise Up Ocean County' decides to reinstate its page. Is this really the kind of online community that @Facebook wants to cultivate?"

424. In January 2020, Board member Bressi, who voted in favor of the JTL Application, was not reappointed to the Board after having served as a Board member since 2000.

425. In January 2020, Mr. Bressi, also a Township Council member, was removed from serving on seven of the eight subcommittees he had been on for years remaining only on the Veteran's committee.

426. Upon information and belief, this was retaliation for Mr. Bressi testifying at a deposition in the *Congregation Oros Bais Yaakov* matter that he had heard the Township's Mayor and Council members make ant-Semitic statements.

**The Township's Declaratory Judgment Action**
**and the Settlement Agreement**

427.     On July 7, 2015, the Township filed a lawsuit captioned *In the Matter of the Application of the Township of Jackson*, Docket No. OCN-L-1879-15 (hereinafter "DJ Action"), an action concerning the Township's obligation to provide for its fair share of the regional need for low and moderate income housing, pursuant to the New Jersey Supreme Court's 2015 decision *In re N.J.A.C. 5:96 and 5:97*, 221 N.J. 1 (2015) ("*Mount Laurel IV*").

428.     In the DJ Action, the Township initially risked the potential of having to create over 3,500 affordable housing units to fulfill its total fair share obligations to provide for low and moderate income housing pursuant to the New Jersey *Mount Laurel* doctrine, a doctrine aimed at addressing exclusionary zoning throughout the State of New Jersey.

429.     However, by way of a Settlement Agreement reached between the Township, the Fair Share Housing Center (hereinafter "FSHC"), and an Intervenor in the action, Highview Homes, the Township was ultimately able to significantly reduce its affordable housing obligation. *See* October 25, 2016 Settlement Agreement, incorporated by reference herein and attached hereto as Exhibit B (hereinafter "Settlement Agreement").

430.     The Settlement Agreement established the Township's Third Round "Present Need" obligation at 28 affordable housing units, its "Prior Round" obligation at 1,247 affordable housing units for the period of 1987-1999 and, relevant to the issues set forth by Plaintiffs in this complaint, the Township's Third Round "Prospective Need" obligation was significantly decreased through the Settlement Agreement from a potential need to provide over 3,500 affordable housing units to a Third Round Prospective Need of only 1,250 units for the period of 1999-2025. *Id.*

431.     The Settlement Agreement sets forth various mechanisms the Township proposes to use to satisfy its entire *Mount Laurel* obligations, including the use of bonus credits, the rehabilitation of dilapidated housing units, and proposed new construction within the Township.

*See* Exhibit B (Settlement Agreement) at 3.

432. The Settlement Agreement requires that 20% of the total housing units ("the 20% set-aside") of any development that is to take place within the Regional Growth ("RG") zones, specifically, the RG-2 and RG-3 zones, be low and moderate income housing. The 20% set-aside required by the Settlement Agreement within the RG-2 and RG-3 zones is to produce low and moderate income housing as shown in the below chart:

| Table 1 | | | | | | |
|---|---|---|---|---|---|---|
| **Regional Growth Zone Potential Development Summary** | | | | | | |
| **PROPERTY** | | | | | **EST. LOT YIELD** | |
| NAME | BLOCK | LOT | ZONE | ACRES | MARKET SF | AFFORDABLE |
| Hirsch | 19403 | 8 | RG -2 | 4.3 | 8 | 2 |
| Scala | 19403 | 4 | RG-2 | 25 | 47 | 10 |
| Fisher | 19501 | 25 | RG-2 | 10.4 | 21 | 4 |
| Pine Rock Terra | 19501 | 26 | RG-2 | 22.2 | 47 | 10 |
| Pantierre | 19501 | 36 | RG-2 | 43.6 | 72 | 18 |
| Connett | 19501 | 35 | RG-2 | 11 | 21 | 4 |
| Hunter | 20501 | 27 | RG-2 | 10.1 | 18 | 4 |
| WB Ocean | 20601 | 15 | RG-2 | 21.5 | 18 | 4 |
| Denton Pines | 20601 | 10 | RG-2 | 21.7 | 35 | 8 |
| Sientkowitz | 20801 | 19 | RG-2 | 15 | 27 | 7 |
| Longo | 20701 | 2 | RG-2 | 8.8 | 21 | 4 |
| | | | | | | |
| Jackson Trails | 23001 | 22-29 | RG-3 | 129 | 367 | 92 |
| Marton | 23003 | 1&5 | RG-3 | 21.6 | 30 | 7 |
| | | | **Total** | **344.2** | **732** | **174** |

433. As shown above, the Township identified thirteen properties within the RG-2 and RG-3 zones that are to be used by the Township to meet its Third Round Prospective Need obligation.

434. Specifically, Plaintiffs' Property, known as "Jackson Trails," was proposed to include development of 367 units, 92 units of which would be set-aside and made affordable to low and moderate-income households.

435. The Superior Court of New Jersey, Law Division, through a December 31, 2016

Order, determined that the Settlement Agreement is "fair and adequately protects the interests of low and moderate-income persons within Jackson's housing region[.]" *See* December 31, 2016 Order, incorporated by reference herein and attached hereto as Exhibit D.

436. In furtherance of the terms set forth in the Settlement Agreement, the December 31, 2016 Order also directs the Township to create and submit a Housing Element and Fair Share Plan ("HEFSP"), for the court to review and determine whether the proposed plan set forth therein is constitutionally compliant and provides a fair and reasonable opportunity for the Township to meet its *Mount Laurel* obligations.

**The Township's Fair Share Plan**

437. The Township's HEFSP, dated June 8, 2017, sets forth specific information on how the Township will meet its *Mount Laurel* constitutional obligations. *See* Township's June 8, 2017 HEFSP, incorporated by reference herein and attached hereto as Exhibit A.

438. Namely, the Township's HEFSP relies on the proposed Development on each site to satisfy the Township's Third Round Prospective Need obligation as follows:

**Table 10: Third Round (1999–2015) Compliance Plan Summary**

| Project Name | Project Location | Project Type | Affordable Units | Rental Bonus Credits | Total Credits |
|---|---|---|---|---|---|
| A. EL @ Jackson, LLC (Carried Forward from Site No. 6) | Perrineville Road | Family Rental (Units Carried Forward from Prior Round) | 146 | 0 | 146 |
| B. Holly Oaks | Block 14801, Lot 5 | Inclusionary Age-Restricted For-Sale | 5 | 0 | 5 |
| C. DVT Enterprises (Maplewood Estates) | Block 1720, Lot 173.03 | Family For-Sale | 1 | 0 | 1 |
| D. SNHPLP Program | TBD | Special Needs Housing | 8 | 0 | 8 |
| E. Leigh Realty-North Tract (Site No. 10) | Interchange of Route 195 and Route 526/527 | Mixed-Use Family Rental | 273 | 272 | 545 |
| F. Highview Homes (Site No. 15) | Block 164, Lot 2 | Inclusionary Family Rental | 40 | 40 | 80 |
| G. RG-2 Zone (Sites Nos. 12, 13, and 14) | Various | Inclusionary Family For-Sale | 175 | 0 | 175 |
| H. Remainder of RG-2 and RG-3 Zones | TBD | Inclusionary with 20-Percent Set-Aside | 290 | 0 | 290 |
| **Totals** | | | **938** | **312** | **1,250** |

*Id.* at 27 of HEFSP.

439. As is shown above, an important component of the Township's fair share plan set forth in the HEFSP is the Township's reliance upon the 290[4] affordable units that are to be produced by the development within the remainder of the property located within the RG-2 Zone (once sites #12, #13, and #14[5] within the RG-2 Zone are discounted) and the property located within the RG-3 Zone to assist in satisfaction of the Township's constitutional *Mount Laurel* Third Round obligation. *See* Exhibit B (Settlement Agreement) and Exhibit A (HEFSP).

**<u>The Court's Judgment of Compliance and Repose</u>**

[4] The Settlement Agreement provides that 281 affordable units will be constructed in the "remainder RG-2 and RG-3 zones." However, the HEFSP relies on the construction of 290 affordable units from these zones. The 290 unit number is used from this point forward as the HEFSP is the more recent document. *See* Exhibit B (Settlement Agreement) at 3 and Exhibit A (HEFSP) Table 10 at 27.

[5] The Settlement Agreement proposes the use of Sites #12, #13, and #14 for the construction of inclusionary development of family rental units projected to produce a total of 203 affordable housing units. These 203 affordable units are to be applied against the Township's Third Round obligation of 1,250 affordable housing units. *See* Exhibit B (Settlement Agreement) at 3, item "F" on the chart.

440.    As a result of the Township's execution of the Settlement Agreement and the June 8, 2017 HEFSP in the DJ Action, the Township was also able to obtain a Judgment of Compliance and Repose ("JOR") from the New Jersey Superior Court, Law Division, on August 16, 2017, thereby confirming judicial approval of the HEFSP and providing the Township with immunity from *Mount Laurel* builder's remedy lawsuits through July 1, 2025. *See* August 16, 2017 JOR, incorporated by reference herein and attached hereto as Exhibit C.

441.    Through the August 16, 2017 JOR, the state court determined that the Township's HEFSP "adequately meets the Township's obligation to provide a realistic opportunity for the provision of low and moderate-income housing and constitutes an appropriate means to fully satisfy the Township's obligation to provide a realistic opportunity for the provision of low and moderate-income housing and constitutes an appropriate means to fully satisfy the Township's Mount Laurel obligation." *Id.* at 6.

442.    Specifically, in meeting the Township's 1,250-unit Third Round obligation, the Township is obligated, per the JOR, to ensure that "290 Units be developed in the remainder of the RG-2 and RG-3 zones in inclusionary developments with a 20% mandatory set-aside." *Id.* at 4.

443.    The JOR requires that "The Township shall fully implement its housing element and fair share plan." *Id.* at 6.

444.    To facilitate the Township's compliance, the JOR further provides that:

> "The Planning Board and all its respective agents, employees and representatives shall make *bona fide* efforts to implement and expedite the components of the Township's compliance package which are within the control of the Planning Board, including *bona fide* efforts to expedite all Planning Board development approvals of all inclusionary developers identified in the housing element and fair share plan to facilitate the provision of affordable housing."

*Id.* at 7.

**Additional Allegations Regarding the Denial of Housing Opportunities
for Orthodox Jews in Jackson Township**

445.     Although the Township has enacted ordinances and entered into the Settlement Agreement as aforesaid, it has engaged in a practice to exclude affordable housing in the Township.

446.     In 2019, Jackson Parke filed an application with the Board to construct a 551-unit housing development in the Township.

447.     The Jackson Parke development was to be built on a property included in the Township's Fair Share Plan.

448.     Jackson Parke, like JTL, would provide affordable housing to the public.

449.     Some of the Jackson Parke housing units had basements.

450.     Upon information and belief, Board member Wall engaged in questioning regarding basements, including asking how many English basements there would be, and if they would have any ingress or egress. Many of the same Township residents who opposed the JTL application spoke out against the Jackson Parke application.

451.     Upon information and belief, the Jackson Parke application was also a subject of the CUPON meetings, and during one, the following statements were made with respect to JTL and Jackson Parke:

> UNIDENTIFIED MALE VOICE: "To say, well, you know, once this is approved then --"
>
> UNIDENTIFIED FEMALE VOICE: "Everything else is approved."
>
> UNIDENTIFIED MALE VOICE: "-- then this gets approved. This is the beginning of something greater. It is just --"
>
> Elenor Hannum: "And that's why we're fighting it."
>
> UNIDENTIFIED MALE VOICE: "That is what it is. I mean,

> because once they -- once they get their toe in the door, then the foot follows. The ankle, the leg, the body, that's it."
>
> Richard Egan: "That's what this project is. Jackson Trails is the anchor. If they can pull this one off, they get it. They get it."
>
> Elenor Hannum: "That and Jackson Parke. Because Jackson Parke --"
>
> UNIDENTIFIED MALE VOICE: "Jackson Parke."
>
> Richard Egan: "Pristine forest, never touched by man. If they lock in two big projects, they'll have a voting block for a school election where they'll get people -- their people on the school board. You think you see for sale signs now in Jackson, wait --"

452. Upon information and belief, the words "they" and "their" refer to the Orthodox Jewish community.

453. On November 4, 2019, the Board voted to deny the Jackson Parke application.

454. Upon information and belief, the Orthodox Jewish community would likely have purchased housing in Jackson Parke.

455. Upon information and belief, the Jackson Parke application, like JTL's Application, was denied because the Orthodox Jewish community would likely have purchased housing in Jackson Parke.

456. This practice of the Defendants in denying housing developments in the Township because the Orthodox Jewish community would likely have purchased housing in the developments disproportionately impacts Orthodox Jews.

457. This pattern and practice of the Defendants, in denying housing developments in the Township because the Orthodox Jewish community would likely have purchased housing in the developments, discriminates against Orthodox Jews.

458. The Board imposed different terms and conditions on the JTL Application, and applied land use regulations in a different manner to the JTL Application.

459.     Township officials made statements indicating a preference against Orthodox Jews and endorsed statements by others that indicated a preference against Orthodox Jews.

460.     Upon information and belief, other non-Orthodox Jewish housing developments in the Township have been approved.

461.     The Defendants' actions described above all took place under color of state law.

462.     JTL was entitled to substantive due process with respect to the consideration of its Application by the Board.

463.     JTL had the right to develop its Development.

464.     Because the Orthodox Jewish community would likely have purchased housing in the JTL Development, JTL's Development would disproportionately benefit Orthodox Jews.

465.     Defendants have interfered with JTL's right to develop the Property where the Orthodox Jewish community would likely have purchased housing and Orthodox Jews would disproportionately benefit from the same.

466.     Defendants have retaliated against JTL for exercising its right to develop the Property where the Orthodox Jewish community would likely have purchased housing and Orthodox Jews would disproportionately benefit from the same.

467.     Defendants have discriminated against JTL for exercising its right to develop the Property where the Orthodox Jewish community would likely have purchased housing and Orthodox Jews would disproportionately benefit from the same.

468.     The Plaintiffs have suffered significant damages as a result of the Defendants' actions.

469.     The Plaintiffs have suffered irreparable harm as a result of the Defendants' actions.

470.     Plaintiffs have sustained and continue to sustain direct injuries including, but not limited to, being barred from the full use and enjoyment of their properties, as guaranteed by the Fair Housing Act.

471.    The Township possesses no compelling interest that justified the denial of the JTL Application nor violation of its fair share plan and Settlement Agreement.

## COUNT I

**Fair Housing Act**
**Religious Discrimination**
**42 U.S.C. § 3604**

472.    Paragraphs 1 through 471 are incorporated by reference as if fully set forth herein.

473.    Defendants, through their actions and the actions of their agents described above, are liable for the violation of Plaintiffs' rights under the federal Fair Housing Act, 42 U.S.C. § 3604(a), under which it is unlawful "[t]o sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin."

474.    Defendants are further liable under 42 U.S.C. § 3604(b), which makes it unlawful to "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin."

475.    Defendants are further liable under 42 U.S.C. § 3604(c), which makes it unlawful "[t]o make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation, or discrimination," based on statements made publicly or otherwise endorsed in public by Defendants' officials.

476.    Defendants' actions to obstruct, delay, and deny JTL's Application for approval of its Development, are and have been based on discriminatory motives related to the religion of the principal of JTL and likely homeowners of the Development, specifically the likelihood that the

population of the Development will include a disproportionate number of Orthodox Jewish individuals.

477. Defendants' policies and procedures, and actions resulting from those policies and procedures that led to the obstruction, delay, and denial of JTL's Application, also have a disparate impact on Orthodox Jews by disproportionately making housing in the Township unavailable to them.

478. The Plaintiffs have been injured by Defendants' discriminatory conduct and has suffered damages as a result.

479. Defendants' conduct was intentional, willful, and made in reckless disregard of the known rights of others.

## COUNT II

### Fair Housing Act
### Racial Discrimination
### 42 U.S.C. § 3604

480. Paragraphs 1 through 479 are incorporated by reference as if fully set forth herein.

481. Defendants, through their actions and the actions of their agents described above, are liable for the violation of Plaintiffs' rights under the federal Fair Housing Act, 42 U.S.C. § 3604(a), under which it is unlawful "[t]o sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin."

482. Defendants are further liable under 42 U.S.C. § 3604(b), which makes it unlawful to "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin."

483. Defendants are further liable under 42 U.S.C. § 3604(c), which makes it unlawful "[t]o make, print, or publish, or cause to be made, printed, or published any notice, statement, or

advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation, or discrimination," based on statements made publicly or otherwise endorsed in public by Defendants' officials.

484. Defendants' actions to obstruct, delay, and deny JTL's Application for approval of its Development, are and have been based on discriminatory motives related to the race of the principal of JTL and likely homeowners of the Development, specifically the likelihood that the homeowner population of the Development will include a disproportionate number of Orthodox Jewish individuals.

485. Defendants' policies and procedures, and actions resulting from those policies and procedures that led to the obstruction, delay, and denial of JTL's Application, also have a disparate impact on Orthodox Jews by disproportionately making housing in the Township unavailable to them.

486. The Plaintiffs have been injured by Defendants' discriminatory conduct and has suffered damages as a result.

487. Defendants' conduct was intentional, willful, and made in reckless disregard of the known rights of others.

## COUNT III

**Fair Housing Act**
**Religious Discrimination**
**42 U.S.C. § 3617**

488. Paragraphs 1 through 487 are incorporated by reference as if fully set forth herein.

489. Defendants, through their actions and the actions of their agents described above are liable for the violation of the Plaintiffs' rights under the federal Fair Housing Act, 42 U.S.C. § 3617, under which "[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title," as Defendants' actions have interfered with JTL's efforts to build and operate a housing development that would disproportionately benefit the Orthodox Jewish community and constitute retaliation against JTL for proposing a project that would serve this group.

**COUNT IV**

**Fair Housing Act**
**Racial Discrimination**
**42 U.S.C. § 3617**

490. Paragraphs 1 through 489 are incorporated by reference as if fully set forth herein.

491. Defendants, through their actions and the actions of their agents described above are liable for the violation of Plaintiffs' rights under the federal Fair Housing Act, 42 U.S.C. § 3617, under which "[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title," as Defendants' actions have interfered with JTL's efforts to build and operate a housing development that would disproportionately benefit the Orthodox Jewish community and constitute retaliation against JTL for proposing a project that would serve this group.

**COUNT V**

**Violation of Religious Land Use and Institutionalized Persons Act of 2000 –**

**"Nondiscrimination"**
**42 U.S.C. § 2000cc(b)(2)**

492. Paragraphs 1 through 491 are incorporated by reference as if set forth fully herein.

493. Defendants have deprived and continue to deprive Plaintiffs of their right to the free exercise of religion, as secured by RLUIPA, by imposing and implementing land use regulations in a manner that discriminates against an assembly or institution on the basis of religion.

## COUNT VI

**Equal Protection Clause**
**Religious Discrimination**
**Fourteenth Amendment to the United States Constitution**
**42 U.S.C. § 1983**

494. Paragraphs 1 through 493 are incorporated by reference as if fully set forth herein.

495. Defendants' laws and actions, on their face and as applied, deprived and continue to deprive Plaintiffs of their right to equal protection of the laws, as secured by the Fourteenth Amendment, by discriminating against and targeting Plaintiffs for disfavor on the basis of religion.

## COUNT VII

**Equal Protection Clause**
**Racial Discrimination**
**Fourteenth Amendment to the United States Constitution**
**42 U.S.C. § 1983**

496. Paragraphs 1 through 495 are incorporated by reference as if fully set forth herein.

497. Defendants' laws and actions, on their face and as applied, deprived and continue to deprive Plaintiffs' of their right to equal protection of the laws, as secured by the Fourteenth Amendment, by discriminating against and targeting JTL and the Orthodox Jewish individuals who may reside in the JTL Development for disfavor on the basis of their race.

## COUNT VIII

**Free Exercise Clause**
**First and Fourteenth Amendments to the United States Constitution**
**42 U.S.C. § 1983**

498.    Paragraphs 1 through 497 are incorporated by reference as if fully set forth herein.

499.    Defendants' laws and actions deprived and continue to deprive Plaintiffs of their right to free exercise of religion, as secured by the First Amendment to the United States Constitution and made applicable to the States by the Fourteenth Amendment by discriminating against JTL for disfavor on the basis of religion.

## COUNT IX

**Establishment Clause**
**First and Fourteenth Amendments to the United States Constitution**
**42 U.S.C. § 1983**

500.    Paragraphs 1 through 499 are incorporated by reference as if fully set forth herein.

501.    Defendants' laws and actions, on their face, are hostile toward and disapproving of religion, specifically the Orthodox Jewish faith.

502.    Defendants do not have a secular legislative purpose for denying the JTL Application, breaching the Settlement Agreement and violating the Fair Share Plan. Rather, the Defendants were motivated by an anti-religious and, more specifically, anti-Orthodox Jewish animus; they have as their object and purpose the suppression of religion and religious conduct.

503.    These laws and actions have the principal and primary effect of inhibiting religion, in that they prevent the Orthodox Jewish community from relocating and residing in the Township.

## COUNT X

**Substantive Due Process**
**Fourteenth Amendment to the United States Constitution**
**42 U.S.C. § 1983**

504.    Paragraphs 1 through 503 are incorporated by reference as if fully set forth herein.

505. Defendants' laws and actions, as applied, deprived and continue to deprive Plaintiffs of their right to substantive due process, as secured by the United States Constitution and made applicable to the States by the Fourteenth Amendment.

**COUNT XI**

**42 U.S.C. § 1982**

506. Paragraphs 1 through 505 are incorporated by reference as if fully set forth herein.

507. The Plaintiffs' principal is a member of the Jewish race.

508. The actions by Defendants are violations of Plaintiffs' right to have the same rights as enjoyed by other citizens to hold and convey real and personal property in violation of 42 U.S.C. § 1982.

**COUNT XII**

**New Jersey Law Against Discrimination**
**N.J. Stat. Ann. § 10:5-1, *et seq.***

509. Paragraphs 1 through 508 are incorporated by reference as if set forth fully herein.

510. By denying JTL, on the basis of religion, the opportunity to develop the Property, Defendants violated and continue to violate Plaintiffs' rights under the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1, *et seq.*

511. Defendants' conduct has caused significant irreparable harm to Plaintiffs.

**COUNT XIII**

**Arbitrary and Capricious Denial of Land Use Application**

512. Paragraphs 1 through 511 are incorporated by reference as if set forth fullyherein.

513. JTL's Application to the Planning Board sought preliminary and final major

subdivision approval, conditional use approval, and preliminary and final major site plan approval in connection with the Property, located in the RG-3 zoning district.

514.    Specifically, the Application proposed inclusionary development including 367 single-family homes, 92 units of which would be reserved for low and moderate-income families to assist the Township in the satisfaction of its 1,250 Third Round *Mount Laurel* obligation, as set forth in the Settlement Agreement.

515.    The Township's controlling Land Use Code and Master Plan discuss RG zones, providing that "Regional growth areas are areas of existing growth or lands immediately adjacent thereto which are capable of accommodating regional growth influences while protecting the essential character and environment of the Pinelands, provided that the environmental objectives [of the CMP] are implemented through municipal master plan and land use ordinances."

516.    The Municipal Land Use Law, N.J.S.A. 40:55D-1, *et seq.* ("MLUL") provides, in pertinent part that, in reviewing an application seeking preliminary site plan approval, "[t]he planning board shall, if the proposed subdivision complies with the ordinance and this act, grant preliminary site plan approval." N.J.S.A. 40:55D-46(b).

517.    The MLUL provides, in pertinent part, that in reviewing an application seeking preliminary major subdivision approval, "[t]he planning board shall, if the proposed subdivision complies with the ordinance and this act, grant preliminary approval to the subdivision." N.J.S.A. 40:55D-48(b).

518.    Under applicable New Jersey law, preliminary approval and final approval of site plan and subdivision applications may be sought simultaneously.

519.    The MLUL provides, in pertinent part, that planning boards shall grant final approval of site plan and subdivision applications if the final approval plans "conform to the standards established by ordinance for final approval . . . ." N.J.S.A. 40:55D-50.

520. The MLUL provides, in pertinent part, that applications for conditional use approval are to be filed pursuant to "definite specifications and standards which shall be clearly set forth with sufficient certainty and definiteness to enable the developer to know their limit and extent." N.J.S.A. 40:55D-67.

521. In support of the Application, JTL submitted a substantial number of documents including, but not limited to, various subdivision plans, boundary surveys, architectural floor plans and drawings, construction plans, and stormwater management reports, many of which were updated during the Board's consideration of the Application.

522. Importantly, JTL supplied an Environmental Impact Statement, dated June 30, 2018, and a Traffic Impact Study, dated January 3, 2019, which was updated on July 19, 2019.

523. JTL also presented expert testimony of various experts in further support of its Application during the Board hearings.

524. One of JTL's experts, John Rea, Traffic Engineer, observed the need for Ocean County Planning Board approval in connection with aspects of the proposed development which may affect a County road.

525. The Board acknowledged in its Resolution that "each of the proposed building lots would comply with the specific area, dimensional and setback requirements of the RG-3 Zoning District."

526. Nonetheless, contrary to the Board's acknowledgement that JTL's proposed inclusionary development Application was consistent with the zoning district provisions governing the zoning district in which the Property is located, the Planning Board denied the Application, setting forth several ostensible reasons in its Resolution, including:

a. the impact of this application on the Joint Military Base of Lakehurst Dix Maguire;

b. the age of several Environmental Studies;

       > c. the need for additional Traffic Studies as the phasing plan was completed; . . . .

*See* Planning Board Resolution, Exhibit E, at 6-7.

527. The Appellate Division of the Superior Court, New Jersey, is among New Jersey courts that have held that a planning board cannot deny approval of a land use application for an otherwise permissible use on the basis of requirements that are imposed by planning boards without any ordinance authority. *W.L. Goodfellows and Co. v. Washington Township Planning Board*, 345 N.J. Super. 109 (App. Div. 2001).

528. The Township Ordinance required the submission of an Environmental Impact Study, which was provided by JTL to the Board.

529. Nowhere in the Ordinance is it mandated that Environmental Impact studies must bear any specific issuance date.

530. Thus, the Board's expressed concern regarding the age of the JTL Environmental Studies was not an appropriate reason justifying denial of the Application.

531. Further, N.J.S.A. 40:55D-22b provides that: "In the event that development proposed by an application for development requires an approval by a governmental agency other than the municipal agency, the municipal agency shall, in appropriate instances, condition its approval upon the subsequent approval of such governmental agency;"

532. Thus, to the extent that the Application was denied due to traffic issues within the jurisdiction of the Ocean County Planning Board, or other issues within the jurisdiction of any governmental agency other than the Board, the denial of the Application was contrary to law.

533. The New Jersey Supreme Court has confirmed that, while site plan review gives planning boards wide discretion to assure compliance with the objectives and requirements of the site plan ordinance, "it 'was never intended to include the legislative or quasi-judicial power to

prohibit a permitted use.'" *PRB Enter., Inc. v. South Brunswick Planning Board*, 105 N.J. 1, 7 (1987).

534.     During the Board hearings, the Board also gave inappropriate weight to the objections set forth by the residents and the professed concerns raised by Jeffrey Riker, Planning Board Member and Chairman of the Environmental Commission, who clearly had his role as a Planning Board member.

535.     In relevant part, Mr. Riker emailed a letter on the morning of the October 7, 2019, which set forth his professed concerns in connection with the Application, stating that he "has reason to distrust" JTL, and that he believes JTL "has not been entirely truthful, forthcoming and reasonably compliant," that "the applicant is not playing by the rules," and that the Application is "not in the best interest of Jackson Township." Mr. Riker signed said letter as "Chairman, Environmental Commission and Member, Planning Board."

536.     JTL even attempted to have Mr. Riker recused from considering and voting on the Application due to his conflicted roles. Nonetheless, the hearing proceeded with JTL agreeing to proceed only if the Board members were not prejudiced by Mr. Riker's comments.

537.     Towards the end of the hearing, JTL's attorney indicated to the Board that JTL would agree to having a vote only on preliminary approval of its Application, with JTL to return to the Board for final approval after outside agency approvals were acquired.

538.     However, the Application was nevertheless denied, even though the Application met the required Ordinance standards for approval, including the Board's acknowledgement that:

> a.   "each of the proposed building lots would comply with the specific area, dimensional and setback requirements of the RG-3 Zoning District, utilizing the Pinelands Development Credits in accordance with Ordinance Section 244-91(D);"
>
> b.   Mr. Borden testified as to the conditional use standards of Ordinance 244- 91, and testified that the Application meets the conditions of the conditional use standards set forth in the

Ordinance; and

c. Mr. Macfarlane's testimony revealed that the application as presented was compliant with Residential Site Improvement Standards ("RSIS") and all Ordinance requirements, as the Applicant's experts testified that the Application as presented conforms with all zoning requirements and design standards, and that the Application did not seek any variance relief.

539. The Board Resolution failed to provide any lawful justification for the Board's denial of JTL's fully conforming Application.

540. By reason of the actions described above, the Board acted in an arbitrary, capricious and unreasonable manner when it denied the fully conforming Application, and said denial should therefore be reversed.

**COUNT XIV**

**Violation of Fair Share Plan/Settlement Agreement**

541. Paragraphs 1 through 540 are incorporated by reference as if set forth fully herein.

542. Through the decisions of *Southern Burlington County, NAACP v. Township of Mount Laurel*, 67 N.J. 151 (1975) ("*Mount Laurel I*"), and *Southern Burlington County, NAACP Township of Mount Laurel* 92 N.J. 158 (1983) ("*Mount Laurel II*"), the New Jersey Supreme Court established that municipal exclusionary planning and zoning practices that prevent affordable housing opportunities for individuals who are economically disadvantaged are unconstitutional.

543. In light of the statewide need for the development of affordable housing, the New Jersey Supreme Court ordered that municipalities must take affirmative steps to provide realistic opportunities for their "fair share" of the region's need for housing affordable to low and moderate income families through amendment to municipal zoning and land use regulations.

544. In response to the New Jersey Supreme Court's mandate, the Legislature enacted the New Jersey Fair Housing Act, N.J.S.A. 52:27D-301, *et seq*., thereby creating and authorizing

the Council on Affordable Housing ("COAH") to evaluate the statewide need for affordable housing, divide that statewide need by region, and review and approve local municipal housing plans for the provision of affordable housing in satisfaction of the overall regional need.

545. In 2015, with the issuance of the *Mount Laurel IV* decision, the New Jersey Supreme Court declared COAH moribund and transferred the evaluation of municipal compliance with the constitutional *Mount Laurel* obligation from COAH to the New Jersey trial courts.

546. The *Mount Laurel IV* opinion authorized New Jersey municipalities to file declaratory judgment actions seeking to comply with their Mount Laurel obligations and, as noted above, Jackson Township filed such an action, *i.e.*, the DJ Action referenced above.

547. The Township's July 7, 2015 DJ Action was thus necessary in order for the Township to protect itself against builder's remedy lawsuits, which protection it ultimately obtained through the JOR, which approved the above-referenced Settlement Agreement.

548. The Township initially risked the potential of having to provide for over 3,500 affordable housing units to fulfill its total *Mount Laurel* obligation for the Third Round alone.

549. However, through the execution of the Settlement Agreement, the Township was able to reduce its Third Round obligation by more than 50%, *i,e.*, to only 1,250 affordable housing units, provided that it comply with the terms of the Settlement Agreement and the JOR which required implementation of the HEFSP.

550. An important component of the HEFSP was the Township's development of 290 affordable units in the RG-2 and RG-3 zones.

551. Indeed, the Township expressly relied on the development of the 290 affordable units within the RG-2 and RG-3 Zones when it entered into the Settlement Agreement and obtained the subsequent issuance of the JOR in the Township's DJ Action.

552. However, contrary to the terms of the Settlement Agreement, the HEFSP, and said

JOR, the Board denied JTL's Application seeking approval to develop the Property to address its *Mount Laurel* obligation.

553. The Resolution denying JTL's Application constitutes a direct violation of the terms of the Settlement Agreement, the HEFSP, and the JOR, as well as the Township's obligations of good faith and fair dealing in the discharge of its obligations associated with the implementation of the Settlement Agreement.

554. The Board's denial renders the Township's compliance with its *Mount Laurel* obligations to be deficient by at least 107 affordable housing units.

555. In addition, the JOR specifically directed the Board to "make *bona fide* efforts to implement and expedite the components of the Township's compliance package which are within the control of the Planning Board" specifically "including *bona fide* efforts to expedite all Planning Board development approvals of all inclusionary developers identified in the housing element and fair share plan to facilitate the provision of affordable housing."

556. JTL provided sufficient evidence demonstrating complete compliance with the governing Ordinances and RSIS standard.

557. However, not only did the Board violate the MLUL when denying the Application, for the reasons expressed above, the Board violated the JOR mandate to "facilitate the provision of affordable housing'" and violated the Township's *Mount Laurel* obligations pursuant to the Settlement Agreement and the JOR when it denied the Application.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request that this Court grant the following relief:

1. A declaration that the denial of JTL's Application is void, invalid and unconstitutional on the ground that it violates the Free Exercise and Establishment Clauses of the First Amendment to the United States Constitution, the Substantive

Due Process and Equal Protection Clauses of the Fourteenth Amendment to the
United States Constitution, the Religious Land Use and Institutionalized Persons
Act, the Fair Housing Act, 42 U.S.C. § 1982, and the New Jersey Law Against
Discrimination;

2.      An order reversing the decision of the Board and an order declaring that the JTL's
        Application for preliminary and final subdivision and site plan approval  and
        conditional use approval to use the Property as provided in its Application to the Board is
        hereby approved;

3.      An order enjoining the Defendants, their officers, employees, agents, successors
        and all others acting in concert with them from applying their laws in a manner that
        violates the Free Exercise and Establishment Clauses of the First Amendment to
        the United States Constitution, the Substantive Due Process and Equal Protection
        Clauses of the Fourteenth Amendment to the United States Constitution, the
        Religious Land Use and Institutionalized Persons Act, the Fair Housing Act, 42
        U.S.C. § 1982, and the New Jersey Law Against Discrimination, or undertaking
        any and all action in furtherance of these acts;

4.      A declaration that the Township is in violation of the terms of the Settlement
        Agreement, the JOR, and the Township's *Mount Laurel* obligations;

5.      A declaration that the Planning Board acted in an arbitrary, capricious and
        unreasonable manner in denying the Application;

6.      A declaration that the Resolution denying the Application is unlawful, invalid and
        void;

7.      A declaration that the Application is approved;

8.      An award of compensatory damages against Defendants in favor of the Plaintiffs

as the Court deems just for the loss of its rights under the Free Exercise and Establishment Clauses of the First Amendment to the United States Constitution, the Substantive Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution, the Religious Land Use and Institutionalized Persons Act, the Fair Housing Act, 42 U.S.C. § 1982, and the New Jersey Law Against Discrimination incurred by the Plaintiffs and caused by the Defendants' laws and actions;

9.    An award to the Plaintiffs of full costs and attorneys' fees arising out of Defendants' actions and land use decisions and out of this litigation; and

10.   Such other and further relief as this Court may deem just and appropriate.

Respectfully submitted by the Plaintiffs this 5th day of February, 2021.

**STORZER & ASSOCIATES, P.C.**

 /s/ Sieglinde K. Rath
Sieglinde K. Rath (#048131991)
Roman P. Storzer, *admitted pro hac vice*
9433 Common Brook Road
Suite 208
Owings Mills, Maryland 21117
rath@storzerlaw.com
Tel: 410.559.6325
Fax: 202.315.3996

**WILENTZ, GOLDMAN & SPITZER, P.A.**

  /s/ Donna M. Jennings
Donna M. Jennings (#017281995)
90 Woodbridge Center Drive
P.O. Box 10
Woodbridge, New Jersey 07095
djennings@wilentz.com
Tel: 732.855.6039

**HILL WALLACK LLP**

/s/ Thomas F. Carroll, III

Thomas F. Carroll, III (#022051983)
21 Roszel Road
P.O. Box 5226
Princeton, New Jersey 08543-5226
tcarroll@hillwallack.com
Tel: 609.734.6336

*Attorneys for Plaintiffs*

**CERTIFICATION**

Pursuant to Local Civil Rule 11.2, I hereby certify that this matter is the subject of an action pending in the Superior Court of New Jersey, Ocean County, Law Division under docket no. OCN-L-002627-20 and captioned as *Jackson Trails, LLC v. Township of Jackson, et al*. that action directly involves the claim set forth in Count XIV of said complaint which was dismissed by this Court. There are no other actions pending in any court, or of any pending arbitration or administrative proceeding, and that no such action, arbitration or administrative proceeding is contemplated at this time. I do not know of any other party who should be joined in this action.

**STORZER & ASSOCIATES, P.C.**
/s/ Sieglinde K. Rath (#048131991)
Sieglinde K. Rath
9433 Common Brook Road, Suite 208
Owings Mills, MD 21117
rath@storzerlaw.com
Tel: 410.559.6325
Fax: 202.315.3996

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 5th day of February, 2021, the foregoing document was electronically filed via the Court's ECF system with notices to the following:

Brent R. Pohlman, Esq.
Methfessel & Werbel
2025 Lincoln Highway, Suite 200
P.O. Box 3012
Edison, New Jersey 08818
pohlman@methwerb.com
Tel: 732.248.4200

/s/Sieglinde K. Rath
Sieglinde K. Rath

EXHIBIT A

# Amended Housing Element and Fair Share Plan

**Township of Jackson**
**Ocean County, New Jersey**

June 8, 2017

Prepared for:

**Jackson Township Planning Board**
95 West Veterans Highway
Jackson, New Jersey 08527

Prepared by:

**JDM Planning Associates, LLC**
614 Harbor Road
Brick, New Jersey 08724

John D. Maczuga, PP
New Jersey Professional Planner
License No. 1714

# Table of Contents

1.0 Introduction ... 1
2.0 Analysis of Demographic, Housing and Employment Characteristics ... 5
2.1 Jackson's Demographics ... 5
2.2 Jackson's Housing Stock ... 6
2.3 Jackson's Employment Characteristics ... 9
3.0 Municipal Fair Share Obligation ... 11
4.0 Compliance Plan ... 12
4.1 Rehabilitation Obligation ... 12
4.2 Prior Round Obligation ... 12
4.2.1 Prior Cycle Credits ... 13
4.2.2 Regional Contribution Agreements (RCAs) ... 15
4.2.3 Built Affordable Units (Post December 15, 1986) ... 16
4.2.4 Proposed Affordable Units ... 20
4.2.5 Prior Round Compliance Plan Caps and Requirements ... 24
4.3 Third Round Compliance Plan ... 26
4.3.1 Proposed Affordable Units ... 27
4.3.2 Third Round Compliance Plan Caps and Requirements ... 34
5.0 Additional Fair Share Plan Components ... 37
5.1 Spending Plan ... 37
5.2 Affirmative Marketing Plan ... 37
5.3 Reporting Requirements ... 37
5.4 Amendments to Affordable Housing Ordinances ... 38

## List of Tables

Table 1: Population Trends, 1990-2010 ........ 5
Table 2: Demographic Indicators, 2010 ........ 6
Table 3: Population by Age, 2010 ........ 6
Table 4: Housing Characteristics, 2010 ........ 8
Table 5: Housing Affordability as a Percentage of Household Income, 2010–2014 ........ 9
Table 6: Occupation of Employed Civilian Population Aged 16 and Over, 2010–2014 . 10
Table 7: Household Income, 2010–2014 ........ 10
Table 8: Prior Round (1987–1999) Compliance Plan Summary ........ 13
Table 9: Rental Bonus Credits Prior Round Obligation (1987-1999) ........ 25
Table 10: Third Round (1999–2015) Compliance Plan Summary ........ 27

## List of Appendices

Appendix A: Settlement Agreement
Appendix B: December 31, 2016 Order of the Court
Appendix C: MR–AH–8 Zone Ordinance
Appendix D: DVT Enterprises, LLC (Maplewood Estates) Settlement Agreement
Appendix E: Ordinance No. 6-17
Appendix F: MF–AH–7 Zone Ordinance
Appendix G: Ordinance No. 8-17
Appendix H: Spending Plan
Appendix I: Affirmative Marketing Plan
Appendix J: Amended Affordable Housing Ordinance

# 1.0 INTRODUCTION

Jackson Township has been engaged in affordable housing activities under the auspices of the Court for over 25 years. In November 1992, the Jackson Township Planning Board prepared a Housing Element of the Master Plan addressing its first cycle (1987–1993) Council on Affordable Housing (COAH) mandated affordable housing obligation. The Housing Element was adopted by the Planning Board on January 26, 1993. A Fairness Hearing was conducted by the Court and, with the recommendation of the Court-appointed Special Master, the Court approved the Township's first cycle plan and a Judgment of Compliance and Repose was entered on October 29, 1993. The Judgment of Compliance and Repose granted the Township six years of protection from exclusionary zoning challenges.

In 1994, COAH issued its cumulative (1987-1999) first and second housing cycle (round) municipal affordable housing obligations. In early 1999, the Township embarked upon the process of developing a cumulative affordable housing compliance plan (Housing Element and Fair Share Plan) under the auspices and protection of the Court. A Draft Housing Element was prepared in November 2000 and submitted to the Court Special Master for review. The Draft Housing Element included a request for reduction of the Township's obligation under COAH's "1,000-unit cap rule", a "senior cap" waiver request, and a request for 247 credits under the "credits without controls rule". The ultimate resolution of these issues and other circumstances (incl.: the issuance of new COAH rules; an additional third round obligation; the subsequent challenge and modification of said rules; and, necessary modifications to the Hovbilt [Site No. 6] and Leigh at Jackson [Site No. 2] affordable housing developments) delayed the preparation of the Township's Cumulative (1987-1999) Affordable Housing Compliance Plan until late 2007. On January 14, 2008, the Planning Board adopted a Housing Element and Fair Share Plan, which was subsequently endorsed by the Township Council on January 22, 2008.

Since the adoption of the 2008 Housing Element and Fair Share Plan, the Township has continued to pursue and process affordable housing production opportunities under the auspices of the Court. On June 29, 2011, the Court issued a Consent Order Incorporating Stipulation of Settlement between Leigh Realty Company, the Jackson Township Planning Board and Jackson Township with respect to Affordable Housing Site No. 2 (formerly Leigh at Jackson). On November 23, 2011, the Court issued an Order granting the relief sought by the Township to modify the Second Amendment to the Hovbilt, Inc. and Jackson Township Affordable Housing Agreement with respect to Affordable Housing Site No. 6. The Order further provided that the Township revise its Compliance Plan to reflect changes to the 2008 Housing Element and Fair Share Plan as a result of the Settlement Agreements affecting Affordable Housing Sites Nos. 2 and 6, and to further conduct a compliance hearing on said plan "… to demonstrate compliance with its prior round and rehabilitation obligations and credits towards its future third round obligation…".

On November 19, 2012, the Planning Board adopted an Amended Housing Element and Fair Share Plan to address the requirements of the November 23, 2011 Order of the Court (i.e., to demonstrate compliance with Township's prior round and rehabilitation obligations and credits toward its future, but at that time, undetermined, third round obligation). The Township Council, on November 20, 2012, endorsed the Amended Housing Element and Fair Share Plan adopted by the Planning Board.

Subsequent to the adoption of the 2012 Plan, and notwithstanding the substantial period of time during which there were no third round rules or a definitive third round affordable housing obligation, the Township continued to pursue and foster affordable housing opportunities aimed at the creation of number of additional affordable units.

The New Jersey Supreme Court, in its decision in March of 2015, In re N.J.A.C. 5:96 and 5:97, 221 N.J. 1 (2015) (Mount Laurel IV), transferred the evaluation of municipal compliance with the Mount Laurel doctrine from COAH to the trial courts. On July 7, 2015, the Township filed a motion for a Declaratory Judgment (IMO Township of

Jackson, County of Ocean, Docket No. OCN-L-001879-15) seeking the declaration of the Court of its compliance with the Mount Laurel doctrine and the Fair Housing Act (N.J.S.A. 53:27D-301 et seq.) in accordance the Court's Mount Laurel IV decision. Fair Share Housing Center, Inc. (FSHC), Highview Homes and EL @ Jackson were granted intervenor status in separate Orders of the Court.

After the filing of the Declaratory Judgment action, the Township and FSHC participated in numerous conferences, motions, appeals, and other proceedings, and with the assistance of the Court's Special Master, Philip Caton, PP, FAICP, ultimately reached a settlement agreement with FSHC and Highview Homes. This agreement, hereinafter referred to as the Settlement Agreement, was dated October 25, 2016 and signed by both FSHC and Highview Homes, and is attached hereto as Appendix A and sets forth the Township's second and third round fair share obligations and a compliance plan to address the obligations.

The Settlement Agreement, and the preliminary compliance plan for the period from 1987 to 2025 that is contained therein, were the subject of a Fairness and Preliminary Compliance hearing before the Honorable Mark A. Troncone, J.S.C., on December 16, 2016. Based upon the testimony of the Court Master and the recommendations set forth in his report entitled *Master's Report for a Mount Laurel Fairness and Preliminary Compliance Hearing, Township of Jackson, Ocean County, New Jersey, IMO Application of the Township of Jackson, Docket No. OCN-L-1879-15*, Judge Troncone issued an Order, dated December 31, 2016 (attached hereto as Appendix B). The Order approved the Settlement Agreement, the obligations established, and compliance mechanisms therein, and contained a further finding that the Township's preliminary compliance plan is "facially constitutionally compliant and provides a fair and reasonable opportunity for Jackson to meet its obligation under Mount Laurel IV", subject to the "Court's approval by way of a Final Compliance Hearing."

This Amended Housing Element and Fair Share Plan is intended to: demonstrate satisfaction of the Township's affordable housing obligations, and the other provisions

*Amended Housing Element and Fair Share Plan*
*June 8, 2017*

and conditions established pursuant to the Settlement Agreement and Judge Troncone's December 31, 2016 Order; and, following a Final Compliance hearing, receive Final Judgment of Compliance and Repose for the period 1987 to 2025.

*Page 4*

## 2.0 Analysis of Demographic, Housing and Employment Characteristics

In accordance with the provisions of the Fair Housing Act and applicable regulation, this housing element contains the following discussion of the Township's demographic, housing, and economic characteristics. The information provided in this section has been compiled from the US Census Bureau, and the New Jersey Department of Labor and Workforce Development.

### *2.1 Jackson's Demographics*

At the time of the 2000 US Census, the Township of Jackson had a population of 42,816 residents (Table 1). This figure represents a 28.8 percent increase over the 33,233 residents that were counted at the time of the 1990 US Census. The Township of Jackson continues to grow considerably, as evidenced by the US Census Bureau's 2010 population estimate of 54,856 residents, which represents a 28.1 percent increase in population in the Township between 2000 and 2010.

**Table 1: Population Trends, 1990-2010**

| | 1990 | 2000 | 2010 | % Change 1990-2000 | % Change 2000-2010 |
|---|---|---|---|---|---|
| **Township of Jackson** | 33,233 | 42,816 | 54,856 | 28.8 | 28.1 |

Source: US Census Bureau (1990, 2000 and 2010)

According to the 2010 US Census, the Township's population is composed of 19,417 households (Table 2). The Township's average household size of 2.80 is greater than both the County's and the State's. It is noted that the Township's percentage of population that is 65 years or older, 14.8 percent, is significantly less than the percentage that is represented at the County level, but more than the percentage that is represented at the State levels. The median household income of Jackson Township, which at the time of the 2010 US Census was estimated to be $89,463, is significantly higher than the estimated median household income at the County and State levels. The median age of 41.6 years that describes Jackson's residents is lower than at the County level, but higher than at the State level.

**Table 2: Demographic Indicators, 2010**

| | Number of Households | Average Household Size | Median Age | % of Population ≥ 65 years | Median Household Income |
|---|---|---|---|---|---|
| **Township of Jackson** | 19,417 | 2.80 | 41.6 | 14.8 | $89,463 |
| **Ocean County** | 221.111 | 2.58 | 42.6 | 21.0 | $59,565 |
| **New Jersey** | 3,214,360 | 2.68 | 39.0 | 13.5 | $69,400 |

Source: US Census Bureau; American Community Survey (Median Household Income)

With regard to the age-structure of the Township's population, the 2010 US Census reported that there were 2,949 pre-school age children in Jackson, which was 5.4 percent of the total population (Table 3). School age children accounted for 11,920 residents, or 21.8 percent of the total population. Working age individuals accounted for 31,864 residents, or 58.1 percent of the total population. Finally, those aged 65 years or older accounted for 8,123 residents, which equated to 14.8 percent of the 2010 population.

**Table 3: Population by Age, 2010**

| | Number | % of Total |
|---|---|---|
| **Pre-School Age** | | |
| Under 5 Years | 2,949 | 5.4 |
| **School Age** | | |
| 5 to 9 Years | 3,709 | 6.8 |
| 10 to 14 Years | 4,222 | 7.7 |
| 15 to 19 Years | 3,989 | 7.3 |
| **Working Age** | | |
| 20 to 24 Years | 2,737 | 5.0 |
| 25 to 34 Years | 5,073 | 9.3 |
| 35 to 44 Years | 7,929 | 14.4 |
| 45 to 54 Years | 9,579 | 17.5 |
| 55 to 59 Years | 3,312 | 6.0 |
| 60 to 64 Years | 3,234 | 5.9 |
| **Senior Age** | | |
| 65 Years and Older | 8,123 | 14.8 |

Source: US Census Bureau

## 2.2 Jackson's Housing Stock

According to the 2010 US Census, Jackson had a total of 20,342 housing units (Table 4). This was an increase of 5,704 units since the 2000 US Census. Of the total number of housing units in existence at the time of the 2010 US Census, 19,417 units, or 95.5

percent, were listed as occupied; owners occupied 87.2 percent of these units, while renters occupied 12.8 percent. The percentage of renter-occupied units is lower than at the County level, where 18.9 percent of all occupied housing units are occupied by renters.

The 2010 US Census reported an average household size in Jackson Township of 2.80 persons, and an average family size of 3.21 persons. These sizes are higher than the corresponding figures for the County. Of the total number of households, family households accounted for 15,042, or 77.5 percent, and non-family households[1] accounted for 4,375, or 22.5 percent.

A total of 10.2 percent of the Township's housing stock was estimated to have been constructed before 1960, and the estimated median year of construction was 1988. The median year of construction is more recent than that of the County and of the State, where it is 1978 and 1966, respectively.

In addition to the above, it is noted that the Township's housing stock is in fair condition. This is evidenced by the fact that the rehabilitation share of old, overcrowded and deficient housing is just 28 units, which represents about one-half of one percent (0.5) of all housing units. Further evidence of the fair condition of the Township's housing stock is provided by the fact that only 137 units (about 0.7 percent of all units) lacked complete plumbing facilities, and only 104 units (about 0.5 percent of all units) lacked complete kitchen facilities. It is also noted that only about 0.7 percent of all occupied units reported overcrowded conditions (1.01 occupants or more per room) in 2010, according to US Census Bureau 2010–2014 estimates.

Regarding housing values, it is noted that the median value of the owner-occupied

---

1 A non-family household is present when a householder lives alone, or when the householder shares the home exclusively with people to whom he or she is not related.

housing units in Jackson during 2010 was estimated to be $324,600. This is greater than the County median value of $264,100, and the State median value of $319,900. Jackson Township's estimated median gross rent of $1,168 is also higher than the County and State median gross rents of $1,139 and $1,046, respectively.

**Table 4: Housing Characteristics, 2010**

| | Number | % of Total |
|---|---|---|
| **Housing Units** | | |
| Number of Units | 20,342 | 100.0 |
| Occupied Housing Units | 19,417 | 95.5 |
| Vacant Housing Units | 925 | 4.5 |
| Number of Units (2000) | 14,638 | 100.0 |
| **Occupancy/Household Characteristics** | | |
| Number of Households | 19,417 | 100.0 |
| Persons Per Household | 2.80 | N/A |
| Family Households | 15,042 | 77.5 |
| Non-Family Households | 4,375 | 22.5 |
| **Year Structure Built*** | | |
| 2010 or Later | 198 | 1.0 |
| 2000 to 2009 | 5,898 | 28.4 |
| 1990 to 1999 | 3,542 | 17.0 |
| 1980 to 1989 | 3,661 | 17.6 |
| 1970 to 1979 | 2,919 | 14.0 |
| 1960 to 1969 | 2,469 | 11.9 |
| 1950 to 1959 | 993 | 4.8 |
| 1940 to 1949 | 499 | 2.4 |
| 1939 or Earlier | 624 | 3.0 |
| **Condition of Units*** | | |
| Lacking Complete Plumbing Facilities | 137 | 0.7 |
| Lacking Complete Kitchen Facilities | 104 | 0.5 |
| **Home Value (Owner-Occupied Units)*** | | |
| $300,000 or More | 9,874 | 57.8 |
| $200,000 - $299,999 | 4,756 | 27.8 |
| $150,000 - $199,000 | 965 | 5.6 |
| $100,000 - $149,000 | 306 | 1.8 |
| $50,000 - $99,999 | 281 | 1.6 |
| $0 - $49,999 | 902 | 5.3 |
| **Median Value** | $324,600 | N/A |
| **Median Rent *** | | |
| $1,499 or More | 639 | 23.8 |
| $1,250 - $1,499 | 466 | 17.4 |
| $1,000 - $1,249 | 724 | 27.0 |
| $500 - $999 | 706 | 26.3 |
| $0 - $499 | 150 | 5.6 |
| **Median Rent** | $1,168 | N/A |

Source: US Census Bureau
Note: (*) 2010–2014 5-Year American Community Survey Estimates of the US Census Bureau

Housing units that have a monthly cost of less than 30 percent of gross household income are considered to be affordable. In the Township of Jackson, a total of 60.6 percent of all owner-occupied housing units and 36.6 percent of renter-occupied housing units were estimated to be affordable (Table 5).

**Table 5: Housing Affordability as a Percentage of Household Income, 2010–2014**

| | Number | % of Total |
|---|---|---|
| **Selected Monthly Owner Costs** | | |
| < 20% | 5,654 | 33.1 |
| 20% to 24% | 2,619 | 15.3 |
| 25% to 29% | 2,073 | 12.1 |
| 30% or More | 6,676 | 39.1 |
| Not Computed | 62 | 0.4 |
| **Gross Rent** | | |
| < 15% | 91 | 3.3 |
| 15% to 19% | 253 | 9.1 |
| 20% to 24% | 294 | 10.6 |
| 25% to 29% | 379 | 13.6 |
| 30% or More | 1,644 | 59.1 |
| Not Computed | 120 | 4.3 |

Source: 2010–2014 5-Year American Community Survey Estimates of the US Census Bureau

## 2.3 *Jackson's Employment Characteristics*

The 2010–2014 American Community Survey (ACS) estimates that 26,205, or about 58.9 percent, of Jackson Township's residents aged 16 and over were employed in the civilian labor force (Table 6). Of those who are employed in the civilian labor force: 37.6 percent are in management, professional, and related occupations; 14.9 percent are in service occupations; 27.7 percent are in sales and office occupations; 11.5 percent are in natural resources, construction, extraction, and maintenance occupations; and, 8.3 percent are involved in production, transportation, and material moving occupations.

**Table 6: Occupation of Employed Civilian Population Aged 16 and Over, 2010–2014**

| | Number | % of Total |
|---|---|---|
| **Management, Professional, Related** | 9,856 | 37.6 |
| **Service** | 3,905 | 14.9 |
| **Sales, Office** | 7,261 | 27.7 |
| **Natural Resources, Construction, Extraction, Maintenance** | 3,010 | 11.5 |
| **Production, Transport., Material Moving** | 2,173 | 8.3 |

Source: 2010–2014 5-Year American Community Survey Estimates of the US Census Bureau

In 1999, the median household income in Jackson was $65,218. According to US Census Bureau estimates, it had risen to $87,629 by 2014 (Table 7). At first glance this may seem like a significant increase. However, it is noted that when these values are inflation-adjusted to 2014 dollars[2], the median income has actually decreased by $5,045 or 5.4 percent.

**Table 7: Household Income, 2010–2014**

| | Number | % of Total |
|---|---|---|
| **< $10,000** | 479 | 2.4 |
| **$10,000 to $14,999** | 539 | 2.7 |
| **$15,000 to $24,999** | 1122 | 5.6 |
| **$25,000 to $34,999** | 1316 | 6.6 |
| **$35,000 to $49,999** | 1768 | 8.9 |
| **$50,000 to $74,999** | 3,261 | 16.4 |
| **$75,000 to $99,999** | 2,784 | 14.0 |
| **$100,000 to $149,999** | 4,879 | 24.6 |
| **$150,000 to $199,999** | 2,219 | 11.2 |
| **$200,000 or More** | 1,498 | 7.5 |
| **Median Household Income (Dollars)** | $87,629 | N/A |

Source: 2010–2014 5-Year American Community Survey Estimates of the US Census Bureau

With regard to the number of jobs that are located within the Township, it is noted that the New Jersey Department of Labor and Workforce Development indicates that there was an average of 11,538 jobs located within the municipality during 2015, which is the latest data available. This represents an increase of approximately 34.0 percent over the 2005 average of 8,609 jobs. The Department of Labor and Workforce Development's basis for this information is jobs that are covered by public unemployment and disability insurance.

2 The 1999 median household income of $65,218 has the same purchasing power as $92,674 in 2014.

## 3.0   MUNICIPAL FAIR SHARE OBLIGATION

Pursuant to the October 25, 2016 Settlement Agreement approved by Judge Troncone's December 31, 2016 Order, the Township's fair share obligation for the period from 1987 through June 30, 2025 is comprised of three components, as follows:

- Rehabilitation Obligation: 28 units
- Prior Round (1987-1999) Obligation: 1,247 units
- Third Round (1999-2025) Obligation: 1,250 units

In accordance with the terms of the Court-approved Settlement Agreement, implementation of this Housing Plan will satisfy the Township's third round obligation through June 30, 2025. The Settlement Agreement, however, did not resolve certain issues related to the application of the cap provided in Section 307.e. of the Fair Housing Act, N.J.S.A. 52:27D-307.e., but did provide that to the extent the issues are resolved in future decisions of the courts, an administrative agency responsible for implementing the Fair Housing Act, or an action by the New Jersey Legislature, any adjustment in to the third round obligation would be addressed in future compliance rounds in accordance with the then-applicable law.

# 4.0 COMPLIANCE PLAN

The following sections demonstrate and detail the satisfaction of the three components of the Township's fair share obligation for the period from 1987 through 2025.

## *4.1 Rehabilitation Obligation*

Per the Court-approved settlement agreement, the Township's 2010 rehabilitation obligation is 28 units. In July 2012, the Township re-established its former rehabilitation program to build upon the success of its earlier program. The current program is funded with a total of $1,380,000 from the Township's affordable housing trust fund, and is administered by Rehabco, Inc. The program has completed 17 units since the 2012 restart, with an average cost of $17,238. In addition, three units have been rehabilitated since 2010 under the Ocean County HUD HOME program, with an average cost of $28,246. The average cost of the twenty units rehabilitated in the Township since 2010 is $18,889. The Township is currently entitled to claim 20 credits toward its 28-unit rehabilitation obligation. However, the Township is committed to expend the entire $1,380,000 committed to rehabilitation under its current Spending Plan towards rehabilitation through 2025 and will continue to satisfy its rehabilitation obligation and beyond with that commitment.

## *4.2 Prior Round Obligation*

Per the Court-approved Settlement Agreement, the Township's prior round (1987–1999) obligation is 1,247 units, which is met through the mechanisms in Table 8, Prior Round (1987-1999) Compliance Plan Summary (below).

**Table 8: Prior Round (1987–1999) Compliance Plan Summary**

| Compliance Mechanism | Affordable Units | Rental Bonus Credits | Total Credits |
|---|---|---|---|
| ***Prior Cycle Credits (April 1, 1980 — December 15, 1986)*** | | | |
| Credits without Controls | 205 | 0 | 205 |
| Group Home | 5 | 0 | 5 |
| ***RCAs*** | | | |
| Trenton (Completed) | 50 | 0 | 50 |
| ***Built Affordable Units (After December 15, 1986)*** | | | |
| Site No. 1 — Willow Point (Family Rental) | 100 | 100 | 200 |
| Site No. 3 — West Lake Village (Senior Rental) | 150 | 0 | 150 |
| Bella Terra (Assisted Living; Senior Rental) | 11 | 0 | 11 |
| Sunrise (Assisted Living; Senior Rental) | 2 | 0 | 2 |
| Orchards at Bartley (Assisted Living; Senior Rental) | 15 | 0 | 15 |
| Colonial Arms (Senior Rental) | 24 | 0 | 24 |
| Tomorrow's Hope (Special Needs) | 5 | 5 | 10 |
| Windsor Crescent/CIS (Family Rental) | 111 | 111 | 222 |
| Arc of Ocean (Special Needs) | 4 | 4 | 8 |
| Habitat for Humanity (Block 2401, Lot 16; Family Sale) | 1 | 0 | 1 |
| ***Proposed Affordable Units*** | | | |
| Site No. 6 — Hovbilt (Family Rental/For-Sale) | 220 | 0 | 220 |
| Site No. 2 — Leigh (Jackson Woods; 159 Family For-Sale; 72 Family Rental) | 231 | 39 | 270 |
| **Totals** | **1,134** | **259** | **1,393** |

The individual components of the Township's prior round compliance plan set forth in Table 8 are detailed in the following sections:

### *4.2.1 Prior Cycle Credits*

Jackson Township claims 210 credits toward satisfying its prior round obligation with crediting detailed below:

**Credits without Controls**

Jackson Township claims 205 credits for the creation of affordable housing units resulting from free market residential development that occurred between April 1, 1980 and December 15, 1986. The Township will apply these credits toward satisfying its prior round obligation.

Pursuant to N.J.A.C. 5:93-3.2(b), a municipality may earn credits for affordable housing units developed via free market residential development provided that:

1. The date of construction of the unit is within the time period specified and is confirmed by a certificate of occupancy.

2. The unit is certified to be in sound condition as a result of an exterior inspection by a licensed building inspector.

3. The unit is currently occupied by a low- and moderate-income household. Household income is to be certified by the head of household on a form designed and accepted by COAH.

4. If the unit is a for sale unit, the unit shall have a market value that is affordable to be a moderate-income household pursuant to the requirements of N.J.A.C. 5:93-7.4(a) and (e). The market value of each such unit is no greater than a sales price determined by averaging the reported actual sales prices of three comparable housing units from the municipality that can be documented as being arms length, closed sales transactions and which occurred within one year of the date of filing of the petition.

5. If the unit is a rental unit, the unit shall have a monthly rent that is affordable to a moderate-income household pursuant to the requirements of N.J.A.C. 5:93-7.4(a) and (f) and the rental unit must be an arms length transaction.

In Summer 1998, the Township initiated an extensive "credits without controls" survey in an effort to determine the number of residential dwelling units that qualify as affordable units pursuant to N.J.A.C. 5:93-3.2(b). Survey forms were mailed to approximately 700 residential units that were identified as rental units with an assessed value of $125,000 and were constructed between April 1, 1980 and December 15, 1986. A total of 491 responses were received by the Court Master.

A structural conditions survey of eligible units was undertaken by the Township's building inspectors during March 2007. Using the results of this survey, the Court Master determined that six (6) units did not meet the "sound condition" criteria set forth above, and subsequently recommended the approval of the Township's petition to apply 194 "credits without controls" toward satisfying its prior round obligation. The Honorable Eugene D. Serpentelli, A.J.S.C., approved the Court Master's recommendation by Order dated June 21, 2007.

On January 8, 2008, the Court Master issued a letter advising the Township of its eligibility to claim eleven (11) additional "credits without controls", due to an increase in the maximum and rental sale prices permitted by COAH. After evaluating the responses from the Township's "credit without controls" survey in the context of COAH-determined maximum affordable rental and sale prices, the Court Master determined that the Township is eligible to apply 205 "credits without controls" toward satisfying its prior round obligation. Therefore, the Township claims 205 "credits without controls", and will apply these credits toward satisfying its prior round obligation.

**Alternative Living Arrangements Facilities**

The Township claims five (5) prior cycle credits for the Developmental Services of New Jersey, Inc. facility, which is located at 76 Buckingham Drive (Block 75.28, Lot 14). This five (5) bedroom group home for mentally challenged adults was issued a certificate of occupancy in 1985. Although Developmental Services of New Jersey, Inc. has ceased operations at the facility, the facility was operational for a minimum of ten years and, therefore, qualifies for crediting.

### *4.2.2 Regional Contribution Agreements (RCAs)*

The Township claims 50 credits from approved Regional Contribution Agreements (RCAs), as outlined below:

**Vista Center (Affordable Housing Site No. 1)**

On December 21, 1999, the Honorable Eugene Serpentelli approved an amendment to Jackson Township's 1993 Affordable Housing Plan whereby the developers of the Vista Center Planned Mixed-Use Development (PMUD) were permitted to satisfy a portion of their affordable obligation via a payment in lieu to fund a 50-unit RCA agreement with the City of Trenton at the then-permitted rate of $20,000 per unit. The Township and the City of Trenton subsequently entered into an RCA. The agreement was approved by the various agencies having jurisdiction, and the agreement implemented. All monies were transferred and the agreement concluded by the end of 2005.

### *4.2.3 Built Affordable Units (Post December 15, 1986)*

The Township claims 433 credits for new affordable housing units built in the Township since 1986. Details of this crediting are provided below:

**Vista Center/Willow Pointe (Affordable Housing Site No. 1)**

In the Township's first cycle Compliance Plan, Vista Center was identified as Affordable Housing Site No. 1. The original proposal in 1987 was for a large, mixed-use development on 1,300 acres that would include a golf course, commercial development, office space, light manufacturing, and a variety of residential housing types totaling approximately 2,800 dwelling units. The Planning Board's approval of the Master Development Plan was conditioned on the developer providing 280 low- and moderate-income units. The developer subsequently reduced its proposal to 800 age-restricted and 190 single-family detached homes, and the revised plan was approved by the Planning Board on April 27, 1999, subject to the applicant entering into an agreement with the Township with respect to the affordable housing obligation. An agreement was entered into by Jackson Township and Vista Center Associates on September 13, 1999. The agreement included the provision of 100 income-restricted family rental units in section AH-1 of the project. The units have been completed and the final certificate of occupancy has been issued. As a family rental project, the units are eligible for one-for-one rental bonus crediting.

In addition the Vista Center Associates agreed to pay $1,000,000 to fund 50 Regional Contribution Agreement (RCA) units (see Section 4.2.2 above) and non-residential affordable housing fees in accordance with the Township's Affordable Housing Development Fee Ordinance.

**West Lake Village (Affordable Housing Site No. 3)**

The West Lake Village project was identified as Affordable Housing Site No. 3 with an affordable housing obligation of 60 units in the first cycle compliance plan. The site is located between South Boston Road and Cooks Bridge Road. In accordance with the agreement between the Township and the developers of Westlake Village, LLC, which was dated September 13, 1999, the developers were to construct 150 units of age- and income-restricted rental housing. The Court approved the amendment of the Township's 1993 plan to permit the project on December 21, 1999. All 150 units have been constructed and are fully occupied. The final Certificate of Occupancy was issued on February 11, 2003.

**Bella Terra**

Bella Terra is an assisted living facility, which is located at 2 Kathleen Drive in Jackson Township. The facility contains 107 assisted living facility beds. In accordance with regulatory requirements, twenty percent of the assisted living rental beds must be set aside for Medicaid residents. In the case of the Bella Terra assisted living facility, twenty percent of the total number of beds have been set aside for occupation by Medicaid residents.

Pursuant to N.J.A.C. 5:97-6.11, a municipality may receive one credit for each Medicaid unit within an assisted living facility. Therefore, making the most conservative assumptions that all the low-income units are two-bedroom units and occupied by related individuals, the Township claims eleven (11) credits toward satisfying its prior round obligation based on the following formula: *(107 Assisted Living Facility Beds × 0.20 Set Aside) ÷ 2 Beds per Bedroom = 11 Units of Credit.*

**Sunrise**

Sunrise of Jackson is an assisted living facility that is located at 390 County Line Road in Jackson Township. The facility contains 75 assisted living facility bedrooms with a total of 100 beds. Per agreement with the Township dated May 10, 2007, the owner agreed to restrict ten (10) units within the facility to Medicaid recipients.

Pursuant to N.J.A.C. 5:97-6.11, a municipality may receive one credit for each Medicaid unit in an assisted living facility. Therefore, the Township claims ten (10) credits toward satisfying its prior round obligation.

**Care One at Jackson**

Care One at Jackson is a senior care facility, which is located at 11 History Lane in Jackson Township. The facility offers post-acute specialty services and long-term care to its clients. At present, Care One at Jackson contains sixteen (16) comprehensive personal care beds. In accordance with regulatory requirements, a minimum of twenty percent of the personal care units are set aside for low-income residents. Therefore, the Township claims two (2) credits toward satisfying its prior round obligation based on the following formula: *(16 Comprehensive Personal Care Beds × 0.20 Set Aside) ÷ 2 Beds per Bedroom = 2 Units of Credit.*

**The Orchards at Bartley**

The Orchards at Bartley is a 72-unit assisted living facility that is located at 175 Bartley Road. This facility was awarded $9,981,591.00 in revenue bonds from the New Jersey Healthcare Facilities Finance Authority. In accordance with regulatory requirements, twenty percent of the assisted living rental units must be set aside for low-income residents. Fifteen (15) rental units are set aside for individuals whose income does not exceed 50 percent of median income for the region. The site received a certificate of occupancy on September 17, 2001.

**Colonial Arms**

The Township is claiming 24 credits for a multi-family rental project on West Veteran's Highway known as Colonial Arms (Block 12001, Lot 5). This project was financed with funding from the U.S. Department of Agriculture (USDA) through a Section 515 Rural Rental Housing Loan. Eligible tenants include: low-income seniors; and; low-income handicapped or disabled persons, regardless of age. Colonial Arms is comprised of three buildings. Eighteen units are located in Building A, which received a Certificate of Occupancy in 1964. No credits can be claimed for these units, which were built before 1980. Another 24 deed-restricted units were located in Buildings B and C, which received Certificates of Occupancy in 1988. The 24 units had been deed-restricted for a minimum of twenty years prior to the expiration of the affordability controls in 2007, and, hence, the Township may claim crediting for these units.

**Tomorrow's Hope**

In addition to the prior cycle credits for alternative living arrangement facilities, the Township claims five (5) rental credits for Tomorrow's Hope alternative living arrangement facility, which received a certificate of occupancy on September 30, 1994. This five (5) bedroom group home for developmentally disabled adults is located at 609 Henry Street (Block 91, Lot 19.03). Post-1986 alternative living arrangement units are eligible for rental bonus crediting.

**Windsor Crescent/Community Investment Strategies (CIS)**

Windsor Crescent, located on Solar Avenue, is a 100-percent affordable, family rental development, which was built and occupied in 2011 and contains 111 dwelling units. The project is situated on a 20.5-acre tract of land that was assembled by the Township, and developed by Community Investment Strategies, Inc., which maintains its offices at 201 Crosswicks Street, Bordentown, NJ 08505. The development was financed with Low-Income Housing Tax Credits (LIHTCs) and subsidies from the New Jersey Department of Community Affairs (NJDCA) and the New Jersey Housing and Mortgage Finance Agency (HMFA) and, as such, has qualifying affordability controls. As a family rental project, the units are eligible for one-for-one rental bonus crediting.

**ARC of Ocean County**

The Township claims four (4) rental credits for special needs housing units provided by the ARC of Ocean County, which received a certificate of occupancy in March 1, 2009. The four (4) bedroom group home for developmentally disabled adults is located at 76 Buckingham Drive (Block 13203, Lot 2). Units (i.e., bedrooms) in post-1986 alternative living arrangements are eligible for rental bonus credits.

**Habitat for Humanity**

One (1) unit of credit is claimed for a family for-sale unit located at 490 Cedar Swamp Road (Block 4201, Lot 16). The unit was constructed by Habitat for Humanity on donated land, and was issued a certificate of occupancy on August 25, 2011. The unit was affirmatively marketed and 30-year affordability controls were established in the deed of sale, which was dated August 26, 2011.

### *4.2.4 Proposed Affordable Units*

The Township claims 423 units/credits in its 1987-1999 cumulative plan for two projects included in prior Court-approved plans that, to date, have not been constructed. Details involving these projects are provided in the following subsections.

**Hovbilt (Affordable Housing Site No. 6)**

In 1999, the Township sought Court approval to amend its 1993 Plan to include the Fairview at Jackson (Hovbilt) site in its affordable housing plan, and to approve an agreement between Hovbilt and the Township to accept a payment in lieu for low- and moderate-income units otherwise to have been built within the development. The agreement called for the full funding of a 97-unit RCA at the rate of $20,000 per unit. Upon favorable recommendation of the Court Master, Philip Caton, and after a Fairness Hearing on December 21, 1999, the Plan amendment and developers agreement were approved by Order of the Honorable Eugene Serpentelli on January 10, 2000.

In April 2007, the Township petitioned the Court to amend its January 10, 2000 Order to allow the amendment of the Developer's Agreement with the Township to convert the

developer funding of a 97-unit RCA to an age-restricted inclusionary project with a 15 percent low- and moderate-income set aside in a project of up to 1,275 units. This modification would have produced up to 192 low- and moderate-income, age-restricted units. Upon favorable recommendation of the Court Master and having conducted a compliance hearing on the matter, the Honorable Eugene Serpentelli issued an Order dated June 21, 2007, which approved the amendment of the Township's Plan and the developer's agreement. As part of the Court Order, Hovbilt agreed to a range of affordability and pricing stratification of the inclusionary affordable units geared toward making additional units available to households with incomes of 30 percent of the regional median household income. The Township has agreed to apply for subsidies to write down the affordability of the inclusionary units, such that additional units may be available to households at or below 30 percent of the regional median, above and beyond that which had already been agreed to by Hovbilt.

The Court, under the scope of its review during the December 21, 1999 Fairness Hearing, determined the property to be approvable, available, developable and suitable as defined in N.J.A.C. 5:93-1.3. On April 2, 2007, the Jackson Township Planning Board granted conditional Preliminary and Final Major Site Plan and Subdivision approval to Sections 1 and 2 of the proposed development, which consisted of 965 units.

The Township and Hovbilt entered into a further agreement (i.e., Second Amendment to the Hovbilt, Inc. and Jackson Township Affordable Housing Agreement). This agreement was approved by Order of the Court dated November 23, 2011, after a conducting a Compliance Hearing on November 10, 2011. The Second Amendment to the Affordable Housing Agreement allowed Hovbilt, or its assign, to sell approximately 290 acres to the Trust for Public Land, to be added to the State-owned Collier's Mill Wildlife Area.

The lands to be conveyed to the Trust for Public Land included an area containing approximately 63 dwelling units approved in 2007 as part of General Development Plan (GDP) for 965 units, as well as an area contemplated for an additional 310 units under the prior Affordable Housing Agreement. The parties to the Second Amendment to the

Affordable Housing Agreement also agreed to include a provision that Hovbilt shall set aside 192 units for inclusionary affordable housing as part of the 902 units previously approved as part of the GDP that remains after removal of the subject property as sold to TPL. Jackson and Hovbilt further agreed that Hovbilt could apply to amend the approvals to include up to 1,100 units on the property still owned by Hovbilt of which 20% would be set aside for affordable housing, with a minimum of 192 affordable units. The Second Amendment provided that in the event final approval for 902 units is reduced as a result of "…a change in state, county or local legislation, regulations, permitting or determinations that limit the development of the Property, Jackson and Hovbilt reserved the right to request an appropriate reduction in the number of affordable housing units through a further hearing before this Court…".

The Second Amendment was signed and approved by the Court and the lands conveyed to the Trust for Public Land in 2012. Hovbilt subsequently filed for bankruptcy and the Hovbilt Site was sold in a Bankruptcy Court proceeding to M&M at Jackson, LLC. The Township was subsequently advised that a new entity, EL at Jackson, LLC, had been formed and assumed the ownership, rights, and obligations of Hovbilt. On September 16, 2016, a Consent Order was entered providing for the rezoning of the former Hovbilt site. Appendix C provides a copy of an ordinance, which is scheduled to be introduced by the Township Council on June 13, 2017 and considered for adoption on June 27, 2017, and which creates a new Mixed Residential–Affordable Housing–8 (MR-AH-8) Zone and rezones the former Hovbilt site (Affordable Housing Site No. 6) in a manner that is consistent with the September 16, 2016 Consent Order, the Settlement Agreement and the prior Affordable Housing Agreements related to the site.

The zoning permits non-age-restricted mixed residential dwelling unit buildings, including detached single-family and two-family dwellings, as well as multi-family development. The zoning permits up to 1,100 dwelling units and requires 20 percent of the units to be set aside for low- and moderate-income households, with 17 percent of the affordable units to be set aside for very low-income households. Upon adoption of the MR-AH-8 Zoning amendment,

the site will again be approvable, available, developable and suitable, and, therefore, entitle the Township to claim crediting for 220 units.

**Leigh/Jackson Woods (Affordable Housing Site No. 2)**

The Leigh/Jackson Woods project, Affordable Housing Site No. 2, was approved by the Court for inclusion in the Township's 1993 Compliance Plan. The project had received a conditional Preliminary Subdivision and Site Plan approval from the Planning Board in March 1989. The 1989 preliminary approval provided for the construction of a total of 1,641 units (311 detached single-family and 1330 multi-family dwelling units), ten percent of which (164 units) were to be set aside for low- and moderate-income households. The Planning Board, on October 15, 2007, voted to deny Final Subdivision and Site Plan approval for Section C of the project and determined that the preliminary approval granted in 1989 for the entire project had lapsed.

Leigh Realty Company subsequently filed several legal challenges to actions taken by the Planning Board and Township related to land development applications made for the property. After lengthy mediation under the guidance of the Court Master, Leigh Realty Company, the Township and Planning Board reached a settlement of these legal challenges. A Consent Order Incorporating Stipulation of Settlement was entered by the Honorable Vincent J. Grasso, A.J.S.C. on June 29, 2011. Chief among the provisions of the Settlement Agreement and Order was the right of Leigh Realty to seek approval of 1,541 dwelling units, of which 15 percent (231) are to be set aside as low- and moderate-income units.

On June 4, 2012 the Jackson Township Planning Board granted Preliminary Major Site Plan approval to The Jackson Woods project for 1,541 non-age-restricted dwelling units, of which 231 units are to be set aside for low- and moderate-income families and individuals. On August 6, 2012 the Jackson Township Planning Board granted Amended Preliminary Major Site Plan approval and Final Major Site Plan approval for the Central Portion (Phase I) of the Jackson Woods development. The approved (final) Central Portion (Phase I) consists of 510 multi-family rental units, of which 72 rental units are to set aside as affordable. Construction

of site improvements and housing units in the Central (Phase I) currently underway, with numerous buildings built and occupied.

The Southeast Section (Phase II) received amended preliminary and final subdivision approval in November 2015. The Southeast Section is to contain 553 for-sale townhomes and an 88-unit, entirely affordable family rental component to be developed by Walters Homes. Funding approval has been received from New Jersey Housing and Mortgage Finance Agency (HMFA) for the affordable units. Construction is scheduled to begin in June 2017 and is anticipated to be completed in 12 to 15 months. The Southwest Section (Phase III) is to contain 549 family rental units, of which 71 are to be reserved for low- and moderate-income households. Construction in the Southwest Section is expected to commence in 2019.

Based upon the foregoing, the Township claims 231 dwelling units and 39 rental bonus credits towards its prior round obligation for the Jackson Woods development. The Township is not eligible to claim all 72 rental units for rental bonus crediting in Central Portion (Phase 1) against its prior round obligation having reached the 259-unit rental bonus cap with the thirty-ninth unit in Phase I.

### *4.2.5 Prior Round Compliance Plan Caps and Requirements*

**Rental Bonus Credits**

Pursuant to N.J.A.C. 5:97-3.5(a), the number of rental units eligible for one-for-one rental bonus credits is limited to qualifying affordable rental units, up to the municipal rental obligation. As cited in Section 7.3 (above), the Township's rental obligation is 259 units. Jackson Township claims one-for-one rental bonus credits for 259 of existing affordable rental units developed per Table 9 (below).

**Table 9: Rental Bonus Credits Prior Round Obligation (1987-1999)**

| Project | Rental Units | Rental Bonus Credits |
|---|---|---|
| Affordable Housing Site No. 1 – Willow Point – Family Rental (100 × 1) | 100 | 100 |
| Affordable Housing Site No. 2 – Jackson Woods- Family Rental (39 × 1) | 39 | 39 |
| Tomorrow's Hope (Special Needs) – (5 × 1) | 5 | 5 |
| Windsor Crescent/CIS – Family Rental (111 × 1) | 111 | 111 |
| ARC of Ocean (Special Needs) – (4 × 1) | 4 | 4 |
| **Total** | **259** | **259** |

**Minimum Rental Obligation**

At least 259 units must be rental units in accordance with N.J.A.C. 5:97-3.10.(b) (i.e., *0.25 [Prior Round Obligation (1,247) Minus (–) Prior Cycle Credits (210)] = 259*). The Township has provided 504 rental units and, therefore, complies with this requirement.

Rental unit crediting has been generated from the following projects:

- Site No. 1 – Willow Pointe (100 Units)
- Site No. 3 – West Lake Village (150 Units)
- Bella Terra (11 Units)
- Sunrise (10 Units)
- Care One at Jackson (2 Units)
- Orchards at Bartley (15 Units)
- Colonial Arms (24 Units)
- Tomorrow's Hope (5 Units)
- Windsor Crescent/CIS (111 Units)
- ARC of Ocean (4 Units)
- Site No. 2 – Leigh (72 Units)

**Maximum RCA Credits**

Prior to P.L. 2008, c.46, enacted into law on July 17, 2008, the Township was permitted under COAH regulations to transfer a maximum of 624 units through RCA agreements.

The use RCAs as a mechanism to satisfy a portion of its obligation was effectively eliminated by this legislation. In 2005, prior to the enactment of P.L. 2008 c.46, the Township had completed the transfer 50 units to the City of Trenton through an RCA agreement, and is entitled to claim crediting for these units under the provisions of P.L. 2008, c.46.

**Maximum Age-Restricted Units**

The Township is permitted to provide a maximum of 247 age-restricted affordable units to address its prior round obligation per N.J.A.C. 5:97-3.10(c) (i.e. *.25 [Prior Round Obligation (1247)] Minus (–) Prior Cycle Credits [210] Minus (–) Transferred RCA Units [50] = 247*). The Township's prior round compliance plan provides 212 age-restricted units, and therefore complies with the maximum age-restricted unit cap. Age-restricted units have been provided as follows:

- West Lake Village (150 Units)
- Bella Terra (11 Units)
- Sunrise (10 Units)
- Care One at Jackson (2 Units)
- Orchards at Bartley (15 Units)
- Colonial Arms (24 Units)

## *4.3 Third Round Compliance Plan*

The Township claims a total of 1,250 credits, including a surplus of 146 credits from the prior round that has been carried forward toward its third round obligation. The following table (Table 10: Third Round Compliance Plan Summary), enumerates how the Township will address its Court-approved 1250-unit third round obligation.

**Table 10: Third Round (1999–2015) Compliance Plan Summary**

| Project Name | Project Location | Project Type | Affordable Units | Rental Bonus Credits | Total Credits |
|---|---|---|---|---|---|
| A. EL @ Jackson, LLC (Carried Forward from Site No. 6) | Perrineville Road | Family Rental (Units Carried Forward from Prior Round) | 146 | 0 | 146 |
| B. Holly Oaks | Block 14801, Lot 5 | Inclusionary Age-Restricted For-Sale | 5 | 0 | 5 |
| C. DVT Enterprises (Maplewood Estates) | Block 1720, Lot 173.03 | Family For-Sale | 1 | 0 | 1 |
| D. SNHPLP Program | TBD | Special Needs Housing | 8 | 0 | 8 |
| E. Leigh Realty-North Tract (Site No. 10) | Interchange of Route 195 and Route 526/527 | Mixed-Use Family Rental | 273 | 272 | 545 |
| F. Highview Homes (Site No. 15) | Block 164, Lot 2 | Inclusionary Family Rental | 40 | 40 | 80 |
| G. RG-2 Zone (Sites Nos. 12, 13, and 14) | Various | Inclusionary Family For-Sale | 175 | 0 | 175 |
| H. Remainder of RG-2 and RG-3 Zones | TBD | Inclusionary with 20-Percent Set-Aside | 290 | 0 | 290 |
| **Totals** | | | **938** | **312** | **1,250** |

The components of the Township's third round compliance plan that are set forth in Table 10 are described below:

### *4.3.1 Proposed Affordable Units*

**Hovbilt (Affordable Housing Site No. 6)**

The Township will carry forward to the third round 146 of the total of 220 affordable units in the Hovbilt project (Affordable Housing Site No. 6), which has been described in detail above.

**Holly Oaks**

A use variance to permit the construction of 28 age-restricted multi-family units and a free-standing bank was approved by the Jackson Township Zoning Board of Adjustment on August 6, 2008, and preliminary and final site plan approval of the bank and preliminary site plan approval of the residential units was approved on January 21, 2009.

The Holly Oaks development, located at the southwest corner of the intersection of Manhattan Street and Cooks Bridge Road (Block 14801, Lot 5), received amended preliminary and final site plan approval of both the bank and residential units on September 9, 2009. All approvals are conditioned upon the set aside of five (5) of the twenty-eight (28) total units as affordable units. Based upon the foregoing, the Township claims five (5) credits for the for-sale, age-restricted units to be created by this project toward its third round affordable housing obligation.

**DVT Enterprises, LLC (Maplewood Estates)**

DVT Enterprises, LLC, the owner and applicant of property known as Block 17201, Lots 1, 37, and 38, received final major subdivision approval from the Jackson Township Planning Board on May 16, 2005. The 13-lot subdivision included 12 new building lots, and a lot bearing an existing detached single-family dwelling. The approval was conditioned upon the applicant satisfying the Township's "Growth Share Ordinance." DVT Enterprises filed a complaint against the Township and Planning Board on January 30, 2009 challenging the growth share ordinance requirements. Pursuant to a Settlement Agreement with DVT Enterprises, LLC dated June 21, 2010, a copy of which is attached as Appendix D, the developer of the property is required to deed restrict the existing dwelling for occupancy by a moderate-income household and pay a total of $76,114 ($6,342.84 per unit upon issuance of a certificate of occupancy) into the Township's Affordable Housing Trust Fund. Construction of site improvements has recently commenced and building permits have been sought. The Township claims one credit for the affordable unit in the Maplewood Estates development.

**Special Needs Housing Partnership Loan Program (SNHPLP)**

By Memorandum of Understanding dated April 10, 2012, the Township, the New Jersey Housing and Mortgage Finance Agency (HMFA) and the New Jersey Department of Human Services (DHS) agreed to participate in the Special Needs Housing Partnership Loan Program (SNHPLP) in an effort to expand housing opportunities and expedite the placement of developmentally disabled individuals into community-based supportive housing within Jackson Township. The Township has transferred $500,000 from its

affordable housing trust fund to the New Jersey Department of Community Affairs (DCA), which is to be matched by $500,000 from the State to fund the development of special needs housing. Based upon the program guidelines of a maximum expenditure of $125,000 per bedroom, the program will generate a minimum of eight (8) bedrooms of special needs housing. Advancing Opportunities, Inc. has received approval from HMFA, with the concurrence of the Township, to develop a four-bedroom group home (Middletree Home) on West Veterans Highway. Applications for building permits have been made and construction is scheduled to start immediately upon receipt thereafter. The Township claims eight units of credit toward its third round affordable housing obligation for the Middletree Home project and an additional future site to be developed under the SNHPLP.

**Village Green (Leigh Realty – North Tract, Affordable Housing Site No. 10)**

The Village Green site (Affordable Housing Site No. 10) consists of approximately 325 noncontiguous acres that are generally located at the Interstate Route 195/Ocean County Routes 527 & 526 interchange. The property is adjacent to the Leigh/Jackson Woods site (Affordable Housing Site No. 2). The Village Green site is owned or controlled by Leigh Realty or affiliated companies. The property is currently zoned HC, Highway Commercial, and LM, Light Manufacturing. The property received various approvals from the Jackson Township Board of Adjustment to construct approximately 2,900,000 square feet of mixed commercial (non-residential) development in a regional commercial development known as "Jackson Commons".

Leigh Realty expressed an interest in developing the property as a mixed-use, town center-type development to be known as the "Village Green". The Township and Leigh Realty, as part of the negotiations resulting in the Affordable Housing Site No. 2 (Jackson Woods) settlement agreement, discussed the potential rezoning of the Affordable Housing Site No. 10 (Leigh Realty—North Tract) to permit the development of a self-contained mixed-use development. Those discussions conducted with the participation of the Court Master resulted in the parties entering into a Consent Agreement signed by the Court, after a "Fairness Hearing", on October 15, 2015.

The Consent Agreement provided for the rezoning of the property to permit a minimum of 1,365 dwelling units and a minimum required non-residential component of 273,000 square feet. Twenty percent (273) of the 1,365 dwelling units within the overall mixed-use development would be required to be set aside as affordable family rental units. The Court Master, affirmed by the Court, has determined the Agreement represents a realistic opportunity for the production of 273 units of affordable housing. On May 9, 2017, the Township Council adopted Ordinance No. 6-2017, which rezoned the property pursuant to the Court-approved Consent Agreement. Ordinance No.6-2017 is attached as Appendix E.

**Highview Homes (Affordable Housing Site No. 15)**

Affordable Housing Site No. 15 (Block 1203, Lot 29) is an approximately 40-acre, vacant, wooded site that is located at the northeast quadrant of the intersection of New Prospect Road and Larsen Road. Highview Homes is the contract purchaser and an intervenor in the Township's Declaratory Judgment Petition (Docket No. OCN-L-1879-15). Highview Homes is a party to the Court-approved Settlement Agreement (Appendix A) whereby the site would be rezoned from its current R-1 Single-Family Residential zoning to permit a maximum of 214 multi-family residential rental units, of which 40 are to be reserved for low- and moderate-income households and individuals. Approximately 20 acres of the site is free of environmental restrictions, and sanitary sewer and water facilities are available. The site is bounded: on the south, across Larsen Road, by Jackson Fire Company No. 1 Station and First Aid Facility and Johnson Elementary School; to the east by detached single-family homes along Birch Drive; and to the west by detached single-family residences along the west side of North New Prospect Road. A draft ordinance creating the MF–AH–7 Zone and rezoning the Highview Homes property accordingly, consistent with the Court-approved Settlement Agreement, is attached as Appendix F. Said Ordinance is scheduled for introduction at the June 13, 2017 Council meeting and to be considered for adoption on June 27, 2017. Based upon the foregoing the site is available, developable and suitable for development as reflected in this plan and the Township is entitled to claim 40 affordable family rental units toward its third

round obligation.

**RG-2 Associates, LLC (Affordable Housing Site No. 12)/Swanbourne, LLC (Affordable Housing Site No. 13)/Jackson Holdings/Grawtown (Affordable Housing Site No. 14)**

Per the Court-approved Settlement Agreement, the Township has included these three sites in its third round plan. All three sites (Site Nos. 12, 13 and 14) are located in the RG-2, Regional Growth Zone, which is situated within the Pinelands area of the Township. Pursuant to P.L. 2008, c.46, developments consisting of newly-constructed residential units, located, or to be located, within the jurisdiction of the Pinelands Commission and subject to the Pinelands Comprehensive Management Plan "shall be required to be reserved for occupancy by low- or moderate-income households at least 20 percent of the residential units constructed, to the extent this is economically feasible." Development plans for all three sites have been prepared, and separate applications have been submitted to the Township at various times and with varying outcomes. All three development applications were submitted to the Pinelands Commission at the time development approvals were sought from Jackson Township and all three development applications have received a certificate of filing from the Pinelands Commission. Collectively the three projects are anticipated to yield 874 detached, single-family units, 20 percent of which (175) are to be set aside for low- and moderate-income households. The particulars of the individual projects are provided below.

1. RG-2 Associates, LLC (Affordable Housing Site No. 12): The RG-2 Associates, LLC property (Block 19403, Lots 2, 6, 7, 10, 12, 19, 20, 30 & 31) consists of 166.6 total acres and is located on Grawtown Road. The site contains 132 developable/upland acres. The developer proposes to build detached, single-family homes on 12,000 square feet lots. The proposed development is to be served by public sewer. The project received preliminary and final major subdivision approval for 186 building lots on November 21, 2016. The required, 20-percent set aside is 37 affordable, for-sale units. The Township claims 37 credits toward its third round obligation for the 37 affordable units that are to be

developed on this site.

2. Swanbourne, LLC (Affordable Housing Site No. 13): The Swanbourne, LLC property (Block 20801, Lots 3, 8, 9, 10, 12, 15, 16, 17, 18, and 28 and Block 20701, Lot 3)) consists of 159 total acres with access to South Hope Chapel Road. The site contains 102 developable/upland acres. The developer proposes to build detached, single-family residences on 12,000 square feet lots. The site has access to public sewer. Development plans that provide for a total of 195 building lots have been prepared, and application has been made to the Jackson Township Zoning Board of Adjustment for a "(d)5 density bonus" and major subdivision approval of this 195-building lot development. The application before the Zoning Board of Adjustment has been adjourned by the applicant's request to July 19, 2017. As a result of the adoption of Ordinance No. 8-2017 by the Township Council on May 23, 2017 (attached as Appendix G) the applicant will not require a "(d)5 density variance" and the Planning Board is likely to assume jurisdiction. The required, 20-percent set-aside would be 39 affordable, for-sale units. The Township claims 39 credits toward its third round obligation for the 39 affordable, for-sale single-family units on this site.

3. Jackson Holdings/Grawtown Estates (Affordable Housing Site No. 14): The Jackson Holdings property (Block 19301, Lot 4) consists of 302 acres along the west side of Grawtown Road. The site contains 191 developable/upland acres. A prior application in 2007 for 493 detached single-family building lots (9,000 square feet minimum) was denied by the Planning Board under the conditional use section of the ordinance, primarily on the basis of the applicant's failure to obtain a Certificate of Filing from the Pinelands Commission demonstrating consistency with the Pinelands Comprehensive Management Plan and traffic concerns. In December 2007 Jackson Holdings filed a legal challenge to the Planning Board's denial, raising as an issue the validity of the conditional use requirements of the Township's ordinance. The trial court reversed the determination of the Planning Board and remanded the application to the Planning

Board for approval. The Planning Board appealed and the Appellate Division remanded to the trial court for the inclusion of the Township.

The Township of Jackson Planning Board undertook a periodic reexamination of its Master Plan in 2008. Several ordinances implementing the provisions of the Master Plan were adopted by the Township Council on November 9, 2010, including Ordinance No. 29-10, which is referenced below. The 2009 Master Plan and implementing ordinances were submitted to the Pinelands Commission. The Commission has not certified either the 2009 Master Plan as it pertains to the Pinelands Area portion of Jackson Township (n.b., it has certified the 2009 zoning map) or Ordinance 29-10.

Ordinance No. 29-10 directly affected all of the properties zoned as RG-2 and RG-3. Specifically, Ordinance No. 29-10 removed and repealed §109-81.D and §109-82.D, which were the conditional use sections in the RG-2 and RG-3 Regional Growth Zones within the Pinelands Areas portion of Jackson Township. These sections permitted the development of residential lots at less than one acre, and at increased densities on lands with certain environmental constraints or impacted by Joint Base McGuire-Dix-Lakehurst pursuant to the Joint Base Land Use Study. They were removed based on density recommendations as described in the Joint Land Use Study for Joint Base McGuire-Dix-Lakehurst (JLUS), the Toms River Corridor Study and the goals and principles of the 2009 Jackson Township Master Plan.

The legal challenge filed by Jackson Holdings in 2007 ultimately concluded in 2011 with the Township asserting that the conditional use standards of the RG2 and RG3 zoning districts were invalid. Ordinance No. 8-17, which was adopted by the Township Council on May 23, 2017 (Appendix G), revised and re-established conditional use standards permitting development of detached single-family units on lots of less than one acre in size and opening the door for the re-application consistent with that previously submitted in 2007 (i.e., 493 building

lots [minimum 9,000 square feet]). The required 20 percent set-aside will result in the creation of 99 affordable for sale units.

### *4.3.2 Third Round Compliance Plan Caps and Requirements*

**Third Round Age-Restricted Units**

Utilizing N.J.A.C. 5:97-3.10(c)2 as the basis for determining the maximum number of age-restricted units that the Township may claim toward its third round obligation, the Township can claim up to a maximum of 312 age-restricted units. This is determined as follows: *Age-Restricted Maximum = 0.25 × Third Round New Construction Obligation = 0.25 × 1250 = 312 Units.*

The Township's third round plan contains only the five proposed age-restricted units in the Holly Oaks development and therefore is well below the age-restricted unit cap.

**Third Round Rental Obligation**

Utilizing N.J.A.C. 5:93-5.15, the Township's rental obligation is calculated as follows: *0.25 × Calculated Need = .25 × 1250 = 312 Units*. The Township's third round compliance plan, which is set forth in Table 10, includes 467 rental units (viz., EL at Jackson, the SNHPLP program, Leigh Reality North, and Highview projects) and, therefore, exceeds by far the minimum rental requirement.

**Third Round Rental Bonus Credits**

Utilizing N.J.A.C. 5:93, the Township may claim rental bonus credits for rental units up to its rental obligation of 312 units. As detailed in Table 10, the Township claims one-for-one rental bonus credits for 272 of the 273 family rental units in Leigh Realty—North Tract (Affordable Housing Site No. 10) and the 40 family-rental units in Highview Homes development (Affordable Housing Site No. 15) for a total of 312 rental bonus credits.

**Third Round Very Low-Income Housing Requirement**

The July 2008 amendments to the New Jersey Fair Housing Act (P.L. 2008, c.46) and the

FSHC Settlement Agreement provide that a minimum of 13 percent of the low- and moderate-income units developed in a municipality shall be "reserved for occupancy by very low-income households."

The Township's prior and third round compliance plans provide for a total of 1,243 new affordable units to be constructed and subject to the 13 percent very low-income requirements of the Fair Housing Act and the Court-approved Settlement Agreement, resulting in a very low-income requirement of 162 units. The following demonstrates compliance with these requirements:

1. As part of the 2007 Court Order, Hovbilt (Affordable Housing No. 6) agreed to a range of affordability and pricing stratification of the inclusionary affordable units geared toward making additional units available to households with incomes of 30 percent of the regional median. The Township has agreed to apply for subsidies to write down the affordability of the inclusionary units, such that additional units may be available to households at or below 30 percent of the regional median, above and beyond that which has been already agreed to by Hovbilt. These requirements survive the bankruptcy sale of the property and will be a condition of any forthcoming development approval obtained by EL @ Jackson, LLC and will yield 37 very low-income units.

2. Leigh/Jackson Woods (Affordable Housing Site No. 2), as described in a preceding section of this Amended Housing Element and Fair Share Plan, consists of three phases. Phase I (Central) is currently under construction and the project affordable housing plan for this phase provides for eight of 72 affordable units in this phase to be qualifying very low-income family rental units. Construction of the affordable units in Phase II (Southeast) is scheduled to commence in June 2017. This 88-unit, all-affordable project, pursuant to funding requirements, will have a minimum of 10 percent (9) of the family rental units as very low-income units. A requirement that 13 percent of the 71 affordable units (9) in Phase III (Southwest) will be developed as very low-income units will be a condition of

any forthcoming development approval.

3. All eight units to be developed pursuant to the SNHPLP program will qualify as very low-income units.

4. The Township and Planning Board will require that 13 percent of the 273 affordable, family-rental units (35) be reserved for occupancy by very low-income households as a condition of any forthcoming development approvals and the required project-specific affordable housing plan related to the Leigh Realty-North Tract (Affordable Housing Site No. 10).

5. The Township and Planning Board will require that 13 percent of the 40 affordable, family-rental units (5) be reserved for occupancy by very low-income households as a condition of any forthcoming approvals and the required project-specific affordable housing plan related to Highview Homes (Affordable Housing Site No. 15).

6. The Township and Planning Board will require that 13 percent of the 175 affordable units (23) be reserved for occupancy by very low-income households as a condition of any forthcoming development approvals and as part of the required project-specific affordable housing plans related to Affordable Housing Sites Nos. 12, 13, and 14.

7. The Township and Planning Board will require that 13 percent of the required number of affordable units be reserved for occupancy by very low-income households for all future development applications in the RG-2 and RG-3 zones. The anticipated buildout of the RG-2 and RG-3 zones is anticipated to yield 290 affordable units and 38 very low-income units.

Based upon the foregoing, the prior and third round compliance plans are anticipated to generate 172 very low-income units, and, therefore, exceed the 162-unit requirement.

## 5.0 ADDITIONAL FAIR SHARE PLAN COMPONENTS

### *5.1 Spending Plan*

Appendix H is the Township's Spending Plan adopted and endorsed by Township Council.

### *5.2 Affirmative Marketing Plan*

Appendix I is a draft of the Township's Affirmative Marketing Plan to be adopted by resolution of the Township Council.

### *5.3 Reporting Requirements*

Per the FSHC Settlement Agreement, on October 25, 2017 and every October 25 thereafter through 2025, the Township is required to provide an annual report of the affordable housing trust fund activity to the New Jersey Department of Community Affairs, Council on Affordable Housing, Local Government Services, or other entity designated by the State of New Jersey, with copy to Fair Share Housing Center, Inc., and posted on the municipal website.

Per the FSHC Settlement Agreement, on October 25, 2017 and every October 25 thereafter through March 2025, the Township will prepare a report on the status of all affordable housing activity within the Township. Such report is to be posted on the Township website.

Per the Settlement Agreement, the Township shall conduct a "midpoint realistic opportunity review" due on July 1, 2020 and consisting of a status report as to its implementation of this Amended Housing Element and Fair Share Plan, and an analysis of whether any unbuilt sites or unfulfilled compliance mechanisms continue to present a realistic opportunity for the production of affordable housing, and whether any compliance mechanisms should be revised or supplemented. Such report shall be posted on the Township website.

Per the Settlement Agreement, within 30 days of October 25, 2019 and every third year thereafter, the Township shall prepare a status report, and post same on its website, as to satisfaction of its very low-income requirements, as set forth in N.J.S.A. 52:27D-329.1 and addressed in this Housing Element and Fair Share Plan.

### *5.4 Amendments to Affordable Housing Ordinances*

Appendix J is a draft ordinance to be adopted by the Township Council amending the Township's affordable housing ordinances consistent with this Amended Housing Element and Fair Share Plan and the Settlement Agreement.

*Amended Housing Element and Fair Share Plan*
*June 8, 2017*

# Appendix A: Settlement Agreement

EXHIBIT B

350R-16

Peter J. O'Connor, Esq.
Kevin D. Walsh, Esq.
Adam M. Gordon, Esq.
Laura Smith-Denker, Esq.
David T. Rammler, Esq.
Joshua D. Bauers, Esq.

RECEIVED
NOV 10 2016
GILMORE & MONAHAN

October 25, 2016

Jean Cipriani, Esq.
Counsel for Township of Jackson
Gilmore & Monahan, P.A.
10 Allen St,
Toms River, NJ 08753

**Re: In the Matter of the Township of Jackson, County of Ocean,** Docket No. L-1879-15

Dear Ms. Cipriani:

This letter memorializes the terms of an agreement reached between the Township of Jackson (the Township, Jackson, or "the municipality"), the declaratory judgment plaintiff, Fair Share Housing Center (FSHC), a Supreme Court-designated interested party in this matter in accordance with In re N.J.A.C. 5:96 and 5:97, 221 N.J. 1, 30 (2015)(Mount Laurel IV) and a defendant in this proceeding, and Highview Homes ("Highview"), which intervened in this proceeding as a defendant pursuant to an order dated ______, 2015.

**Background**

Jackson filed the above-captioned matter on July 7, 2015 seeking a declaration of its compliance with the Mount Laurel doctrine and Fair Housing Act of 1985, N.J.S.A. 52:27D-301 et seq. in accordance with In re N.J.A.C. 5:96 and 5:97, supra. Prior to the completion of a trial on the matter before the Honorable Mark A. Troncone, J.S.C., FSHC, Highview, and the Township began mediation proceedings with the assistance of the Special Master, Philip B. Caton. Through that process, the Township and FSHC agreed to settle the litigation and to present that settlement to the trial court with jurisdiction over this matter to review, recognizing that the settlement of Mount Laurel litigation is favored because it avoids delays and the expense of trial and results more quickly in the construction of homes for lower-income households.

**Settlement terms**

The Township and FSHC hereby agree to the following terms:

1. FSHC agrees that the Township, through the adoption of a Housing Element and Fair Share Plan, including spending plan in accordance with the terms of this Agreement, and the implementation of the Plan and this Agreement, satisfies its obligations under the Mount Laurel doctrine and Fair Housing Act of 1985, N.J.S.A. 52:27D-301 et seq., for the Prior Round (1987-1999) and Third Round (1999-2025).

2. At this time and at this particular point in the process resulting from the Supreme Court's Mount Laurel IV decision, when fair share obligations have yet to be definitively determined, it is appropriate for the parties to arrive at a settlement regarding a municipality's Third Round present and prospective need instead of doing so through plenary adjudication of the present and prospective need.

3. FSHC and Jackson hereby agree that Jackson's affordable housing obligations are as follows:

| | |
|---|---|
| Rehabilitation Share (per Kinsey Report[1]) | 28 |
| Prior Round Obligation (pursuant to N.J.A.C. 5:93) | 1247 |
| Third Round (1999-2025) Prospective Need (per Kinsey Report, as adjusted through this settlement agreement) | 1250 |

4. The Township's efforts to meet its present need/rehabilitation share include the following: In July 2012 the Township re-established its rehabilitation program to build upon the success of its earlier program. The current program is funded with a total of $1,380,000 from the Township's affordable housing trust fund, and is administered by Rehabco, Inc. The municipality agrees to continue this program. The 28-unit obligation may be satisfied through units rehabilitated during or since 2010. This is sufficient to satisfy the Township's present need obligation of 28 units.

5. As noted above, the Township has a Prior Round prospective need of 1247 units, which is met through the following compliance mechanisms:

| Compliance Mechanism | Affordable Units | Rental Bonuses | Total Credits |
|---|---|---|---|
| ***Prior Cycle Credits (4/1/80 – 12/15/86)*** | | | |
| Credits without Controls | 205 | 0 | 205 |
| Group Home | 5 | 0 | 5 |
| ***RCAs*** | | | |
| Trenton (Completed) | 50 | 0 | 50 |
| ***Built Affordable Units (Post 12/15/86)*** | | | |
| Site #1 – Willow Point (Family Rental) | 100 | 100 | 200 |
| Site #3 – West Lake Village (Senior Rental) | 150 | 0 | 150 |
| Bella Terra (Assisted Living; Senior Rental) | 11 | 0 | 11 |
| Sunrise (Assisted Living; Senior Rental) | 2 | 0 | 2 |
| Orchards at Bartley (Assisted Living; Senior Rental) | 15 | 0 | 15 |
| Colonial Arms (Senior Rental) | 24 | 0 | 24 |
| Tomorrow's Hope (Special Needs) | 5 | 5 | 10 |
| Windsor Crescent/CIS (Family Rental) | 111 | 111 | 222 |
| ARC of Ocean (Special Needs) | 4 | 4 | 8 |
| Habitat for Humanity (B2401, L16; Family Sale) | 1 | 0 | 1 |
| ***Proposed Affordable Units*** | | | |
| Site #6 – Hovbilt (Family Rental) | 192 | 0 | 192 |
| Site #2 – Leigh (Jackson Woods; 159 Family for Sale, 72 Family Rental) | 231 | 39 | 270 |
| **TOTAL** | **1116** | **259** | **1375** |

[1] David N. Kinsey, PhD, PP, FAICP, NEW JERSEY LOW AND MODERATE INCOME HOUSING OBLIGATIONS FOR 1999-2025 CALCULATED USING THE NJ COAH PRIOR ROUND (1987-1999) METHODOLOGY, May 2016.

6. The Township has implemented or will implement the following mechanisms to address its Third Round prospective need of 1250 units:

| Project Name | Project Location | Project Type | Number of Affordable Units or Credits | Rental Bonus Credits | Total Credits |
|---|---|---|---|---|---|
| A. EL @ Jackson, LLC (**carried over from Site #6 above**) | Perrineville Road | Family Rental (Units Carried Forward from Prior Round) | 128 | 128 | 256 |
| B. Holly Oaks | Blk. 14801, Lot 5 | Inclusionary - Age-restricted- For Sale | 5 | 0 | 5 |
| C. SNHPLP Program | TBD | Special Needs Housing | 8 | 0 | 8 |
| D. Leigh Realty-North Tract (Site #10) | Rt.195 and Rt. 526/527 Interchange | Mixed Use Development - Family Rental | 273 | 184 | 457 |
| E. Highview Homes (Site #15) | Blk. 164, Lot 2 | Inclusionary Development -Family Rental | 40 | 0 | 40 |
| F. RG-2 Zone (Sites #12, #13, and #14) | Misc. | Inclusionary Development -Family Rental | 203 | 0 | 203 |
| | | **Subtotal** | **657** | **312** | **969** |
| G. Remainder of RG-2 and RG-3 Zones | 281 | Inclusionary development - 20% Affordable Unit Setaside Requirement | 281 | 0 | 281 |
| | | **Totals** | **938** | **312** | **1250** |

At its option, Jackson Township may apply to the court to amend the judgment entered in this matter to provide compliance mechanisms, including 100% affordable housing development, that otherwise satisfy the fair share obligations that relate in the chart above to F. RG-2 Zone (Sites #12, #13, and #14) and G. Remainder of RG-2 and RG-3 Zones. Such an application, which shall be on notice to and opportunity to be heard by FSHC, shall demonstrate how the units to be provided instead of units listed above at items F

and/or G provide a realistic opportunity in accordance with applicable law and comply with all terms of this Agreement.

7.  The Township agrees to require 13% of all units referenced in this plan, with the exception of units constructed as of July 1, 2008, and units subject to preliminary or final site plan approval, to be very low income units, with half of the very low income units being available to families.  The municipality will comply with those requirements through requiring that 13% of the affordable units in the Leigh Realty – North, Highview Homes, and RG-2 Zone (Sites #12, #13, and #14) and Remainder of RG-2 and RG-3 Zones are very low income units, and through the SNHPLP program units. For EL @ Jackson, pursuant to the 2007 Order of Judge Eugene Serpentelli, 17% of the affordable units in that project shall be very low income units.

8.  The Township shall meet its Third Round Prospective Need in accordance with the following standards as agreed to by the Parties and reflected in the table in paragraph 6 above:

    a.  Third Round bonuses will be applied in accordance with N.J.A.C. 5:93-5.15(d).

    b.  At least 50 percent of the units addressing the Third Round Prospective Need shall be affordable to very-low-income and low-income households with the remainder affordable to moderate-income households.

    c.  At least twenty-five percent of the Third Round Prospective Need shall be met through rental units, including at least half in rental units available to families.

    d.  At least half of the units addressing the Third Round Prospective Need in total must be available to families.

    e.  The Township agrees to comply with an age-restricted cap of 25% and to not request a waiver of that requirement.  This shall be understood to mean that in no circumstance may the municipality claim credit toward its fair share obligation for age-restricted units that exceed 25% of all units developed or planned to meet its cumulative prior round and third round fair share obligation.

9.  The Township shall add to the list of community and regional organizations in its affirmative marketing plan, pursuant to N.J.A.C. 5:80-26.15(f)(5), Fair Share Housing Center, the New Jersey State Conference of the NAACP, 14 Clifton Ave. S., Lakewood, NJ 08701, the Latino Action Network, PO Box 943, Freehold, NJ 07728, NAACP Toms River Branch, PO Box 5144, Toms River 08754, and NAACP Ocean County/Lakewood Branch, PO Box 836,Lakewood, NJ 08701, OCEAN, Inc., S&F Plaza, 2008  Rt. 37 East – Suite 12, Toms River, NJ 08753, the New Jersey Housing Resource Center,  637 South Clinton Avenue, P.O. Box 18550, Trenton, NJ 08650, and the Supportive Housing Association, 15 Alden St # 14, Cranford, NJ 07016, and shall, as part of its regional affirmative marketing strategies during its implementation of this plan, provide notice to those organizations of all available affordable housing units.  The Township also agrees to require any other entities, including developers or persons or companies retained to do affirmative marketing, to comply with this paragraph.

10. All units shall include the required bedroom distribution, be governed by controls on affordability and affirmatively marketed in conformance with the Uniform Housing

Affordability Controls, N.J.A.C. 5:80-26.1 et. seq. or any successor regulation, with the exception that in lieu of 10 percent of affordable units in rental projects being required to be at 35 percent of median income, 13 percent of affordable units in such projects shall be required to be at 30 percent of median income, and all other applicable law, except as provided in paragraph 7 above. The Township as part of its HEFSP shall adopt and/or update appropriate implementing ordinances in conformance with standard ordinances and guidelines developed by COAH to ensure that this provision is satisfied.

11. All new construction units shall be adaptable in conformance with P.L.2005, c.350/N.J.S.A. 52:27D-311a and -311b and all other applicable law.

12. As an essential term of this settlement the Township shall adopt an amended Housing Element and Fair Share Plan including spending plan consistent with this agreement, and shall adopt an ordinance providing for the amendment of the Township's Affordable Housing Ordinances and Zoning Ordinances to implement the terms of this settlement agreement and the zoning contemplated herein within 120 days of Court's approval of this Settlement Agreement.

13. The parties agree that the obligations set forth in this agreement and steps taken to fulfill these obligations meet all the need that the Township is required to address pursuant to the Mount Laurel Doctrine and Fair Housing Act through June 30, 2025.

The parties anticipate that future decisions of a court of competent jurisdiction in Ocean County, including but not limited to decisions of the Appellate Division or Supreme Court and/or a determination by an administrative agency responsible for implementing the Fair Housing Act, or an action by the New Jersey Legislature, will establish fair share obligations for the Third Round and the application of the 1000-unit cap during the Third Round, including whether portions of the obligation above the capped amount must be satisfied in future rounds. In view of the unsettled nature of those issues now, the parties have elected not to enter into a settlement regarding whether there may be an obligation deferred to future housing cycles arising from the manner in which the cap is applied during the Third Round. The parties reserve all rights to address how such obligations will be calculated or addressed, including any arguments as to the potential carrying over of any extra credits to future rounds in conformance with the then-applicable law.

Notwithstanding any change in law or other circumstance, the Township shall not have an obligation to be satisfied in the period through 2025 beyond the mechanisms set forth in this Agreement. However, with the exception of F. RG-2 Zone (Sites #12, #13, and #14) and G. Remainder of RG-2 and RG-3 Zones, which are subject to a provision included above that allows for replacement of those compliance mechanisms with alternative compliance mechanisms, the Township shall be obligated to implement all terms of this settlement agreement and its Fair Share Plan, including by leaving in place any site specific zoning adopted or relied upon in connection with the Plan approved pursuant to this settlement agreement; taking all steps necessary to support the development of any 100% affordable developments referenced herein; and otherwise fulfilling the fair share obligation as established herein. The reduction of the Township's obligation below that established in this agreement does not provide a basis for seeking leave to amend this agreement or seeking leave to amend an order or judgment pursuant to R. 4:50-1.

14. The Township maintains an affordable housing trust fund balance and will prepare a Spending Plan that will be a part of the HEFSP, subject to the review of the Court, the

Special Master and FSHC. The parties understand that expenditures of funds that the court finds are "committed" for expenditure pursuant to N.J.S.A. 52:27D-329.2 and -329.3, shall have the four-year time period for expenditure designated pursuant to those provisions beginning to run with the entry of a final judgment approving this settlement in accordance with the provisions of In re Tp. Of Monroe, 442 N.J. Super. 565 (Law Div. 2015) (aff'd 442 N.J. Super. 563). On the first anniversary of the execution of this agreement, and every anniversary thereafter through the end of this agreement, the Township agrees to provide annual reporting of trust fund activity to the New Jersey Department of Community Affairs, Council on Affordable Housing, or Local Government Services, or other entity designated by the State of New Jersey, with a copy provided to Fair Share Housing Center and posted on the municipal website, using forms developed for this purpose by the New Jersey Department of Community Affairs, Council on Affordable Housing, or Local Government Services. The reporting shall include an accounting of all housing trust fund activity, including the source and amount of funds collected and the amount and purpose for which any funds have been expended.

15. On the first anniversary of the execution of this agreement, and every anniversary thereafter through the end of this agreement, the Township agrees to provide annual reporting of the status of all affordable housing activity within the municipality through posting on the municipal website with a copy of such posting provided to Fair Share Housing Center, using forms previously developed for this purpose by the Council on Affordable Housing or any other forms endorsed by the Special Master and FSHC.

16. The Fair Housing Act includes two provisions regarding action to be taken by the Township during the ten-year period of protection provided in this agreement. The Township agrees to comply with those provisions as follows:

    a. For the midpoint realistic opportunity review due on July 1, 2020, as required pursuant to N.J.S.A. 52:27D-313, the Township will post on its municipal website, with a copy provided to Fair Share Housing Center, a status report as to its implementation of its Plan and an analysis of whether any unbuilt sites or unfulfilled mechanisms continue to present a realistic opportunity and whether any mechanisms to meet unmet need should be revised or supplemented. Such posting shall invite any interested party to submit comments to the municipality, with a copy to Fair Share Housing Center, regarding whether any sites no longer present a realistic opportunity and should be replaced and whether any mechanisms to meet unmet need should be revised or supplemented. Any interested party may by motion request a hearing before the court regarding these issues.

    b. For the review of very low income housing requirements required by N.J.S.A. 52:27D-329.1, within 30 days of the third anniversary of this agreement, and every third year thereafter, the Township will post on its municipal website, with a copy provided to Fair Share Housing Center, a status report as to its satisfaction of its very low income requirements, including the family very low income requirements referenced herein. Such posting shall invite any interested party to submit comments to the municipality and Fair Share Housing Center on the issue of whether the municipality has complied with its very low income housing obligation under the terms of this settlement.

17. FSHC previously had intervened in earlier litigation involving Jackson Township and all parties have acknowledged that due to that earlier intervention FSHC is a party in this litigation. FSHC is hereby deemed to have party status in this matter and to have

intervened in this matter as a defendant without the need to file a motion to intervene or an answer or other pleading.  The parties to this agreement agree to request the Court to enter an order declaring FSHC is an intervenor, but the absence of such an order shall not impact FSHC's rights.

18. This settlement agreement must be approved by the Court following a fairness hearing as required by Morris Cty. Fair Hous. Council v. Boonton Twp., 197 N.J. Super. 359, 367-69 (Law Div. 1984), aff'd o.b., 209 N.J. Super. 108 (App. Div. 1986); East/West Venture v. Borough of Fort Lee, 286 N.J. Super. 311, 328-29 (App. Div. 1996).  The Township shall present its planner as a witness at this hearing.  FSHC agrees not to challenge the attached Plan (Exh. A) at the fairness hearing.   In the event the Court approves this proposed settlement, the parties contemplate the municipality will receive "the judicial equivalent of substantive certification and accompanying protection as provided under the FHA," as addressed in the Supreme Court's decision in In re N.J.A.C. 5:96 & 5:97, 221 N.J. 1, 36 (2015).  The "accompanying protection" shall remain in effect through July 1, 2025. If the settlement agreement is rejected by the Court at a fairness hearing it shall be null and void.

19. If an appeal is filed of the Court's approval or rejection of the Settlement Agreement, the Parties agree to defend the Agreement on appeal, including in proceedings before the Superior Court, Appellate Division and New Jersey Supreme Court, and to continue to implement the terms of the Settlement Agreement if the Agreement is approved before the trial court unless and until an appeal of the trial court's approval is successful at which point, the Parties reserve their right to rescind any action taken in anticipation of the trial court's approval. All Parties shall have an obligation to fulfill the intent and purpose of this Agreement.

20. This settlement agreement may be enforced through a motion to enforce litigant's rights or a separate action filed in Superior Court, Ocean County.  A prevailing movant or plaintiff in such a motion or separate action shall be entitled to reasonable attorney's fees.

21. Unless otherwise specified, it is intended that the provisions of this Agreement are to be severable.  The validity of any article, section, clause or provision of this Agreement shall not affect the validity of the remaining articles, sections, clauses or provisions hereof.  If any section of this Agreement shall be adjudged by a court to be invalid, illegal, or unenforceable in any respect, such determination shall not affect the remaining sections.

22. This Agreement shall be governed by and construed by the laws of the State of New Jersey.

23. This Agreement may not be modified, amended or altered in any way except by a writing signed by each of the Parties.

24. This Agreement may be executed in any number of counterparts, each of which shall be an original and all of which together shall constitute but one and the same Agreement.

25. The Parties acknowledge that each has entered into this Agreement on its own volition without coercion or duress after consulting with its counsel, that each party is the proper person and possess the authority to sign the Agreement, that this Agreement contains the entire understanding of the Parties and that there are no representations, warranties, covenants or undertakings other than those expressly set forth herein.

26. Each of the Parties hereto acknowledges that this Agreement was not drafted by any one of the Parties, but was drafted, negotiated and reviewed by all Parties and the Special Master, therefore, the presumption of resolving ambiguities against the drafter shall not apply.  Each of the Parties expressly represents to the other Parties that: (i) it has been represented by counsel in connection with negotiating the terms of this Agreement; and (ii) it has conferred due authority for execution of this Agreement upon the persons executing it.

27. Any and all Exhibits and Schedules annexed to this Agreement are hereby made a part of this Agreement by this reference thereto.  Any and all Exhibits and Schedules now and/or in the future are hereby made or will be made a part of this Agreement with prior written approval of both Parties.

28. This Agreement constitutes the entire Agreement between the Parties hereto and supersedes all prior oral and written agreements between the Parties with respect to the subject matter hereof except as otherwise provided herein.

29. No member, official or employee of the Borough shall have any direct or indirect interest in this Settlement Agreement, nor participate in any decision relating to the Agreement which is prohibited by law, absent the need to invoke the rule of necessity.

30. Anything herein contained to the contrary notwithstanding, the effective date of this Agreement shall be the date upon which all of the Parties hereto have executed and delivered this Agreement.

31. All notices required under this Agreement ("Notice[s]") shall be written and shall be served upon the respective Parties by certified mail, return receipt requested, or by a recognized overnight or by a personal carrier.  In addition, where feasible (for example, transmittals of less than fifty pages) shall be served by facsimile or e-mail.  All Notices shall be deemed received upon the date of delivery.  Delivery shall be affected as follows, subject to change as to the person(s) to be notified and/or their respective addresses upon ten (10) days notice as provided herein:

**TO FSHC:**            Kevin D. Walsh, Esq.
                        Fair Share Housing Center
                        510 Park Boulevard
                        Cherry Hill, NJ  08002
                        Phone: (856) 665-5444
                        Telecopier: (856) 663-8182
                        E-mail: kevinwalsh@fairsharehousing.org

**TO THE TOWNSHIP:**    Jean Cipriani, Esq.
                        Counsel for Township of Jackson
                        Gilmore & Monahan, P.A.
                        10 Allen St,
                        Toms River, NJ 08753
                        Telecopier:  732-244-1840
                        Email:  jlc@gm-law.net

**TO HIGHVIEW:**        Richard J. Hoff, Jr. , Esq.

Bisgaier Hoff, LLC
25 Chestnut Street -Suite 3
Haddonfield, NJ 08033
Email: rhoff@bisgaierhoff.com

**TO SPECIAL MASTER:** Philip B. Caton, PP, FAICP
Clarke Caton Hintz
100 Barrack Street
Trenton, NJ 08608
Email: pcaton@cchnj.com

**WITH A COPY TO THE MUNICIPAL CLERK:** Clerk,
Township of Jackson
95 W. Veterans Hwy
Jackson, NJ 08527
Telecopier: 732-928-4377

Please sign below if these terms are acceptable.

Sincerely,

Kevin D. Walsh, Esq.
Counsel for Intervenor/Interested Party
Fair Share Housing Center

On behalf of the Township of Jackson, with the authorization of the governing body

Michael Reina, Mayor
Dated: 10-26-16

On behalf of Highview Homes:

James Smith, member
Dated: 11/8/16

RESOLUTION OF THE TOWNSHIP OF JACKSON
JACKSON, NEW JERSEY

RESOLUTION NUMBER: 350R-16 DATE OF ADOPTION: 10-25-16

TITLE: RESOLUTION OF THE TOWNSHIP OF JACKSON, COUNTY OF OCEAN, STATE OF NEW JERSEY, AUTHORIZING THE EXECUTION OF A SETTLEMENT AGREEMENT WITH FAIR SHARE HOUSING CENTER

Council Member Updegrave presents the following resolution.

Seconded by Martin

**WHEREAS,** the Township of Jackson filed a complaint in July of 2015 seeking a declaration of its compliance with the Mount Laurel Doctrine and Fair Housing Act, entitled In the Matter of the Township of Jackson, Docket No. OCN-L-1879-15 and has participated in the proceedings in the Court in order to determine the proper methodology for the calculation of Fair Share Obligations for municipalities in Ocean County as contemplated by the Supreme Court In the Matter of the Adoption of N.J.A.C. 5:96 and 5:97 by the New Jersey Council on Affordable Housing, 221 N.J. 1 (2015) ("Decision"); and

**WHEREAS,** there are open issues regarding an obligation for the period 1999-2015 during which no effective COAH regulations were adopted from which the Township's Third Round affordable housing obligation could be established, and the applicability of the 1,000 unit cap to the Third Round period which ends in 2025; and

**WHEREAS,** Fair Share Housing Center's position on Jackson Township's Third Round Affordable Housing obligation from 1999-2025, as of its expert report of May 2016 is 3,616 affordable housing units, not inclusive of prior round obligation; and

**WHEREAS,** prior to the Court reaching a decision, the Township engaged in settlement discussions with Fair Share Housing Center and the parties agreed to establish the Township's Third Round Present Need at 28 units and the Third Round Prospective Need for the 1999-2025 to be 1,250 units, in order to ensure that the Township receives the benefits of bonus credits where appropriate; and

**WHEREAS,** the Township and Fair Share Housing Center have come to an agreement that the Township shall satisfy its Prospective Need through a plan consisting of 657 units (414 units being part of projects which have previously been included in compliance plan) to be achieved in six separate developments which will enable the Township to claim 312 additional Rental Bonus Credits; and

Ann Marie Eden

**ANN MARIE EDEN, R.M.C.**
**TOWNSHIP CLERK**

**DATED:** 10-25-16

| RECORD OF VOTE | | | | Council V.P. | Council President |
|---|---|---|---|---|---|
| TOWNSHIP COUNCIL | Barry Calogero | Scott Martin | Ann Updegrave | Kenneth Bressi | Robert Nixon |
| YES | | ✓ | ✓ | ✓ | |
| NO | ✓ | | | | |
| ABSTAIN | | | | | |
| ABSENT | | | | | ✓ |

Ann Marie Eden 1/8

I, Ann Marie Eden, Municipal Clerk of the Township of Jackson in the County of Ocean, hereby certify that the above is a true copy of a Resolution adopted by the Township Council on the 25th day of October 2016.

WHEREAS, the balance of the Prospective Need will be through the mandatory 20% set aside requirement of the Pinelands Commission in the Regional Growth Zones of the Pinelands sections of the Township; and

WHEREAS, the proposed settlement agreement, attached hereto, shall settle the Township's entire third round obligation, regardless of determinations by the Courts.

**NOW, THEREFORE, BE IT RESOLVED,** by the Township Committee of the Township of Jackson as follows:

1. The Mayor is hereby authorized to sign the agreement, attached hereto, on its behalf.

2. This Resolution shall take effect immediately.



*Amended Housing Element and Fair Share Plan*
*June 8, 2017*

# Appendix B: December 31, 2016 Order of the Court

**GILMORE & MONAHAN, P.A.**
Ten Allen Street
P.O. Box 1540
Toms River, NJ 08754
(732) 240-6000
Attorneys for **Township of Jackson**
**JEAN L. CIPRIANI, ESQ. NJ ATTY ID #:** 048771994

| **IN THE MATTER OF THE APPLICATION OF THE TOWNSHIP OF JACKSON, a municipal corporation of the State of New Jersey** | SUPERIOR COURT OF NEW JERSEY<br>OCEAN COUNTY<br>LAW DIVISION<br><br>DOCKET NO. OCN-L-1879-15<br><br>**ORDER ON FAIRNESS AND PRELIMINARY COMPLIANCE HEARING** |
|---|---|

**THIS MATTER** having been opened to the Court by Gilmore & Monahan, P.A., attorneys for the Township of Jackson (hereinafter referred to as "Jackson"), Jean L. Cipriani, Esquire, appearing, in the presence of Adam Gordon, Esquire, attorney for Interested Party and Intervenor, Fair Share Housing Center, Inc., (hereinafter referred to as "FSHC") and Richard Hoff, Esquire, attorney for Interested Party and Intervenor Highview Homes, by way of Fairness and Preliminary Compliance Hearing held pursuant to and in accordance with East/West Venture v. Borough of Fort Lee, 286 N.J. Super. 311 (App. Div. 1996); and sufficient notice of this hearing having been given in accordance with In the Matter of the Adoption of N.J.A.C. 5:96 & 5:97 by the New Jersey Council on Affordable Housing, 221 N.J. 1 (2015) ("Mount Laurel IV") and Morris County Fair Housing Council v. Boonton Tp., 197 N.J. Super. 359 (Law. Div. 1984); and the Court

GILMORE & MONAHAN
A Professional Corporation
COUNSELLORS AT LAW
Allen Street Professional Center
Ten Allen Street
P.O. Box 1540
Toms River, New Jersey 08754

having considered the testimony of Jackson qualified expert, John Maczuga, P.P., and the Court-appointed Special Master, Philip Caton, P.P., F.A.I.C.P.; and the Court having considered the Settlement Agreement entered into between Jackson, FSHC and Highview Homes dated October 25, 2016, and Jackson's Revised Housing Plan Summary referenced therein; and the Court having considered the testimony and presentations of Interested Parties at the time of the hearing; and good cause having been shown;

**IT IS** on this 31st day of December 2016, **ORDERED** that

1. The Court finds that the Settlement Agreement between Jackson, FSHC and Highview Homes is fair and adequately protects the interests of low and moderate income persons within Jackson's housing region based upon the criteria set forth in East/West Venture v. Borough of Fort Lee, 286 N.J. Super. 311 (App. Div. 1996) for approving a settlement of Mount Laurel litigation; and

2. The Court preliminarily finds that Jackson's proposed draft summary Housing Element and Fair Share Plan is facially constitutionally compliant and provides a fair and reasonable opportunity for Jackson to meet its obligation under Mount Laurel IV, subject to Jackson's satisfaction of any conditions set forth by the Court's Special Master, and subject to the Court's approval by way of a Final Compliance Hearing to be held as hereinafter set forth; and

3. A Final Compliance Hearing is hereby scheduled for **1:30 p.m. on May 5,** 2017, by which time Jackson shall have complied with the above-referenced conditions, shall have submitted to the Special Master for review and comment Jackson's Housing Element and Fair Share Plan and all Resolutions and Ordinances required to implement the Housing Element and Fair Share Plan, and shall have provided for the Planning Board of the Township of Jackson to

GILMORE & MONAHAN
A Professional Corporation
COUNSELLORS AT LAW
Allen Street Professional Center
Ten Allen Street
P.O. Box 1540
Toms River, New Jersey 08754

finalize and adopt the Housing Element and Fair Share Plan and the Jackson Township Council to endorse same and to adopt all necessary effectuating Resolutions and Ordinances; and

4. FSHC be and hereby is granted status of Intervenor in this matter; and

5. The temporary immunity previously granted to Jackson herein is hereby extended until and through the day following the May 31, 2017; and

6. A copy of this Order shall be served upon all parties on the service list in this matter within 7 days of Jackson's receipt thereof.

MARK A. TRONCONE, J.S.C.

GILMORE & MONAHAN
A Professional Corporation
COUNSELLORS AT LAW
Allen Street Professional Center
Ten Allen Street
P.O. Box 1540
Toms River, New Jersey 08754

*Amended Housing Element and Fair Share Plan*
*June 8, 2017*

# Appendix C: MR–AH–8 Zone Ordinance

**ORDINANCE NO.**

**AN ORDINANCE OF THE TOWNSHIP OF JACKSON, COUNTY OF OCEAN, STATE OF NEW JERSEY, AMENDING CHAPTER 244 OF THE TOWNSHIP CODE OF THE TOWNSHIP OF JACKSON, ENTITLED "LAND USE AND DEVELOPMENT REGULATIONS" BY ESTABLISHING A NEW ZONING DISTRICT KNOWN AS THE "MIXED RESIDENTIAL-AFFORDABLE HOUSING-8 (MR-AH-8) ZONE"**

**NOW, THEREFORE, BE IT ORDAINED,** by the governing body of the Township of Jackson, County of Ocean, State of New Jersey, as follows:

**SECTION 1.** The Zoning Map of the Township of Jackson is hereby amended to create a new Mixed Residential-Affordable Housing-8 (MR-AH-8) Zone and placing the following parcels in said zone: Block 10401, Lots 5.01 and 5.04; and, Block 17802, Lot 57.01.

**SECTION 2.** The Township Code of the Township of Jackson is hereby amended and supplemented to amend Chapter 244, entitled "Land Use and Development Regulations," Section 42, entitled "List of Zones," to add the following zoning district: MR-AH-8 — Mixed Residential-Affordable Housing-8 Zone.

**SECTION 3.** The Township Code of the Township of Jackson is hereby amended and supplemented to amend Chapter 244, entitled "Land Use and Development Regulations," to add new Section 51.2, which shall be entitled "MR-AH-8 — Mixed Residential-Affordable Housing-8" and read as follows:

**§ 244-51.2: MF-AH-8 — Mixed Residential-Affordable Housing-8 Zone.**

A. Intent. The intent of the MR-AH-8 Zone is to provide a suitable location(s) for the construction of inclusionary housing, which will provide the construction of between 192 and 220 low- and moderate-income households in a manner that is consistent with the Township's duly-adopted Housing Element and Fair Share Plan for the period 1999-2025.

B. Permitted principal uses of buildings and structures are as follows:

(1) Detached single-family dwellings.

(2) Two-family dwellings.

(3) Multi-family dwellings.

(4) Open space and recreational uses and facilities.

(5) Retention drainage basin(s) and related structures; provided, however, that said basin(s) is (are) designed and used as an amenity and for aesthetic purposes, as well as for drainage, flood control, water recharge and fire-protection purposes.

(6) Essential services.

C. Permitted accessory uses of buildings and structures are as follows:

(1) Fences and walls, subject to the provisions of § 244-190.

(2) Gatehouses.

(3) Off-street parking and garages, subject to the provisions of § 244-197 and § 244-198.

(4) Satellite dish antennas, subject to the provisions of § 244-165.

(5) Sheds (garden, storage or tool): A maximum of one shed shall be permitted per residential lot.

(6) Signs, subject to the provisions of § 244-207.

(7) Buildings or structures necessary for the administration and/or maintenance of the infrastructure, streets, off-street parking facilities, drainage facilities, recreational facilities, open space areas and other facilities and areas that are the maintenance responsibility of a homeowners' association for the development.

(8) Other customary accessory buildings, which are clearly incidental to the principal use and buildings and for the exclusive use of residents of the development, and which shall be limited to social and recreational uses.

D. Conditional uses, subject to the provisions of Article VIII of this chapter, are as follows:

(1) Public utilities (subject to § 244-128).

E. Area, yard and building requirements are as follows:

(1) The minimum tract area for a mixed residential development shall be 100 contiguous acres under a single ownership or control.

(2) The minimum tract frontage of a mixed residential development shall be 250 continuous feet along an existing minor arterial or major collector as identified in the Circulation Plan Element of the Jackson Township Master Plan.

(3) The minimum tract width of a mixed residential development shall be 250 feet.

(4) The minimum tract depth of a mixed residential development shall be 250 feet.

(5) The maximum number of dwelling units in the MR-AH-8 Zone shall be 1,100 units.

(6) The minimum unoccupied open space in a mixed residential development shall be 30 percent.

(7) All parking areas and other above ground improvements, with the exception of access drives or access roadways, landscaping and screening areas, and permitted signs shall be set back a minimum of 35 feet from the exterior tract boundary of the mixed residential development.

(8) Principal buildings shall be set back a minimum of 50 feet from the exterior tract boundary of the mixed residential development.

(9) The following standards shall apply to multi-family residential buildings in a mixed residential development:

   (a) The maximum principal building height shall be 45 feet and not more than three stories, subject to the provisions of § 244-156.

   (b) The maximum building length viewed from any elevation shall be 200 feet.

   (c) No multi-family residential building shall contain more than 24 units.

(d) No multi-family residential building containing more than 16 units shall be located within 100 feet of any exterior boundary of the mixed residential development.

(e) No multi-family residential building shall be located closer than 30 feet to any access drive or internal roadway.

(f) No multi-family residential building shall be located closer than 20 feet to any parking area, except for access aisles or driveways to garages and/or carports that serve the multi-family residential building.

(g) The minimum distances between multi-family residential buildings and other principal buildings shall be as follows:

[1] Any building side wall to side wall shall have a minimum distance of 30 feet between the midpoint of said side walls, and/or a minimum distance of 25 feet between the side wall corners.

[2] Any building side wall to front or rear building walls shall be a minimum distance of 40 feet between the midpoint of said walls and/or a minimum distance of 30 feet between the side wall building corner and front or rear wall building corner.

[3] Any front-to-rear, front-to-front or rear-to-rear building wall shall have a minimum distance of 50 feet between the midpoint of said walls and/or a minimum distance of 40 feet between the building wall corners.

(10) Area, Yard and Building Requirements for detached single-family development and two-family development shall be as follows:

(a) Single-Family Dwellings:

[1] Lot area: 12,500 square feet

[2] Lot width: 90 feet

[3] Lot frontage: 75 feet

[4] Lot depth: 120 feet

[5] Front yard setback: 30 feet

[6] Rear yard setback: 30 feet

[7] One-side yard setback: 10 feet

[8] Combined side yard setback: 25 feet

[9] Maximum building height: 35 feet

[10] Maximum accessory building height: 15 feet

[11] Maximum building coverage: 30 percent

[12] Maximum lot coverage: 70 percent

(b) Two-Family Dwellings:

[1] Lot area: 20,000 square feet

[2] Lot width: 170 feet

[3] Lot frontage: 150 feet

[4] Lot depth: 120 feet

[5] Front yard setback: 30 feet

[6] Rear yard setback: 30 feet

[7] Side yard setback: 15 feet

[8] Maximum building height: 35 feet

[9] Maximum accessory building height: 15 feet

[10] Maximum building coverage: 40 percent

[11] Maximum lot coverage; 70 percent

(c) Notwithstanding the bulk requirements for lots for two-family dwellings that are set forth in this section, fee simple units for duplex units shall be permitted, provided that the combined lots shall meet the bulk requirements of section (b) above and further provided that one side yard may be zero.

(d) No accessory building shall be located in any required front yard area on single-family residential and two-family family residential lots.

F. Affordable Housing Requirements.

(1) Twenty percent of the residential units within a mixed residential development, but no less than 192 units, shall be set-aside for low- and moderate-income households. A minimum of 17 percent of the low and moderate income units shall be set-aside for very-low income households per Court-approved Settlement Agreement, the Jackson Township Housing Element and Fair Share Plan, COAH regulations and the Uniform Housing Affordability Controls. The required very-low income units shall be considered part of the low-income unit requirement for the purposes of determining satisfaction of the required 20 percent set-aside.

(2) No more than 110 low and moderate income units shall be located in any given section of a mixed-residential development.

(3) An applicant for final site plan and/or subdivision approval shall submit for approval by the Township Affordable Housing Planner, or designated Administrative Agent, as part of the submission for final approval a project affordable housing plan demonstrating compliance with the Township's Housing Element and Fair Share Plan; prevailing COAH regulations, and the Uniform Housing Affordability Controls.

(4) The developer of a mixed residential development in the MR-AH-8 Zone shall enter into a developer's agreement with the Township of Jackson setting forth the terms, conditions, requirements and obligations of the respective parties.

G. Buffer Requirements.

(1) No use, building, or structure shall be constructed, placed, located or erected within 50 feet of an exterior boundary of the mixed residential development, with the exception of entrance roadways, gatehouses, signs, utilities, fences or walls.

(2) No portion of the tract buffer area shall be part of a private residential or nonresidential lot, but instead shall be part of the common open space used and maintained by the homeowners' association.

   (3) All buffer areas shall be in accordance with the provisions of § 244-50E(2), (3) and (4).

  H. Solid Waste Storage.

   (1) For multi-family residential units, without attached garages, solid waste storage shall be provided in accordance with the provisions of § 244-208.

   (2) Solid waste storage areas shall be in accordance with the provisions of § 244-50S(2), (3) and (4).

  I. Outdoor Lighting.

   (1) All interior development roads, parking areas, dwelling entranceways and pedestrian walks shall be provided with sufficient illumination to minimize hazards to pedestrians and motor vehicles utilizing the same, but, in no case, shall such lighting be less than is required to provide a minimum lighting level of 0.5 horizontal foot-candle throughout such areas from dawn to dusk. Where necessary, lights shall be shielded to avoid glare disturbing to occupants of the buildings. Lighting shall be so arranged as to reflect away from all adjoining residential buildings.

  J. Recreation.

   (1) Passive and active recreation areas, such as pathways, natural woods and fields, seating areas and lawns, shall be provided and suitably arranged throughout the site. A minimum of 25 percent of the tract area shall be provided as open space and recreation in accordance with the requirements set forth in § 244-50O(2) through (8), (9)(a) through (c) and (10) through (12) and § 244-199.

  K. Parking.

   (1) Off-street parking shall be provided in accordance with the requirements of § 244-197 or as otherwise provided pursuant to the New Jersey Residential Site Improvement Standards (N.J.A.C. 5:21-1).

       (2)     Off-street parking shall comply with the requirements set forth in § 244-50P.

L.     Courtyards.

       (1)     Courtyards bounded on three or more sides by wings of the same building or by the walls of separate buildings shall be a minimum court width of three feet for each one foot in height of the tallest building or building wing.

M.    Garages and/or Carports.

       (1)     Garages and/or carports serving multi-family development, when provided in a mixed residential development, shall be in accordance with § 244-50I, § 244-197 and § 244-198.

N.     Homeowners' Association.

       (1)     A homeowners' association, composed of all of the residents of a mixed residential development, shall be created and shall be responsible for the activities per § 244-50J.

O.     Improvements.

       (1)     Unless specified otherwise herein, all public and private improvements on the site of a mixed residential development shall comply with the standards, criteria and requirements of this chapter.

P.     Landscaping.

       (1)     Landscaping within a mixed residential development shall be provided in accordance with the requirements of § 244-193.

Q.     Laundry Equipment.

       (1)     No outside area or equipment shall be provided for the hanging or outside airing of laundry in any manner.

R.     Sectionalization and Staging Plan.

       (1)     A sectionalization and staging plan for the construction of a mixed residential development shall be submitted as part of the preliminary site plan application and shall comply with the requirements set forth in § 244-50Q.

S. Sidewalks and Aprons.

(1) Sidewalks and aprons shall be provided in accordance with the provisions of § 244-203 and shall be designed and constructed as part of an integrated sidewalk system within a mixed residential development.

T. Dwelling Units.

(1) Unit elevations. Each dwelling unit and combined complex of dwelling units shall have a compatible architectural theme with variations in design to provide attractiveness to the development, which shall include consideration of landscaping techniques, building orientation to the site and to other structures, topography, natural features and individual dwelling unit design, such as varying unit widths, staggering unit setbacks, providing different exterior materials, changing rooflines and roof designs, altering building heights and changing types of windows, shutters, doors, porches, colors and vertical or horizontal orientation of the facades, singularly or in combination.

(2) Unit offset. Not more than two consecutive dwelling units in the same building shall be constructed without setbacks, offsets and/or breaks in the front and rear building elevations of at least four feet.

(3) Unit width. Each attached dwelling unit shall have a minimum width of 18 feet.

U. Utilities.

(1) No individual wells or individual sewage disposal systems shall be permitted, and each building shall be serviced with said utilities by a central supply or disposal system, which is approved by the Jackson Township Board of Health, Jackson Township Municipal Utilities Authority and other controlling agencies. No building permit shall be issued unless and until plans for such facilities have been submitted to

the proper authorities for approval and adequate provisions are made to ensure that such necessary facilities shall be installed.

(2)     All buildings shall be connected to an approved and functioning public water supply system and sanitary sewer system prior to the issuance of any certificate of occupancy.

(3)     All utility lines leading to and within the site of a mixed residential development shall be installed underground.

V.     General Development Plan Approval Permitted.

(1)     A developer of a parcel of land greater than 100 acres in size for which the developer is seeking approval of a mixed residential development pursuant to the Municipal Land Use Law, P.L. 1975, c. 291 (N.J.S.A. 40:55D-1 et seq.) may submit a general development plan to the planning board prior to the granting of preliminary approval of that development by the Planning Board.

(2)     The general development plan shall set forth the permitted number and type of dwelling units for the mixed residential development, in its entirety, according to a schedule that sets forth the timing of the various sections of the development. The mixed residential development shall be developed in accordance with the general development plan approved by the Planning Board notwithstanding any provision of P.L. 1975, c. 291 (N.J.S.A. 40:55D-1 et seq.), or an ordinance or regulation adopted pursuant thereto after the effective date of the approval.

(3)     The term of the effect of the general development plan approval shall be determined by the Planning Board using the guidelines set forth in Subsection V(4) of this section, except that the term of the effect of the approval shall not exceed 20 years from the date upon which the developer receives final approval of the first section of the planned development pursuant to P.L. 1975, c. 291 (N.J.S.A. 40:55D-1 et seq.).

(4) In making its determination regarding the duration of the effect of approval of the development plan, the Planning Board shall consider the number of dwelling units to be constructed; prevailing economic conditions, the timing schedule to be followed in completing the development and the likelihood of its fulfillment; the developer's capability of completing the proposed development; and the contents of the general development plan and any conditions, which the Planning Board attaches to the approval thereof.

(5) The following details shall be submitted as part of the general development plan:

(a) A general land use plan indicating the tract area and general location of the permitted uses and residential dwelling unit types to be included in the planned development at a scale of not smaller than one inch equals 200 feet. The total number of dwelling units proposed shall be set forth and the locations of same shall be provided.

(b) A circulation plan showing the general location and types of transportation facilities, including facilities for pedestrian access within the planned development and any proposed improvements to the existing transportation system outside the planned development.

(c) An open space plan showing the proposed land area and a general location of open space and recreation and any other land areas to be set aside for conservation and purposes and a general description of improvements proposed to be made thereon, including a plan for the operation and maintenance of parks, recreational lands and community facilities.

(d) A utility plan indicating the need for and showing the proposed location of sewage and water lines; any drainage facilities necessitated by the physical characteristics of the

site; proposed methods for handling solid waste disposal; and a plan for the operation and maintenance of proposed utilities.

(e) A stormwater management plan setting forth the proposed method of controlling and managing stormwater on the site.

(f) An environmental inventory, including a general description of the vegetation, soils, topography, geology, surface hydrology, climate and cultural resources of the site, existing man-made structures or features, and the probable impact of the development on the environmental attributes of the site.

(g) A community facility plan indicating the scope and type of supporting community facilities, which may include but not be limited to educational or cultural facilities, historic sites, libraries, hospitals, firehouses and police stations.

(h) A housing plan outlining the number of housing units to be provided and the extent to which the proposed development is consistent with the affordable housing requirements pursuant to the Jackson Township Housing Element and Fair Share Plan, COAH Rules, and the Uniform Housing Affordability Controls.

(i) A local service plan indicating those public services, which the applicant proposes to provide and which may include, but not be limited to, water, sewer, cable and solid waste disposal.

(j) A fiscal report describing the anticipated demand on municipal services to be generated by the mixed residential development and any other financial impacts to be faced by Jackson Township as a result of the completion of the development. The fiscal report shall also include a detailed projection of property tax revenues that will accrue to the County, Township and school district according to the timing schedule provided under Subsection V(5)(k) of this section,

and following the completion of the planned development in its entirety.

(k) A proposed timing schedule in the case of a planned development whose construction is contemplated over a period of years, including any terms or conditions, which are intended to protect the interests of the planned development prior to the completion of the development in its entirety.

(6) A municipal development agreement, which shall mean a written agreement between Jackson Township and a developer relating to the proposed development.

(7) Required findings of the Planning Board. Prior to approval of a general development plan, the Planning Board shall find the following facts and conclusions:

(a) That departures by the proposed development from zoning regulations otherwise applicable to the subject property conform to the zoning ordinance standards for mixed residential development.

(b) That the proposals for maintenance and conservation of the common open space are reliable, and the amount, location and purpose of the common open space are adequate.

(c) That provisions, through the physical design of the proposed development, for public services, control over vehicular and pedestrian traffic, and the amenities of light and air, recreation and visual enjoyment are adequate.

(d) That the proposed development will not have an unreasonably adverse impact upon the area in which it is proposed to be established.

(e) In the case of a proposed development that contemplates construction over a period of years, that the terms and conditions intended to protect the interests of the public and of

the residents, occupants and owners of the proposed development in the total completion of the development are adequate.

(8)  In addition, the Board may set forth those conditions, which it deems necessary to protect the interests of the general public and the residents of the mixed residential development. Such conditions shall be predicated on the following criteria:

(a)  That each stage of development shall include required open space in proportion to that part of the total residential units in the development. Such open space shall include both recreation and conservation uses accessible to the resident population within the development.

(b)  That the size and timing of successive stages of a mixed residential development shall be conditioned upon the availability and provision of suitable capacity of facilities such as arterial highways, primary roadways of Ocean County, primary roadways of Jackson Township, sewer, water, stormwater drainage, and other services whose capacities must be expanded as a result of the development.

(9)  General development plan; timing schedule modification. In the event that the developer seeks to modify the proposed timing schedule, such modification shall require the approval of the Planning Board. The Planning Board shall, in deciding whether or not to grant approval of the modification, take into consideration prevailing economic and market conditions, anticipated and actual need for residential units within Jackson Township and the region, and the availability and capacity of public facilities to accommodate the proposed development.

(10)  General development plan hearing on modifications required.

(a) The developer may make amendments or revisions to the general development plan. However, the developer shall be required to gain the prior approval of the Planning Board if, after approval of the mixed residential development, the developer wishes to make any variation in the location of land uses or to increase the density of residential development.

(b) Any variation in the location of land uses or increase in density proposed in reaction to a negative decision of or condition of development approval imposed by the Pinelands Commission pursuant to P.L. 1979, c. 111 (N.J.S.A. 13:18A-1 et seq.), or Department of Environmental Protection pursuant to P.L. 1979, c. 111 (N.J.S.A. 13:18A-1 et seq.), shall be approved by the Planning Board if the developer can demonstrate, to the satisfaction of the Planning Board, that the variation being proposed is a direct result of such determination by the Pinelands Commission or the Department of Environmental Protection, as the case may be.

(11) General development plan on modifications not required. Once a general plan has been approved by the Planning Board, it may be amended or revised only upon application by the developer approved by the Planning Board.

(12) Certification upon completion; failure to complete or comply; termination of approval.

(a) Upon the completion of each section of the development as set forth in the approved general development plan, the developer shall notify the administrative officer, by certified mail, as evidence that the developer is fulfilling his obligation under the approved plan. For the purposes of this section, "completion" of any section of the development shall mean that the developer has acquired a certificate of occupancy for

every residential unit as set forth in the approved general development plan and pursuant to Section 15 of P.L. 1975, c. 217 (N.J.S.A. 52:27D-133).

[1] If the Township does not receive such notification at the completion of any section of the development, the Township shall notify the developer, by certified mail, in order to determine whether or not the terms of the approved plan are being complied with.

[2] If a developer does not complete any section of the development within 2 years of the date provided for in the approved plan, or if at any time the Township has cause to believe that the developer is not fulfilling his obligations pursuant to the approved plan, the Township shall notify the developer, by certified mail, and the developer shall have 30 days within which to give evidence that he is fulfilling his obligations pursuant to the approved plan. The Township thereafter shall conduct a hearing to determine whether or not the developer is in violation of the approved plan. If, after such a hearing, the Township finds good cause to terminate the approval, it shall provide written notice of same to the developer and the approval shall be terminated 30 days thereafter.

(b) In the event that a developer who has general development plan approval does not apply for preliminary approval for the planned development that is the subject of that general development plan approval within five years of the date upon which the general development plan has been approved by the Planning Board, the Township shall have cause to terminate the approval.

(13) General development plan satisfactory completion. In the event that a development that is the subject of an approved general development plan is completed before the end of the term of the approval, the approval shall terminate with the completion of the development. For the purposes of this section, a development shall be considered complete on the date upon which a certificate of occupancy has been issued for the final residential unit in the last section of the development in accordance with the timing schedule set forth in the approved general development plan and the developer has fulfilled all obligations pursuant to the approval.

(14) General development plan approval procedure.

(a) The Planning Board shall grant or deny general development plan approval within 95 days after submission of a complete application to the administrative officer, or within such further time as may be consented to by the applicant. Failure of the Planning Board to act within the period prescribed shall constitute general development plan approval of the planned development.

**SECTION 4.** All ordinances or parts of ordinances inconsistent herewith are hereby repealed.

**SECTION 5.** If any section, subsection, sentence, clause, phrase or portion of this ordinance is for any reason held to be invalid or unconstitutional by a court of competent jurisdiction, such portion shall be deemed a separate, distinct and independent provision, and such holding shall not affect the validity of the remaining portions hereof.

**SECTION 6.** This ordinance shall take effect after second reading and publication as required by law.

Date: ____________________ ________________________________

Michael Reina
MAYOR

**NOTICE**

**NOTICE IS HEREBY GIVEN** that the foregoing ordinance was introduced and passed by the Township Council on first reading at a meeting of the Township Council of the Township of Jackson held on the 13th day of June, 2017, and will be considered for second reading and final passage at a regular meeting of the Township Council to be held on the 27th day of June, 2017 at 7:00 p.m. or as soon thereafter as this matter can be reached, at the Jackson Township Municipal Building, located at 95 West Veterans Highway, Jackson, New Jersey, at which time and place any persons desiring to be heard upon the same will be given the opportunity to be so heard.

__________________________
Ann Marie Eden, RMC
Township of Jackson

*Amended Housing Element and Fair Share Plan*
*June 8, 2017*

# Appendix D: DVT Enterprises, LLC (Maplewood Estates) Settlement Agreement

# SETTLEMENT AGREEMENT

This Settlement Agreement is entered into on this 21 day of June, 2010 by and between **DVT ENTERPRISES, LLC, a/k/a MAPLEWOOD ESTATES** ("Plaintiff" or "Developer") and **JACKSON TOWNSHIP PLANNING BOARD** and the **TOWNSHIP OF JACKSON** ("Defendant") (collectively referred to as the "Parties").

**WHEREAS,** the plaintiff has received a final major subdivision approval on May 16, 2005 for premises known as Block 17201, Lots 1, 37 and 38 (formerly Block 9.01, Lots 173.02, 174.01 and 174.02) in the Township of Jackson, for a subdivision creating a total of thirteen (13) residential building lots which includes twelve (12) new building lots and one (1) existing home (the "Project"); and

**WHEREAS**, the Plaintiff has filed a Complaint against the Defendants on or about January 30, 2009; and

**WHEREAS,** the Defendant, Township of Jackson, served an Answer, Counterclaim and Third Party Complaint dated March 20, 2009 and the Defendant, Jackson Township Planning Board, filed an Answer and Separate Defenses on or about February 27, 2009 (the Third Party Defendant, Counsel on Affordable Housing ("COAH") has been dismissed as a party to this action.); and

**WHEREAS,** the Plaintiff's Complaint specifically addresses Jackson Township Ordinance 109-198.1, referred to as the Jackson Township "Growth Share Ordinance," which Ordinance imposes a requirement to provide affordable housing pursuant to the FHA and COAH's rules on developers for the creation of affordable housing, which obligation is determined pursuant to said Ordinance; and

**WHEREAS,** the parties hereto have reached an agreement to settle the dispute as more fully set forth herein, do hereby agree to the settlement of the action currently pending in the Superior Court of New Jersey, Ocean County, Law Division, bearing Docket No. OCN-L-447-09.

**NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and in consideration of the mutual covenants and undertakings set forth herein and without making any admissions as to any of the claims in either the Complaint, Answer or Counterclaim, the parties desire to enter into this Settlement Agreement for the purposes of resolving the issues related to the above-captioned litigation as follows:

1) Plaintiff agrees to execute or cause to be executed any and all documents required to deed restrict the use of the home currently existing on proposed Block 173.03 to a moderate for sale affordable unit which will be targeted to a sixty percent (60%) of median income three (3) person household. The deed restriction, affirmative marketing, sale and use of the home referenced herein shall, where applicable, be in accordance with the Uniform Housing Affordability Controls, N.J.A.C. 5:80-26 et seq., the Fair Housing Act, N.J.S.A. 52:27D-301 et seq., and N.J.A.C. 5:97 et seq. The aforesaid restriction shall be effective from the time that the Developer receives a total of six (6) Certificates of Occupancy (C.O.) for the Project. The deed restriction shall be recorded with the Ocean County Clerk within 30 days of the issuance of the sixth Certificate of Occupancy being issued by the Township for the Defendant.

2) Plaintiff agrees to pay to the Defendant, Jackson Township, a fee in the amount of and not to exceed $76,114.00 (Seven Six Thousand One Hundred Fourteen Dollars and No Cents), which fee may be used by the Township, pursuant to the FHA, to offset any affordable housing/growth share obligation that may arise from this development application or for any other eligible purpose for expenditure of affordable housing trust funds under the FHA and applicable rules implementing the Act. Such payment shall be in full and final satisfaction of any and all affordable housing obligation requirement and/or fee which may be imposed upon the plaintiff relating to the subject development application.

3) The parties shall attend to the execution of any and all maps of subdivision, Developer's Agreements allowing the plaintiff to file the plat and map of subdivision within 30 days of the court approval of the Settlement Agreement pursuant to the Fairness Hearing subject to confirmation from the Planning Board Engineer that the Plaintiff has achieved compliance with the resolution requirements.

4) All parties to this Agreement hereby further acknowledge and agree that the plaintiff's payment of $76,114.00 (Seventy-Six Thousand One Hundred Fourteen Dollars and No Cents) is intended to assist the township in addressing its Affordable Housing Growth Share Obligations. It being further agreed by and between the parties that Jackson Township will seek to receive the benefit of N.J.A.C. 5:97-3.17 as part of the Fairness Hearing. If at the Fairness Hearing the Special Master and the Court determine that the Township is entitled to receive the benefit of N.J.A.C. 5:97-3.17, then the Township shall be permitted to claim three (3) credits pertaining to

this approval against the Jackson Township's third Round Affordable Housing/growth share obligation.

5) The parties do fully and completely release and discharge one another from any and all claims which were raised or may be raised as part of the litigation captioned herein and filed under docket number OCN-L-447-09.

6) The parties further agree that the Plaintiff shall pay the $76,114 in the proportionate amount of and at the time the Developer receives a Certification of Occupancy (C.O.) for each new residential unit. ($76,114.00/12 units = $6,342.84 per unit, which shall be payable at the time each C.O. is issued.)

7) The Parties further agree that if the FHA or –the rules and/or policies implementing the FHA are altered to reduce the obligation of municipalities or developers to less than the Developer's obligation agreed to in this Agreement,, then and in such an event, the Developer's obligations under this Agreement shall be reduced to reflect the new obligation, including removal of the restriction outlined in Paragraph 1 hereof. However, in no event, shall the Plaintiff/Developer's obligation be less than the monetary contribution set forth in paragraph (6) six herein.

8) This agreement is specifically conditioned upon the Planning Board and Township Council adopting a resolution authorizing the settlement of this matter in accordance with this agreement. Each entity shall be responsible to secure such duly adopted and executed resolution. The agreement is also conditioned upon the Court's approval of the settlement agreement at a fairness hearing on notice and the Court's determination that the Township is entitled to claim bonus credits pursuant to N.J.A.C. 5:97-3.17.

9) Within ten (10) days of complete execution of this agreement by all parties, including the adoption of resolutions authorizing settlement of this matter by the Planning Board and Township Council, the Township shall send out the appropriate notice of a Fairness Hearing as specified by the Court/Court Master to be conducted by the Court to give the public and interested parties the opportunity to be heard regarding this settlement. The Court must also conduct the appropriate and required fact finding and legal determinations that this settlement is consistent with law and equity and is in the best interests of the protected class. All of the parties to this agreement have agreed to participate and cooperate in the fairness hearing and shall be required to use best efforts to secure a Court Order approving of this settlement. If the Court finds that the settlement is sufficient and that the Township is entitled to claim bonus

credits pursuant to N.J.A.C. 5:97-3.17, then this agreement shall become binding on the parties. If the Court does not approve of this agreement and/or the bonus credit pursuant to N.J.A.C. 5:97-3.17, as a result of the fairness hearing, this matter shall be returned to the active trial list automatically for disposition as appropriate by the Court.

10) The Parties further agree that the Plaintiff's Development Application was approved prior to the adoption, in August 2009, of the Chapter 100 and the provisions thereof were not in force or effect at the time of the Plaintiff's Application and therefore do not attach to the Plaintiff's application.

Notices: All notices, requests, demands, acceptances and other communications which are required or permitted under this Agreement shall be in writing and shall be deemed to have been duly given when delivered to the party or the attorney representing the party (I) when delivered personally, or (ii) when sent by fax if sent on a business day prior to 5:00 p.m. local time at the place of receipt, or on the following business day if sent after 5:00 p.m. or on a non-business day, or (iii) on the day following delivery to a courier service if sent by next day delivery via a recognized international courier service, or (iv) five days after the date when mailed by registered or certified mail, return receipt requested, postage prepaid.

Binding Effect Benefits: This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective heirs, administrators, executors, successors and assigns.

Nothing in this Agreement, express or implied, is intended to confer on any person other than the parties hereto or their respective heirs, administrators, executors, successors and assigns, any rights, remedies, obligations or liabilities. This agreement may be recorded with the Ocean County Clerk's Office by any party.

Governing Law / Waiver of Jury Trial: The interpretation and performance of this Agreement shall be governed by and construed in accordance with the laws of the State of New Jersey, without regard to such State's conflicts of law principles. The terms and conditions contained herein are to be resolved in Ocean County, New Jersey, without a jury.

Default: In the event of a default by the developer in making any payments pursuant to this Agreement, the Township shall be permitted at its discretion to issue a stop work order for the entire project and/or shall be permitted to withhold the issuance of any C.O.'s, and/or withhold the release of any performance bonds as may be associated with this project. The action taken by the township in this regard shall remain in effect until the event of default has been cured.

Headings: Headings of the Sections in this Agreement are for reference purposes only and shall not be deemed to have any substantive effect.

Counterparts: This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same instrument.

Entire Agreement: This Agreement is the entire agreement by and between the parties.

This Agreement may not be modified or altered in any form without the express written consent of all parties, which agreement must be in writing and signed by each party hereto.

**IN WITNESS WHEREOF,** the undersigned have signed this Settlement Agreement on the date set forth below.

Witness: Date: Name:

6/21/10

**DVT ENTERPRISES, LLC, a/k/a MAPLEWOOD ESTATES,**

Planning Board Sec'y 4-5-10

**JACKSON TOWNSHIP PLANNING BOARD**

Township Clerk 3-15-10

**TOWNSHIP OF JACKSON**

*Amended Housing Element and Fair Share Plan*
*June 8, 2017*

# Appendix E: Ordinance No. 6-17

**ORDINANCE NO. 06-17**

**AN ORDINANCE OF THE TOWNSHIP OF JACKSON, COUNTY OF OCEAN, STATE OF NEW JERSEY, AMENDING CHAPTER 244 OF THE TOWNSHIP CODE OF THE TOWNSHIP OF JACKSON, ENTITLED "LAND USE AND DEVELOPMENT REGULATIONS" WHEREBY ESTABLISHING ADDITIONAL ZONING DISTRICTS KNOWN AS "MIXED USE NEIGHBORHOOD CENTER/HIGHWAY COMMERCIAL ZONE" AND "MIXED USE NEIGHBORHOOD CENTER/LIGHT INDUSTRIAL ZONE"**

**NOW, THEREFORE, BE IT ORDAINED,** by the governing body of the Township of Jackson, County of Ocean, State of New Jersey, as follows:

**SECTION 1.** The Zoning Map of the Township of Jackson is hereby amended to establish the boundaries of the Mixed Use Neighborhood Center/Highway Commercial (MUNC/HC) and Mixed Use Neighborhood Center/Light Industrial (MUNC/LM) zoning districts in accordance with the map entitled "Mixed Use Neighborhood Center Zoning Amendment" prepared by JDM Planning Associates, LLC dated 12/10/13 attached hereto and part of this Ordinance. The following parcels shall be designated as follows:

| Block | Lots (Zoned – MUNCH/LM) | Block | Lots (Zoned-MUNC/HC) |
|---|---|---|---|
| 2502 | 1 and 2 | 2402 | 1 through 8 |
| 2403 | 1 through 12 | 4201 | 1, 2, 3, 56 & 57 |
| 2503 | 1 through 10 | 4301 | 1, 2, 3 & 4 |
| 2504 | 1 & 2 | 2301 | 1, 2, 26, 28, 29 & 30 |

**SECTION 2.** The Township Code of the Township of Jackson is hereby amended and supplemented so as to amend Chapter 244, entitled "Land Use and Development Regulations," so as to amend §244-42 entitled "List of Zones" so as to add the following zoning districts:

MUNC/HC – Mixed Use Neighborhood Center/Highway Commercial Zone
MUNC/LM – Mixed Use Neighborhood Center/Light Industrial Zone

LMORE & MONAHAN
A Professional Corporation
COUNSELLORS AT LAW
llen Street Professional Center
Ten Allen Street
P.O. Box 1540
Toms River, New Jersey 08754

**SECTION 3.** The Township Code of the Township of Jackson is hereby amended and supplemented so as to amend Chapter 244, entitled "Land Use and Development Regulations," so as to add §244-57.1 which shall be entitled "MUNC/HC – Mixed Use Neighborhood Center/Highway Commercial Zone" and which shall read as follows:

A. Permitted principal uses of buildings and structures are as follows:
   (1) All principal uses permitted in the HC Highway Commercial Zone; and
   (2) Mixed Use Neighborhood Centers in accordance with the provisions of Section 244-239 of this Chapter.

B. Permitted accessory uses of buildings and structures are as follows:
   (1) All accessory uses of buildings and structures permitted in the HC Highway Commercial Zone.

C. Conditional uses, subject to the provisions of Article VIII of this Chapter as follows:
   (1) All conditional uses in the HC Highway Commercial Zone.

D. Area, yard and building requirements for the MUNC/HC Zoning District are as follows:
   (1) Same as in HC Highway Commercial Zone.

**SECTION 4.** The Township Code of the Township of Jackson is hereby amended and supplemented so as to amend Chapter 244, entitled "Land Use and Development Regulations," so as to add §244-62.1 which shall be entitled "MUNC/LM – Mixed Use Neighborhood Center/Light Industrial" and which shall read as follows:

A. Permitted principal uses of buildings and structures are as follows:
   (1) All principal uses permitted in the LM Commercial Office/Light Industrial Zone; and
   (2) Mixed Use Neighborhood Centers in accordance with the provisions of Section 244-239 of this Chapter.

B. Permitted accessory uses of buildings and structures are as follows:
   (1) All accessory uses of buildings and structures permitted in the LM Office Commercial/Light Industrial Zone.

C. Conditional uses, subject to the provisions of Article VIII of this Chapter as follows:

LMORE & MONAHAN
A Professional Corporation
COUNSELLORS AT LAW
llen Street Professional Center
Ten Allen Street
P.O. Box 1540
Toms River, New Jersey 08754

            (1) All conditional uses in the LM Office Commercial/Light Industrial Zone.

D. Area, yard and building requirements for the MUNC/LM Zoning District are as follows:

(1) Same as in the LM Commercial Office/Light Industrial Zone.

**SECTION 5.** The Township Code of the Township of Jackson is hereby amended and supplemented so as to amend Chapter 244, entitled "Land Use and Development Regulations," so as to add Article XV which shall be entitled "Mixed Use Neighborhood Centers."

**SECTION 6.** The Township Code of the Township of Jackson is hereby amended and supplemented so as to amend Chapter 244, entitled "Land Use and Development Regulations," so as to add §244-239 within Article XV which shall be entitled "Mixed Use Neighborhood Centers (MUNC) and which shall read as follows:

In zones where a Mixed Use Neighborhood Center (MUNC) is a permitted principal use, the following shall apply:

A. General Requirements. The following general requirements for a Mixed Use Neighborhood Center development shall apply:

(1) In all zones where Mixed Use Neighborhood Centers are a permitted principal use and an applicant proposes the development of a Mixed Use Neighborhood Center or addition to same, the provisions of this section shall apply and supersede the remaining zoning provisions of the particular zone;

(2) The minimum tract size of a Mixed Use Neighborhood Center shall be twenty (20) contiguous acres. This subsection shall not prohibit the subdivision of property within a Mixed Use Neighborhood Center into lots less than twenty (20) acres subject to the minimum lot area requirements set forth in section F. below;

(3) Not more than sixty (60) percent of the total number of dwelling units shall be located in buildings of the same type.

(4) Not more than ten (10) percent of the total number of dwelling units, including required affordable units, shall have three or more bedrooms;

(5) No detached single-family dwellings shall be permitted in a Mixed Use Neighborhood Center;

LMORE & MONAHAN
A Professional Corporation
COUNSELLORS AT LAW
llen Street Professional Center
Ten Allen Street
P.O. Box 1540
Toms River, New Jersey 08754

(6) No dwelling unit in the Mixed Use Neighborhood Center shall have four (4) or more bedrooms;

(7) The initial Mixed Use Neighborhood Center approved under this section shall provide for both a minimum of one thousand three hundred sixty five (1365) dwelling units, of which 20% or a minimum of two hundred seventy three (273) shall be affordable family rental units, and a minimum of two hundred seventy three thousand square feet (273,000) of required commercial space consistent with section H. below; and

(8) A Developer's Agreement shall be required as a condition of any approval of a Mixed Use Neighborhood Center.

B. Permitted principal uses of buildings and structures are as follows:

(1) Retail establishments excluding the sale or rental of non-fossil fueled motor vehicles;

(2) Business offices and services, including but not limited to, real estate and travel agencies, insurance, advertising, financial, and printing and copying;

(3) Personal service establishments, including but not limited to, barber shops, tailor, beauty salon, dry cleaning (with no cleaning done on-premises), and pet grooming (with no boarding facilities);

(4) Health clubs, day spas, and fitness centers;

(5) Studios for dance, music, art, crafts, gymnastics, martial arts, and photography;

(6) Professional offices for medical, health services, law, engineering, architecture, and accounting;

(7) Establishments serving food or beverages (alcoholic and non-alcoholic) to the general public, such as restaurants, cafés, delicatessens, taverns, bars, pubs, micro-breweries, nightclubs, confectionery and ice cream shops, excluding drive thru facilities but including walk-up windows and outdoor dining, provided adequate pedestrian access is maintained;

(8) Adult and child day care facilities, and early learning centers;

(9) Banks and financial services excluding businesses with check cashing as primary or principal service;

(10) Indoor commercial recreation facilities, including bowling alley, skating rink, swimming pool, and amusements and entertainment for children;

(11) Bed and breakfast inns and homes;

(12) Hotels, motels, and extended stay facilities limiting stays to less than 45 days or less;

LMORE & MONAHAN
A Professional Corporation
COUNSELLORS AT LAW
llen Street Professional Center
Ten Allen Street
P.O. Box 1540
Toms River, New Jersey 08754

(13) Private clubs and fraternal organizations;

(14) Art galleries, museums, and theatres (motion picture and stage, but excluding adult entertainment venues);

(15) Multi-family dwellings, including multi-family dwelling units in mixed use buildings;

(16) Townhouses of four (4) or more units per building;

(17) Live-work units and loft style apartments in mixed use buildings only;

(18) Surface parking and parking structures;

(19) Municipal, County, State, and Federal offices and buildings;

(20) Municipal County, and State open space, parks and playgrounds;

(21) Police, fire and emergency sub-stations;

(22) Transit facilities and shelters;

(23) Private open space, parks, playgrounds, plazas, squares, courtyards, urban gardens, clubhouses, community buildings and facilities for the use of residents and visitors of the Mixed Use Neighborhood Center; and

(24) Essential services.

C. Permitted temporary uses are as follows:

(1) Outdoor art and craft shows, antique shows, flea markets or group activities in accordance with the provisions of §244-158;

(2) Municipally sponsored events and festivals;

(3) Street vending and kiosks subject to the requirements of §310-1 et seq.;

(4) Seasonal outdoor retail sales in accordance with the provisions of §244-158;

D. Permitted accessory buildings and uses are as follows:

(1) Fences and walls subject to the design standards in §244-239(K)(9) below;

(2) Signs subject to the design standards in §244-239(k)(7) below;

(3) Off-street parking and loading facilities in accordance with the provisions of §244-239(K)(6) below;

(4) Public restrooms;

(5) Parks, playgrounds, recreational facilities and buildings, community buildings, and clubhouses;

(6) Detached garages;

(7) Production of electrical power through alternative sources including but not limited to natural gas;

(8) Minor solar or photovoltaic energy facilities or structures; and

(9) Automobile electrical charging stations.

LMORE & MONAHAN
A Professional Corporation
COUNSELLORS AT LAW
llen Street Professional Center
Ten Allen Street
P.O. Box 1540
Toms River, New Jersey 08754

E. Conditional Uses

(1) Farmers Market – Farmers Markets may be permitted as a conditional use in the Mixed Use Neighborhood Center zone, provided that the lot, use and structures shall adhere to the minimum standards of the particular zone and the following:

(a) No area for outdoor sales or storage shall be located within the front yard area or closer to the rear and side property lines than the required rear yard and side yard setbacks for accessory buildings for the particular zone

(b) The retailing of farm products raised off-site and transported to the property in question for sale is permitted

(c) Parking shall be provided in accordance with the provisions set forth at §244-239(K)(6) below

F. Area, yard and building requirements for a Mixed Use Neighborhood Center (MUNC) shall be in accordance with the following table:

| | Min. Lot Area (Sq. Ft.) | Min. Lot Width (Ft.) | Min. Lot Depth (Ft.) | Min. Front Yard Set-back (Ft.) | Min. Side Yard Set-back (Ft.) | Min. Rear Yard Set-back (Ft.) | Max. Building Height (Ft.) | Max. Building Coverage (%) | Max. Lot Coverage (%) |
|---|---|---|---|---|---|---|---|---|---|
| **Mixed Use Building Lots** | 10,000 | 100 | 100 | 5 | 0 | 20 | 65 | 75 | 100 |
| **Multi-Family Residential Lots** | 4,250 | 50 | 85 | 15 | 25 | 30 | 65 | 65 | 80 |
| **Townhouse (Fee Simple) Lots** | 1,800 | 18 | 90 | 15 | 0 | 25 | 40 | 75 | 85 |
| **Freestanding Non-Residential Use Lots** | 5,000 | 50 | 100 | 15 | 20 | 25 | 65 | 65 | 85 |
| **Freestanding Large Retail Establishment Lots** | 100,000 | 250 | 250 | 50 | 30 | 50 | 45 | 50 | 80 |
| **All other Non-Residential Permitted Use Lots** | 5,000 | 50 | 100 | 15 | — | 25 | 45 | 60 | 75 |

G. Residential Development Linked to Commercial Development

LMORE & MONAHAN
A Professional Corporation
COUNSELLORS AT LAW
Allen Street Professional Center
Ten Allen Street
P.O. Box 1540
Toms River, New Jersey 08754

(1) The maximum number, and the timing of the construction and occupancy, of dwelling units permitted in a Mixed Use Neighborhood Center shall be determined by the amount of qualifying commercial development, as defined and limited herein; the total number of residential units to be constructed in a Mixed Use Neighborhood Center shall not exceed 2,500 units;

(2) Commercial development as defined herein shall mean the gross floor area of a building or buildings, or portions thereof, within the Mixed Use Neighborhood Center used for non-residential, non-tax exempt purposes;

(3) Except as otherwise excluded or limited herein pursuant to subsection H. below, the developer of a Mixed Use Neighborhood Center shall be permitted to develop one (1) dwelling unit for every two hundred (200) square feet of qualifying commercial development;

(4) The total number of dwelling units within a Mixed Use Neighborhood Center shall be determined at the time of the grant of preliminary site approval by the Planning Board based upon the amount of qualifying commercial development approved as part of the same preliminary site plan approval, however the total number of residential units to be constructed in a Mixed Use Neighborhood Center shall not exceed 2,500 units.

H. Limitations and Exclusions. The amount of commercial development used to determine the maximum number of dwelling units permitted (qualifying commercial development) in a Mixed Use Neighborhood Center pursuant to subsection G.(3) above shall be established based upon the following limitations and exclusions from the total amount of commercial development:

(1) A minimum of fifteen percent (15%) of the amount of qualifying commercial development used for determining the permitted number of dwelling units pursuant to G(3) above shall be located within mixed use buildings;

(2) Commercial floor area for a single grocery store/food market up to fifty thousand (50,000) square feet shall be considered qualifying commercial development for the purposes of determining the maximum number of dwelling units permitted in the Mixed-Use Neighborhood Center pursuant to G(3) above. Commercial floor area of such grocery store/food market in excess of fifty thousand (50,000) square feet is permitted but shall not be considered qualifying commercial development.

(3) The amount of qualifying commercial development used to determine the maximum number of dwelling units permitted within the Mixed

LMORE & MONAHAN
A Professional Corporation
COUNSELLORS AT LAW
llen Street Professional Center
Ten Allen Street
P.O. Box 1540
Toms River, New Jersey 08754

Use Neighborhood Center pursuant to G(3) above may include up to two (2) ground level single use buildings or users of up to thirty five thousand (35,000) square feet each. Commercial floor area in each of the two (2) ground level single use buildings or users in excess of thirty five thousand square feet shall be permitted but shall not be considered qualifying commercial development.

(4) Except as otherwise provided in H(2) and H(3) above, commercial floor area in excess of fifteen thousand square feet for any ground level single user **not** in a mixed use building shall be permitted but excluded as qualifying commercial development in determining the maximum number of dwelling units permitted pursuant to G(3) above;

(5) The total amount of qualifying commercial development permitted pursuant to H(2) and H(3) above shall not constitute more than forty percent (40%) of the total amount of qualifying commercial development used in determining the maximum number of permitted dwelling units pursuant to G(3) above.

(6) Additional dwelling units may be added to a Mixed Use Neighborhood Center at a rate of one (1) dwelling unit per two hundred (200) square feet of additional qualifying commercial development subject to the limitations and exclusions of this section and an amended preliminary site plan approval;

(7) Large retail establishments and other freestanding single user commercial buildings in excess or fifteen thousand (15,000) square feet are generally to be discouraged within the interior of Mixed Use Neighborhood Centers. Nothing in this subsection shall prohibit or discourage the development of large retail establishments and other large free standing single use commercial buildings in excess of fifteen thousand (15,000) square feet along the periphery of Mixed Use Neighborhood Centers, provided such facilities have direct access to either Ocean County Routes 526 (Commodore Boulevard) or 527 (Cedar Swamp Road) and are reasonably connected to the Mixed Use Neighborhood Center and further provided such commercial development shall not be considered qualifying commercial development unless otherwise provided pursuant to H.(2) , H.(3), or H.(4) above.

LMORE & MONAHAN
A Professional Corporation
COUNSELLORS AT LAW
llen Street Professional Center
Ten Allen Street
P.O. Box 1540
Toms River, New Jersey 08754

I. Phasing of Residential Units to Commercial Development Required. The occupancy of residential units within a Mixed Use Neighborhood Center shall be subject to the following:

(1) At the time of preliminary approval the specific commercial development used to determine the total number of permitted residential units (qualifying commercial development) pursuant to subsection G. (3) above shall be clearly identified;

(2) The issuance of Certificates of Occupancy (COs) for residential units in the Mixed Use Neighborhood Center shall be based upon the issuance of Certificates of Approval for the required commercial development in accordance with the following table:

| **Certificates of Approval Issued (Percent of Required Commercial Space)** | **Eligible for Certificates of Occupancy (Percent of Approved Units)** |
|---|---|
| 0 | 35 |
| 25 | 50 |
| 50 | 75 |
| 75 | 90 |
| 100 | 100 |

(3) The main civic space (Village Green) shall be complete prior to the issuance of COs for any residential units in excess of the five hundredth (500th) approved dwelling unit in the Mixed Use Neighborhood Center.

J. Affordable Housing Requirements

(1) Every Mixed Use Neighborhood Center, or addition thereto, shall have an affordable housing set aside requirement as determined by the Township's Housing Element and Fair Share Plan, Consent Order approved the Court, or in accordance with the Developer Agreement required as part of preliminary site plan approval;

(2) Twenty percent (20%) of the first 1365 dwelling units in the initial Mixed Use Neighborhood Center or two hundred seventy three (273) shall be low and moderate-income family rental units. A minimum of thirteen percent (13%) of the total number of low and moderate income units shall be affordable to households of very low income;

(3) Additional dwelling units beyond the first 1365 in the initial Mixed Use Neighborhood Center, dwelling units in additional new Mixed Use Neighborhood Centers beyond the initial, and any expansion of a Mixed Use Neighborhood Center shall provide an affordable housing set aside of fifteen percent (15%) of the total number of dwelling units for rental units and twenty percent (20%) for for-sale units. A

LMORE & MONAHAN
A Professional Corporation
COUNSELLORS AT LAW
Allen Street Professional Center
Ten Allen Street
P.O. Box 1540
Toms River, New Jersey 08754

minimum of thirteen percent (13%) of all low and moderate income units shall be affordable by very low income households:

(4) Required affordable units shall be reasonably integrated and dispersed among the market rate rental or sale units in the Mixed Use Neighborhood Center.

(5) All affordable units within the Mixed Use Neighborhood Center shall be built and operated in accordance with prevailing Council on Affordable Housing (COAH) regulations in effect at the time of preliminary approval and the Uniform Housing Affordability Controls (N.J.A.C. 5:80-26.1 et seq.);

(6) An applicant for preliminary site plan approval shall submit for approval as part of the submission for preliminary approval a project affordable housing plan demonstrating compliance with the Township's Housing Element and Fair Share Plan; prevailing COAH regulations, and the Uniform Housing Affordability Controls.

K. Design and Improvement Standards. The following design and improvement standards shall apply in a Mixed-Use Neighborhood Center, notwithstanding any conflict with the design and improvement standards elsewhere in this Chapter:

(1) Pedestrian Ways, Road, Street and Block Design Standards

(a) All streets, alleys and pedestrian pathways shall connect to other streets, and connect to existing and projected streets outside the neighborhood.

(b) Modular masonry materials, such as brick, slate, stone and concrete pavers, or cast-in-place paving materials, such as poured concrete, exposed aggregate concrete slabs, shall be used on sidewalks, pedestrian ways, crosswalks, public or semi-public plazas, courtyards and open spaces.

(c) No block shall have a length greater than four hundred (400) feet without an alley or pedestrian pathway providing through access to another street or alley. No block shall have a length of less than 150 feet, measured centerline to centerline of adjoining streets.

(d) Curb interruptions are permitted only for alleys, driveways, barrier-free access and other parking access points specified herein.

(e) A hierarchy of streets shall be utilized, providing for the respective needs of pedestrians, bicycles and automobiles. The Street Hierarchy and Circulation Plan developed as part of the approval of a Mixed Use Neighborhood Development shall

LMORE & MONAHAN
A Professional Corporation
COUNSELLORS AT LAW
Allen Street Professional Center
Ten Allen Street
P.O. Box 1540
Toms River, New Jersey 08754

generally follow the classifications, dimensional requirements, and design standards for same set forth in Appendix A or as otherwise provided pursuant to the standards contained in N.J.A.C. 5:21-4.1 through 4.5, utilizing the cumulative average daily traffic (ADT) for both residential and non-residential traffic volumes. A bicycle/pedestrian circulation component shall be included as part of the overall circulation plan.

(f) A Mixed Use Neighborhood Center shall have a minimum of three (3) access roads providing separate ingress and egress on to either Ocean County Route 526 or 527. No parallel parking shall be permitted along any roadway segment ingressing a Mixed Use Neighborhood Center within one hundred (100) feet of either Ocean County Route 526 or 527.

(g) The circulation and roadway plan for the Mixed Use Neighborhood Center shall include to the maximum extent practicable provisions to accommodate public transportation, including but not limited to: bus stops; transit shelters; bicycle racks; taxi stops; etc.

(2) General Building Design Standards

(a) The first (i.e., closest to sidewalk grade) level residential unit shall be raised a minimum of two (2) feet above average sidewalk grade unless handicap access to such building is required.

(b) An encroachment of not more than eight (8) feet may be permitted into required front or rear yard setback for: first floor unenclosed front and rear porches, stoops, stairs, and balconies. Stairs/steps may encroach into the required front yard setback to within twelve inches (12") of the property line. An encroachment of not more than five (5) feet may be permitted into required setbacks for bay windows and cornices, provided the length of the encroachment comprises less than fifty (50) per cent of the length of the façade.

(c) Building elements, canopies, and marquees, along streets serving predominately mixed residential and non-residential uses, may extend into required setbacks provided a minimum ten (10) feet of vertical clearance is maintained over all pedestrian ways.

(d) All wall-mounted mechanical, electrical, communication, and service equipment, including, including satellite dishes and

LMORE & MONAHAN
A Professional Corporation
COUNSELLORS AT LAW
Allen Street Professional Center
Ten Allen Street
P.O. Box 1540
Toms River, New Jersey 08754

vent pipes, shall be screened from nearby streets by parapets, walls, fences, landscaping, or other approved measures.

(e) All rooftop mechanical equipment and other appurtenances shall be screened, to the maximum extent practicable, from the view of all adjoining properties and building floors. The following, when above the roofline, require screening: stair wells; elevator shafts; air conditioning units; large vents; heat pumps; and mechanical equipment.

(f) Buildings on corner lots shall be considered significant structures. If deemed appropriate by the approving Board corner buildings may be designed with additional height and architectural treatments, such as towers to emphasize their location.

(g) Buildings located at gateways to the Village Green or a central mixed use or commercial concentration shall mark the transition to such areas using massing, additional height and/or architectural embellishments to achieve the effect of entry into the Village Green.

(3) Commercial and Mixed Use Building Design Standards

(a) Commercial buildings shall provide a shop front at sidewalk level along the entire length of its frontage, with the exception of lobbies and building services serving the residential component of mixed-use buildings. The shop front shall be no less than 60% glazed in clear glass and may be shaded by an awning, which may overlap the sidewalk.

(b) Stories may not exceed 14 feet in height from finished floor to finished ceiling, except for: a first floor commercial function, which shall be a minimum of 10 feet with a maximum of 25 feet; and the uppermost story of a building, which may not exceed 16 feet. A single floor level exceeding 16 feet, or 25 feet at ground level, shall be counted as two (2) stories. A mezzanine extending beyond 33% of the floor area shall be counted as an additional story.

(c) Residential uses, except for lobbies, entry-ways and accessory uses serving the residents of the mixed use building, such as community rooms and fitness facilities with shop front treatment on the building elevation, are not permitted on the ground floor of mixed-use buildings.

(d) Restaurants, coffee houses, and other similar uses may utilize a portion of the sidewalk for outdoor dining. A minimum

LMORE & MONAHAN
A Professional Corporation
COUNSELLORS AT LAW
llen Street Professional Center
Ten Allen Street
P.O. Box 1540
Toms River, New Jersey 08754

clearance of sixty (60) inches shall be reserved along the outside edge of a sidewalk for pedestrian passage.

(e) In mixed-use buildings, an architectural distinction shall be made between ground floor commercial uses and upper level commercial or apartment uses. Storefronts and other ground floor entrances shall be accentuated.

(f) Storefronts are an integral part of a building and shall be integrally designed with the upper floors to be compatible with the overall facade character. Ground floor retail, service, and restaurant uses shall have large display windows. Buildings with multiple storefronts shall be unified through the use of architecturally compatible materials, colors, details, awnings, signage, and lighting fixtures.

(4) Residential Design Standards

(a) Townhouse or other row-type dwellings with the minimum setback shall have the front entry set to one (1) side of the facade to preserve the possibility of retrofitting a ramp for wheelchair access.

(b) Townhouse type lots shall have a street screen constructed along the un-built parts of the frontage line. A minimum of twenty-five (25) percent of the townhouses on any townhouse block shall have front porches. Such front porches may encroach into the front setback and shall not count against lot coverage requirements.

(c) Townhouse type lots shall have their rear lot lines coinciding with an alley twenty-four (24) feet wide containing a vehicular pavement width of at least ten (10) feet one-way and sixteen (16) feet two-way.

(d) Off-street parking for Townhouse type lots shall be to the rear of the building. Access shall be through a vehicular alley. Nothing herein shall prohibit parking for townhouses on-street, in off-site off-street parking lots or garages located no greater than two hundred fifty feet (250') from the lot they are intended to serve.

(e) Front loaded garages and side-loaded garages requiring access in the front of the townhouse buildings they are intended to serve are prohibited.

(5) Civic Use, Recreation and Open Space Design Standards

(a) Civic Use lands shall include, but not be limited to, parks, squares, greens, plazas, greenways, and civic use lots and

LMORE & MONAHAN
A Professional Corporation
COUNSELLORS AT LAW
Allen Street Professional Center
Ten Allen Street
P.O. Box 1540
Toms River, New Jersey 08754

buildings. Large area recreational uses such as regional parks and playfields are discouraged and, if included, shall be located only on the periphery of any Mixed-Use Neighborhood Center. Lands designated for civic use shall be developable for the intended uses and largely unconstrained from development.

(b) A minimum of five (5) percent of the gross area of the Mixed Use Neighborhood Center (excluding greenways, regional parks, playfields, environmentally constrained lands, and storm water management facilities) or five (5) acres, (whichever is greater) shall be allocated to civic use lands. A range of civic use lands, including parks, squares, and playgrounds shall be distributed within residential neighborhoods and areas of non-residential and mixed use.

(c) Each Mixed Use Neighborhood Center shall contain at least one (1) main civic space (Village Green), to function as a focal point for civic activities, no less than forty thousand (40,000) square feet and no greater than one hundred forty thousand (140,000) square feet in contiguous area. No single square or park shall be more than thirty (30) percent of the required civic use lands.

(d) The remaining required civic use lands, other than the main civic space(s), shall be divided into lesser tracts and distributed such that no part of the developed Mixed Use Neighborhood Center is further than twelve hundred (1,200) feet from a park or square.

(e) The Village Green, plazas, and squares shall have at least fifty (50) percent of their perimeter abutting public or semi-public lands or streets.

(6) Parking and Loading Design Standards. The following standards shall supplement the standards set forth in §244-196, §244-197 and§244-198 and the event the standards of this subsection shall conflict, the provisions of this subsection shall supersede:

(a) Vehicle access to a lot shall be from the rear of the property, a secondary street or alleyway wherever practical;

(b) Shared access drives shall be required except where shared access is not available or ,practical and further provided that access drives shall be provided alongside property lines to facilitate and provide shared access to adjacent properties in the event of future development;

LMORE & MONAHAN
A Professional Corporation
COUNSELLORS AT LAW
Allen Street Professional Center
Ten Allen Street
P.O. Box 1540
Toms River, New Jersey 08754

(c) On-street parking shall be permitted in Mixed-Use Neighborhood Centers in accordance with the approved Street Hierarchy and Circulation Plan and the Street Design Standards in Appendix A;

(d) "Parking space" within a Mixed-Use Neighborhood Center shall mean a storage area for the parking of a motor vehicle;

(e) Parking areas shall be interconnected, wherever practical, by cross-access drives which promote fluid access to parking areas on adjoining properties;

(f) Wherever practical, each lot shall provide cross-access easements for its parking areas and access drives guaranteeing access to adjacent lots. Interconnections shall be strategically placed and easily identifiable to ensure safe and convenient traffic flow between parking areas. In the event a property is proposed for development, provisions for cross access drives shall be established with appropriate easements to facilitate interconnections as adjacent properties develop.

(g) With the exception of properties fronting on and with direct access to Ocean County Routes 526 or 527, parking shall be located on-street, in public parking areas, or in designated parking areas to the rear of buildings, wherever practical. All parking areas shall be adequately screened and landscaped per section (13) below;

(h) With the exception of properties fronting on and with direct access to, County Routes 526 or 527, parking shall not be located between the street right-of-way and the front façade of buildings;

(i) Provision of safe pedestrian access to and through parking lots and connections to other pedestrian links shall be required, including striping, enhanced pavement markings, lighting and traffic calming features;

(j) Parking structures (garages) shall be visually screened from all rights –of-way, public open space areas, and residential uses. Such screening shall include a liner building for a minimum of the first floor. Screening of upper floors may include landscaping, walls, liner buildings, other architectural elements or decorative features;

(k) Principal use parking structures shall be architecturally integrated into surrounding development consistent with the

LMORE & MONAHAN
A Professional Corporation
COUNSELLORS AT LAW
llen Street Professional Center
Ten Allen Street
P.O. Box 1540
Toms River, New Jersey 08754

overall design and character of the immediate neighborhood within which it is situated;

(l) Shared parking shall be encouraged. Nothing herein shall prohibit the reservation of a limited number of parking spaces for particular residential or non-residential users or the restriction of the hours of certain parking spaces for particular residential or non-residential users.

(m) Each application involving non-residential development in excess of five thousand square feet shall submit a parking study to support the proposed on-street and off-street parking required to accommodate the development proposed. The parking study shall contain as a minimum the following:

[1] A projection of peak parking demand utilizing the methodology and factors provided in the most current edition of the report entitled Parking Generation, an information report published by the Institute of Transportation Engineers (ITE). In calculating peak parking demand an applicant may exclude non-residential space within liner buildings with perpendicular depth of thirty (30) feet or less and individual retail users with unshared street access of five hundred (500) square feet or less;

[2] A calculation of the number of parking spaces needed by expanding the peak parking demand by ten percent (10%) to assure a reasonable number of vacant parking spaces to permit adequate turnover of parking spaces;

[3] An identification of how the proposed parking is to be remain available to future occupants and users;

[4] The required number of parking spaces may be reduced by up to 100% in the event of one, or a combination of, the following:

[a] The proposed use is within four hundred feet (400') of an available parking facility;

[b] Sufficient on-street parking is available within a fifty feet (50') radius of the property;

[c] Non-residential space within liner buildings with perpendicular depth of thirty (30) feet or less and individual retail uses of five hundred (500) square feet or less with direct street access, shall have no parking requirement; and

LMORE & MONAHAN
A Professional Corporation
COUNSELLORS AT LAW
Allen Street Professional Center
Ten Allen Street
P.O. Box 1540
Toms River, New Jersey 08754

[d] The shared parking analysis in accordance with subsection e) below substantiates a reduction.

[5] If shared parking is proposed the applicant shall submit a shared parking study documenting how adequate parking is to be provided and maintained to satisfy the identified parking demands. The study shall be prepared in accordanee with the procedures and methodology set forth in the most current edition of a report entitled Shared Parking, published by the Urban Land Institute or the most current shared parking methodology published by either the Urban Land Institute or the Institute of Transportation Engineers. The shared parking study may also adjust projected parking demand based upon an analysis of captured parking utilizing the procedures provided in the most current edition of the publication entitled Trip Generation Handbook prepared by the Institute of Transportation Engineers. The captured and shared parking study shall include as a minimum the following:

[a] A calculation of the projected peak parking demand for each use that will be sharing available parking supply;

[b] A calculation of the extent to which parking demand is to be mitigated on site as a result of trips captured from adjoining land uses and therefore occurring without the use of a vehicle;

[c] A calculation of the peak parking demand for the proposed development utilizing shared parking procedures;

[d] An expansion of the peak parking demand by ten percent (10%) to assure an adequate number of spaces for the turnover of parking spaces;

[e] A determination of the number of on-site parking spaces to be provided; and

[f] A determination of the number of on-street parking spaces that are available to the proposed development in accordance with the standards of this section.

LMORE & MONAHAN
A Professional Corporation
COUNSELLORS AT LAW
llen Street Professional Center
Ten Allen Street
P.O. Box 1540
Toms River, New Jersey 08754

(n) The following minimum parking area setback requirements shall be provided:

[1] Minimum setback from right-of-way: ten (10) feet;

[2] Minimum setback from residential use side property line: twenty (20) feet;

[3] Minimum setback from non-residential use side property line: five (5) feet;

[4] Minimum setback from Ocean County Route 526 and Route 527: thirty (30) feet; and

[5] Parking lot setbacks for lots having five or fewer spaces shall be subject to Planning Board approval.

(o) Parking lot layout, landscaping, buffering and screening shall be provided to minimize direct view of vehicles from streets, and sidewalks, avoid spillover light, glare, or noise onto adjoining properties and provide shading upon tree maturity.

[1] Parking lots exposed to views from streets and sidewalks shall screened by a minimum four (4) feet high, four season landscape hedge or screen or three (3) feet high wall. Such screen, hedge or wall shall not obstruct the visibility of pedestrians or motor vehicles.

[2] All surface parking lots of twenty (20) spaces or more shall provide shade trees, with a caliper of a minimum of two and one half (2.5) inches, at a rate of one shade tree per ten (10) spaces.

[3] Surface parking lots shall incorporate landscaping strips to separate parking rows wherever practical.

(p) Loading area and loading area operational requirements shall be subject to Planning Board approval and as minimum include the following:

[1] No delivery, loading, trash removal or compaction or other such operations shall be permitted between the hours of 9:00 p.m. and 6 a.m. unless an applicant shall provide evidence that barriers to sound are to be provided to effectively limit noise levels to 45 dBA or less as measured at any adjoining property line.

[2] Service and loading areas shall be located at the rear of buildings. Loading docks shall not be located along primary street frontages.

[3] Screening and landscaping shall be required to minimize direct views of loading areas from adjacent

LMORE & MONAHAN
A Professional Corporation
COUNSELLORS AT LAW
llen Street Professional Center
Ten Allen Street
P.O. Box 1540
Toms River, New Jersey 08754

properties or public rights-of –way. Screening and buffering shall be provided via walls, fences and landscaping. Building recesses and depressed ramps may be used as screening measures.

(q) Lighting Standards - Building Exterior and Street

[1] All building exterior and street lighting shall be designed to prevent glare onto adjacent properties. Pedestrian pathways shall be clearly marked and well lighted for security and identification without significant negative spillover to adjacent properties. The height of lighting fixtures shall be a maximum of sixteen (16) feet for parking areas and drives and twelve (12) feet for pedestrian walkways.

[2] Streetlights and alley lights shall be decorative and match or compliment the overall architectural style of the Mixed Use Neighborhood Center of the immediate neighborhood of which it is a part.

[3] Decorative street lights, a maximum of twelve (12) feet in height, shall be provided at regular intervals along all non-residential and mixed use streets, parking areas, sidewalks, walkways, courtyards, civic use areas, and interior open space areas. Street lighting on residential streets shall be spaced no greater than one hundred fifty (150) feet apart per side and located at all intersections.

[4] The use of minimum wattage metal halide or color-corrected sodium or mercury vapor light sources is encouraged. The use of lower-wattage streetlights, more closely spaced, rather than higher wattage street lighting more widely space shall be encouraged. Non-color corrected low-pressure sodium lighting is prohibited.

[5] For alleyways and pedestrian walkways between buildings, lighted bollards shall be strongly encouraged.

[6] Light fixtures attached to the exterior of buildings shall be architecturally compatible with the style, materials, colors, and details of the building.

[7] The color spectrum and character of the light produced by the lighting used should be consistent and

LMORE & MONAHAN
A Professional Corporation
COUNSELLORS AT LAW
llen Street Professional Center
Ten Allen Street
P.O. Box 1540
Toms River, New Jersey 08754

compatible throughout the Mixed Use Neighborhood Center, including the exterior of lighted buildings, streets, signs, parking areas, pedestrian walkways, and other areas. Residential side shielding shall be provided where abutting residential uses. The use of low-pressure sodium, fluorescent, or mercury vapor lighting, either attached to buildings or to light the exterior of buildings, shall be prohibited.

[8] Building facades shall be lighted from the exterior, and in general, the light source should be concealed through shielding or recessed behind architectural features. Mounting brackets and associated hardware should be inconspicuous.

[9] Porch and yard post lighting is encouraged to augment and complement street lighting design.

[10] Garages along streets or alleys shall provide building-mounted lighting facing the alley or street, unless streetlights are provided along the street or alley.

(7) Sign Design Standards

(a) Signs affixed to the exterior of a building shall be architecturally compatible with the style, composition, materials, colors, and details of the building, as well as with other signs used on the building or its vicinity.

(b) Building-mounted signs shall be located in architecturally-appropriate sign bands or other similar facade features, shall not interfere with door and window openings, conceal architectural details or obscure the composition of the facade. Whenever possible, signs located on buildings within the same block shall be placed the same height in order to create a unified sign band. Signs shall be mounted so that the method of installation is concealed.

(c) Wood and metal, painted with a durable high-quality finish are the preferred materials for signs. Flat signs should be framed with raised edges. Wood signs shall be fabricated from high-quality exterior grade wood with suitable grade finishes. Sign colors should be compatible with the colors of the building facade.

(d) Signs mounted perpendicular to, and projecting from, a building wall of a mixed use or commercial building shall be permitted, provided the following standards are met: the

LMORE & MONAHAN
A Professional Corporation
COUNSELLORS AT LAW
llen Street Professional Center
Ten Allen Street
P.O. Box 1540
Toms River, New Jersey 08754

signboard does not exceed six (6) square feet; a minimum of ten (10) feet of vertical clearance is provided from the ground or sidewalk to the lower edge of the signboard; the top of the signboard shall not extend above the height of the first floor of the building; the maximum distance from the building to the signboard shall not exceed six (6) inches nor shall the signboard extend more than four (4) feet from the building; the height of the lettering, numbers or graphics on the signboard shall not exceed eight (8) inches; there shall be a limit of one projecting, perpendicularly mounted, signboard per business and shall not be used in conjunction with wall-mounted or free standing signs.

(e) Painted glass window and door signs shall be permitted subject to the following standards: the painted sign area shall not exceed the lesser of 10% of the window or door glass or four (4) square feet; the sign shall be hand or silk screen painted; the height of the lettering shall not exceed four (4) inches; there shall be one (1), painted window or door sign per business; and a painted window or door sign may be used in conjunction with one (1)additional sign from the following: a wall mounted sign, an applied letter sign, a projecting sign or an awning sign.

(f) Awning signs for first floor businesses, shall be permitted subject to the following standards: if the awning sign is the primary sign, it shall not exceed ten (10) square feet and shall not be in addition to a wall-mounted sign, and lettering height shall be no greater than nine inches; if awning sign is a secondary sign, lettering shall be located on the valance only and lettering height shall be limited to six (6) inches or less; and no business shall have more than one awning sign.

(g) Businesses located in corner buildings are permitted signage as permitted by this subsection on both street frontages.

(h) Signs shall be either spot lit or backlit with a diffused light source. Spotlighting shall require complete shielding of all light sources. Light shall not significantly spill over to other portions of the building or site. Backlighting shall illuminate the letters, characters, or graphics on the sign. Warm fluorescent bulbs may be used to illuminate the interior of display windows. Neon signs placed inside the display windows shall ensure low intensity colors.

LMORE & MONAHAN
A Professional Corporation
COUNSELLORS AT LAW
llen Street Professional Center
Ten Allen Street
P.O. Box 1540
Toms River, New Jersey 08754

(i) Temporary civic, cultural, and public service window posters, promotional or other special event (e.g. sale) inside of first floor commercial uses, shall be permitted provided: they do not individually or in the aggregate exceed the lesser of twenty five (25) percent of the total area of the window or six (6) square feet; and any such sign shall not be posted for more than ninety (90) days.

(8) Refuse and Recycling Design Standards

(a) Shared refuse and recycling facilities shall be utilized wherever available or practical.

(b) The storage of refuse and recyclables shall be provided inside of buildings or within an outdoor area in the rear of the property, screened around the perimeter by wood enclosures with roof or by brick/masonry walls with cap, with a minimum height of seven (7) feet on three sides, and door or gate on the remaining side which visually screens the inside of the storage area.

(c) A minimum five (5) feet wide landscape area shall be provided along the walls of the outdoor storage enclosure.

(9) Fence and Wall Design Standards

(a) Fencing shall be constructed of vinyl, masonry, aluminum, wrought iron or combinations thereof;

(b) No fencing located in any front yard area between the front building line and street line shall exceed three feet in height nor contain any solid section or component except for masonry pillars/columns. Such masonry pillars/columns shall not exceed eighteen inches in width and shall maintain a minimum of six feet between any such pillars/columns, excepting pillars/columns forming walkways or gates.

(c) Solid masonry walls, not to exceed six feet in height may be utilized for screening purposes in side and rear yard areas.

(10) Landscaping and Buffer Design Standards

(a) Notwithstanding the provisions of §244-193B and C, the Planning Board may approve reduced buffers consistent with the overall concept of the Mixed Use Neighborhood Centers to provide more compact, mixed use development. This may include the elimination or reduction of buffers and screening separating residential and non-residential uses, where appropriate, as determined by the Board.

LMORE & MONAHAN
A Professional Corporation
COUNSELLORS AT LAW
llen Street Professional Center
Ten Allen Street
P.O. Box 1540
Toms River, New Jersey 08754

(b) In addition to the street tree species permitted pursuant to of §244-193A(b) the following may also be utilized within a Mixed-Use Neighborhood Center:

[1] London Plane (*Platanus acerifolia)*

[2] American Sycamore (*Platanus occidentalis)*

[3] Swamp White Oak (*Quercus bicolor)*

[4] American Hornbeam (*Carpinus caroliniana)*

(c) Notwithstanding the provisions of §244-193, street trees within a Mixed-Use Neighborhood Center may be planted between the curb and sidewalk in locations and spaced in accordance with the design standards for the respective street types set forth in Appendix A. Street trees planted between the cur and sidewalk shall also meet the species and planting strip/grate sizing requirements set forth in the most current edition of the publication entitled *Trees for New Jersey Streets*, prepared by the Shade Tree Federation of New Jersey.

**SECTION 7.** The Township Code of the Township of Jackson is hereby amended and supplemented so as to amend Chapter 244, entitled "Land Use and Development Regulations," so as to amend §244-6 entitled "Definitions" in order to add and arrange alphabetically the following definitions:

APARTMENT UNIT
One or more rooms with private bath, kitchen and sleeping facilities constituting an independent, self-contained dwelling unit in a building containing three or more dwelling units or non-residential use(s) on the ground floor.

CERTIFICATE OF APPROVAL
A certificate issued by the construction official pursuant to N.J.A.C. 5:23-2 upon completion of work that requires a construction permit but not a certificate of occupancy.

CIVIC USE
A publicly or privately owned space or building available to the general public, for recreation, cultural and/or community purposes.

FARMER'S MARKET
The seasonal selling or offering for sale at retail of vegetables or produce, flowers, orchard products, and similar agricultural products, occurring in a pre-designated

LMORE & MONAHAN
A Professional Corporation
COUNSELLORS AT LAW
llen Street Professional Center
Ten Allen Street
P.O. Box 1540
Toms River, New Jersey 08754

area, where the vendors are individuals who have raised the vegetable or produce or have taken same on consignment for retail sale.

GREENWAY
A linear open space area designated on an approved development plan connecting or linking natural features; recreational features; bicycle and/or pedestrian facilities.

LARGE RETAIL ESTABLISHMENTS
Single occupant retail uses with a gross floor area of fifty thousand (50,000) square feet or greater.

LINER BUILDING
A building specifically designed to screen or mask a parking lot or parking structure (garage) from a view or frontage.

LIVE /WORK UNIT
Space within a mixed use building, owned or leased and utilized as a single unit, consisting of a dwelling unit (living area) not on the ground level and a permitted non-residential use (working area) on the ground level, connected by a private internal staircase.

LOFT APARTMENT
An apartment unit, located on the upper floor of a mixed use building, characterized by large un-partitioned living areas and high ceilings.

MINOR SOLAR OR PHOTOVOLTAIC ENERGY FACILITY OR STRUCTURE
A fuel cell, solar or photovoltaic panel or system of panels for the production of energy that: uses solar energy as its fuel; is located on the same property as the power beneficiary; is intended to offset all or a portion of the beneficiary's on-site energy consumption; is intended to mitigate electrical system improvement requirements; and generates not more than 110% of the power consumed on the beneficiary's premises for any 12 month period.

MIXED USE BUILDING
A building of two or more stories with a minimum of the ground floor consisting exclusively of non-residential uses and a minimum of one floor of residential use over one or more lower floors of non-residential use.

SQUARE
An open space designated for unstructured recreation and civic purposes. A square is spatially defined by building frontages. Squares shall be located at the intersection of key thoroughfares and range in size from one half to four acres.

VILLAGE GREEN

LMORE & MONAHAN
A Professional Corporation
COUNSELLORS AT LAW
Allen Street Professional Center
Ten Allen Street
P.O. Box 1540
Toms River, New Jersey 08754

The primary open space area for public recreation and public gathering, centrally located, and an integral part of the core of the most intensely developed, mixed use, portion of an approved Mixed-Use Development Neighborhood.

**SECTION 8.** All ordinances or parts of ordinances inconsistent herewith are hereby repealed.

**SECTION 9.** If any section, subsection, sentence, clause, phrase or portion of this ordinance is for any reason held to be invalid or unconstitutional by a court of competent jurisdiction, such portion shall be deemed a separate, distinct and independent provision, and such holding shall not affect the validity of the remaining portions hereof.

**SECTION 10.** This ordinance shall take effect after second reading and publication as required by law.

Date: 5-11-17

Michael Reina
MAYOR

**NOTICE**

**NOTICE IS HEREBY GIVEN** that the foregoing ordinance was introduced and passed by the Township Council on first reading at a meeting of the Township Council of the Township of Jackson held on the 11th day of April, 2017, and will be considered for second reading and final passage at a regular meeting of the Township Council to be held on the 9th day of May, 2017 at 7:30 p.m., or as soon thereafter as this matter can be reached, at the Jackson Township Municipal Building, located at 95 West Veterans Highway, Jackson, New Jersey, at which time and place any persons desiring to be heard upon the same will be given the opportunity to be so heard.

Ann Marie Eden
Township of Jackson

I, Ann Marie Eden, Municipal Clerk of the Township of Jackson in the County of Ocean, State of New Jersey hereby certify that the above is a true copy of Ordinance No. 06-17 adopted by the Township Council on the 9th day of May, 2017.

Date: 6-5-17

Ann Marie Eden, RMC
Township Clerk

LMORE & MONAHAN
A Professional Corporation
COUNSELLORS AT LAW
llen Street Professional Center
Ten Allen Street
P.O. Box 1540
Toms River, New Jersey 08754

# Appendix F: MF–AH–7 Zone Ordinance

**ORDINANCE NO. -17**

**AN ORDINANCE OF THE TOWNSHIP OF JACKSON, COUNTY OF OCEAN, STATE OF NEW JERSEY, AMENDING AND SUPPLEMENTING CHAPTER 244 OF THE TOWNSHIP CODE OF THE TOWNSHIP OF JACKSON, ENTITLED "LAND USE AND DEVELOPMENT REGULATIONS" ESTABLISHING THE MF-AH-7 MULTIFAMILY AFFORDABLE HOUSING-7 ZONE**

**NOW, THEREFORE, BE IT ORDAINED,** by the governing body of the Township of Jackson, County of Ocean, State of New Jersey, as follows:

**SECTION 1.** The Zoning Map of the Township of Jackson is hereby amended to establish the boundaries of the Multifamily Affordable Housing – 7 Zone (MF-AH-7) zoning district. The following parcel shall be designated as MF-AH-7:

| Block | Lot |
|---|---|
| 1203 | 29 |

**SECTION 2.** The Township Code of the Township of Jackson is hereby amended and supplemented so as to amend Chapter 244, entitled "Land Use and Development Regulations," so as to amend §244-42 entitled "List of Zones" so as to add and arrange alphabetically the following zoning district:

MF-AH-7 Multifamily Affordable Housing-7 Zone

**SECTION 3.** The Township Code of the Township of Jackson is hereby amended and supplemented so as to amend Chapter 244, entitled "Land Use and Development Regulations," so as to add §244-57.3 which shall be entitled "MF-AH-7 Multifamily Affordable Housing-7 Zone" which shall read as follows:

:ILMORE & MONAHAN
A Professional Corporation
COUNSELLORS AT LAW
.llen Street Professional Center
Ten Allen Street
P.O. Box 1540
Toms River, New Jersey 08754

A. Intent. The intent of the MF-AH-7 Zone is to provide a suitable location(s) for the construction of inclusionary housing, which will provide the construction of a substantial amount of low- and moderate-income households consistent with the Township's duly adopted Housing Element and Fair Share Plan for the period 1999-

2025. To the extent that the regulations of this MF-AH-7 conflict with any other provision(s) and/or regulation(s) within the Township's Land Use and Development Regulations, §190-224, et seq., the provisions of this Section shall control.

B. Permitted principal uses of buildings and structures are as follows:

(1) Multifamily dwellings at a total tract density not to exceed 216 total units of which 40 units shall be reserved as affordable units (as affordable unit is defined by the regulations of the Council on Affordable Housing and the Township's Land Use and Development Regulations).

C. Permitted accessory uses of buildings and structures are as follows:

(1) Fences and walls, subject to the provisions of § 244-190, with the exception that the maximum wall height within the MF-AH-7 District shall be ten feet (10').

(2) Off-street parking shall be subject to the provisions of this section and §§ 244-197 and 244-198. Provided that parking fields in the MF-AH-7 District shall be permitted in the front yard setback provided that said parking fields are no less than 50' from the property line.

(3) Pump houses, which are directly used for the maintenance and operation of utilities and/or a swimming pool serving a multifamily development.

(4) Satellite dish antennas, subject to the owner's or homeowners' association rules, as applicable.

(5) Sheds strictly for the storage of materials and equipment, which are directly used for the maintenance of the buildings and grounds of a multifamily development. Private residential sheds shall not be permitted.

(6) Community identification signs, or monument signs, may be placed on one or both sides of each entrance to the multifamily community. Directional signs shall be permitted, as well as temporary sales, leasing and community identification signs. Signs are subject to the provisions of § 244-207.

(7) Swimming pools for residents of the multifamily development and their guests, subject to the provisions of § 244-216. Private residential swimming pools shall not be permitted.

(8) Recreational amenities (i.e., tot lots, courts, gazebos).

(9) Garages, provided said garages remain within ownership control of the owner of the multi-family development or the homeowners' association.

(10) Management and leasing offices and buildings or structures necessary for the administration and/or maintenance of the infrastructure, streets, off-street parking facilities, drainage facilities, recreational facilities, open space areas, and other facilities and areas that are the maintenance responsibility of a homeowners' association for, or owner of, the development.

(11) Other customary accessory buildings, which are clearly incidental to the principal use and buildings and for the exclusive use of residents of the development, and which shall be limited to social and recreational uses.

D. Area, yard and building minimum requirements for MF-AH-7 District are as follows:

(1) Applicable Bulk Standards

| DENSITY REQUIREMENTS | MF-AH-7 REQUIREMENTS |
|---|---|

GILMORE & MONAHAN
A Professional Corporation
COUNSELLORS AT LAW
Allen Street Professional Center
Ten Allen Street
P.O. Box 1540
Toms River, New Jersey 08754

| MAXIMUM RESIDENTIAL YIELD (units) | 216 |
|---|---|
| AFFORDABLE HOUSING SET ASIDE (units) | 40 |
| | |
| **LOT REQUIREMENTS** | |
| MINIMUM LOT AREA (ACRES) | 35 |
| MINIMUM LOT WIDTH (FEET) | 200 |
| MINIMUM LOT FRONTAGE (FEET) | 200 |
| MINIMUM LOT DEPTH (FEET) | 200 |
| **PRINCIPAL BUILDING REQUIREMENTS** | |
| MINIMUM FRONT YARD SETBACK (FEET) | 100 |
| MINIMUM REAR YARD SETBACK (FEET) | 100 |
| MINIMUM SIDE YARD SETBACK (FEET) | 50 |
| MAXIMUM BUILDING HEIGHT (including Clubhouse)(FEET) | 42 and 3 stories |
| MAXIMUM BUILDING LENGTH (FEET) | 230 |
| **ACCESSORY BUILDING REQUIREMENTS - GARAGES** | |
| MINIMUM DISTANCE FROM PRINCIPAL BUILDING | 30 |
| MINIMUM FRONT YARD SETBACK (FEET) | 100 |
| MINIMUM REAR YARD SETBACK (FEET) | 50 |
| MINIMUM SIDE YARD SETBACK (FEET) | 50 |
| MAXIMUM BUILDING HEIGHT (FEET) | 15 |
| **MINIMUM BUFFER AREA REQUIREMENTS** | |
| FRONT YARD BUFFER (FEET) | 35 |
| REAR YARD BUFFER (FEET) | 75 |
| SIDE YARD BUFFER (FEET) | 50 |
| BUFFER ADJACENT TO SINGLE FAMILY DWELLING UNIT OR SINGLE FAMILY RESIDENTIAL ZONING DISTRICT (FEET) | 100 |
| FRONT YARD BUFFER TO AN EXISTING STREET (FEET) | 35 |
| **MINIMUM BUILDING DISTANCE REQUIREMENTS** | |
| SIDE WALL TO SIDE WALL AT MIDPOINT (FEET) | 30 |
| SIDE WALL TO FRONT OR REAR WALL AT MIDPOINT (FEET) | 40 |
| FRONT WALL TO REAR WALL AT MIDPOINT (FEET) | 50 |
| REAR WALL TO REAR WALL AT MIDPOINT (FEET) | 50 |

:ILMORE & MONAHAN
A Professional Corporation
COUNSELLORS AT LAW
.llen Street Professional Center
Ten Allen Street
P.O. Box 1540
Coms River, New Jersey 08754

| | |
|---|---|
| DISTANCE BETWEEN PRINCIPAL BUILDING AND ACCESS DRIVEWAY OR INTERNAL DRIVEWAY CURLINE (FEET) | 25 |
| DISTANCE BETWEEN PRINCIPAL BUILDING AND PARKING AREA CURBLINE (FEET) | 20 |
| DISTANCE BETWEEN PRINCIPAL BUILDING AND ACCESS AISLE OR DRIVEWAY TO GARAGE OR CARPORT (FEET) | 25 |
| **MONUMENT SIGN REQUIREMENTS** | |
| MAXIMUM AMOUNT OF SIGNS | 2 |
| MAXIMUM SIGN HEIGHT (FEET) | 6 |
| MAXIMUM SIGN SIZE (SQUARE FEET) | 48 |
| MINIMUM DISTANCE TO STREET RIGHT OF WAY (FEET) | 25 |
| MINIMUM DISTANCE TO A PROPERTY LINE (FEET) | 5 |

(2) Buffering and Landscaping Requirements - Buffer areas shall be developed in an aesthetic manner for the primary purpose of screening views and reducing noise perception beyond the lot. Buffer widths shall be measured horizontally and perpendicularly to lot and street lines. No structure, except as otherwise provided herein, activity, storage of materials, decks, patio or parking of vehicles shall be permitted in a buffer area. Drainage and utility structures shall be permitted in the buffer area. The location and design of buffers shall consider the use of the portion of the property being screened; the distance between the use and the adjoining property line; differences in elevation; the type of buffer, such as dense planting, existing woods, a wall or fence; buffer height; buffer width; and other combinations of man-made and natural features. The buffer shall be designed, planted, graded, landscaped and developed with the general guideline that the closer a use or activity is to a property line or the more intense the use, the more effective the buffer area must be in obscuring light and vision and reducing noise beyond the lot.

(a) All application, to the extent feasible, shall seek to preserve all natural wooded tracts along perimeter areas of a given tract and may be calculated as part of the required buffer area, provided that the growth is of a density and the area has sufficient width to serve the purpose of a buffer.

(b) All buffer areas shall be planted and maintained to provide screening and an aesthetically pleasing design. In general, the Planning Board may approve waivers to the standard landscaping requirements of this chapter, provided the plan presented is appropriate and adequate to meet the intent of providing suitable screening.

(c) Landscaping within a multifamily development in an MF-AH-7 District shall be provided to create an aesthetically pleasing design in accordance with the requirements of § 244-193 provided that buffers

ILMORE & MONAHAN
A Professional Corporation
COUNSELLORS AT LAW
Allen Street Professional Center
Ten Allen Street
P.O. Box 1540
Toms River, New Jersey 08754

along major collector roads within the MF-AH-7 District shall be a minimum of thirty-five feet (35'). The Planning Board may approve waivers to standard landscaping requirements of this chapter, provided the plan presented is appropriate and adequate to meet the intent of providing an interesting and attractive landscape.

E. Laundry equipment. No outside area or equipment shall be provided for the hanging or outside airing of laundry in any manner.

F. Lighting. All interior development roads, parking areas, dwelling entranceways and pedestrian walks within a development in the MF-AH-7 District shall be provided with sufficient illumination to minimize hazards to pedestrians and motor vehicles utilizing the same, but in no case shall such lighting be less than is required to provide a minimum lighting level of 0.5 horizontal footcandle throughout such areas from dusk to dawn. Lights shall be shielded to avoid glare disturbing to occupants of the buildings and shall be so arranged as to reflect away from all adjoining properties.

G. Open space and Recreation. Every tract of land developed in the MF-AH-7 District shall include common open space and active and passive recreation facilities in accordance with the following:

(1) Open space requirements. For the purposes of this section, the term "open space" is defined to mean any area of land (exclusive of buildings, streets, parking areas and utility rights-of-way or water) which is open to the sky and which is set aside for active or passive recreational use. Buffers may be included as passive recreation.

(2) A minimum of 25% of the gross tract acreage shall be set aside for private use for active and passive open space and recreational purposes and for common open space.

(3) Lands used or deeded to public agencies for roads, streets or utilities, including utility easements, shall not be defined as common open space. However, bodies of water located within the tract may be counted as common open space.

(4) Any lands set aside for open space shall be available for the residents of the community to use for active and passive recreational activities.

(5) There shall be a close visual and physical relationship between open space and dwelling units. Open space areas shall be an integral part of the development and shall be located to best suit the purpose(s) for which they are intended.

H. Parking.

(1) Parking shall be provided in accordance with the New Jersey Residential Site Improvement Standards (N.J.A.C. 5:21)

(2) Parking along all internal streets, driveways and parking lot aisles within a multifamily development shall be permitted.

I. Sidewalks and aprons. Unless otherwise required pursuant to the New Jersey Residential Site Improvement Standards (N.J.A.C. 5:21), sidewalks and aprons shall be provided, at a minimum on one side of the street, and shall be designed and constructed as part of an integrated sidewalk system within a multifamily

:ILMORE & MONAHAN
A Professional Corporation
COUNSELLORS AT LAW
Allen Street Professional Center
Ten Allen Street
P.O. Box 1540
Toms River, New Jersey 08754

development located to facilitate safe pedestrian circulation throughout the community.

J. Solid waste.

(1) Solid waste storage shall be provided in accordance with the provisions of § 244-208 provided that in the MF-AH-7 District, the provisions of §144-208(j) shall not be applicable. With respect to the area and distance requirements within the MF-AH-7 District there shall be provided at least three (3) outdoor solid waste storage areas and such solid waste storage areas shall not be located further than 500 feet from the entrance of any dwelling unit which is intended to be served. The foregoing requirements shall not be applicable if a trash compactor is proposed to serve the development.

(2) The preliminary and final site development plans of a development shall illustrate the method of refuse collection and shall note the locations of refuse areas, in addition to the size, height and type of screening for same.

(3) Solid waste storage, collection and disposal shall be the responsibility of the condominium association, the homeowners' association, or the owner or as otherwise permitted in the Municipal Services Act (N.J.S.A. 40:67)

(4) Separate collection bins, located in accordance with the requirements of § 244-208, shall be provided for the collection of recyclable materials.

K. Streets, internal

(1) All streets, driveways, parking aisles and parking was within a development in an MF-AH-7 District shall be provided in accordance with the requirements of the New Jersey Residential Site Improvement Standards (N.J.A.C. 5:21)

(2) No street, driveway, parking aisle or parking area located within a development in an MF-AH-7 District shall have a name which will duplicate or so nearly duplicate so as to be confused with the names of any other existing public or private street located within the Township of Jackson. All street names shall be subject to the approval of the municipal agency.

L. Utilities.

(1) All dwelling units in the project shall be served with public water, sanitary sewers and underground electric, telephone and cable television services.

(2) All dwelling units and community buildings shall be connected to an approved and functioning public water supply system and sanitary sewer system prior to the issuance of any certificate of occupancy.

(3) All utilizing lines leading to and within the site of a multifamily development shall be installed underground.

(4) For any public improvement(s) required to installed and/or upgraded by an Applicant as a condition of approval for any development within the MF-AH-7 District, the Applicant shall be entitled to a credit against applicable connection fees for units within the development up to the total construction costs of such a public improvement(s), less the portion of such construction costs representing Applicant's pro rata share of the costs of such public improvements in accordance with the provisions of N.J.S.A. 40:55D-42. In the event that the Township or any other public entity is required to construct

ILMORE & MONAHAN
A Professional Corporation
COUNSELLORS AT LAW
Allen Street Professional Center
Ten Allen Street
P.O. Box 1540
Toms River, New Jersey 08754

and/or upgrade any public improvement(s), which construction is necessitated by any development within the MF-AH-7 District, Applicant shall be required to contribute its pro rata share of the costs of such public improvements in accordance with the provisions of N.J.S.A. 40:55D-42.

M. Conformance with Township's Tree Removal Provisions (§405-1, et seq.)

(1) Tree removal for developments within the MF-AH-7 District shall be in accordance with the provisions of § 405-1 et seq., provided that:

(a) the Exemption Area for any development within the MF-AH-7 District, as such Exemption Areas are defined at §405-11(E), shall be established as fifty percent (50%) of the total tract size, which Exemption Area shall be contiguous; and

(b) for purposes of tree replacement fees, developments within the MF-AH-7 District shall treated as commercial uses within the meaning of §405-9(D).

N. Affordable housing requirements.

(1) An applicant for final site plan approval shall submit for approval by the Township Affordable Housing Planner or designated Administrative Agent as part of the submission for final approval a project affordable housing plan demonstrating compliance with the Township's Housing Element and Fair Share Plan; prevailing COAH regulations, and the Uniform Housing Affordability Controls.

(2) The developer for any development within the MF-AH-7 District shall enter into a developer's agreement with the Township of Jackson setting forth the terms , conditions, requirements and obligations of the respective parties

(3) Assuming a development yield of 216 total units, 40 of such residential units developed with the MF-AH-7 Zone shall be reserved for occupancy by low income and moderate households (hereinafter "Affordable Units") as the terms Affordable Units is defined by the COAH regulations per the provisions of N.J.A.C. 5:93-1 et seq.

O. Expedited application review process and exemption from cost generative measures. The following review provisions shall apply to development applications in the MF-AH-7 Zone:

(1) The applicant shall submit all plans and documents to the Planning Board for review and approval. Completion review shall be done within 20 business days of the receipt of the initial application and within 10 days of any subsequent filing if the prior filing was deemed incomplete. As soon as the application is deemed complete, the Planning Board shall distribute the plans to those persons and agencies desired and/or required by the Planning Board and/or law to review, comment upon and/or approve development plans and to all other municipal agencies which normally review, comment upon and/or approve development plans. The failure of a municipal agency to submit a report to the Planning Board shall not extend the time for review and action by the Board.

GILMORE & MONAHAN
A Professional Corporation
COUNSELLORS AT LAW
Allen Street Professional Center
Ten Allen Street
P.O. Box 1540
Toms River, New Jersey 08754

(2) The development plans submitted shall contain the information ordinarily required by ordinance for complete applications reserving Applicant's right to request waivers from such submission requirements.

(3) To the extent practical, counsel for the Board shall attempt to have a memorialization resolution prepared the night of the Board's vote on the application such that the Board can vote on the application and resolution simultaneously.

**SECTION 4.** All ordinances or parts of ordinances inconsistent herewith are hereby repealed.

**SECTION 5.** If any section, subsection, sentence, clause, phrase or portion of this ordinance is for any reason held to be invalid or unconstitutional by a court of competent jurisdiction, such portion shall be deemed a separate, distinct and independent provision, and such holding shall not affect the validity of the remaining portions hereof.

**SECTION 6.** This ordinance shall take effect after second reading and publication as required by law.

Date: _______________

_______________________________
MAYOR MICHAEL REINA

## NOTICE

**NOTICE IS HEREBY GIVEN** that the foregoing ordinance was introduced and passed by the Township Committee on first reading at a meeting of the Township Council of the Township of Jackson held on the **13th day of June, 2017**, and will be considered for second reading and final passage at a regular meeting of the Township Council to be held on the **27th day of June, 2017** at 7:30 p.m. or soon thereafter as this matter can be reached at the Township Municipal Building located on 95 West Veterans Highway in Jackson, New Jersey, at which time and place any persons desiring to be heard upon the same will be given the opportunity to be so heard.

_______________________________
Ann Marie Eden, RMC
Township Clerk

ILMORE & MONAHAN
A Professional Corporation
COUNSELLORS AT LAW
Allen Street Professional Center
Ten Allen Street
P.O. Box 1540
Toms River, New Jersey 08754

# Appendix G: Ordinance No. 8-17

# ORDINANCE NO. 08-17

**AN ORDINANCE OF THE TOWNSHIP OF JACKSON, COUNTY OF OCEAN, STATE OF NEW JERSEY, AMENDING AND SUPPLEMENTING CHAPTER 244 OF THE TOWNSHIP CODE OF THE TOWNSHIP OF JACKSON, ENTITLED "LAND USE AND DEVELOPMENT REGULATIONS" CHAPTER 244-90 ENTITLED "RG-2 REGIONAL GROWTH ZONE", CHAPTER 244-91 ENTITLED "RG-3 REGIONAL GROWTH ZONE" AND CHAPTER 244-104 ENTITLED "USE OF PINELANDS DEVELOPMENT CREDITS"**

**NOW, THEREFORE, BE IT ORDAINED,** by the governing body of the Township of Jackson, County of Ocean, State of New Jersey, as follows:

**SECTION 1.** The Township Code of the Township of Jackson is hereby amended and supplemented so as to amend Chapter 244, entitled "Land Use and Development Regulations," so as to amend §244-90 entitled "RG-2 Regional Growth Zone" so as to add subsection D. which shall be entitled "Conditional Uses" which shall read as follows:

**(D).** Conditional Uses:

1. Detached, single-family developments on lots less than one acre without the use of Pinelands Development Credits, subject to the following conditions:
   a. Maximum Density: 2.0 dwelling units per acres
   b. Minimum lot area: 12,000 square feet
   c. Minimum lot width: 100 feet
   d. Minimum lot frontage: 80 feet
   e. Minimum lot depth: 120 feet
   f. Minimum front yard setback: 30 feet
   g. Minimum side yard setback: 15 feet
   h. Minimum rear yard setback: 30 feet
   i. Minimum accessory structure setback: 10 feet, not permitted in front yard
   j. The proposed lots are to be serviced by a public sanitary sewer system.
   k. Compliance with the requirement of an affordable housing set aside as set forth in the Fair Housing Act, N.J.S.A. 52:27D-329.9.
   l. Submission of a traffic impact assessment for all preliminary major subdivisions regardless of the number of lots created.
2. Detached single-family developments on lots less than one acre with the use of Pinelands Development Credits in accordance with §244-102 et seq., subject to the following conditions:
   a. Maximum Density: 3.0 dwelling units per acres
   b. Minimum lot area: 10,000 square feet
   c. Minimum lot width: 100 feet
   d. Minimum lot frontage: 80 feet
   e. Minimum lot depth: 100 feet

IMORE & MONAHAN
A Professional Corporation
COUNSELLORS AT LAW
Allen Street Professional Center
Ten Allen Street
P.O. Box 1540
Toms River, New Jersey 08754

    f. Minimum front yard setback: 30 feet
g. Minimum side yard setback: 10 feet
h. Minimum rear yard setback: 30 feet
i. Minimum accessory structure setback: 10 feet, not permitted in front yard
j. The proposed lots are to be serviced by a public sanitary sewer system.
k. Compliance with the requirement of an affordable housing set aside as set forth in the Fair Housing Act, N.J.S.A. 52:27D-329.9.
l. Submission of a traffic impact assessment for all preliminary major subdivisions regardless of the number of lots created.

3. Detached single-family developments, with the use of Pinelands Development Credits in accordance with §244-102 et seq., subject to the following standards only if the restrictions of the buffer overlay zone in accordance with §244-101 will prevent achievement of the maximum residential density permitted:
    a. Maximum Density: 3.0 dwelling units per acres
    b. Minimum lot area: 9,000 square feet
    c. Minimum lot width: 75 feet
    d. Minimum lot frontage: 75 feet
    e. Minimum lot depth: 100 feet
    f. Minimum front yard setback: 30 feet
    g. Minimum side yard setback: 10 feet
    h. Minimum rear yard setback: 30 feet
    i. Minimum accessory structure setback: 10 feet, not permitted in front yard
    j. The proposed lots are to be serviced by a public sanitary sewer system.
    k. Compliance with the requirement of an affordable housing set aside as set forth in the Fair Housing Act, N.J.S.A. 52:27D-329.9.
    l. Submission of a traffic impact assessment for all preliminary major subdivisions regardless of the number of lots created.

**SECTION 2.** The Township Code of the Township of Jackson is hereby amended and supplemented so as to amend Chapter 244, entitled "Land Use and Development Regulations," so as to amend §244-91 entitled "RG-3 Regional Growth Zone" so as to add subsection D. which shall be entitled "Conditional Uses" which shall read as follows:

**(D).** Conditional Uses:

1. Detached, single-family developments on lots less than one acre without the use of Pinelands Development Credits, subject to the following conditions:
    a. Maximum Density: 2.0 dwelling units per acres
    b. Minimum lot area: 12,000 square feet
    c. Minimum lot width: 100 feet
    d. Minimum lot frontage: 80 feet

LMORE & MONAHAN
A Professional Corporation
COUNSELLORS AT LAW
Allen Street Professional Center
Ten Allen Street
P.O. Box 1540
Toms River, New Jersey 08754

    e. Minimum lot depth: 120 feet
f. Minimum front yard setback: 30 feet
g. Minimum side yard setback: 15 feet
h. Minimum rear yard setback: 30 feet
i. Minimum accessory structure setback: 10 feet, not permitted in front yard
j. The proposed lots are to be serviced by a public sanitary sewer system.
k. Compliance with the requirement of an affordable housing set aside as set forth in the Fair Housing Act, N.J.S.A. 52:27D-329.9.
l. Submission of a traffic impact assessment for all preliminary major subdivisions regardless of the number of lots created.

2. Detached single-family developments on lots less than one acre with the use of Pinelands Development Credits in accordance with §244-102 et seq., subject to the following conditions:
   a. Maximum Density: 3.0 dwellimg units per acres
   b. Minimum lot area: 10,000 square feet
   c. Minimum lot width: 100 feet
   d. Minimum lot frontage: 80 feet
   e. Minimum lot depth: 100 feet
   f. Minimum front yard setback: 30 feet
   g. Minimum side yard setback: 10 feet
   h. Minimum rear yard setback: 30 feet
   i. Minimum accessory structure setback: 10 feet, not permitted in front yard
   j. The proposed lots are to be serviced by a public sanitary sewer system.
   k. Compliance with the requirement of an affordable housing set aside as set forth in the Fair Housimg Act, N.J.S.A. 52:27D-329.9.
   l. Submission of a traffic impact assessment for all preliminary major subdivisions regardless of the number of lots created.
3. Detached single-family developments, with the use of Pinelands Development Credits in accordance with §244-102 et seq., subject to the following standards only if the restrictions of the buffer overlay zone in accordance with §244-101 will prevent achievement of the maximum residential density permitted:
   a. Maximum Density: 3.0 dwelling units per acres
   b. Minimum lot area: 9,000 square feet
   c. Minimum lot width: 75 feet
   d. Minimum lot frontage: 75 feet
   e. Minimum lot depth: 100 feet
   f. Minimum front yard setback: 30 feet
   g. Minimum side yard setback: 10 feet
   h. Minimum rear yard setback: 30 feet

LMORE & MONAHAN
A Professional Corporation
COUNSELLORS AT LAW
llen Street Professional Center
Ten Allen Street
P.O. Box 1540
Toms River, New Jersey 08754

      i. Minimum accessory structure setback: 10 feet, not permitted in front yard
j. The proposed lots are to be serviced by a public sanitary sewer system.
k. Compliance with the requirement of an affordable housing set aside as set forth in the Fair Housing Act, N.J.S.A. 52:27D-329.9.
l. Submission of a traffic impact assessment for all preliminary major subdivisions regardless of the number of lots created.

**SECTION 3.** The Township Code of the Township of Jackson is hereby amended and supplemented so as to amend Chapter 244, entitled "Land Use and Development Regulations," so as to amend §244-104 entitled "Use of Pinelands Development Credits" so as to amend subsection A. which shall read as follows:

**A.** To permit development of parcels of land in the RG-2 and RG-3 Zones according to the density and lot area requirements as set forth in sections §244-90 and §244-91, respectively.

**SECTION 4.** The Township Code of the Township of Jackson is hereby amended and supplemented so as to amend Chapter 244, entitled "Land Use and Development Regulations," so as to amend §244-104 entitled "Use of Pinelands Development Credits" so as to delete subsections E and F in their entirety, and to replace subsections E. and F. which shall read as follows:

**E.** When a variance or other approval is granted to permit a residential use in the RG-2 or RG3 zones pursuant to §244-90(D)(2) or §244-91(D)(2), 0.25 of a Pinelands development credit shall be purchased and redeemed for each such dwelling unit.

**F.** When a variance or other approval for a nonresidential use within the RG-2 and RG-3 Zones is granted by the Township, one-quarter of one Pinelands development credit (i.e., one right) shall be purchased and redeemed for every 6,500 square feet of floor area, or portion thereof, or one-quarter of one Pinelands development credit (i.e., one right) shall be purchased and redeemed for every acre, or portion thereof, of land at the parcel, whichever shall require the purchase and redemption of more Pinelands development credits.

**SECTION 5.** All ordinances or parts of ordinances inconsistent herewith are hereby repealed.

**SECTION 6.** If any section, subsection, sentence, clause, phrase or portion of this ordinance is for any reason held to be invalid or unconstitutional by a court of competent jurisdiction, such portion shall be deemed a separate, distinct and independent provision, and such holding shall not affect the validity of the remaining portions hereof.

LMORE & MONAHAN
A Professional Corporation
COUNSELLORS AT LAW
Allen Street Professional Center
Ten Allen Street
P.O. Box 1540
Toms River, New Jersey 08754

**SECTION 7.** This ordinance shall take effect after second reading and publication as required by law.

Date: 5-24-17

MAYOR MICHAEL REINA

## NOTICE

**NOTICE IS HEREBY GIVEN** that the foregoing ordinance was introduced and passed by the Township Committee on first reading at a meeting of the Township Council of the Township of Jackson held on the **9th day of May, 2017**, and will be considered for second reading and final passage at a regular meeting of the Township Council to be held on the **23rd day of May, 2017** at 7:30 p.m. or soon thereafter as this matter can be reached at the Township Municipal Building located on 95 West Veterans Highway in Jackson, New Jersey, at which time and place any persons desiring to be heard upon the same will be given the opportunity to be so heard.

Ann Marie Eden, RMC
Township Clerk

I, Ann Marie Eden, Municipal Clerk of the Township of Jackson in the County of Ocean, State of New Jersey hereby certify that the above is a true copy of Ordinance No. 08-17 adopted by the Township Council on the 23rd day of May, 2017.

Date: 5-31-17

Ann Marie Eden, RMC
Township Clerk

LMORE & MONAHAN
A Professional Corporation
COUNSELLORS AT LAW
llen Street Professional Center
Ten Allen Street
P.O. Box 1540
Toms River, New Jersey 08754

*Amended Housing Element and Fair Share Plan*
*June 8, 2017*

# Appendix H: Spending Plan

# Affordable Housing Trust Fund Spending Plan

## Jackson Township
## Ocean County, New Jersey

**June 5, 2017**

Prepared for:
**Jackson Township Council**
95 West Veterans Highway
Jackson, NJ  08527

Prepared by:
**JDM Planning Associates, LLC**
614 Harbor Road
Brick, New Jersey 08724

John D. Maczuga, PP
New Jersey Professional Planner
License No. 1714

***Affordable Housing Trust Fund Spending Plan***

*Jackson Township, Ocean County, New Jersey*

*June 5, 2017*

## Table of Contents

1 — Introduction ..... 1

2 — Revenues for Certification Period ..... 1

3 — Revenue Schedule ..... 3

4 — Administrative Mechanism to Collect and Distribute Development Fee Revenues ..... 4

5 — Description of Anticipated Use of Affordable Housing Funds ..... 4

5.1 — Rehabilitation and New Construction Programs and Projects (N.J.A.C. 5:97-8.7): ..... 4

5.2 — Affordability Assistance (N.J.A.C. 5:97-8.8) ..... 6

5.3 — Administrative Expenses (N.J.A.C. 5:97-8.9) ..... 8

5.4 — Other Mechanisms ..... 10

6 — Expenditure Schedule ..... 11

7 — Excess or Shortfall of Funds ..... 11

8 — Barrier Free Escrow ..... 12

9 — Summary ..... 12

***Affordable Housing Trust Fund Spending Plan***

*Jackson Township, Ocean County, New Jersey*

*June 5, 2017*

## 1 — Introduction

Jackson Township, Ocean County, has prepared a housing element and fair share plan in accordance with the Municipal Land Use Law (N.J.S.A. 40:55D-1 et seq.), the Fair Housing Act (N.J.S.A. 52:27D-301) and the affordable housing regulations of the New Jersey Department of Community Affairs (NJDCA; N.J.A.C. 5:97-1 et seq. and N.J.A.C. 5:96-1 et seq.). A development fee ordinance creating a dedicated revenue source for affordable housing was approved by the NJDCA on April 26, 1993 and adopted by the municipality on April 26, 1993. The ordinance establishes the affordable housing trust fund for which this spending plan is prepared.

## 2 — Revenues for Certification Period

As of December 31, 2016, Jackson Township has collected $6,569,633.19 and expended $5,642,014.52, resulting in a balance of $927,618.67 (hereinafter rounded to as $927,619). All development fees, payments in lieu of constructing affordable units on site, funds from the sale of units with extinguished controls, and interest generated by the fees are deposited in a separate interest-bearing affordable housing trust fund in Ocean First Bank for the purposes of affordable housing. These funds shall be spent in accordance with N.J.A.C. 5:97-8.7 through N.J.A.C. 5:97-8.9, as described in the sections that follow.

To calculate a projection of revenue anticipated during the period of third round substantive certification, Jackson Township considered the following:

1) Development Fees:

a) Residential and nonresidential projects which have had development fees imposed upon them at the time of preliminary or final development approvals;

b) All projects currently before the planning and zoning boards for development approvals that may apply for building permits and certificates of occupancy; and,

c) Future development that is likely to occur based on historical rates of development.

2) Payments-in-Lieu-of-Construction:

a) Payments-in-lieu-of-construction are anticipated from DVT Enterprises, LLC (Maplewood Estates) in years 2017-2019.

3) Other Funding Sources:

a) No funds from other sources are anticipated.

4) Projected Interest:

a) Interest on the projected revenue in the municipal affordable housing trust fund at the current average interest rate.

## 3 — Revenue Schedule

The projection of revenues is detailed below:

| Revenue Schedule (2017-2025) | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Source | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | Total |
| Development Fees — Approved | $40,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $40,000 |
| Development Fees — Pending | $40,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $40,000 |
| Development Fees — Projected | $80,000 | $160,000 | $160,000 | $160,000 | $160,000 | $160,000 | $160,000 | $160,000 | $160,000 | $1,360,000 |
| Payments-in-Lieu-of-Construction | $12,686 | $31,714 | $31,714 | $0 | $0 | $0 | $0 | $0 | $0 | $76,114 |
| Other Funds | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Interest | $1,500 | $1,500 | $1,500 | $1,500 | $1,500 | $1,500 | $1,500 | $1,500 | $1,500 | $13,500 |
| Total | $174,186 | $193,214 | $193,214 | $161,500 | $161,500 | $161,500 | $161,500 | $161,500 | $161,500 | $1,529,614 |

Jackson Township projects a total of $1,529,614 in revenue to be collected between January 1, 2017 and December 31, 2025. This projected amount, when added to Jackson Township's trust fund balance as of December 31, 2016, results in anticipated total revenue of $2,457,233, which is available to fund and administer its affordable housing program. All interest earned on the account shall be used only for the purposes of affordable housing.

## 4 — Administrative Mechanism to Collect and Distribute Development Fee Revenues

Jackson Township shall adhere to the following procedural sequence for the collection and distribution of development fee revenues:

1) Collection of Development Fee Revenues:
    a) Collection of development fee revenues shall be consistent with Jackson Township's development fee ordinance for both residential and non-residential developments in accordance with the NJDCA's rules, as well as P.L. 2008, c.46, Section 8 (N.J.S.A. 52:27D-329.2) and Section 32 through Section 38 (N.J.S.A. 40:55D-8.1 through N.J.S.A. 40:55D-8.7).
2) Distribution of Development Fee Revenues:
    a) The Municipal Housing Liaison instructs the Chief Financial Officer to release the required amount of funding to the recipient entity based on the type and nature of the affordable housing activity.

## 5 — Description of Anticipated Use of Affordable Housing Funds

Jackson Township anticipates using affordable housing funds as described in the following subsections.

### 5.1 — Rehabilitation and New Construction Programs and Projects (N.J.A.C. 5:97-8.7):

Jackson Township will dedicate no additional monies from its affordable housing trust fund to the rehabilitation of existing housing or new construction programs.

1) Rehabilitation Program:

a) No additional monies from the affordable housing trust fund will be dedicated to Jackson Township's rehabilitation program through 2025. Jackson's rehabilitation program is not funded by the affordable housing trust fund. The township's rehabilitation program is funded by a separate account, which, as of the preparation of this Affordable Housing Trust Fund Spending Plan, had a total remaining balance of $934,969.71 (n.b., the original balance of this separate account was $1,380,000.00). These funds, which are separate from and in addition to those in Jackson's affordable housing trust fund will be used for the rehabilitation of existing housing units in Jackson Township that are occupied by low- and moderate-income households. As indicated in Jackson's 2017 Amended Housing Element and Fair Share Plan, the township's total remaining rehabilitation obligation is eight units. Jackson will use the $934,969.71 to complete its remaining rehabilitation obligation of eight units, and, in fact, will surpass its rehabilitation obligation by continuing to implement its rehabilitation program until the remaining $934,969.71 has been fully expended.

2) New Construction Programs:

a) No affordable housing trust fund monies will be allocated to new construction programs in the period through 2025.

## 5.2 — Affordability Assistance (N.J.A.C. 5:97-8.8)

As detailed below, Jackson Township is required to expend a minimum of $1,063,085 from its affordable housing trust fund to render units more affordable.

| Affordability Assistance Calculation | | |
|---|---|---|
| Actual Development Fees through 12/31/16 | | $3,449,906 |
| Actual Interest Earned through 12/31/16 | + | $337,409 |
| Projected Development Fees from 01/01/17 through 12/31/25 | + | $1,440,000 |
| Projected Interest from 01/01/17 through 12/31/25 | + | $13,500 |
| Housing Activity Expenditures through 06/02/08 | – | $1,697,199 |
| Total | = | $3,543,616 |
| 30 Percent of Total | × 0.3 = | $1,063,085 |
| Affordability Assistance Expenditures through 12/31/16 | – | $0.00 |
| **Projected Minimum Required Affordability Assistance Requirement from 01/01/17 through 12/31/25** | = | **$1,063,085** |
| **Projected Minimum Very Low-Income Affordability Assistance Requirement from 01/01/17 through 12/31/25** | ÷ 3.0 = | **$354,362** |

Jackson Township will dedicate $1,063,085 from the affordable housing trust fund to render units more affordable, including $354,362 to render units more affordable to households earning 30 percent or less of the median income by region, as follows:

1) A total of $751,219 will be used to reimburse the township for housing activities funded pursuant to Bond Ordinance No. 17-07. These housing activities included multiple land purchases and associated soft costs related to the Windsor Crescent (Solar Avenue I) project.
2) Up to an additional $311,866 (n.b., $1,063,085 total affordability assistance requirement – $751,219 used to reimburse the township for previous housing activities = $311,866 remaining affordability assistance requirement) will be used to provide affordability assistance in a manner that is compliant with applicable rules and regulations, including, but not limited to:
   a) Provision of subsidies to render required low and moderate income units in inclusionary developments affordable to very-low income households;
   b) Provision of down payment assistance; and,
   c) Provision of security deposit assistance.
   d) Provision of rental assistance.

### 5.3 — Administrative Expenses (N.J.A.C. 5:97-8.9)

As detailed below, Jackson Township may spend a maximum of $759,956 from its affordable housing trust fund to fund the administration of its affordable housing program.

| Administrative Expenses Calculation | | |
|---|---|---|
| Actual Development Fees through 12/31/16 | | $3,449,906 |
| Actual Interest Earned through 12/31/16 | + | $337,409 |
| Projected Development Fees from 01/01/17 through 12/31/25 | + | $1,440,000 |
| Projected Interest from 01/01/17 through 12/31/25 | + | $13,500 |
| Payments-in-Lieu-of-Construction and Other Deposits through 07/17/08 | + | $2,550,000 |
| Total RCA Expenditures | – | $0 |
| Total | = | $7,790,815 |
| 20 Percent of Total | × 0.2 = | $1,558,163 |
| Administrative Expenses through 12/31/16 | – | $798,207 |
| **Projected Maximum for Administrative Expenses from 01/01/17 through 12/31/25** | = | **$759,956** |

Jackson Township will allocate up to $759,956 from the affordable housing trust fund for administrative purposes. Projected administrative expenditures, subject to the 20-percent cap, are as follows:

1) Administration of affordable housing programs.
2) Payment of employee salaries and benefits.

3) Payment of other miscellaneous administrative expenses and costs related to the preparation and implementation of the Amended Housing Element and Fair Share Plan.

The maximum that may be spent for administration is limited to 20 percent of affordable housing trust fund revenue in any given year, not 20 percent of the total projected revenue through 2025. In the case of Jackson, this amount is: $34,837 in 2017; $38,643 in 2018 and 2019; and, $32,300 for every year from 2020 through 2025 (n.b., values represent 20 percent of annual projected revenues as shown in Section 3 — Revenue Schedule).

Notwithstanding the above, the 20-percent maximum may be exceeded if: 1) less than 20 percent of historic revenues have been expended on administration; and, 2) the total administrative expenditure in a given year is not more than 20 percent of the annual revenue in same year, plus the difference between 20 percent of historic revenues and historic administrative expenditures.

Through December 31, 2016, the township allocated only $798,207, or approximately 12.1 percent of historic affordable housing trust fund revenues, to administrative expenditures. Thus, the township is entitled to exceed the aforementioned, 20-percent maximum by up to a total of an additional $515,720 for the period from 2017 through 2025 (n.b., 20 percent of the historic revenues through December 31, 2016 = $1,313,927 maximum permitted historic administrative expenditures; $1,313,927 maximum permitted historic administrative expenditures – $798,207 actual historic administrative expenditures = $515,720 permissible excess in administrative expenditures from 2017 through 2025).

Based on the values provided in the expenditure schedule (see: Section 6 — Expenditure Schedule), Jackson is using only $451,736 of the permissible excess in administrative expenditures from 2017 through 2025 (n.b., 20 percent of projected

annual revenue for all years from 2017 through 2025 = $305,923; $759,956 projected maximum for administrative expenses from 2017 through 2025 – $305,923 portion of projected revenue subject to 20-percent cap = $454,033 portion of the permissible excess in administrative expenditures from 2017 through 2025 used).

In the event that the township's actual administrative expenditures are less than the amounts provided in the expenditure schedule, the township will reallocate funds from administration to other programs in accordance with Section 5.4 of this Affordable Housing Trust Fund Spending Plan.

### 5.4 — Other Mechanisms

In accordance with applicable rules and regulations, Jackson will allocate $634,192 toward additional affordability assistance, or other fair share compliance mechanisms described in the township's Amended Housing Element and Fair Share Plan. The Township will establish programs, using both trust fund monies earmarked for affordability assistance and "other mechanisms" provided in the Expenditure Schedule below, to:

a. Provide down payment assistance for low and moderate income households targeting the affordable set-aside units to be developed in Affordable Housing Sites #12, #13, and #14 and the remainder of the RG-2 and RG-3 Zone;
b. Provide rental assistance subsidies to allow required low and moderate income in inclusionary rental developments to be offered to very-low income households beyond the 13% very-low income requirement; and
c. Provide rental assistance to low and moderate income households in inclusionary rental developments.

## 6 — Expenditure Schedule

The projected expenditures are detailed below:

| Expenditure Schedule (2017-2025) | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Programs** | **Units** | **2017** | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** | **2024** | **2025** | **Total** |
| Rehabilitation Program | TBD | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| New Construction | 0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Affordability Assistance | TBD | $751,219 | $38,984 | $38,983 | $38,983 | $38,983 | $38,983 | $38,983 | $38,983 | $38,984 | $1,063,085 |
| Administration | — | $84,439 | $84,440 | $84,439 | $84,440 | $84,439 | $84,440 | $84,439 | $84,440 | $84,440 | $759,956 |
| Other Mechanisms | TBD | $0.00 | $79,274 | $79,274 | $79,274 | $79,274 | $79,274 | $79,274 | $79,274 | $79,274 | $634,192 |
| **Total** | **TBD** | **$835,658** | **$202,698** | **$202,696** | **$202,697** | **$202,696** | **$202,697** | **$202,696** | **$202,697** | **$202,698** | **$2,457,233** |

## 7 — Excess or Shortfall of Funds

In the event of any expected or unexpected shortfall if the anticipated revenues are not sufficient to implement the plan, Jackson Township will address the shortfall through annual fee receipts or other available funding sources.

If more funds than anticipated are collected, projected funds exceed the amount necessary to implement the Fair Share Plan, or Jackson Township is reserving funds for affordable housing projects to meet a future affordable housing obligation, these excess funds will be used to fund an eligible affordable housing activity pursuant to applicable rules and regulations.

## 8 — Barrier Free Escrow

Collection and distribution of barrier free funds shall be consistent with Jackson Township's affordable housing ordinance and in accordance with N.J.A.C. 5:97-8.5.

## 9 — Summary

Jackson Township intends to spend affordable housing trust fund revenues pursuant to N.J.A.C. 5:97-8.7 through N.J.A.C. 5:97-8.9, and consistent with the housing programs outlined in its 2017 Amended Housing Element and Fair Share Plan.

Jackson Township had a balance of $927,619 in its affordable housing trust fund as of December 31, 2016, and it anticipates an additional $1,529,614 in revenue through 2025 for a total of $2,457,233. The municipality will dedicate $1,063,085 toward affordability assistance, $759,956 toward administrative costs, and $634,192 toward other mechanisms.

| Spending Plan Summary | | |
|---|---|---|
| Balance as of 12/31/16 | | $927,619 |
| Projected Development Fees from 01/01/17 through 12/31/25 | + | $1,440,000 |
| Projected Payments-in-Lieu-of-Construction from 01/01/17 through 12/31/25 | + | $76,114 |
| Projected Other Funds from 01/01/17 through 12/31/25 | + | $0 |
| Projected Interest from 01/01/17 through 12/31/25 | + | $13,500 |
| **Total Revenue** | = | **$2,457,233** |
| Projected Rehabilitation Expenditures from the Affordable Housing Trust Fund | – | $0.00 |
| Projected New Construction Project Expenditures (Total for all Projects) | – | $0.00 |
| Projected Affordability Assistance Expenditures | – | $1,063,085 |
| Projected Administrative Expenses | – | $759,956 |
| Projected Expenditures for Other Mechanisms | – | $634,192 |
| **Total Projected Expenditures** | = | **$2,457,233** |
| **Remaining Balance** | = | **$0.00** |

*Amended Housing Element and Fair Share Plan*
*June 8, 2017*

# Appendix I: Affirmative Marketing Plan

**RESOLUTION**
**OF THE MAYOR AND TOWNSHIP COUNCIL OF THE TOWNSHIP OF JACKSON, COUNTY OF OCEAN, STATE OF NEW JERSEY ADOPTING THE "AFFIRMATIVE MARKETING PLAN" FOR THE TOWNSHIP OF JACKSON**

**WHEREAS**, in accordance with the Fair Housing Act and the New Jersey Uniform Housing Affordability Controls (N.J.A.C. 5:80-26-1, *et seq*.), the Township of Jackson is required to adopt by resolution an Affirmative Marketing Plan to ensure that all affordable housing units created are affirmatively marketed to low- and moderate-income households, particularly those living and/or working within Housing Region 4, the housing region encompassing the Township of Jackson.

**NOW, THEREFORE, BE IT RESOLVED,** that the Mayor and Council of the Township of Jackson, County of Ocean, State of New Jersey, do hereby adopt the following Affirmative Marketing Plan:

**Affirmative Marketing Plan**

A. All affordable housing units in the Township of Jackson shall be marketed in accordance with the provisions herein, unless otherwise provided by law or regulation of the State of New Jersey.

B. This Affirmative Marketing Plan shall apply to all developments that contain, or will contain, low- and moderate-income units, including those that are part of the Township's prior round Fair Share Plan and its current Fair Share Plan, and those that may be constructed in future developments not yet anticipated by the Fair Share Plan.

C. The Affirmative Marketing Plan shall be implemented by an Administrative Agent designated by and/or under contract to the Township of Jackson. All costs of advertising and affirmatively marketing affordable housing units shall be borne by the developer/seller/owner of the affordable unit(s).

D. In implementing the Affirmative Marketing Plan, the Administrative Agent, acting on behalf of the Township of Jackson, shall undertake the following strategies:

1. Publication of one advertisement in a newspaper of general circulation within the housing region.

2. Broadcast of one advertisement by a radio or television station broadcasting throughout the housing region.

3. At least one additional regional marketing strategy using one of the other sources listed below.

E. The Affirmative Marketing Plan is a regional marketing strategy designed to attract buyers and/or renters of all majority and minority groups, regardless of race, creed, color, national origin, ancestry, marital or familial status, gender, affectional or sexual orientation, disability, age or number of children, to housing units that are being marketed by a developer or sponsor of affordable housing. The Affirmative Marketing Plan is also intended to target those potentially eligible persons who are least likely to apply for affordable units in the housing region. It is a continuing program that directs all marketing activities toward the housing region in which the municipality is located, and covers the entire period of the deed restriction for each restricted housing unit. The Township of Jackson is in Housing Region 4, which consists of Mercer, Monmouth, and Ocean counties.

F. The Affirmative Marketing Plan is a continuing program that is intended to be followed throughout the entire period of restrictions and shall meet the following requirements:

1. All newspaper articles, announcements and requests for applications for low- and moderate-income units shall appear in at least one major-circulation, daily newspaper of regional circulation (i.e., circulation throughout all of Housing Region 4), or through a series of daily newspapers that reaches all of Housing Region 4 residents. This may include but is not limited to the Asbury Park Press, Atlantic City Press, Trenton Time, and Ocean County Observer.

2. For new developments, the primary marketing shall take the form of at least one press release and a paid display advertisement in the above newspaper(s) once a week for four consecutive weeks. Additional advertising and publicity shall be on an "as needed" basis. The developer/owner shall disseminate all public service announcements and pay for display advertisements. The developer/owner shall provide proof of publication to the Administrative Agent. All press releases and advertisements shall be approved in advance by the Administrative Agent.

3. The advertisement shall include a description of the:

   a. Street address(es) of the units;

   b  Directions to the units;

   c. Range of prices for the units;

   d. Numbers of bedrooms in units (bedroom mix);

   e. Maximum income permitted to qualify for the units;

   f. Location of applications;

g.    Business hours when interested households may obtain an application;

h.    Application fees, if any;

i.    Number of units currently available; and,

j.    Anticipated dates of availability.

4.    Newspaper articles, announcements and information on where to request applications for low- and moderate-income housing shall also appear at least once a week for four consecutive weeks in at least three locally oriented weekly newspapers within the housing region, one of which shall be circulated primarily within Ocean County and the other two of which shall be circulated primarily outside of Ocean County but within the housing region.

5.    The following regional cable television stations or regional radio stations shall be used during the first month of advertising.   The developer must provide satisfactory proof of public dissemination:

a.    3 — KYW-TV (CBS Broadcasting Inc.)

b.    6 — WPVI-TV (American Broadcasting Companies, Inc., Walt Disney)

c.    10 — WCAU (NBC Telemundo License Co., General Electric)

d.    12 — WHYY-TV (WHYY, Inc.)

e.    17 — WPHL-TV (Tribune Company)

f.    23 — WNJS (New Jersey Public Broadcasting Authority)

g.    29 — WTXF-TV (Fox Television Stations, Inc., News Corp.)

h.    48 — WGTW-TV (Trinity Broadcasting Network)

i.    52 — WNJT (New Jersey Public Broadcasting Authority)

j.    57 — WPSG (CBS Broadcasting Inc.)

k.    61 — WPPX (Paxson Communications License Company, LLC)

l.    65 — WUVP-TV (Univision Communications, Inc.)

m.    69 — WFMZ-TV (Maranatha Broadcasting Company, Inc.)

G. Applications, brochure(s), sign(s) and/or poster(s) used as part of the affirmative marketing program shall be available/posted in the following locations:

1. Jackson Township Municipal Building

2. Jackson Township Web Site

3. Developer's Sales/Rental Offices

4. Ocean County Administration Building

5. Monmouth County Administration Building

6. Mercer County Administration Building

7. Ocean County Library (all branches)

9. Monmouth County Library (all branches)

10. Mercer County Library (all branches)

Applications shall be mailed by the Administrative Agent and Municipal Housing Liaison to prospective applicants upon request. In addition, applications shall be available at the developer's sales/rental office and shall be mailed to prospective applicants upon request.

H. The Administrative Agent shall develop, maintain and update a list of community contact person(s) and/or organizations(s) in Monmouth, Ocean, and Mercer counties that will aid in the affirmative marketing program, with particular emphasis on contacts that will reach out to groups that are least likely to apply for housing within the region, including major regional employers.

1. Quarterly informational flyers and applications shall be sent to each of the following agencies for publication in their journals and for circulation among their members: Ocean County Board of Realtors; Monmouth County Association of Realtors; and, Mercer County Association of Realtors

2. Quarterly informational circulars and applications shall be sent to the administrators of each of the following agencies within the counties of Ocean, Monmouth and Mercer: Welfare or Social Service Board (via the Director); Rental Assistance Office (local office of DCA); Office on Aging; Housing Authority (municipal or county); Community Action Agencies; and, Community Development Departments

3. Quarterly informational circulars and applications shall be sent to the chief personnel administrators of major employers within the region that are included

on the list of community contact person(s) and/or organizations(s) in Monmouth, Ocean, and Mercer Counties that shall be developed, maintained and updated by the Administrative Agent.

4.   Quarterly informational circulars and applications shall also be sent to the offices of the following organizations: Fair Share Housing Center; Latino Action Network; New Jersey State Conference of the NAACP; NAACP Long Branch Unit; NAACP Lakewood Branch Unit; NAACP Trenton Branch Unit; NAACP Bayshore (Matawan) Branch Unit; NAACP Red Bank Branch Unit; NAACP Toms River Branch Unit; NAACP Asbury Park/Neptune Branch Unit; STEPS Conference; OCEAN, Inc.; Supportive Housing Association; Ocean County Board of Chosen Freeholders; and, New Jersey Housing Resource Center.

I.   The following is a listing of community contact person(s) and/or organizations in that will aid in the affirmative marketing program and provide guidance and counseling services to prospective occupants of low- and moderate-income units:

1.   Fair Share Housing Center

2.   Latino Action Network

3.   New Jersey State Conference of the NAACP

4.   NAACP Long Branch Unit

5.   NAACP Lakewood Branch Unit

6.   NAACP Trenton Branch Unit

7.   NAACP Bayshore (Matawan) Branch Unit

8.   NAACP Red Bank Branch Unit

9.   NAACP Toms River Branch Unit

10.   NAACP Asbury Park/Neptune Branch Unit

11.   STEPS Conference

12.   OCEAN, Inc.

13.   Supportive Housing Association

14.   Ocean County Board of Chosen Freeholders

15.   New Jersey Housing Resource Center

J. A random selection method to select occupants of low- and moderate-income housing will be used by the Administrative Agent, in conformance with N.J.A.C. 5:80-26.16 (l). The Affirmative Marketing Plan shall provide a regional preference for all households that live and/or work in Housing Region 4, which is comprised of Ocean, Monmouth and Mercer counties.

K. The Administrative Agent shall administer the Affirmative Marketing Plan. The Administrative Agent has the responsibility to: income-qualify low- and moderate-income households; place income-eligible households in low- and moderate-income units upon initial occupancy; provide for the initial occupancy of low- and moderate-income units with income-qualified households; continue to qualify households for re-occupancy of units as they become vacant during the period of affordability controls; assist with outreach to low- and moderate-income households; and, enforce the terms of the deed restriction and mortgage loan as per N.J.A.C 5:80-26-1, *et seq*.

L. The Administrative Agent shall provide or direct qualified low- and moderate-income applicants to counseling services on subjects such as budgeting, credit issues, mortgage qualifications, rental lease requirements and landlord/tenant law and shall develop, maintain and update a list of entities and lenders willing and able to perform such services.

M. All developers/owners of low- and moderate-income housing units shall be required to undertake and pay the costs of the marketing of the affordable units in their respective developments, subject to the direction and supervision of the Administrative Agent.

N. The implementation of the Affirmative Marketing Plan for a development that includes affordable housing shall commence at least 120 days before the issuance of either a temporary or permanent certificate of occupancy. The implementation of the Affirmative Marketing Plan shall continue until all low-income housing units are initially occupied and for however long affordable units exist that remain deed restricted, and for which the occupancy or re-occupancy of such units continues to be necessary.

O. The Administrative Agent shall provide the Affordable Housing Liaison with the information required to comply with monitoring and reporting requirements pursuant to N.J.A.C.5:80-26-1, *et seq*.

I hereby certify that this is a true copy of a resolution duly adopted by the Mayor and Council of the Township of Jackson at a Township Council meeting held on ______________, 2017.

______________________

Ann Marie Eden, RMC
Municipal Clerk

*Amended Housing Element and Fair Share Plan*
*June 8, 2017*

# Appendix J: Amended Affordable Housing Ordinance

# Chapter 244. Land Use and Development Regulations

## Article XIII. Affordable Housing

### § 244-222. Intent.

1. It is the intent of this article to regulate the development and management of low- and moderate-income housing units constructed in compliance with the Housing Element of the Master Plan of the Township of Jackson.
2. Applicability. The provisions of this Ordinance shall apply:
   a. To all affordable housing developments and affordable housing units that currently exist within Jackson Township;
   b. To all affordable housing developments and affordable housing units that are proposed to be created pursuant to the Jackson Township Housing Plan Element and Fair Share Plan;
   c. To all unanticipated future developments that will provide affordable housing for low- and moderate-income households; and,
   d. To any property in Jackson Township that is currently zoned for nonresidential uses and that is subsequently rezoned for multifamily residential purposes, and to all approvals for multifamily residential development granted by the Jackson Planning Board or Zoning Board of Adjustment, including approvals of use or density variances, site plans, or subdivisions, and redevelopment projects subject to a redevelopment plan adopted by the Township governing body governing the development and redevelopment of designated areas in need of rehabilitation or areas in need of redevelopment in the township, including substantial revisions to previously approved developments, where such rezoning, approval or revision results in or increases the number of residential units by five (5) or more units.

### § 244-223. Definitions.

As used in this article, the following terms shall have the meanings indicated:

AFFORDABLE

A sales price or rent level that is within the means of a low- or moderate-income household as defined within N.J.A.C. 5:93-7.4, and, in the case of an ownership unit, that the sales price for the unit conforms to the standards set forth in N.J.A.C. 5:80-26.6, as may be amended and supplemented, and, in the case of a rental unit, that the rent for the unit conforms to the standards set forth in N.J.A.C. 5:80-26.12, as may be amended and supplemented.

**AFFORDABLE HOUSING ADMINISTRATOR (AH ADMINISTRATOR)**

The Township Planner of the Township of Jackson, other municipal official(s) and/or designee(s) appointed or contracted by the Township Committee of the Township of Jackson

to administer the compliance and/or implementation of the Township's affordable housing plan.

**AFFORDABLE HOUSING DEVELOPMENT**

A development included in or approved pursuant to the Housing Element and Fair Share Plan or otherwise intended to address the Township's fair share obligation, and includes, but is not limited to, an inclusionary development, a municipal construction project or a 100 percent affordable housing development.

**AGE-RESTRICTED UNIT**

A housing unit designed to meet the needs of, and exclusively for, the residents of an age-restricted segment of the population such that: 1) all the residents of the development wherein the unit is situated are 62 years of age or older; or 2) at least 80 percent of the units are occupied by one person who is 55 years of age or older; or 3) the development has been designated by the Secretary of the U.S. Department of Housing and Urban Development as "housing for older persons" as defined in Section 807(b)(2) of the Fair Housing Act, 42 U.S.C. § 3607.

**DEVELOPER'S AFFORDABLE HOUSING PLAN**

A plan submitted by the developer and approved by the Affordable Housing Administrator which shall identify the manner in which the developer plans to develop, price, market and restrict the low- and moderate-income dwelling units in accordance with this article.

**EXEMPT SALES**

Includes the transfer of ownership between husband and wife and transfers of ownership between former spouses as a result of a judicial decree of divorce or a judicial separation, but not including sales to third parties; the transfer of ownership between family members as a result of inheritance; the transfer of ownership through an executor's deed to a Class A beneficiary and a transfer of ownership by court order.

**FAIR MARKET VALUE**

The unrestricted price of a low- or moderate-income housing unit if sold at a current real estate market rate.

**INCLUSIONARY DEVELOPMENT**

A residential housing development in which a percentage of the housing units are reserved for low- and moderate-income households. This term includes, but is not limited to: new construction, the conversion of a non-residential structure to residential use and the creation of new affordable units through the gut rehabilitation or reconstruction of a vacant residential structure.

**LOW-INCOME HOUSING**

Housing affordable according to Council on Affordable Housing (COAH) standards for home ownership and rental costs and occupied or reserved for occupancy by households with a gross household income equal to 50% or less of the median gross household income for households of the same size within the housing region in which the house is located and subject to affordability controls.

**MODERATE-INCOME HOUSING**

Housing affordable according to Council on Affordable Housing (COAH) standards for home ownership and rental costs and occupied or reserved for occupancy by households with a gross household income of more than 50% but less than 80% of the median gross

household income for households of the same size within the housing region in which the house is located and subject to affordability control.

**PRICE DIFFERENTIAL**

The difference between the controlled unit sale price and the fair market value as determined at the date of the proposed contract of sale after reasonable real estate broker fees have been paid.

**REPAYMENT CLAUSE**

Obligation of a seller exercising the repayment option to pay 95% of the price differential to a municipality at closing for use within the municipal housing plan.

**REPAYMENT OPTION**

The option of a seller of a low- or moderate-income unit to sell a unit pursuant to N.J.A.C. 5:92-12.7 at a fair market value subject to compliance with the terms of the repayment clause.

**SET-ASIDE**

The percentage of housing units devoted to low- and moderate-income households within an inclusionary development.

**UNIT COMPLETION**

The receipt of any temporary or final certificate of occupancy.

VERY LOW-INCOME HOUSING

Housing affordable according to the Council on Affordable Housing (COAH) standards for home ownership and rental costs and occupied or reserved for occupancy by households with a gross household income of 30 percent or less of the median gross household income for households of the same size within the housing region in which the house is located and subject to affordability controls.

## § 244-224. Affordable housing sites.

A. Low- and moderate-income housing required.

(1) Developers of the affordable housing (AH) sites, as designated on the Zoning Map of the Township of Jackson, Ocean County, New Jersey, shall be required to set aside the number of affordable units specified in any existing valid approval and in accordance with the Housing Element Fair Share Plan.

(2) In addition to the set-aside requirements above, the developers of affordable housing (AH) sites shall be subject to the requirements of the underlying zoning of the respective site set forth in Article **X**.

B. Fee required. Prior to the issuance of a certificate of occupancy for an affordable housing unit, the developer of affordable housing sites shall pay a fee to the Township to offset the costs of the services of the Affordable Housing (AH) Administrator. Said fee shall be the prevailing fees charged by the Affordable Housing Management Service of the New Jersey Department of Community Affairs for such services.

C. Affordable Housing Administrator (AH Administrator).

(1) The Township shall appoint an Affordable Housing Administrator ("AH Administrator") to monitor sales and resales of affordable housing units.

(2) Initial sales and rental transactions as well as all resale and re-rental transactions of affordable housing units within the inclusionary developments shall be administered by the Jackson Township AH Administrator under this chapter.

(3) Jackson Township may delegate the administration of duties named in § **244-225E** to the Department of Community Affairs Affordable Housing Management Service (AHMS), a

nonprofit organization or another qualified entity. Such delegation must be approved by the Jackson Township Committee.

## § 244-225. Low- and moderate-income housing requirements.

A. Building permits. No building permit(s) shall be issued for any development within an affordable housing (AH) site without the submission and approval of a developer's affordable housing plan by the AH Administrator.

B. Bedroom distribution.

(1) Non-age-restricted AH sites. Affordable housing units within AH sites that are not restricted to senior citizens shall have the following distribution of bedroom types:

(a) At a minimum, 30% of all low- and moderate-income units shall be two-bedroom units;

(b) At a minimum, 20% of low- and moderate-income units shall be three-bedroom units; and

(c) No more than 20% of all low- and moderate-income units may be one-bedroom and efficiency units.

(d) The remainder, if any, may be allocated at the discretion of the developer.

(2) Age-restricted AH sites. Low- and moderate-income units restricted to senior citizens may utilize a modified bedroom distribution. At a minimum, the number of bedrooms shall equal the number of senior citizen low- and moderate-income units within the inclusionary development. The standards can be met by creating all one-bedroom units or by creating a two-bedroom unit for each efficiency unit.

C. Unit location.

(1) Affordable housing units shall be situated on the development tract in locations no less desirable than market-priced dwelling units within the development and shall be equally accessible to common open space, community facilities and shopping facilities.

(2) Rental units may be concentrated for ownership and management unit reasons

(3) The exterior design of the low- and moderate-income housing units shall be harmonious in scale, texture, and materials with the market-priced units on the tract

(4) Deed restrictions. Developers of housing units for low- and moderate-income households shall enter into a written agreement, binding on all successors-in-interest, in accordance with current COAH regulations or Court requirements for Resale/Rental Control, at the time of sale, resale, rental or re-rental regardless of the availability of Federal, State, County or Township subsidy programs.

(5) In inclusionary developments, to the extent possible, low- and moderate-income units shall be integrated with the market units.

D. Phasing. Approval of the developer's affordable housing plan shall be contingent upon the development, whether developed in one stage or in two or more stages, meeting the following phasing schedule:

| Minimum Percentage of Low- and Moderate-Income Units Completed | Percentage of Marketing Housing Units Completed |
|---|---|
| 0% | 25% |
| 10% | 25%, plus 1 unit |
| 50% | 50% |

| Minimum Percentage of Low- and Moderate-Income Units Completed | Percentage of Marketing Housing Units Completed |
|---|---|
| 75% | 75% |
| 100% | 90% |
| — | 100% |

E. Occupancy selection.

(1) The AH Administrator shall designate an application period during which applications to purchase or rent affordable housing units will be accepted.

(2) Applications shall be accepted only if submitted on an application form prepared and/or approved by the AH Administrator. Applications shall be completely filled out and notarized. Knowingly or intentionally making any false statement on a form shall be grounds for disqualifying an applicant even if the applicant is otherwise eligible. The following information shall be required:

a. A copy of IRS Form 1040A or 1040EZ (Tax Computation Form) for each of the three years prior to the date of the application.

b. A letter from all employers stating present annual income or four consecutive pay stubs dated within 120 days of the interview date.

c. A letter or appropriate reporting form verifying benefits, including but not limited to social security or pension.

d. A letter or appropriate reporting form verifying any other sources of income claimed by the applicant household.

e. Reports that verify income from assets to be submitted by banks or other financial institutions managing trust funds, money market accounts, stocks or bonds.

f. Reports that verify assets that do not earn regular income such as real estate and savings with delayed earnings provisions.

(3) The AH Administrator shall determine whether the applicant meets the income and other requirements established in these regulations. The review process for a prospective purchaser shall involve a credit background report; to be an eligible applicant, the applicant shall have an acceptable credit history such that there is a realistic possibility that he will be approved for a mortgage

(4) The AH Administrator will determine which eligible applicants shall be offered the opportunity to purchase or rent affordable housing units. Selection from among the eligible applicants shall be on a random basis, subject only to that size of household priority schedule established in Subsection **E(6)** below.

(5) In the event that an application is determined by the AH Administrator to be ineligible for a low- or moderate-income unit, the applicant may request reconsideration by the AH Administrator. Such request shall be made in writing within 10 days of receipt of notice of ineligibility by the applicant. The AH Administrator shall make a new eligibility determination and provide the applicant with specific findings as to the basis for such eligibility determination.

(6) Occupancy Standards

(a) In referring certified households to specific restricted units, the Administrative Agent shall, to the extent feasible and without causing an undue delay in the occupancy of a unit, strive to:

[1] Provide an occupant for each bedroom;

[2] Provide children of different sexes with separate bedrooms;

[3] Provide separate bedrooms for parents and children; and,

[4] Prevent more than two persons from occupying a single bedroom.

(7) Waiting list. The AH Administrator may establish a waiting list for the remaining eligible applicants. After all the units are occupied, the AH Administrator may choose to accept new applications. If an applicant is deemed eligible, the applicant shall be placed on the waiting list at the bottom of the particular priority classification for which the applicant qualifies. The AH Administrator shall periodically recertify the applicants on the waiting list to ensure that the list remains current and that the applicants are still qualified for the units to which they applied.

~~F. Income eligibility standards.~~

~~**(1)** Income eligibility ceilings for low- and moderate-income units for various sized households shall be established by the AH Administrator based upon United States Department of Housing and Urban Development Uncapped Median Income by Family Size for Ocean County and as adopted by COAH. No applicant with a household income in excess of these ceilings shall be eligible to rent or purchase the low- and moderate-income units.~~

~~**(2)** Upon annual adoption of updated income standards by COAH, the AH Administrator shall modify its income eligibility ceilings accordingly.~~

~~**(3)** For purposes of determining income and eligibility, the AH Administrator shall consider:~~

~~**(a)** All sources of income, whether taxable or nontaxable, including social security and pensions.~~

~~**(b)** Imputed income. For the purpose of determining eligibility and rents, interest on the present value of real property and extraordinary personal property owned by the applicant shall be imputed and deemed additional income. Interest shall be imputed at the average interest rate on money market accounts in the region as determined by the AH Administrator.~~

~~**(c)** The income and assets of all members of the household as well as the income and assets of any individual who is expected to occupy the unit for which the household is seeking to qualify shall be included in the determination of eligibility and of rents. The form used for verification of household income shall include an affidavit attesting that the application contains the complete income of all current or anticipated household members.~~

~~**G.** Initial sales and rental prices.~~

~~**(1)** All units offered for sale or rent are to be affordable to a cross section of low- and moderate-income households. With respect to low-income households, that shall include households earning between 40% and 50% of median, adjusted for household size. With respect to moderate-income households, that shall include households earning between 50% and 80% of median, adjusted for household size.~~

~~(2) For affordable housing within an AH site, the average selling price of units in each unit size category shall not exceed a price affordable to a household earning 57.5% of median, adjusted for household size.~~

~~(3) In order to ensure that units within an AH site are affordable throughout the range set forth in Subsection **G(1)** above, the developer shall establish a range of stratified prices of sales units for the low-and moderate-income units, for each unit size. The developer shall provide, to the extent practicable, for the following distribution of sales prices for every 20 low- and moderate-income units; the average of the range shall not exceed the levels set forth in Subsection **G(2)** above.~~

~~**(a)** Low.~~

~~**[1]** One at 40% through and 42.5%.~~

~~**[2]** Three at 42.6% through and 47.5%.~~

~~**[3]** Six at 47.6% through 50%.~~

~~**(b)** Moderate.~~

~~[1] One at 50.1% through and 57.5%.~~

~~[2] One at 57.6% through and 64.5%.~~

~~[3] One at 64.6% through and 68.5%.~~

~~[4] One at 68.6% through and 72.5%.~~

~~[5] Two at 72.6% through and 77.5%.~~

~~[6] Four at 77.6% through and 80.0%.~~

~~(4) Sales prices shall be considered affordable where the household purchasing the unit will not spend more than 28% of gross household income, after a 10% down payment, including the monthly principal, interest, taxes, insurance and homeowners' association fees, if any. In making these calculations, the following considerations shall govern:~~

~~(a) Mortgage payments shall be determined on the basis of a thirty-year fixed-rate mortgage at the prevailing interest rates obtainable from at least two major lenders active in Ocean County;~~

~~(b) Property taxes shall be determined by applying the equalized property tax rate in Jackson Township currently in effect to the proposed selling price of the unit;~~

~~(c) The developer shall use the best available assumptions to determine the insurance and homeowners' association fees to be applied to the units, subject to the approval of the AH Administrator as to reasonableness only for use in this calculation.~~

~~(d)Homeowners' association fees shall be set at a specific percentage of those paid by market purchasers. This percentage must be included in the master deed of any inclusionary development.~~

~~(5) Rental prices shall be considered affordable where the household renting the affordable housing unit will not spend more than 30% of gross household income for rent, including utilities. Maximum rent shall be calculated as a percentage of the regional median income adopted by the COAH that applies to the rental housing unit. The allowance for utilities shall be the personal benefit allowance for utilities as defined by the Department of Housing and Urban Development (HUD).~~

~~(6) At least half of all units devoted to low- and moderate-income households within inclusionary developments shall be affordable to low-income households. At least half of all units in each bedroom distribution and half of all rental units in inclusionary developments shall be available for low-income households.~~

~~**H.** Procedure for resale transaction prior to expiration of controls.~~

~~**(1)** All resale transactions of affordable housing units shall be administered by the AH Administrator. From the date on which the AH Administrator receives a notice of intent to sell by the owner of a low- and moderate-income unit, the AH Administrator shall have the exclusive right to refer prospective purchasers to that unit for a period of 90 days unless waived in writing. In the event that a contract for the unit is executed within the ninety-day period set above and the prospective buyer is unable to close, the period during which the AH Administrator shall have the exclusive right to market the unit is automatically extended for a period of 21 days from the date it is notified of the buyer's inability to close.~~

~~**(2)** In the event that no contract has been entered into for the unit at the end of a ninety-day period, the owner of the unit may seek approval from the AH Administrator to sell the unit directly. The AH Administrator may authorize the applicant to sell the unit as follows. However, if the AH Administrator determines that the failure to enter into a contract was the result of negligence, absence of good-faith effort or lack of cooperation on the part of the seller, the AH Administrator shall require the applicant to attempt to sell the unit for an additional ninety-day period.~~

~~**(a)** In the case of a low-income unit, to a low- or moderate-income buyer; or~~

**(b)** In the case of a moderate-income unit to a buyer whose income does not exceed 120% of median.

**(c)** Any subsequent sale shall be fully subject to the resale restrictions contained in these regulations. The deed to the above income purchaser shall specifically contain a deed restriction establishing that it is subject to all the affordability controls outlined in this article.

I. Calculation of resale price. The resale price of the affordable housing unit shall be the base price increased pursuant to Subsection **I(1)** and **(2)** below.

**(1)** Percentage increase in household income. The price approved by the AH Administrator at which the seller acquired the property shall be the base price. The base price shall be multiplied by 100% plus the percentage increase in the HUD uncapped median income by family size for Ocean County from the time of acquisition of the property to the date that notice of intent to sell is given to the AH Administrator. For example, if the base price is $30,000 and the median income at the time of the initial acquisition is $32,000 and, at the time of the resale transaction, the median income has increased 25% to $40,000, then the resale price is as follows:

$$\frac{100}{100} + \frac{25}{100} = 1.25$$

$30,000 x 1.25 = $37,500

(2) Improvements.

**(a)** In addition, the seller shall be entitled to add to the selling price of the unit the cost of an eligible capital improvement to the affordable housing unit which pursuant to N.J.A.C. 5:92-12.8 renders the unit suitable for a larger household

**(b)** Upon request of an owner of an affordable housing unit, the AH Administrator shall consider within 30 days whether to grant prior approval of an improvement and to approve a specific dollar amount up to the amount actually upended for that improvement.

**J.** Exempt sales.

**(1)** The following transactions shall be deemed nonsales for the purpose of this article. The owner of the affordable unit shall be entitled to a statement of exemption from the AH Administrator upon application.

**(a)** Transfer of an affordable housing unit between husband and wife.

**(b)** Transfer of ownership of an affordable housing unit between former spouses as a result of a judicial decree, judgment or order of divorce, but not including sales to third parties.

**(c)** Transfer of ownership of an affordable housing unit as a result of inheritance.

 

        ~~**(d)** Transfer of ownership of an affordable housing unit through an order of the Superior Court.~~

~~**(2)** A grant of exemption shall not eliminate the resale control restriction set forth in these regulations. Any subsequent sale shall be subject to all of the terms of these regulations.~~

~~**K.** Rental increases. All rerental transactions shall be administered by the AH Administrator. The rents of affordable housing units may increase annually based on the percentage increase in median income for the Ocean County housing region as determined from the uncapped Section 8 income limits, published by HUD, or other recognized standard adopted by the COAH that applies to the rental housing unit.~~

~~**L.** Rental of low- and moderate-income sales unit. No owner of an affordable housing unit may lease the unit to a tenant without prior written approval of the AH Administrator. Such approval shall not be granted except when justified by particular and unusual circumstances. An owner seeking such approval shall submit a written request to the AH Administrator setting forth the particular circumstances of the case, including the reasons for the request to rent, the proposed duration of the tenancy and certification that the proposed tenant is a qualified low- or moderate-income household. In the event that the AH Administrator approves the request, it shall notify the owner of the unit. The owner shall rent the unit only to a qualified low- or moderate-income tenant for the period approved by the AH Administrator at a rent affordable to a low- or moderate-income tenant, whichever is applicable.~~

~~M. Conversion of rental units to sales units. Rental units may be converted for sale as condominium, cooperative or fee simple units, but any sale of converted units shall continue to be restricted to persons meeting the income eligibility standards as set forth in this article unless COAH requires otherwise. No rental unit which is part of the rental component of the Township's Housing Element and Fair Share Plan shall be converted to a condominium, cooperative or sale unit without approval of the court.~~

~~N.Exemption from rent control ordinances. All rental units, both market and affordable, shall not be subject to any rent control ordinance which may be adopted in the Township of Jackson during the time period in which affordable housing price controls are effective.~~

~~O. Duration of controls.~~

~~(1) Except as otherwise provided in these regulations, all units for sale or resale subject to the provisions of this article shall be subject to resale and rental controls for a period of 20 years from the date of acquisition of the unit by the initial purchaser or lessee.~~

~~(2) All units for owner-occupied rehabilitation subject to the Jackson Township Housing Rehabilitation Program shall be subject to affordability controls for a period of six years.~~

~~(3) All lower-income dwelling units shall be covered by covenants to ensure that in all initial sales and rentals, and in all subsequent resales and rerentals, the units will continue to remain available and affordable to the lower-income households for which they were intended for the period specified in this~~

subsection in accordance with the requirements and standards established by COAH.

**P.** Expiration of controls. The restrictive covenant governing the deeds of the low- and moderate-income units shall include an option permitting purchase of the affordable unit at the maximum allowable restricted sales price at the time of the first nonexempt sale after controls on affordability have been in effect on the unit for the period specified in this article subject to the requirements set forth below. The option to buy shall be available to Jackson Township, the New Jersey Department of Community Affairs (DCA), the New Jersey Housing and Mortgage Finance Agency (HMFA) or a qualified nonprofit organization as determined by the New Jersey Council on Affordable Housing (COAH). All restrictive covenants governing low- and moderate-income units shall require the owner to notify the AH Administrator by certified mail of any intent to sell the unit 90 days prior to entering into an agreement for the first nonexempt sale after controls have been in effect on the housing units for the period specified in this article. Upon receipt of such notice, the option to buy the unit at the maximum allowable restricted sales price shall be available for 90 days. The AH Administrator shall notify the Jackson Township Committee, DCA, HMFA and COAH that the unit is for sale. If the Township exercises this option, it may enter into a contract of sale. If the Township fails to exercise this option within 90 days, the first of the other entities giving notice to the seller of its intent to purchase during the ninety-day period shall be entitled to purchase the unit. If the option to purchase the unit at the maximum allowable restricted sales price is not exercised by a written intent to purchase, the owner may proceed to sell the housing unit. If the owner does not sell the unit within one year of the date of the delivery of notice of intent to sell, the option to buy the unit shall be restored and the owner shall be required to submit a new notice of intent to sell 90 days prior to any future proposed date of sale. Any option to buy a housing unit at the maximum allowable restricted sales price shall be exercised by certified mail and shall be deemed exercised upon mailing.

(1) Jackson Township option.

(a) If the Township elects to purchase a low- or moderate-income unit pursuant to this article:

1. It may convey or rent the housing unit to a low- or moderate-income purchaser or tenant at a price or rent not to exceed the maximum allowable restricted sales price or rental for a period of up to 20 years.
2. It may convey the unit at fair market value subject to the deposit of the "price differential" as defined in § **244-223** in the Jackson Township Housing Trust Fund devoted solely to the creation, rehabilitation or maintenance of low- and moderate-income housing.
3. Money placed in the Jackson Township Housing Trust Fund may not be expended pursuant to Subsection **P(1)(a)[2]** above until a plan for its use is developed and approved by the Township Committee and the court.

~~(b) In the event that the Township purchases low-income housing units, the Township shall maintain them as low-income housing units~~

~~(c) In the event that the Township elects to purchase low- or moderate-income housing units and convey them at fair market value, the Township shall:~~

~~1. Notify the COAH and the court of any proposed sale and resale price 90 days before closing~~

~~2. Notify COAH and the court of the price differential;~~

~~3. Deposit the price differential in the Jackson Township Housing Trust Fund devoted solely to the creation, rehabilitation or maintenance of low- and moderate-income housing; andN~~

~~4. otify COAH and the court by February 1 of each calendar year of the existing balance within the Jackson Township Housing Trust Fund.~~

~~(2) State option. When the DCA or HMFA elects to purchase a low- or moderate-income unit pursuant to this section, it may:~~

~~a. Convey or rent the housing unit to a low- or moderate-income purchaser or tenant at a price or rent not to exceed the allowable restricted sales price or rental; or~~

~~b. Convey the unit at fair market value and utilize the price differential to subsidize the construction, rehabilitation or maintenance of low- and moderate-income housing within the appropriate housing region.~~

~~(3) Nonprofit option. Nonprofit agencies that have been designated by COAH shall be eligible to purchase low- or moderate-income units pursuant to this section for the sole purpose of conveying or renting the housing unit to a low- or moderate-income purchaser or tenant at a price or rent not to exceed the allowable restricted sales price or rental. Low-income units shall be made available to low-income purchasers or tenants, and the housing unit shall be regulated by the restrictive covenant and lien in a form adopted by COAH. The term of the controls on affordability shall be the same as those required by this article.~~

~~(4) Seller's option.~~

~~a. An eligible seller of a low- or moderate-income sales unit which has been controlled for at least 20 years and who has provided notice of an intent to sell may proceed with the sale if no eligible entity as outlined in Subsection **P(1)**, **(2)** or **(3)** above exercises its option to purchase within 90 days.~~

~~b. Subject to other applicable requirements of this article, the seller may elect to:~~

~~i. Sell to a qualified low- or moderate-income household at the controlled unit sales price in accordance with existing COAH rules,~~

provided that the unit is regulated by the restrictive covenant and lien adopted by COAH for an additional period of 20 years; or

ii. Exercise the repayment option and sell to any purchaser at market price, provided that 95% of the price differential is paid into the Jackson Township Housing Trust Fund at closing.

c. If the sale will be to a qualified low- and moderate-income household, the AH Administrator shall certify the income qualifications of the purchaser and the Township shall ensure that the housing unit is regulated by the restrictive covenant and lien as required by COAH.

d. The AH Administrator shall examine any contract of sale containing a repayment option to determine if the proposed sales price bears a reasonable relationship to the housing unit's fair market value. In making this determination, the AH Administrator may rely on comparable sales data or an appraisal. The AH Administrator shall not approve any contract of sale where there is a determination that the sales price does not bear a reasonable relationship to fair market value. The AH Administrator shall make a determination within 20 days of receipt of the contract of sale and shall calculate the repayment option payment.

e. The Township shall also adopt an appeal procedure by which a seller may submit written documentation requesting the AH Administrator to recompute the repayment obligation if the seller believes an error has been made or to reconsider a determination that a sales price does not bear a reasonable relationship to fair market value. A repayment obligation determination made as a result of an owner's appeal shall be final administrative determination of the Township.

f. The repayment shall occur at the date of closing and transfer of title for the first nonexempt transaction after the expiration of controls on affordability. Repayment proceeds shall be deposited in the Jackson Township Housing Trust Fund devoted solely to the creation, rehabilitation or maintenance of low- and moderate-income housing. Money deposited in the Jackson Township Housing Trust Fund may not be expended until a plan for its use is developed and approved by the Township and COAH.

Continued application of options. When a housing unit has been maintained as a low- or moderate-income unit after controls have been in effect for the period specified in this article, the restrictive covenant governing the housing units shall allow the Township, the state, nonprofit agencies and sellers of low- and moderate-income units to again exercise all the same options as provided in this article.

**Q.** Foreclosure.

~~(1) A judgment of foreclosure or a deed in lieu of foreclosure by a financial institution regulated by state and/or federal law shall extinguish controls on affordable housing units, provided that there is a compliance with N.J.A.C. 5:92-12.10. Notice of foreclosure shall allow the Township, the Department of Community Affairs, the Housing and Mortgage Finance Agency or a nonprofit organization to purchase the affordable housing unit at a maximum permitted sales price and maintain it as an affordable unit for the balance of the intended period of control.~~

~~(2) In the event of a foreclosure sale, the owner of the affordable housing unit shall be personally obligated to pay the Township any surplus funds but only to the extent that such surplus funds exceed the difference between the maximum price permitted at the time of foreclosure and the amount necessary to redeem the debt to the financial institution, including the cost of foreclosure.~~

~~**R.** Second mortgages. No second mortgage shall be placed upon the property without the prior written approval of the AH Administrator. In determining whether to grant an approval for the second mortgage, the AH Administrator shall consider the need for the second mortgage and the impact that the second mortgage shall have upon the ability to maintain the unit as a low- and moderate-income unit. Under no circumstances shall a foreclosure of a second mortgage constitute grounds for eliminating the resale controls provided for in this regulation. Prior written approval shall be denied unless second mortgages are specifically authorized by COAH regulations and the application is consistent with those regulations.~~

~~**S.**~~

~~Sale of personal items. Items of personal property which are not permanently affixed to the unit (e.g., refrigerator, freezer, washer or dryer) and which were not included when the affordable housing unit was purchased may be the subject of separate negotiations between the parties subsequent to the signing of the contract for the purchase of the house. Any agreed price for the purchase of any item or items of personal property shall be reasonable considering the original cost, nature, age and condition of the item. The price to be paid for items of personal property shall not be used as a mechanism to avoid or circumvent the limitations on the resale price of the unit itself. In no event shall the right to purchase the unit be conditioned upon the buyer's willingness to agree to purchase any item or items of personal properties of the seller.~~

~~**T.** Certificate of occupancy.~~

~~(1) No certificate of occupancy for a low- or moderate-income unit shall be issued until the developer shall have submitted and have approved by the Township Attorney a deed restriction encompassing all the provisions of these regulations.~~

~~(2) No certificate of occupancy shall be issued for the resale of a low- or moderate-income unit unless the AH Administrator shall certify that the resale complies with the terms of these regulations.~~

~~(3) No low- and moderate-income unit may be occupied by an initial purchaser or resale purchaser without a certificate of occupancy.~~

~~**U.** Affirmative marketing. The AH Administrator shall develop and implement an affirmative marketing program for affordable housing units that shall include the following:~~

~~**(1)** An announcement that specifies eligibility requirements and a request for applications for low- and moderate-income units shall be placed in newspapers of general circulation within Ocean County and the region.~~
~~[Amended 3-17-1994 by Ord. No. 6-94]~~

~~**(2)** Press releases announcing the availability of low- and moderate-income housing units shall be submitted to newspapers of general circulation within Ocean County and the region.~~
~~[Amended 3-17-1994 by Ord. No. 6-94]~~

~~**(3)** The availability and eligibility of low- and moderate-income housing shall be announced to the Ocean County Housing Agency, the Ocean County Office on Aging, the Township of Jackson, local religious and other civic organizations and other appropriate local and area-wide groups.~~

~~**(4)** The marketing program will commence at least 90 days before issuance of either temporary or permanent certificates of occupancy and shall continue until all low- and moderate-income housing units are under contract of sale and/or lease.~~

~~**V.** Waiver. In the event of a special hardship or in the event that a minor technical modification of these regulations is necessary to effectively implement the policy of this article, the AH Administrator may waive or modify those regulations relating to occupancy selection, sale or resale prices or income eligibility standards, provided that such waiver or modification is consistent with the intent of these regulations and the Land Use and Development Regulations and does not violate COAH policy or regulation or any statute.~~

F. Control Periods for Restricted Ownership Units and Enforcement Mechanisms

a. Control periods for restricted ownership units shall be in accordance with N.J.A.C. 5:80-26.5, as may be amended and supplemented, and each restricted ownership unit shall remain subject to the requirements of this Ordinance for a period of at least thirty (30) years, until Jackson Township takes action to release the unit from such requirements; prior to such action, a restricted ownership unit must remain subject to the requirements of N.J.A.C. 5:80-26.1, as may be amended and supplemented.

b. The affordability control period for a restricted ownership unit shall commence on the date the initial certified household takes title to the unit.

c. Prior to the issuance of the initial certificate of occupancy for a restricted ownership unit and upon each successive sale during the period of restricted ownership, the Administrative Agent shall determine the restricted price for the unit and shall also determine the non-restricted, fair market value of the

unit based on either an appraisal or the unit's equalized assessed value without the restrictions in place.

d. At the time of the initial sale of the unit, the initial purchaser shall execute and deliver to the Administrative Agent a recapture note obligating the purchaser (as well as the purchaser's heirs, successors and assigns) to repay, upon the first non-exempt sale after the unit's release from the restrictions set forth in this Ordinance, an amount equal to the difference between the unit's non-restricted fair market value and its restricted price, and the recapture note shall be secured by a recapture lien evidenced by a duly recorded mortgage on the unit.

e. The affordability controls set forth in this Ordinance shall remain in effect despite the entry and enforcement of any judgment of foreclosure with respect to restricted ownership units.

f. A restricted ownership unit shall be required to obtain a Continuing Certificate of Occupancy or a certified statement from the Construction Official stating that the unit meets all Code standards upon the first transfer of title following the removal of the restrictions provided under N.J.A.C. 5:80-26.5(a), as may be amended and supplemented.

G. Price Restrictions for Restricted Ownership Units, Homeowner Association Fees and Resale Prices

a. Price restrictions for restricted ownership units shall be in accordance with N.J.A.C. 5:80-26.1, as may be amended and supplemented, including:

[1] The initial purchase price for a restricted ownership unit shall be approved by the Administrative Agent;

[2] The Administrative Agent shall approve all resale prices, in writing and in advance of the resale, to assure compliance with the foregoing standards;

[3] The master deeds of inclusionary developments shall provide no distinction between the condominium or homeowner association fees and special assessments paid by low- and moderate-income purchasers and those paid by market purchasers; and,

[4] The owners of restricted ownership units may apply to the Administrative Agent to increase the maximum sales price for the unit on the basis of anticipated capital improvements. Eligible capital improvements shall be those that render the unit suitable for a larger household or the addition of a bathroom.

H. Buyer Income Eligibility

a.  Buyer income eligibility for restricted ownership units shall be in accordance with N.J.A.C. 5:80-26.1, as may be amended and supplemented, such that low-income ownership units shall be reserved for households with a gross household income less than or equal to 50 percent of median income and moderate-income ownership units shall be reserved for households with a gross household income less than 80 percent of median income.

b.  Notwithstanding the foregoing, however, the Administrative Agent may, upon approval by the Township Committee, and subject to the Court's approval, permit moderate-income purchasers to buy low-income units in housing markets if the Administrative Agent determines that there is an insufficient number of eligible low-income purchasers to permit prompt occupancy of the units. All such low-income units to be sold to moderate-income households shall retain the required pricing and pricing restrictions for low-income units.

c.  A certified household that purchases a restricted ownership unit must occupy it as the certified household's principal residence and shall not lease the unit; provided, however, that the Administrative Agent may permit the owner of a restricted ownership unit, upon application and a showing of hardship, to lease the restricted unit to another certified household for a period not to exceed one year.

d.  The Administrative Agent shall certify a household as eligible for a restricted ownership unit when the household is a low-income household or a moderate-income household, as applicable to the unit, and the estimated monthly housing cost for the particular unit (including principal, interest, taxes, homeowner and private mortgage insurance and condominium or homeowner association fees, as applicable) does not exceed 33 percent of the household's eligible monthly income.

I.  Limitations on Indebtedness Secured by Ownership Unit, Subordination

a.  Prior to incurring any indebtedness to be secured by a restricted ownership unit, the owner shall apply to the Administrative Agent for a determination in writing that the proposed indebtedness complies with the provisions of this Section, and the Administrative Agent shall issue such determination prior to the owner incurring such indebtedness.

b.  With the exception of First Purchase Money Mortgages, neither an owner nor a lender shall at any time cause or permit the total indebtedness secured by a restricted ownership unit to exceed 95 percent of the maximum allowable resale price of the unit, as such price is determined by the Administrative Agent in accordance with N.J.A.C.5:80-26.6(b).

J.  Capital Improvements to Ownership Units

a.  The owners of restricted ownership units may apply to the Administrative Agent to increase the maximum sales price for the unit on the basis of capital improvements made since the purchase of the unit. Eligible capital improvements

shall be those that render the unit suitable for a larger household or that add an additional bathroom. In no event shall the maximum sales price of an improved housing unit exceed the limits of affordability for the larger household.

b. Upon the resale of a restricted ownership unit, all items of property that are permanently affixed to the unit or were included when the unit was initially restricted (e.g., refrigerator, range, washer, dryer, dishwasher, wall-to-wall carpeting) shall be included in the maximum allowable resale price. Other items may be sold to the purchaser at a reasonable price that has been approved by the Administrative Agent at the time of the signing of the agreement to purchase. The purchase of central air conditioning installed subsequent to the initial sale of the unit and not included in the base price may be made a condition of the unit resale provided the price, which shall be subject to 10-year, straight-line depreciation, has been approved by the Administrative Agent. Unless otherwise approved by the Administrative Agent, the purchase of any property other than central air conditioning shall not be made a condition of the unit resale. The owner and the purchaser must personally certify at the time of closing that no unapproved transfer of funds for the purpose of selling and receiving property has taken place at the time of or as a condition of resale.

K. Control Periods for Restricted Rental Units

a. Control periods for restricted rental units shall be in accordance with N.J.A.C. 5:80-26.11, as may be amended and supplemented, and each restricted rental unit shall remain subject to the requirements of this Ordinance for a period of at least thirty (30) years, until Jackson Township takes action to release the unit from such requirements. Prior to such action, a restricted rental unit must remain subject to the requirements of N.J.A.C. 5:80-26.1, as may be amended and supplemented.

b. Deeds of all real property that include restricted rental units shall contain deed restriction language. The deed restriction shall have priority over all mortgages on the property, and the deed restriction shall be filed by the developer or seller with the records office of Ocean County. A copy of the filed document shall be provided to the Administrative Agent within 30 days of the receipt of a Certificate of Occupancy.

c. A restricted rental unit shall remain subject to the affordability controls of this Ordinance despite the occurrence of any of the following events:

1. Sublease or assignment of the lease of the unit;
2. Sale or other voluntary transfer of the ownership of the unit; or,
3. The entry and enforcement of any judgment of foreclosure on the property containing the unit.

L. Rent Restrictions for Rental Units, Leases

i.  A written lease shall be required for all restricted rental units and tenants shall be responsible for security deposits and the full amount of the rent as stated on the lease. A copy of the current lease for each restricted rental unit shall be provided to the Administrative Agent.

ii.  No additional fees or charges shall be added to the approved rent (except, in the case of units in an assisted living residence, to cover the customary charges for food and services) without the express written approval of the Administrative Agent.

iii.  Application fees (including the charge for any credit check) shall not exceed five percent of the monthly rent of the applicable restricted unit and shall be payable to the Administrative Agent to be applied to the costs of administering the controls applicable to the unit as set forth in this Ordinance.

iv.  No rent control ordinance or other pricing restriction shall be applicable to either the market units or the affordable units in any development in which at least 15 percent of the total number of dwelling units are restricted rental units in compliance with this Ordinance.

M.  Tenant Income Eligibility

a.  Tenant income eligibility shall be in accordance with N.J.A.C. 5:80-26.13, as may be amended and supplemented, and shall be determined, as follows:

1.  Very low-income rental units shall be reserved for households with a gross household income less than or equal to 30 percent of median income;

2.  Low-income rental units shall be reserved for households with a gross household income less than or equal to 50 percent of median income; and,

3.  Moderate-income rental units shall be reserved for households with a gross household income less than 80 percent of median income.

b.  The Administrative Agent shall certify a household as eligible for a restricted rental unit when the household is a very low-income household, low-income household or a moderate-income household, as applicable to the unit, and the rent proposed for the unit does not exceed 35 percent (40 percent for age-restricted units) of the household's eligible monthly income as determined pursuant to N.J.A.C. 5:80-26.16, as may be amended and supplemented; provided, however, that this limit may be exceeded if one or more of the following circumstances exists:

       i.   The household currently pays more than 35 percent (40 percent for households eligible for age-restricted units) of its gross household income for rent, and the proposed rent will reduce its housing costs;

      ii.   The household has consistently paid more than 35 percent (40 percent for households eligible for age-restricted units) of eligible monthly income for rent in the past and has proven its ability to pay;

    iii.   The household is currently in substandard or overcrowded living conditions;

    iv.   The household documents the existence of assets with which the household proposes to supplement the rent payments; or,

     v.   The household documents reliable anticipated third-party assistance from an outside source such as a family member in a form acceptable to the Administrative Agent and the owner of the unit.

  c.   The applicant shall file documentation sufficient to establish the existence of the circumstances enumerated in this subsection with the Administrative Agent, who shall counsel the household on budgeting.

N. Maximum Rents and Sales Prices:

  a.   In establishing rents and sales prices of affordable housing units, the Administrative Agent shall follow the procedures set forth in UHAC, utilizing the regional income limits established by COAH or a successor entity.

  b.   The maximum rent for restricted rental units within each affordable development shall be affordable to households earning no more than 60 percent of median income, and the average rent for restricted rental units shall be affordable to households earning no more than 52 percent of median income.

  c.   The developers and/or municipal sponsors of restricted rental units shall establish at least one rent for each bedroom type for both low-income and moderate-income units, provided that at least 10 percent of all low- and moderate-income rental units shall be affordable to very low-income households, earning 30 percent or less of the regional median household income.

  d.   The maximum sales price of restricted ownership units within each affordable development shall be affordable to households earning no more than 70 percent of median income, and each affordable development must achieve an affordability average of 55 percent for restricted ownership units; in achieving this affordability average, moderate-income ownership units must be available for at least three different sales prices for each bedroom type, and low-income ownership units must be available for at least two different sales prices for each bedroom type.

  e.   In determining the initial sales prices and rent levels for compliance with the affordability average requirements for restricted units other than assisted living facilities and age-restricted developments, the following standards shall be used:

        i. A studio shall be affordable to a one-person household;

       ii. A one-bedroom unit shall be affordable to a one and one-half person household;

      iii. A two-bedroom unit shall be affordable to a three-person household;

     iv. A three-bedroom unit shall be affordable to a four and one-half person household; and

      v. A four-bedroom unit shall be affordable to a six-person household.

f. In determining the initial sales prices and rents for compliance with the affordability average requirements for restricted units in assisted living facilities and age-restricted developments, the following standards shall be used:

        i. A studio shall be affordable to a one-person household

       ii. A one-bedroom unit shall be affordable to a one and one-half person household; an

      iii. A two-bedroom unit shall be affordable to a two-person household or to two one-person households.

g. The initial purchase price for all restricted ownership units shall be calculated so that the monthly carrying cost of the unit, including principal and interest (based on a mortgage loan equal to 95 percent of the purchase price and the Federal Reserve H.15 rate of interest), taxes, homeowner and private mortgage insurance and condominium or homeowner association fees do not exceed 28 percent of the eligible monthly income of the appropriate size household as determined under N.J.A.C. 5:80-26.4, as may be amended and supplemented; provided, however, that the price shall be subject to the affordability average requirement of N.J.A.C. 5:80-26.3, as may be amended and supplemented.

h. The initial rent for a restricted rental unit shall be calculated so as not to exceed 30 percent of the eligible monthly income of the appropriate size household, including an allowance for tenant paid utilities, as determined under N.J.A.C. 5:80-26.4, as may be amended and supplemented; provided, however, that the rent shall be subject to the affordability average requirement of N.J.A.C. 5:80-26.3, as may be amended and supplemented.

i. The price of owner-occupied low- and moderate-income units may increase annually based on the percentage increase in the regional median income limit for each housing region. In no event shall the maximum resale price established by the Administrative Agent be lower than the last recorded purchase price.

j. The rent of low- and moderate-income units may be increased annually based on the permitted percentage increase in the Housing Consumer Price Index for the United States. This increase shall not exceed nine percent in any one year. Rents for units constructed pursuant to low- income housing tax credit regulations shall be indexed pursuant to the regulations governing low- income housing tax credits.

(17) Requirements for affordable housing. Developments which include affordable housing units shall be subject to the following provisions:

    A.  In accordance with N.J.S.A. 52:27D-329.1 (P.L. 2008, C. 46) at least 13 percent of the affordable units provided within the township shall be reserved for very low income households, i.e. households earning 30 percent or less of the median income and of that amount at least 50 percent shall be reserved for very low income families (i.e., non-age restricted and not reserved for special needs populations). For developments with eight (8) or more affordable housing units on site, at least 13 percent of all low- and moderate-income units shall be affordable to households earning no more than 30 percent of median income. A minimum of 50 percent of these units shall be reserved for very low income families.

    B.  Age restriction. The sales and rentals of not more than 25 percent of the affordable housing units constructed within the Township may be age restricted to senior citizens as defined by and in accordance with the Federal Fair Housing Act and as regulated by N.J.A.C. 5:92-14, provided that no more than 25 percent of the total affordable housing units constructed within the Township shall be age restricted. A request to age restrict housing units may only be granted after the Planning Board or Board of Adjustment has received the consent of the Township Committee. In designing its project, the applicant may propose constructing the senior citizen restricted affordable units in the same building or buildings in order to maximize the potential of preserving a more tranquil lifestyle for the senior citizen resident; and to the foregoing extent, the requirement of integration of the affordable units with conventional units is modified.

    C.  Low/Moderate Split and Bedroom Distribution of Affordable Housing Units:

        1.  The fair share obligation shall be divided equally between low- and moderate-income units, except that where there is an odd number of affordable housing units, the extra unit shall be a low income unit.

        2.  In each affordable development, at least 50 percent of the restricted units within each bedroom distribution shall be low-income units

    D.  Utilities

        1.  Affordable units shall utilize the same type of heating source as market units within an inclusionary development.

        2.  Tenant-paid utilities included in the utility allowance shall be set forth in the lease and shall be consistent with the utility allowance approved by the DCA for its Section 8 program.

    E.  Accessibility Requirements

1. The first floor of all restricted townhouse dwelling units and all restricted units in all other multistory buildings shall be subject to the technical design standards of the Barrier Free Subcode, N.J.A.C. 5:23-7 and the following:

   a. All restricted townhouse dwelling units and all restricted units in other multistory buildings in which a restricted dwelling unit is attached to at least one other dwelling unit shall have the following features:

      i. An adaptable toilet and bathing facility on the first floor; and,

      ii. An adaptable kitchen on the first floor; and,

      iii. An interior accessible route of travel on the first floor; and,

      iv. An adaptable room that can be used as a bedroom, with a door or the casing for the installation of a door, on the first floor; and,

      v. If not all of the foregoing requirements in this paragraph can be satisfied, then an interior accessible route of travel must be provided between stories within an individual unit, but if all of the foregoing requirements in this paragraph have been satisfied, then an interior accessible route of travel shall not be required between stories within an individual unit; and,

      vi. An accessible entranceway as set forth at P.L. 2005, c. 350 (N.J.S.A. 52:27D-311a, et seq.) and the Barrier Free Subcode, N.J.A.C. 5:23-7, or evidence that Little Egg Harbor Township has collected funds from the developer sufficient to make 10 percent of the adaptable entrances in the development accessible:

         1. Where a unit has been constructed with an adaptable entrance, upon the request of a disabled person who is purchasing or will reside in the dwelling unit, an accessible entrance shall be installed.

         2. To this end, the builder of restricted units shall deposit funds within the Little Egg Harbor Township Affordable Housing Trust Fund sufficient to install accessible entrances in 10 percent of the affordable units that have been constructed with adaptable entrances.

         3. The funds deposited under the terms of this paragraph shall be used by Little Egg Harbor Township for the sole purpose of making the

adaptable entrance of an affordable unit accessible when requested to do so by a person with a disability who occupies or intends to occupy the unit and requires an accessible entrance.

4. The developer of the restricted units shall submit a design plan and cost estimate to the Construction Official of Little Egg Harbor Township for the conversion of adaptable to accessible entrance

5. Once the Construction Official has determined that the design plan to convert the unit entrances from adaptable to accessible meet the requirements of the Barrier Free Subcode, N.J.A.C. 5:23-7, and that the cost estimate of such conversion is reasonable, payment shall be made to the Jackson Township Affordable Housing Trust Fund.

b. Full compliance with the foregoing provisions shall not be required where an entity can demonstrate that it is "site impracticable" to meet the requirements. Determinations of site impracticability shall be in compliance with the Barrier Free Subcode, N.J.A.C. 5:23-7.

(18))Alternative Living Arrangements

A. The administration of an alternative living arrangement shall be in compliance with N.J.A.C. 5:93-5.8 and the UHAC, with the following exceptions:

B. Affirmative marketing (N.J.A.C. 5:80-26.15), provided, however, that the units or bedrooms may be affirmatively marketed by the provider in accordance with an alternative plan approved by the Court;

C. Affordability average and bedroom distribution (N.J.A.C. 5:80-26.3).

D. With the exception of units established with capital funding through a 20-year operating contract with the Department of Human Services, Division of Developmental Disabilities, alternative living arrangements shall have at least 30 year controls on affordability in accordance with the UHAC, unless an alternative commitment is approved by the Court.

E. The service provider for the alternative living arrangement shall act as the Administrative Agent for the purposes of administering the affirmative marketing and affordability requirements for the alternative living arrangement.

[Added 4-26-2004 by Ord. No. 13-04; amended 9-12-2006 by Ord. No. 21-06]

A.

Applicability. This section of the land use regulations of the Township of Jackson sets forth the mechanisms by which developers shall provide for a fair share of affordable housing based on growth that is associated with development taking place within the Township of Jackson.

(1)

Residential development. Except as exempted by Subsection **A(3)**, all residential development that results in the construction of new market-rate dwelling units in accordance with N.J.A.C. 5:94-1 et seq., shall be subject to the growth share provisions of this section.

(2)

Nonresidential development. Except as exempted by Subsection **A(3)**, all nonresidential development that results in an increase in gross floor area of any existing nonresidential structure or the construction of a new nonresidential structure in accordance with N.J.A.C. 5:94-1 et seq., shall be subject to the growth share provisions of this section.

(3)

Exemptions. All developments that received preliminary or final approval from the Planning Board and/or Board of Adjustment, as applicable, prior to the effective date of this section.

B.

Residential growth share provisions.

(1)

Pursuant to the applicable rules and regulations of COAH, all residential developments of eight or more lots or units shall provide one affordable housing unit (as defined by COAH) on site for every eight market-rate units or petition the Council for approval to provide the affordable housing units off site or make a payment-in-lieu of providing affordable housing on site or constructing the affordable housing unit, in accordance with Subsection **D**.

(2)

For developments that result in a number of market-rate residential units not evenly divisible by eight, the developer may construct the additional affordable unit on site or, alternatively, the developer may make a payment-in-lieu of constructing the additional affordable unit in accordance with Subsection **D**. If the developer selects the latter option, the amount of said payment shall be established by subtracting any whole multiples of eight from the total number of market-rate residential units being created, dividing any remaining number of units by eight and multiplying the resulting fraction by $200,000.

(3)

All residential development consisting of less than eight residential units may provide one affordable unit on site or may make a payment-in-lieu of constructing the proportionate fraction of the affordable housing unit required. If the developer selects the latter option, the amount of said payment shall be established by dividing the number of market-rate units by eight and multiplying the resulting fraction by $200,000.

(4)

All residential developments not subject to Subsection **B(1)** through **(3)** shall be subject to the provision of the Township's Mandatory Development Fee Ordinance (Ordinance No. 08-05).[1]

[1]

*Editor's Note: See § **244-12J(3)** and **(4)**.*

C.

Nonresidential growth share provisions.

(1)

All nonresidential developments that result in an increase in gross floor area of any existing nonresidential building or the construction of a new nonresidential building in the Township of

Jackson shall provide one affordable housing unit for every 25 jobs that result from the application of standards adopted by COAH (presently found in Appendix E of N.J.A.C. 5:94-1 et seq.) and based on use groups, as defined by the International Building Code (IBC) which has been incorporated by reference into the Uniform Construction Code ("UCC").

(2)

All nonresidential developments in the Township of Jackson shall provide one unit of affordable housing for every 25 jobs created by new or expanded development. Determinations of the number of jobs created shall be based on the new or expanded floor area in the development and by the conversion factors, by use group, established by COAH as Appendix E in N.J.A.C. 5:94-1 et seq.

(3)

For nonresidential developments that result in a number of jobs not evenly divisible by 25, the developer may construct the additional affordable unit off site in accordance with Subsection **D** or, alternatively, the developer may make a payment-in-lieu of constructing an additional affordable unit in accordance with Subsection **D**. If the developer selects the latter option, the amount of said payment shall be established by subtracting any whole multiples of 25 from the total number of jobs being created, dividing any remaining number of jobs by 25 and multiplying the resulting fraction by $200,000.

(4)

All nonresidential developments creating less than 25 jobs may provide one affordable housing unit off site in accordance with Subsection **D** or may make a payment-in-lieu of constructing an affordable housing unit. If the developer selects the latter option, the amount of said payment shall be established by dividing the number of jobs by 25 and multiplying the resulting fraction by $200,000.

D.

Affordable housing compliance mechanisms. All residential developments consisting of eight or more units or lots must provide affordable housing on site. For all residential developments consisting of seven or less units and for all nonresidential developments, the developer may satisfy its affordable housing growth share obligation through the following mechanisms permitted in COAH's rules:

(1)

The construction of the affordable housing unit(s) on site;

(2)

The construction of the affordable housing unit(s) off site but within the Township of Jackson;

(3)

The purchase of an existing market-rate home at another location in the Township and its conversion to an affordable price-restricted home in accordance with COAH criteria, regulations and policies; or

(4)

Contributing a payment-in-lieu of providing affordable housing as set forth below:

(a)

Payments-in-lieu of the construction of affordable housing shall be negotiated with the Township Council, but shall in no case be less than $200,000 per unit unless the cost of the Township independently developing an affordable housing unit within the Township is less. Payments-in-lieu of construction of affordable housing may exceed $200,000 but shall not exceed the cost of the Township independently developing an affordable housing unit within the Township.

(b)

Regardless of the mechanism by which the applicant has been approved to satisfy the required number of affordable housing units, any development or portion thereof that generates a fraction of an affordable housing unit as all or a portion of the obligation shall be required to make a payment-

~~in-lieu of construction for that fraction of a unit. The payment shall be no greater than the fractional prorated cost of constructing an affordable housing unit in the Township.~~

~~E.~~

~~Division for low- and moderate-income affordable housing. The affordable housing units to be produced pursuant to these regulations shall be allocated as follows: Where only one affordable housing unit is required, that housing unit shall be available to a low-income individual or household; where more than one affordable housing unit is required, the total number of units shall be divided equally between low- and moderate-income individuals or households; and where the total number of affordable housing units required is an odd number, the last housing unit shall be available to a low-income individual or household.~~

~~F.~~

~~Compliance with COAH rules and regulations.~~

~~(1)~~

~~Affordable housing units being constructed on site or off site shall meet the requirements of Article **XIII**, Affordable Housing, of this chapter and shall be in conformance with COAH's third round rules at N.J.A.C. 5:94-1 et seq., and the Uniform Housing Affordability Controls at N.J.A.C. 5:80-26.1 et seq., including, but not limited to requirements regarding phasing schedule, controls on affordability, low-/moderate-income split, heating source, maximum rent and/or sales price, affordability average, bedroom distribution and affirmative marketing.~~

~~(2)~~

~~To the greatest extent possible, affordable housing units being provided within inclusionary developments shall be disbursed through inclusionary developments and shall be located within buildings designed to be architecturally indistinguishable from the market-rate units otherwise being constructed within the development. To that end, the scale, massing, roof pitch and architectural detailing (such as the selection of exterior materials, doors, windows, etc.) of the buildings containing the affordable housing units shall be similar to and compatible with that of the market-rate units.~~

~~(3)~~

~~All applicants subject to this section shall include, as part of any application to the Zoning Board of Adjustment or Planning Board, a calculation from a qualified professional as to the affordable housing obligation generated by the project and a plan through which the applicant intends to satisfy said affordable housing obligation.~~



Peter J. O'Connor, Esq.
Kevin D. Walsh, Esq.
Adam M. Gordon, Esq.
Laura Smith-Denker, Esq.
David T. Rammler, Esq.
Joshua D. Bauers, Esq.

October 25, 2016

Jean Cipriani, Esq.
Counsel for Township of Jackson
Gilmore & Monahan, P.A.
10 Allen St,
Toms River, NJ 08753

**Re: In the Matter of the Township of Jackson, County of Ocean,** Docket No. L-1879-15

Dear Ms. Cipriani:

This letter memorializes the terms of an agreement reached between the Township of Jackson (the Township, Jackson, or "the municipality"), the declaratory judgment plaintiff, Fair Share Housing Center (FSHC), a Supreme Court-designated interested party in this matter in accordance with In re N.J.A.C. 5:96 and 5:97, 221 N.J. 1, 30 (2015)(Mount Laurel IV) and a defendant in this proceeding, and Highview Homes ("Highview"), which intervened in this proceeding as a defendant pursuant to an order dated ______, 2015.

**Background**

Jackson filed the above-captioned matter on July 7, 2015 seeking a declaration of its compliance with the Mount Laurel doctrine and Fair Housing Act of 1985, N.J.S.A. 52:27D-301 et seq. in accordance with In re N.J.A.C. 5:96 and 5:97, supra. Prior to the completion of a trial on the matter before the Honorable Mark A. Troncone, J.S.C., FSHC, Highview, and the Township began mediation proceedings with the assistance of the Special Master, Philip B. Caton. Through that process, the Township and FSHC agreed to settle the litigation and to present that settlement to the trial court with jurisdiction over this matter to review, recognizing that the settlement of Mount Laurel litigation is favored because it avoids delays and the expense of trial and results more quickly in the construction of homes for lower-income households.

**Settlement terms**

The Township and FSHC hereby agree to the following terms:

1. FSHC agrees that the Township, through the adoption of a Housing Element and Fair Share Plan, including spending plan in accordance with the terms of this Agreement, and the implementation of the Plan and this Agreement, satisfies its obligations under the Mount Laurel doctrine and Fair Housing Act of 1985, N.J.S.A. 52:27D-301 et seq., for the Prior Round (1987-1999) and Third Round (1999-2025).

2. At this time and at this particular point in the process resulting from the Supreme Court's Mount Laurel IV decision, when fair share obligations have yet to be definitively determined, it is appropriate for the parties to arrive at a settlement regarding a municipality's Third Round present and prospective need instead of doing so through plenary adjudication of the present and prospective need.

3. FSHC and Jackson hereby agree that Jackson's affordable housing obligations are as follows:

| | |
|---|---|
| Rehabilitation Share (per Kinsey Report[1]) | 28 |
| Prior Round Obligation (pursuant to N.J.A.C. 5:93) | 1247 |
| Third Round (1999-2025) Prospective Need (per Kinsey Report, as adjusted through this settlement agreement) | 1250 |

4. The Township's efforts to meet its present need/rehabilitation share include the following: In July 2012 the Township re-established its rehabilitation program to build upon the success of its earlier program. The current program is funded with a total of $1,380,000 from the Township's affordable housing trust fund, and is administered by Rehabco, Inc. The municipality agrees to continue this program. The 28-unit obligation may be satisfied through units rehabilitated during or since 2010. This is sufficient to satisfy the Township's present need obligation of 28 units.

5. As noted above, the Township has a Prior Round prospective need of 1247 units, which is met through the following compliance mechanisms:

| Compliance Mechanism | Affordable Units | Rental Bonuses | Total Credits |
|---|---|---|---|
| ***Prior Cycle Credits (4/1/80 – 12/15/86)*** | | | |
| Credits without Controls | 205 | 0 | 205 |
| Group Home | 5 | 0 | 5 |
| ***RCAs*** | | | |
| Trenton (Completed) | 50 | 0 | 50 |
| ***Built Affordable Units (Post 12/15/86)*** | | | |
| Site #1 – Willow Point (Family Rental) | 100 | 100 | 200 |
| Site #3 – West Lake Village (Senior Rental) | 150 | 0 | 150 |
| Bella Terra (Assisted Living; Senior Rental) | 11 | 0 | 11 |
| Sunrise (Assisted Living; Senior Rental) | 2 | 0 | 2 |
| Orchards at Bartley (Assisted Living; Senior Rental) | 15 | 0 | 15 |
| Colonial Arms (Senior Rental) | 24 | 0 | 24 |
| Tomorrow's Hope (Special Needs) | 5 | 5 | 10 |
| Windsor Crescent/CIS (Family Rental) | 111 | 111 | 222 |
| ARC of Ocean (Special Needs) | 4 | 4 | 8 |
| Habitat for Humanity (B2401, L16; Family Sale) | 1 | 0 | 1 |
| ***Proposed Affordable Units*** | | | |
| Site #6 – Hovbilt (Family Rental) | 192 | 0 | 192 |
| Site #2 – Leigh (Jackson Woods; 159 Family for Sale, 72 Family Rental) | 231 | 39 | 270 |
| **TOTAL** | **1116** | **259** | **1375** |

[1] David N. Kinsey, PhD, PP, FAICP, NEW JERSEY LOW AND MODERATE INCOME HOUSING OBLIGATIONS FOR 1999-2025 CALCULATED USING THE NJ COAH PRIOR ROUND (1987-1999) METHODOLOGY, May 2016.

6. The Township has implemented or will implement the following mechanisms to address its Third Round prospective need of 1250 units:

| Project Name | Project Location | Project Type | Number of Affordable Units or Credits | Rental Bonus Credits | Total Credits |
|---|---|---|---|---|---|
| A. EL @ Jackson, LLC (**carried over from Site #6 above**) | Perrineville Road | Family Rental (Units Carried Forward from Prior Round) | 128 | 128 | 256 |
| B. Holly Oaks | Blk. 14801, Lot 5 | Inclusionary - Age-restricted- For Sale | 5 | 0 | 5 |
| C. SNHPLP Program | TBD | Special Needs Housing | 8 | 0 | 8 |
| D. Leigh Realty-North Tract (Site #10) | Rt.195 and Rt. 526/527 Interchange | Mixed Use Development - Family Rental | 273 | 184 | 457 |
| E. Highview Homes (Site #15) | Blk. 164, Lot 2 | Inclusionary Development -Family Rental | 40 | 0 | 40 |
| F. RG-2 Zone (Sites #12, #13, and #14) | Misc. | Inclusionary Development -Family Rental | 203 | 0 | 203 |
| | | **Subtotal** | **657** | **312** | **969** |
| G. Remainder of RG-2 and RG-3 Zones | 281 | Inclusionary development - 20% Affordable Unit Setaside Requirement | 281 | 0 | 281 |
| | | **Totals** | **938** | **312** | **1250** |

At its option, Jackson Township may apply to the court to amend the judgment entered in this matter to provide compliance mechanisms, including 100% affordable housing development, that otherwise satisfy the fair share obligations that relate in the chart above to F. RG-2 Zone (Sites #12, #13, and #14) and G. Remainder of RG-2 and RG-3 Zones. Such an application, which shall be on notice to and opportunity to be heard by FSHC, shall demonstrate how the units to be provided instead of units listed above at items F

and/or G provide a realistic opportunity in accordance with applicable law and comply with all terms of this Agreement.

7. The Township agrees to require 13% of all units referenced in this plan, with the exception of units constructed as of July 1, 2008, and units subject to preliminary or final site plan approval, to be very low income units, with half of the very low income units being available to families. The municipality will comply with those requirements through requiring that 13% of the affordable units in the Leigh Realty – North, Highview Homes, and RG-2 Zone (Sites #12, #13, and #14) and Remainder of RG-2 and RG-3 Zones are very low income units, and through the SNHPLP program units. For EL @ Jackson, pursuant to the 2007 Order of Judge Eugene Serpentelli, 17% of the affordable units in that project shall be very low income units.

8. The Township shall meet its Third Round Prospective Need in accordance with the following standards as agreed to by the Parties and reflected in the table in paragraph 6 above:

   a. Third Round bonuses will be applied in accordance with N.J.A.C. 5:93-5.15(d).

   b. At least 50 percent of the units addressing the Third Round Prospective Need shall be affordable to very-low-income and low-income households with the remainder affordable to moderate-income households.

   c. At least twenty-five percent of the Third Round Prospective Need shall be met through rental units, including at least half in rental units available to families.

   d. At least half of the units addressing the Third Round Prospective Need in total must be available to families.

   e. The Township agrees to comply with an age-restricted cap of 25% and to not request a waiver of that requirement. This shall be understood to mean that in no circumstance may the municipality claim credit toward its fair share obligation for age-restricted units that exceed 25% of all units developed or planned to meet its cumulative prior round and third round fair share obligation.

9. The Township shall add to the list of community and regional organizations in its affirmative marketing plan, pursuant to N.J.A.C. 5:80-26.15(f)(5), Fair Share Housing Center, the New Jersey State Conference of the NAACP, 14 Clifton Ave. S., Lakewood, NJ 08701, the Latino Action Network, PO Box 943, Freehold, NJ 07728, NAACP Toms River Branch, PO Box 5144, Toms River 08754, and NAACP Ocean County/Lakewood Branch, PO Box 836,Lakewood, NJ 08701, OCEAN, Inc., S&F Plaza, 2008 Rt. 37 East – Suite 12, Toms River, NJ 08753, the New Jersey Housing Resource Center, 637 South Clinton Avenue, P.O. Box 18550, Trenton, NJ 08650, and the Supportive Housing Association, 15 Alden St # 14, Cranford, NJ 07016, and shall, as part of its regional affirmative marketing strategies during its implementation of this plan, provide notice to those organizations of all available affordable housing units. The Township also agrees to require any other entities, including developers or persons or companies retained to do affirmative marketing, to comply with this paragraph.

10. All units shall include the required bedroom distribution, be governed by controls on affordability and affirmatively marketed in conformance with the Uniform Housing

Affordability Controls, N.J.A.C. 5:80-26.1 et. seq. or any successor regulation, with the exception that in lieu of 10 percent of affordable units in rental projects being required to be at 35 percent of median income, 13 percent of affordable units in such projects shall be required to be at 30 percent of median income, and all other applicable law, except as provided in paragraph 7 above. The Township as part of its HEFSP shall adopt and/or update appropriate implementing ordinances in conformance with standard ordinances and guidelines developed by COAH to ensure that this provision is satisfied.

11. All new construction units shall be adaptable in conformance with P.L.2005, c.350/N.J.S.A. 52:27D-311a and -311b and all other applicable law.

12. As an essential term of this settlement the Township shall adopt an amended Housing Element and Fair Share Plan including spending plan consistent with this agreement, and shall adopt an ordinance providing for the amendment of the Township's Affordable Housing Ordinances and Zoning Ordinances to implement the terms of this settlement agreement and the zoning contemplated herein within 120 days of Court's approval of this Settlement Agreement.

13. The parties agree that the obligations set forth in this agreement and steps taken to fulfill these obligations meet all the need that the Township is required to address pursuant to the Mount Laurel Doctrine and Fair Housing Act through June 30, 2025.

The parties anticipate that future decisions of a court of competent jurisdiction in Ocean County, including but not limited to decisions of the Appellate Division or Supreme Court and/or a determination by an administrative agency responsible for implementing the Fair Housing Act, or an action by the New Jersey Legislature, will establish fair share obligations for the Third Round and the application of the 1000-unit cap during the Third Round, including whether portions of the obligation above the capped amount must be satisfied in future rounds. In view of the unsettled nature of those issues now, the parties have elected not to enter into a settlement regarding whether there may be an obligation deferred to future housing cycles arising from the manner in which the cap is applied during the Third Round. The parties reserve all rights to address how such obligations will be calculated or addressed, including any arguments as to the potential carrying over of any extra credits to future rounds in conformance with the then-applicable law.

Notwithstanding any change in law or other circumstance, the Township shall not have an obligation to be satisfied in the period through 2025 beyond the mechanisms set forth in this Agreement. However, with the exception of F. RG-2 Zone (Sites #12, #13, and #14) and G. Remainder of RG-2 and RG-3 Zones, which are subject to a provision included above that allows for replacement of those compliance mechanisms with alternative compliance mechanisms, the Township shall be obligated to implement all terms of this settlement agreement and its Fair Share Plan, including by leaving in place any site specific zoning adopted or relied upon in connection with the Plan approved pursuant to this settlement agreement; taking all steps necessary to support the development of any 100% affordable developments referenced herein; and otherwise fulfilling the fair share obligation as established herein. The reduction of the Township's obligation below that established in this agreement does not provide a basis for seeking leave to amend this agreement or seeking leave to amend an order or judgment pursuant to R. 4:50-1.

14. The Township maintains an affordable housing trust fund balance and will prepare a Spending Plan that will be a part of the HEFSP, subject to the review of the Court, the

Special Master and FSHC. The parties understand that expenditures of funds that the court finds are "committed" for expenditure pursuant to N.J.S.A. 52:27D-329.2 and -329.3, shall have the four-year time period for expenditure designated pursuant to those provisions beginning to run with the entry of a final judgment approving this settlement in accordance with the provisions of In re Tp. Of Monroe, 442 N.J. Super. 565 (Law Div. 2015) (aff'd 442 N.J. Super. 563). On the first anniversary of the execution of this agreement, and every anniversary thereafter through the end of this agreement, the Township agrees to provide annual reporting of trust fund activity to the New Jersey Department of Community Affairs, Council on Affordable Housing, or Local Government Services, or other entity designated by the State of New Jersey, with a copy provided to Fair Share Housing Center and posted on the municipal website, using forms developed for this purpose by the New Jersey Department of Community Affairs, Council on Affordable Housing, or Local Government Services. The reporting shall include an accounting of all housing trust fund activity, including the source and amount of funds collected and the amount and purpose for which any funds have been expended.

15. On the first anniversary of the execution of this agreement, and every anniversary thereafter through the end of this agreement, the Township agrees to provide annual reporting of the status of all affordable housing activity within the municipality through posting on the municipal website with a copy of such posting provided to Fair Share Housing Center, using forms previously developed for this purpose by the Council on Affordable Housing or any other forms endorsed by the Special Master and FSHC.

16. The Fair Housing Act includes two provisions regarding action to be taken by the Township during the ten-year period of protection provided in this agreement. The Township agrees to comply with those provisions as follows:
   a. For the midpoint realistic opportunity review due on July 1, 2020, as required pursuant to N.J.S.A. 52:27D-313, the Township will post on its municipal website, with a copy provided to Fair Share Housing Center, a status report as to its implementation of its Plan and an analysis of whether any unbuilt sites or unfulfilled mechanisms continue to present a realistic opportunity and whether any mechanisms to meet unmet need should be revised or supplemented. Such posting shall invite any interested party to submit comments to the municipality, with a copy to Fair Share Housing Center, regarding whether any sites no longer present a realistic opportunity and should be replaced and whether any mechanisms to meet unmet need should be revised or supplemented. Any interested party may by motion request a hearing before the court regarding these issues.
   b. For the review of very low income housing requirements required by N.J.S.A. 52:27D-329.1, within 30 days of the third anniversary of this agreement, and every third year thereafter, the Township will post on its municipal website, with a copy provided to Fair Share Housing Center, a status report as to its satisfaction of its very low income requirements, including the family very low income requirements referenced herein. Such posting shall invite any interested party to submit comments to the municipality and Fair Share Housing Center on the issue of whether the municipality has complied with its very low income housing obligation under the terms of this settlement.

17. FSHC previously had intervened in earlier litigation involving Jackson Township and all parties have acknowledged that due to that earlier intervention FSHC is a party in this litigation. FSHC is hereby deemed to have party status in this matter and to have

intervened in this matter as a defendant without the need to file a motion to intervene or an answer or other pleading. The parties to this agreement agree to request the Court to enter an order declaring FSHC is an intervenor, but the absence of such an order shall not impact FSHC's rights.

18. This settlement agreement must be approved by the Court following a fairness hearing as required by Morris Cty. Fair Hous. Council v. Boonton Twp., 197 N.J. Super. 359, 367-69 (Law Div. 1984), aff'd o.b., 209 N.J. Super. 108 (App. Div. 1986); East/West Venture v. Borough of Fort Lee, 286 N.J. Super. 311, 328-29 (App. Div. 1996). The Township shall present its planner as a witness at this hearing.  FSHC agrees not to challenge the attached Plan (Exh. A) at the fairness hearing.  In the event the Court approves this proposed settlement, the parties contemplate the municipality will receive "the judicial equivalent of substantive certification and accompanying protection as provided under the FHA," as addressed in the Supreme Court's decision in In re N.J.A.C. 5:96 & 5:97, 221 N.J. 1, 36 (2015).  The "accompanying protection" shall remain in effect through July 1, 2025. If the settlement agreement is rejected by the Court at a fairness hearing it shall be null and void.

19. If an appeal is filed of the Court's approval or rejection of the Settlement  Agreement, the Parties agree to defend the Agreement on appeal, including in proceedings before the Superior Court, Appellate Division and New Jersey Supreme Court, and to continue to implement the terms of the Settlement  Agreement if the Agreement is approved before the trial court unless and until an appeal of the trial court's approval is successful at which point, the Parties reserve their right to rescind any action taken in anticipation of the trial court's approval. All Parties shall have an obligation to fulfill the intent and purpose of this Agreement.

20. This settlement agreement may be enforced through a motion to enforce litigant's rights or a separate action filed in Superior Court, Ocean County.  A prevailing movant or plaintiff in such a motion or separate action shall be entitled to reasonable attorney's fees.

21. Unless otherwise specified, it is intended that the provisions of this Agreement are to be severable.  The validity of any article, section, clause or provision of this Agreement shall not affect the validity of the remaining articles, sections, clauses or provisions hereof.  If any section of this Agreement shall be adjudged by a court to be invalid, illegal, or unenforceable in any respect, such determination shall not affect the remaining sections.

22. This Agreement shall be governed by and construed by the laws of the State of New Jersey.

23. This Agreement may not be modified, amended or altered in any way except by a writing signed by each of the Parties.

24. This Agreement may be executed in any number of counterparts, each of which shall be an original and all of which together shall constitute but one and the same Agreement.

25. The Parties acknowledge that each has entered into this Agreement on its own volition without coercion or duress after consulting with its counsel, that each party is the proper person and possess the authority to sign the Agreement, that this Agreement contains the entire understanding of the Parties and that there are no representations, warranties, covenants or undertakings other than those expressly set forth herein.

26. Each of the Parties hereto acknowledges that this Agreement was not drafted by any one of the Parties, but was drafted, negotiated and reviewed by all Parties and the Special Master, therefore, the presumption of resolving ambiguities against the drafter shall not apply. Each of the Parties expressly represents to the other Parties that: (i) it has been represented by counsel in connection with negotiating the terms of this Agreement; and (ii) it has conferred due authority for execution of this Agreement upon the persons executing it.

27. Any and all Exhibits and Schedules annexed to this Agreement are hereby made a part of this Agreement by this reference thereto. Any and all Exhibits and Schedules now and/or in the future are hereby made or will be made a part of this Agreement with prior written approval of both Parties.

28. This Agreement constitutes the entire Agreement between the Parties hereto and supersedes all prior oral and written agreements between the Parties with respect to the subject matter hereof except as otherwise provided herein.

29. No member, official or employee of the Borough shall have any direct or indirect interest in this Settlement Agreement, nor participate in any decision relating to the Agreement which is prohibited by law, absent the need to invoke the rule of necessity.

30. Anything herein contained to the contrary notwithstanding, the effective date of this Agreement shall be the date upon which all of the Parties hereto have executed and delivered this Agreement.

31. All notices required under this Agreement ("Notice[s]") shall be written and shall be served upon the respective Parties by certified mail, return receipt requested, or by a recognized overnight or by a personal carrier. In addition, where feasible (for example, transmittals of less than fifty pages) shall be served by facsimile or e-mail. All Notices shall be deemed received upon the date of delivery. Delivery shall be affected as follows, subject to change as to the person(s) to be notified and/or their respective addresses upon ten (10) days notice as provided herein:

**TO FSHC:**             Kevin D. Walsh, Esq.
                         Fair Share Housing Center
                         510 Park Boulevard
                         Cherry Hill, NJ  08002
                         Phone: (856) 665-5444
                         Telecopier: (856) 663-8182
                         E-mail: kevinwalsh@fairsharehousing.org

**TO THE TOWNSHIP:**     Jean Cipriani, Esq.
                         Counsel for Township of Jackson
                         Gilmore & Monahan, P.A.
                         10 Allen St,
                         Toms River, NJ 08753
                         Telecopier:  732-244-1840
                         Email: jlc@gm-law.net

**TO HIGHVIEW:**         Richard J. Hoff, Jr. , Esq.

Bisgaier Hoff, LLC
25 Chestnut Street -Suite 3
Haddonfield, NJ 08033
Email: rhoff@bisgaierhoff.com

**TO SPECIAL MASTER:** Philip B. Caton, PP, FAICP
Clarke Caton Hintz
100 Barrack Street
Trenton, NJ 08608
Email: pcaton@cchnj.com

**WITH A COPY TO THE MUNICIPAL CLERK:** Clerk,
Township of Jackson
95 W. Veterans Hwy
Jackson, NJ 08527
Telecopier: 732-928-4377

Please sign below if these terms are acceptable.

Sincerely,

Kevin D. Walsh, Esq.
Counsel for Intervenor/Interested Party
Fair Share Housing Center

On behalf of the Township of Jackson, with the authorization of the governing body

______________________________

______________________________

Dated: 10-26-16

On behalf of Highview Homes:

______________________________

Dated:_________________________

# EXHIBIT C

**GILMORE & MONAHAN, P.A.**
Ten Allen Street
P.O. Box 1540
Toms River, NJ 08754
(732) 240-6000
Attorneys for **Township of Jackson**
**Jean L. Cipriani, NJ ATTY ID# 048771994**

| **IN THE MATTER OF THE APPLICATION OF THE TOWNSHIP OF JACKSON, a municipal corporation of the State of New Jersey** | SUPERIOR COURT OF NEW JERSEY<br>OCEAN COUNTY<br>LAW DIVISION<br><br>DOCKET NO. OCN-L-1879-15<br><br>**JUDGMENT OF COMPLIANCE AND REPOSE** |
|---|---|

**THIS MATTER** having been opened to the Court by Gilmore & Monahan, P.A., attorneys for the Township of Jackson (hereinafter referred to as "Jackson"), Jean L. Cipriani, Esquire, appearing, in the presence of Adam M. Gordon, Esq., attorney for Interested Party and Intervenor, Fair Share Housing Center, Inc., (hereinafter referred to as "FSHC"), Richard J. Hoff, Esq. of Bisgaier Hoff, attorney for Interested Party and Intervenor Highview Homes and Frank Petrino, Esq. attorney for Interested Party and Intervenor EL at Jackson, by way of Final Compliance Hearing held pursuant to and in accordance with East/West Venture v. Borough of Fort Lee, 286 N.J. Super. 311 (App. Div. 1996); and sufficient notice of this hearing having been given in accordance with In the Matter of the Adoption of N.J.A.C. 5:96 & 5:97 by the New Jersey Council on Affordable Housing, 221 N.J. 1 (2015) ("Mount Laurel IV") and Morris County Fair Housing Council v. Boonton Tp., 197 N.J. Super. 359 (Law. Div. 1984); and the Court having considered the

GILMORE & MONAHAN
A Professional Corporation
COUNSELLORS AT LAW
Allen Street Professional Center
Ten Allen Street
P.O. Box 1540
Toms River, New Jersey 08754

testimony the Court-appointed Special Master, Philip B. Caton, P.P., A.I.C.P.; and the Court having considered the Settlement Agreement entered into between Jackson, Highview Homes and FSHC dated October 25, 2016, and Jackson's duly adopted and endorsed Housing Element and Fair Share Plan referenced therein and other exhibits presented by Jackson in support thereof; and the Court having considered the testimony and presentations of Interested Parties at the time of the hearing; and good cause having been shown;

**IT IS** on this 16th day of **August**, 2017, **ORDERED** that

1. The Council of Affordable Housing had adopted regulations codifying a fair share methodology for the Prior Round Obligation, which resulted in the assignment of a Prior (Second) Round Obligation for the Township of Jackson of 1247 units for the period of 1987-1999.

2. The Court finds that the Township's Compliance Plan fully satisfies the Township's Prior (Second) Round Obligation.

3. The Township of Jackson, Highview Homes and Fair Share Housing Center ("FHSC") entered into an Agreement dated October 25, 2016, which the Court found by Order dated December 31, 2016 to fairly and adequately protect the interests of low and moderate income persons within Jackson's housing region based upon the criteria set forth in East/West Venture v. Borough of Fort Lee, 286 N.J. Super. 311 (App. Div. 1996) for approving a settlement of Mount Laurel litigation.

4. The Jackson Township Planning Board adopted the Housing Element and Fair Share Plan on June 19, 2017 which was endorsed by the Jackson Township Council on June 27, 2017. For ease of reference this Judgment shall refer to the adopted housing element and fair share plan as the Compliance Plan.

GILMORE & MONAHAN
A Professional Corporation
COUNSELLORS AT LAW
Allen Street Professional Center
Ten Allen Street
P.O. Box 1540
Toms River, New Jersey 08754

5.  The Settlement Agreement set the Township's Present Need obligation at 28 units which will be met through ongoing participation in the Ocean County Community Development Block Grant funded Rehabilitation Program and the continued operation of its municipal rehabilitation program which was re-established in July of 2012; and

6.  The "prospective need" for the Township for the period 1999-2025 was determined to be 1,250 units by mutual agreement of the parties; and

7.  The Township's 1,250 unit obligation shall be subject to the COAH second round rental housing minimum and rental bonus caps as follows:

    a)  At least twenty-five percent (25%) of the obligation will be met through rental units.

    b)  At least half of the rental units must be available to families

    c)  At least half of the units must be for low-income households and at least thirteen percent (13%) of the total units must be available to people who are very-low-income and half of those to very-low-income families

    d)  A maximum of twenty-five percent (25%) of the housing may be age-restricted.

8.  The Township shall meet its 1,250 unit obligation as follows:

    (1) 156 Units carried forward from Prior Round for which crediting was not claimed.

    (2) 5 units for the Holly Oaks Inclusionary Age-Restricted for-sale development. This project has received preliminary and final site plan approval.

    (3) 1 Credit for an affordable single-family detached dwelling unit in the DVT Enterprises/Maplewood Estates development, a 13-lot subdivision including 12 new building lots.

GILMORE & MONAHAN
A Professional Corporation
COUNSELLORS AT LAW
Allen Street Professional Center
Ten Allen Street
P.O. Box 1540
Toms River, New Jersey 08754

(4) 8 credits for an 8-bedroom special needs facility to be developed under the NJDCA Special Needs Housing Partnership Program pursuant to a Memorandum of Understanding with NJHMFA and the New Jersey Department of Human Services dated April 10, 2012.

(5) 545 Credits for 273 units and 272 rental bonus credits from the Leigh-realty North Tract "Village Green" Mixed-Use family rental project, memorialized in a Consent Agreement approved by the Court on October 15, 2015.

(6) 80 credits for 40 affordable family rental units and 40 rental bonus credits in the "Highview Homes" inclusionary development site, which has been rezoned to the MF-AH 7 zone consistent with the Settlement Agreement between Jackson Township, Highview Homes and FSHC.

(7) 175 credits for 175 affordable family units in the RG-2 Zone:

i. Affordable Housing Site #12 - RG-2 Associates - 37 credits for 37 affordable units to be developed in a 186 unit inclusionary development site.

ii. Affordable Housing Site #13 - Swanbourne, LLC – 39 credits for 39 affordable for-sale single family units to be developed in the proposed 195 building lot inclusionary development.

iii. Affordable Housing Site # 14 - Jackson Holdings/Grawtown Estates 99 credits for 99 affordable for-sale units of the 493-total building lot inclusionary development.

(8) 290 Units to be developed in the remainder of the RG-2 and RG-3 zones in inclusionary developments with a 20% mandatory set-aside.

GILMORE & MONAHAN
A Professional Corporation
COUNSELLORS AT LAW
Allen Street Professional Center
Ten Allen Street
P.O. Box 1540
Toms River, New Jersey 08754

9. The Master has issued a report entitled "Master's Report for a *Mount Laurel* Compliance Hearing" for the Township of Jackson, Ocean County, New Jersey" (hereinafter "Master's Report") and incorporated herein by reference in which the Master has recommended approval of the Township's Compliance Plan based upon his conclusion that (a) the Township's 2017 Plan is consistent with the Mount Laurel doctrine and COAH's substantive rules (N.J.A.C. 5:97); (b) that, subject to the submittal of additional information and ordinances, the Township be granted continued immunity from Mount Laurel lawsuits through July 1, 2025 or until the date required for submission of a Fourth Round Housing Element and Fair Share Plan is established by regulation, statute, or decision of a Court with appropriate jurisdiction for all municipalities in New Jersey.

10. The Court has reviewed the Compliance Plan, the master's report and all objections to the Compliance Plan.

11. The Court adopts the recommendations of the Master conditioned on the submission of additional documentation and ordinances within 120 days of the date of this Order, with the exception of Condition 9 of the Master's Report, which shall be considered excised from the Master's Report without objection by the Special Master and other counsel and which the Township shall not be required to satisfy.

12. Based upon review of the aforementioned documents and conditioned on the submittal of additional information identified in the Master's Report, the Court accepts the recommendations of its Master that the Court award a Judgment of Repose thereby declaring that implementation of the housing element and fair share plan fully discharges the Township of its responsibility of any further affordable housing responsibilities from July 1, 2015 until June 30, 2025.

GILMORE & MONAHAN
A Professional Corporation
COUNSELLORS AT LAW
Allen Street Professional Center
Ten Allen Street
P.O. Box 1540
Toms River, New Jersey 08754

NOW, THEREFORE, it is on this 16th day of August, 2017

ORDERED and ADJUDGED as follows:

A. The Township has a rehabilitation share of 28 units.

B. The Township's Compliance Plan fully satisfies its prior round obligation to create a realistic opportunity for the creation of 1,247 low and moderate-income housing units.

C. The housing element and fair share plan referenced herein and incorporated by reference adequately meets the Township's obligation to provide a realistic opportunity for the provision of low and moderate-income housing and constitutes an appropriate means to fully satisfy the Township's Mount Laurel obligation.

D. The Township shall fully implement its housing element and fair share plan. As part of implementing its housing element and fair share plan, the Township shall fund its indigenous needs rehabilitation program from developer's fees or Community Development Block Grant Funds or whatever other means is permitted by law.

E. The Township of Jackson shall address, to the satisfaction of the Court Master, the Conditions of the Master's Report with the exception of Condition #9 within 120 days of the date of this order. During this 120-day period the Township shall confer with and provide all relevant documents to Special Master Caton and Fair Share Housing Center. The Special Master shall submit a letter to the Court confirming compliance, which shall result in this Judgment being unconditional, whether or not the Court enters another order confirming that the Township has satisfied the conditions. If the Master concludes that the Township has not satisfied the conditions, the Court shall issue an Order to Show Cause providing the Township an opportunity to demonstrate why the repose granted to this Judgment of Compliance and Repose should not be revoked.

GILMORE & MONAHAN
A Professional Corporation
COUNSELLORS AT LAW
Allen Street Professional Center
Ten Allen Street
P.O. Box 1540
Toms River, New Jersey 08754

F. The Motion to Enforce Litigant's Rights concerning a challenge to Jackson Township Ordinance 12-17 filed by EL @ Jackson shall be subject to a separate proceeding as directed by the Court from the bench and memorialized in a scheduling order dated August 4, 2017.

G. The Planning Board and all its respective agents, employees and representatives shall make *bona fide* efforts to implement and expedite the components of the Township's compliance package which are within the control of the Planning Board, including *bona fide* efforts to expedite all Planning Board development approvals of all inclusionary developers identified in the housing element and fair share plan to facilitate the provision of affordable housing.

H. The Township shall pay the master's fees if it requires the master's services. If a developer in the Township's plan and the Township require the master's services, each shall bear a responsibility to pay half of the master's fees.

I. The Court shall retain jurisdiction in the event of any challenges to the ordinances adopted pursuant hereto or any ordinances to implement any Court approved amendment to the plan.

J. This Judgment of Repose shall provide immunity to the Township and the Planning Board from all Mount Laurel litigation through July 1, 2025.

K. A copy of this Order shall be served upon all parties on the service list in this matter within 7 days of Jackson's receipt thereof.

MARK A. TRONCONE, J.S.C.

GILMORE & MONAHAN
A Professional Corporation
COUNSELLORS AT LAW
Allen Street Professional Center
Ten Allen Street
P.O. Box 1540
Toms River, New Jersey 08754

# EXHIBIT D

**GILMORE & MONAHAN, P.A.**
Ten Allen Street
P.O. Box 1540
Toms River, NJ 08754
(732) 240-6000
Attorneys for **Township of Jackson**
**JEAN L. CIPRIANI, ESQ. NJ ATTY ID #:** 048771994

| | |
|---|---|
| **IN THE MATTER OF THE APPLICATION OF THE TOWNSHIP OF JACKSON, a municipal corporation of the State of New Jersey** | SUPERIOR COURT OF NEW JERSEY<br>OCEAN COUNTY<br>LAW DIVISION<br><br>DOCKET NO. OCN-L-1879-15<br><br>**ORDER ON FAIRNESS AND PRELIMINARY COMPLIANCE HEARING** |

**THIS MATTER** having been opened to the Court by Gilmore & Monahan, P.A., attorneys for the Township of Jackson (hereinafter referred to as "Jackson"), Jean L. Cipriani, Esquire, appearing, in the presence of Adam Gordon, Esquire, attorney for Interested Party and Intervenor, Fair Share Housing Center, Inc., (hereinafter referred to as "FSHC") and Richard Hoff, Esquire, attorney for Interested Party and Intervenor Highview Homes, by way of Fairness and Preliminary Compliance Hearing held pursuant to and in accordance with East/West Venture v. Borough of Fort Lee, 286 N.J. Super. 311 (App. Div. 1996); and sufficient notice of this hearing having been given in accordance with In the Matter of the Adoption of N.J.A.C. 5:96 & 5:97 by the New Jersey Council on Affordable Housing, 221 N.J. 1 (2015) ("Mount Laurel IV") and Morris County Fair Housing Council v. Boonton Tp., 197 N.J. Super. 359 (Law. Div. 1984); and the Court

GILMORE & MONAHAN
A Professional Corporation
COUNSELLORS AT LAW
Allen Street Professional Center
Ten Allen Street
P.O. Box 1540
Toms River, New Jersey 08754

having considered the testimony of Jackson qualified expert, John Maczuga, P.P., and the Court-appointed Special Master, Philip Caton, P.P., F.A.I.C.P.; and the Court having considered the Settlement Agreement entered into between Jackson, FSHC and Highview Homes dated October 25, 2016, and Jackson's Revised Housing Plan Summary referenced therein; and the Court having considered the testimony and presentations of Interested Parties at the time of the hearing; and good cause having been shown;

**IT IS** on this 31st day of December 2016, **ORDERED** that

1. The Court finds that the Settlement Agreement between Jackson, FSHC and Highview Homes is fair and adequately protects the interests of low and moderate income persons within Jackson's housing region based upon the criteria set forth in East/West Venture v. Borough of Fort Lee, 286 N.J. Super. 311 (App. Div. 1996) for approving a settlement of Mount Laurel litigation; and

2. The Court preliminarily finds that Jackson's proposed draft summary Housing Element and Fair Share Plan is facially constitutionally compliant and provides a fair and reasonable opportunity for Jackson to meet its obligation under Mount Laurel IV, subject to Jackson's satisfaction of any conditions set forth by the Court's Special Master, and subject to the Court's approval by way of a Final Compliance Hearing to be held as hereinafter set forth; and

3. A Final Compliance Hearing is hereby scheduled for **1:30 p.m. on May 5,** 2017, by which time Jackson shall have complied with the above-referenced conditions, shall have submitted to the Special Master for review and comment Jackson's Housing Element and Fair Share Plan and all Resolutions and Ordinances required to implement the Housing Element and Fair Share Plan, and shall have provided for the Planning Board of the Township of Jackson to

GILMORE & MONAHAN
A Professional Corporation
COUNSELLORS AT LAW
Allen Street Professional Center
Ten Allen Street
P.O. Box 1540
Toms River, New Jersey 08754

finalize and adopt the Housing Element and Fair Share Plan and the Jackson Township Council to endorse same and to adopt all necessary effectuating Resolutions and Ordinances; and

4. FSHC be and hereby is granted status of Intervenor in this matter; and

5. The temporary immunity previously granted to Jackson herein is hereby extended until and through the day following the May 31, 2017; and

6. A copy of this Order shall be served upon all parties on the service list in this matter within 7 days of Jackson's receipt thereof.

MARK A. TRONCONE, J.S.C.

GILMORE & MONAHAN
A Professional Corporation
COUNSELLORS AT LAW
Allen Street Professional Center
Ten Allen Street
P.O. Box 1540
Toms River, New Jersey 08754

EXHIBIT E

**RESOLUTION 2019-31**

**RESOLUTION OF THE PLANNING BOARD OF THE TOWNSHIP OF JACKSON, COUNTY OF OCEAN, STATE OF NEW JERSEY DENYING THE APPLICATION FOR PRELIMINARY & FINAL MAJOR SUBDIVISION APPROVAL, CONDITIONAL USE APPROVAL AND PRELIMINARY & FINAL MAJOR SITE PLAN APPROVAL, JACKSON TRAILS, LLC, BLOCK 23001, LOTS 22-29**

**WHEREAS**, Jackson Trails, LLC, has applied to the Jackson Township Planning Board seeking Preliminary & Final Major Subdivision Approval, Conditional Use Approval and Preliminary & Final Major Site Plan Approval with respect to the property commonly known as Lots 22-29 in Block 23001, as shown on the official tax maps of the Township of Jackson; and

**WHEREAS**, in support of this application, the Applicant has submitted a Preliminary & Final Major Subdivision Plan dated July 12, 2018, with a latest revision date of July 29, 2019, indicated, consisting of 80 sheets and signed by Graham J. Macfarlane; and

**WHEREAS**, the Applicant has further submitted a Boundary Survey prepared by Professional Design Services, LLC, and signed by James J. Kuhn, which drawing is dated October 11, 2017, with a latest revision date of January 9, 2018; and

**WHEREAS**, the Applicant has further submitted 2 separate Boundary Surveys for Lots 22, 23 and 24, and Lots 25, 27 and 28 respectively, prepared by Professional Design Services, LLC, both of which were signed by James J. Kuhn; and

**WHEREAS**, the Applicant has further submitted Architectural Floor Plans & Elevation Drawings prepared by Anthony F. Zero, dated June 18, 2019, with no revision dates indicated, an Environmental Impact Statement prepared by Professional Design Services, LLC, dated June 30, 2018, a Traffic Impact Study prepared by McDonough & Rea Associates dated January 3, 2019, with a latest revision date of July 19, 2019, Preliminary Plans – Major

DASTI, MURPHY
McGUCKIN, ULAKY,
KOUTSOURIS & CONNORS
COUNSELLORS AT LAW
620 WEST LACEY ROAD
P.O. BOX 1057
FORKED RIVER, N.J. 08731

Subdivision Construction Plan County Route 547 consisting of 22 sheets prepared by Professional Design Services, LLC, signed by Graham J. Macfarlane dated September 28, 2018, with a latest revision date of July 29, 2019, Stormwater Management Report prepared by Professional Design Services, Inc., signed by Graham J. Macfarlane dated July 3, 2018, with a latest revision date of July 18, 2019, Boundary & Topographic Survey consisting of 1 sheet prepared by Professional Design Services, LLC, signed by James J. Kuhn dated April 30, 2019 with no revision dates indicated, Demolition Plan consisting of 1 sheet prepared by Professional Design Services, LLC, signed by Graham J. Macfarlane dated May 7, 2019, with no revision dates indicated, Phasing Plan consisting of 1 sheet prepared by Professional Design Services, LLC, signed by Graham J. Macfarlane dated May 21, 2019, with no revision dates indicated, Tree Location and Tree Save Plan consisting of 1 sheet prepared by Professional Design Services, LLC, signed by Graham J. Macfarlane dated May 14, 2019, with no revision dates indicated, Architectural Floor Plan and Elevation Drawing prepared by AFZ Architecture & Design dated June 18, 2019, with no revision dates indicated, Preliminary & Final Major Subdivision Plans Pump Station Site Plan consisting of 7 sheets prepared by Professional Design Services, LLC, signed by Graham J. Macfarlane dated July 12, 2018, with a latest revision date of July 15, 2019, Boundary & Topographic Survey consisting of 1 sheet prepared by Professional Design Services, LLC, signed by James J. Kuhn dated April 30, 2019, with no revision dates indicated, Major Subdivision Final Plat consisting of 1 sheet prepared by Professional Design Services, LLC, signed by James J. Kuhn dated July 12, 2019, with no revision dates indicated, Final Plat Major Subdivision Plan Phase 1 consisting of 5 sheets prepared by Professional Design Services, LLC, signed by James J. Kuhn dated July 12, 2019, with no revision dates indicated, Final Plat Major Subdivision Phase 2 consisting of 3 sheets prepared by Professional Design Services, LLC, signed by James J, Kun, dated July 12, 2019,

DASTI, MURPHY
McGUCKIN, ULAKY,
KOUTSOURIS & CONNORS

COUNSELLORS AT LAW

620 WEST LACEY ROAD
P.O. BOX 1057
FORKED RIVER, N.J. 08731

with no revision dates indicated, Final Plat Major Subdivision Phase 3 consisting of 1 sheet prepared by Professional Design Services, LLC, signed by James J. Kuhn dated July 12, 2109, with no revision dates indicated, Final Plat Major Subdivision Plan Phase 3 consisting of 4 sheets prepared by Professional Design Services, LLC, signed by James J. Kuhn dated July12, 2019, with no revision dates indicated, and a Final Plat Major Subdivision Plan Phase 4 consisting of 4 sheets prepared by Professional Design Services, LLC, dated July 12,2019, with no revision dates indicated; and

**WHEREAS**, the Applicant has sought Conditional Use Approval, Preliminary & Final Major Subdivision Approval, as well as Preliminary & Final Major Site Plan Approval to establish 367 single-family, residential building lots, 2 lots designated for multi-family development including a total of 92 multi-family units, 2 stormwater management lots, 1 of which would contain a sanitary sewer pump station, and a 24,500 sq. ft. house of worship lot; and

**WHEREAS**, each of the proposed building lots would comply with the specific area, dimensional and setback requirements of the RG-3 Zoning District, utilizing the Pinelands Development Credits in accordance with Ordinance Section 244-91(D); and

**WHEREAS,** the Applicant has been represented by Salvatore Alfieri, Esquire; and

**WHEREAS**, during the hearings on this matter, the Applicant presented the testimony of Ian Borden, a Professional Planner of the State of New Jersey who is qualified and accepted by the Board as an expert witness in this matter; and

**WHEREAS**, Mr. Borden attempted to address each of the conditional use requirements and environmental issues effecting the subject property at the initial hearing in this matter; and

**WHEREAS,** Mr. Borden gave a brief description of a Traffic Report, although he is not a Traffic Expert; and

DASTI, MURPHY
McGUCKIN, ULAKY,
KOUTSOURIS & CONNORS

COUNSELLORS AT LAW

620 WEST LACEY ROAD
P.O. BOX 1057
FORKED RIVER, N.J. 08731

**WHEREAS**, Mr. Borden further testified as to the phasing of the proposed project; and

**WHEREAS**, Mr. Borden testified that, in addition to the 367 single-family lots, an additional 92 affordable housing units would be constructed totaling 459 units in total; and

**WHEREAS**, Mr. Borden testified as to the density of the subject property, the proposal of a sanitary sewer connected through an interlocal agreement with Manchester Township, while obtaining potable water from the Jackson Township Municipal Utilities Authority; and

**WHEREAS**, Mr. Borden testified that a Certificate of Filing was received from the Pinelands Commission dated April 5, 2019; and

**WHEREAS**, Mr. Borden testified that, as part of the Township's Affordable Housing Plan, the site in question has a 20 percent set aside for affordable housing; and

**WHEREAS**, Mr. Borden testified as to the conditional use standards of Ordinance 244-91, and testified that the Applicant meets the conditions of the conditional use standards; and

**WHEREAS**, the Applicant submitted into evidence:

Exhibit A-1. A deed restriction language with respect to a contaminated site and adjoining property; and

**WHEREAS**, the Applicant's expert testified that the application as presented conforms with all zoning requirements and design standards, and the Applicant is not seeking any variance relief as part of this application; and

**WHEREAS**, the Applicant presented the testimony of Richard Venino, Esquire, an asserted Title Expert, who testified as to the status of Division Street, which is a 50 ft. right-of-way shown on the Township's tax maps; and

**WHEREAS**, Mr. Venino indicated there is no public interest in this right-of-way and no other properties have use or access to same; and

**DASTI, MURPHY**
**McGUCKIN, ULAKY,**
**KOUTSOURIS & CONNORS**

COUNSELLORS AT LAW

620 WEST LACEY ROAD
P.O. BOX 1057
FORKED RIVER, N.J. 08731

**WHEREAS**, the Applicant next presented the testimony of Graham Macfarlane, a Professional Engineer and Professional Planner of the State of New Jersey who is, likewise, qualified as an expert witness in this matter; and

**WHEREAS**, Mr. Macfarlane introduced the following exhibits:

Exhibit A-2.    An aerial display;

Exhibit A-3.    Overall development plan layout;

Exhibit A-4.    Overall improvement plan colored rendering;

Exhibit A-5.    House of Worship site plan; and

**WHEREAS**, Mr. Macfarlane's testimony revealed that the application as presented would be compliant with RSIS Standards and all Ordinance requirements; and

**WHEREAS**, the Applicant did request a waiver with respect to lighting to permit a lower lighting level than otherwise required by Ordinance; and

**WHEREAS**, the Board then opened the matter to public comment and such comment was received from numerous residents testifying in opposition to the application; and

**WHEREAS**, this matter was then continued before the Jackson Township Planning Board on October 7, 2019; and

**WHEREAS**, the Applicant presented the testimony of their Traffic Expert, John Rea, a Professional Engineer of the State of New Jersey who is qualified and accepted by the Board as an expert witness in this matter; and

**WHEREAS**, Mr. Rea testified as to his traffic counts and report, which had been submitted to the Board; and

**WHEREAS**, during the second public hearing, the Applicant withdrew its request for a waiver with respect to sidewalks; and

DASTI, MURPHY
McGUCKIN, ULAKY,
KOUTSOURIS & CONNORS

COUNSELLORS AT LAW

620 WEST LACEY ROAD
P.O. BOX 1057
FORKED RIVER, N.J. 08731

**WHEREAS,** Mr. Rea's testimony reveals that levels of service in the PM peak periods are at level D on 2 separate roadways and level F along South Hope Chapel Road; and

**WHEREAS,** Mr. Rea testified that various roadways surrounding the project are county roads and the Applicant requires approval from the County of Ocean with respect to road widening or other improvements in the county right-of-way; and

**WHEREAS,** Mr. Rea testified that the Applicant requires access from 2 points to the subject properties; and

**WHEREAS,** a discussion was held relating to a Traffic Report of the Township's Traffic Safety Officer dated August 15, 2019; and

**WHEREAS,** Exhibit A-7 was marked into evidence which was an Ocean County Engineer's Office checklist review dated August 21, 2019; and

**WHEREAS,** the Applicant then submitted the testimony of Graham Macfarlane, P.E., who testified as to Exhibit A-8, minutes of an Ocean County Planning Board Meeting of August 21, 2019; and

**WHEREAS,** numerous members of the public, again, testified in opposition to this application; and

**WHEREAS,** late in the evening of October 7, 2019, Members of the Board questioned whether it was appropriate to vote on the application as presented to date, as there appeared to be additional questions which the Board Members had based upon public comments received by the Board that evening; and

**WHEREAS,** the Board did discuss a number of conditions which the Applicant acknowledged; and

**WHEREAS,** questions remained relating to the impact of this application on the Joint Military Base of Lakehurst Dix Maguire; and

**DASTI, MURPHY McGUCKIN, ULAKY, KOUTSOURIS & CONNORS**
COUNSELLORS AT LAW
620 WEST LACEY ROAD
P.O. BOX 1057
FORKED RIVER, N.J. 08731

**WHEREAS,** the Board requested from the Applicant additional time to review the details of the items which had been presented in evidence, to review the application plans as presented before rendering an ultimate decision on this matter; and

**WHEREAS,** the Applicant's Attorney advised the Board that they would not consent to any further adjournments, did not want to present or permit any additional testimony or allow any additional public comment and argued that their application was fully compliant and essentially demanded the Board vote to approve their application; and

**WHEREAS,** Board Members relayed concerns regarding the Applicant's Environmental Study, the terms of any proposed stipulations or conditions which would apply to any approval granted whether it be preliminary and final; and

**WHEREAS,** the Board questioned whether an additional Traffic Study would be required as the phasing plan was completed, as well as the age of certain environmental studies being more than 14 years old; and

**WHEREAS,** despite concerns of certain Members of the Board that it was inappropriate to vote that evening, a motion was duly made and seconded by other Members to approve the application, which motion received 4 votes in the affirmative and 4 votes in the negative; and

**WHEREAS,** the matter was subsequently adjourned, however, the failure of the motion to receive affirmative vote of 5 of the 8 Members present resulted as a matter of law in the denial of the application; and

**WHEREAS,** the Applicant subsequently filed a Motion for Reconsideration before the Board, which Motion was heard on December 2, 2019; and

DASTI, MURPHY
McGUCKIN, ULAKY,
KOUTSOURIS & CONNORS

COUNSELLORS AT LAW

620 WEST LACEY ROAD
P.O. BOX 1057
FORKED RIVER, N.J. 08731

**WHEREAS**, that motion reargued, essentially, questions of law, and again, the Applicant did not agree therein to permit any additional information to be provided to the Board; and

**NOW, THEREFORE BE IT RESOLVED** this 2nd day of December, 2019 that the Applicant's request for Preliminary and Final Major Subdivision Approval, Conditional Use Approval, and Preliminary and Final Major Site Plan Approval has been denied.

**BE IT FURTHER RESOLVED** the Board Secretary shall cause to be published a Notice of Decision pursuant to the provisions of this Board and N.J.S.A 40:55-10(i) and provide an Affidavit of Publication to the Secretary of the Board.

**CERTIFICATION**

I hereby certify that I, the undersigned, am Secretary to the Planning Board of the Township of Jackson and hereby certify that the foregoing Resolution was adopted by the Planning Board at a meeting held on the 2nd day of December, 2019 and memorialized by the Planning Board on the 16th day of December, 2019.

Denise M. Buono

**DENISE BUONO, SECRETARY**
Jackson Township Planning Board

**DASTI, MURPHY McGUCKIN, ULAKY, KOUTSOURIS & CONNORS**
COUNSELLORS AT LAW
620 WEST LACEY ROAD
P.O. BOX 1057
FORKED RIVER, N.J. 08731

Z:\CLIENT MATTERS - GL\Jackson Twp. Planning Board\GL-27544 Jackson Trails, LLC P32125\Resolution Jackson Trails P32125 - denial.doc